Nos. 2022-1391, 2022-1425

# United States Court of Appeals for the Federal Circuit

FRESHUB, INC., FRESHUB, LTD.,
*Plaintiffs-Appellants*,

v.

AMAZON.COM, INC., PRIME NOW, LLC, WHOLE FOODS MARKET
SERVICES, INC., AMAZON.COM SERVICES LLC,
*Defendants-Cross-Appellants*.

―――――――――――――

Appeal from the United States District Court for the Western District of Texas,
Case No. 6:21-cv-00511-ADA, Judge Alan D. Albright

―――――――――――――

**PLAINTIFFS-APPELLANTS FRESHUB, INC. AND
FRESHUB, LTD.'S OPENING BRIEF
[NON-CONFIDENTIAL]**

―――――――――――――

Paul J. Andre
Lisa Kobialka
James Hannah
KRAMER LEVIN NAFTALIS
& FRANKEL LLP
990 Marsh Road
Menlo Park, CA 94025
Telephone: (650) 752-1700

*ATTORNEYS FOR FRESHUB, INC. AND FRESHUB, LTD.*

# PATENT CLAIMS

## U.S. Patent No. 9,908,153

**1.** A voice processing system comprising:

    a first system configured to receive user spoken words comprising:

        a microphone;

        a wireless network interface;

        a digitizer coupled to the microphone, wherein the digitizer is configured to convert spoken words into a digital representation;

        a first computer;

        non-transitory memory that stores instructions that when executed by the first computer cause the first system to perform operations comprising:

            receive via the digitizer a verbal order, comprising at least one item, from a user, wherein the verbal order was captured by the microphone and digitized by the digitizer;

            immediately transmit, using the wireless network interface, the digitized order to a computer system remote from the first system;

    the computer system, the computer system comprising:

        a networks interface;

        a second computer;

        non-transitory memory that stores instructions that when executed by the second computer cause the computer system to perform operations comprising:

            receive, using the network interface, the digitized order from the first system;

            translate at least a portion of the digitized order to text;

            identify an item corresponding to the text;

            add the identified item to a list associated with the user;

            enable the list, including the identified item, to be displayed via a user display.

**6.** The voice processing system as defined in claim 1, wherein the computer system is configured to cause the list to be provided to the user via a website.

**U.S. Patent No. 10,213,810**

**1.** A voice processing system comprising:

    a networks interface;

    a computer;

    non-transitory memory that stores instructions that when executed by the computer cause the computer to perform operations comprising:

        associate a unique identifier with a remote system configured to receive user spoken words, the remote system comprising:

            a microphone, a wireless network interface, a voice output system, and a digitizer coupled to the microphone, wherein the digitizer is configured to convert spoken words into a digital representation;

        download configuration data to the remote system;

        receive, using the network interface, a digitized order of a user from the remote system;

        translate at least a portion of the digitized order to text;

        use the text, translated from the digitized order, to identify an item corresponding to the text description;

        include the identified item in a set of one or more items associated with the user;

        enable the set of items, including the identified item, to be displayed to the user via a user device different than the remote system; and

        enable the set of items, including the identified item, to be provided to an item provider.

**U.S. Patent No. 10,232,408**

**20.** A computer-implemented method, the method comprising:

    receiving over a network at a network interface a digitized order of a user from a remote system configured to receive user spoken words, the remote system comprising a microphone, a wireless network interface, and a digitizer coupled to the microphone, wherein the digitizer is configured to convert spoken words into a digital representation;

    translating, using a processing system comprising at least one processing device and configured to perform translation of voice orders to text, at least a portion of the digitized order to text;

    matching, using the processing system, the text, translated from the digitized order, to a text description associated with a unique product identifier;

based at least in part on the unique product identifier associated with the text description matched to the text translated from the digitized order, identifying, using the processing system, an item corresponding to the text;

causing the identified item to be placed on an item set associated with the user; and

enabling the item set, including at least the identified item, to be displayed via a user display remote from the processing system.

**30.** Non-transitory memory that stores instructions that when executed by a computer cause the computer to perform operations comprising:

receive a digitized voice communication of a user from a remote system configured to receive user spoken words, the remote system comprising a microphone, a wireless network interface, and a digitizer coupled to the microphone, wherein the digitizer is configured to convert spoken words into a digital representation;

translate at least a portion of the digitized voice communication to text;

match the text, translated from the digitized voice communication, to a text description associated with a unique product identifier, wherein the text description is accessed from a data store;

based at least in part on the unique product identifier associated with the text description matched to the text translated from the digitized voice communication, identify an item corresponding to the text;

cause the identified item to be included in an item set associated with the user; and

enable the item set, including the identified item, to be displayed via a user display.

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Freshub, Inc. and Freshub, Ltd. certifies the following:

1.  The full name of every entity represented by us is:

    Freshub, Inc. and Freshub, Ltd.

2.  The name of the real party in interest for the entity.  Do not list the real party if it is the same as the entity:

    Not applicable.

3.  All parent corporations and any other publicly held companies that own 10 percent or more of the stock of the party or amicus curia represented by me are listed below:

    Freshub, Ltd. is a subsidiary of Ikan Holdings, LLC.

4.  The names of all law firms, and the partners or associates that have not entered an appearance in the appeal, and (a) appeared for the entity in the lower tribunal; or (b) are expected to appear for the entity in this court:

    Aakash Jariwala, Christina M. Finn, Eileen Patt, Jenna Elizabeth Fuller, Melissa T.G. Brenner, and Michael Lee of Kramer Levin Naftalis & Frankel LLP; and

    John P. Palmer of Naman Howell Smith & Lee, P.L.L.C.

5.  Other than the originating case number(s), the title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.

    None.

6.  All information required by Fed. R. App. P. 26.1(b) and (c) in criminal cases and bankruptcy cases.

    None.

Respectfully submitted,

Dated: May 24, 2022          By:  */s/ Paul J. Andre*
                                   Paul J. Andre
                                   Kramer Levin Naftalis
                                    & Frankel LLP
                                   990 Marsh Road
                                   Menlo Park, CA 94025
                                   Tel: 650.752.1700
                                   Fax: 650.752.1810
                                   pandre@kramerlevin.com

                                   *Attorneys for Plaintiffs-Appellants,*
                                   FRESHUB, INC. and FRESHUB, LTD.

# TABLE OF CONTENTS

**Page**

PATENT CLAIMS ...................................................................................i

CERTIFICATE OF INTEREST ..........................................................iv

STATEMENT OF RELATED CASES ..................................................1

JURISDICTIONAL STATEMENT ......................................................2

INTRODUCTION ................................................................................4

STATEMENT OF THE ISSUES...........................................................6

STATEMENT OF THE CASE AND FACTS ........................................7

    A.    The Public Recognized the Novelty of the Patented
Voice Processing Technology, Whose
Development Began in 2005......................................................7

    B.    Amazon Released the Infringing Alexa Years
After the Innovations in the Asserted Patents Were
Disclosed ...................................................................................9

    C.    Amazon Contested Two Claim Elements at Trial
and One More in Post-Trial Briefing.......................................13

    D.    Freshub's Pre-Trial Motion *in Limine* Sought to
Prevent Amazon from Making Prejudicial
Arguments Regarding Freshub's Prosecution of
the Asserted Patents ................................................................15

    E.    Freshub Accurately Predicted Amazon Would
Improperly Attempt to Paint Freshub as a Bad
Actor........................................................................................15

SUMMARY OF ARGUMENT .............................................................18

ARGUMENT .......................................................................................20

    I.    STANDARD OF REVIEW ................................................20

II.    JUDGMENT AS A MATTER OF LAW IS
       APPROPRIATE BECAUSE THERE WAS NO
       LEGALLY SUFFICIENT EVIDENTIARY BASIS TO
       FIND NO INFRINGEMENT ................................................21

       A.    Amazon Did Not Present Even a Mere Scintilla,
             Much Less Substantial Evidence, to Support Its
             Non-Infringement Contentions .................................21

             1.    Amazon's corporate representative admitted
                   that Alexa infringes all elements of the '153
                   Patent. ...........................................................21

             2.    Unsupported expert testimony should be
                   disregarded, particularly when it contradicts
                   the testimony of a knowledgeable
                   longstanding Amazon employee. ...................25

       B.    Amazon Did Not Have Any Evidence, Much Less
             Substantial Evidence, of No Infringement................28

             1.    Freshub proved that Alexa satisfies the non-
                   transitory Memory Element............................28

             2.    The district court ignored the great weight of
                   the evidence regarding the Item Element. ......33

             3.    Amazon's Alexa satisfies the Order Element.................39

       C.    Amazon's Expert Applied a "Special Meaning," as
             Opposed to the Plain and Ordinary Meaning, to the
             Claim Terms "Item" and "Order"..............................41

III.   A NEW TRIAL IS REQUIRED TO CORRECT THE
       SIGNIFICANT PREJUDICE TO FRESHUB ...................44

       A.    The Jury's Non-Infringement Verdict Was Against
             the Great Weight of Evidence...................................47

       B.    The District Court Abused Its Discretion in
             Denying Freshub's Motion *in Limine* Because
             Amazon Had No Proper Purpose for Introducing
             the Filing Dates of the Continuation Applications ..................48

C.    The District Court Abused Its Discretion in Allowing Amazon to Prejudice the Jury by Unfairly Painting Freshub as a Bad Actor ................................. 49

1.    Amazon introduced irrelevant and prejudicial issues external to infringement. ....................................... 49

2.    Amazon appealed to the jury's patriotic sense of duty to protect the United States Constitution and patent system from a foreign threat. ............................................................................... 54

CONCLUSION ....................................................................................... 58

## **CONFIDENTIAL MATERIAL OMITTED**

The material omitted from page 29 contains a technical definition from confidential testimony regarding Amazon's technology that was sealed in the district court.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*800 Adept, Inc. v. Murex Sec., Ltd.*,
  539 F.3d 1354 (Fed. Cir. 2008) ........................................................42

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
  598 F.3d 1336 (Fed. Cir. 2010) ........................................................52

*Barry v. Medtronic, Inc.*,
  914 F.3d 1310 (Fed. Cir. 2019) ...................................................20, 44

*Guile v. United States*,
  422 F.3d 221 (5th Cir. 2005) .......................................................25, 27

*Hall v. Freese*,
  735 F.2d 956 (5th Cir. 1984) ................................................47, 54, 56

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
  755 F.3d 1367 (Fed. Cir. 2014) ...................................................41, 42

*HRC Guam Co. v. Bayview II L.L.C.*,
  2017 Guam 25 (Guam Dec. 29, 2017)................................................53

*Irvan v. Frozen Food Express, Inc.*,
  780 F.2d 1228 (5th Cir. 1986) ......................................................53, 56

*Eli Lilly and Co., v. Aradigm Corp.*,
  376 F.3d 1352 (Fed. Cir. 2004) ........................................................20

*Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*,
  863 F.2d 867 (Fed. Cir. 1988) ...............................................45, 46, 48

*Magnivision, Inc. v. Bonneau Co.*,
  115 F.3d 956 (Fed. Cir. 1997) ...............................................50, 53, 57

*Minn. Mining & Mfg. v. Chemque, Inc.*,
  303 F.3d 1294 (Fed. Cir. 2002) ........................................................20

*Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.*,
  853 F.3d 1370 (Fed. Cir. 2017) ........................................................20

ix

*Smith v. Transworld Drilling Co.*,
　773 F.2d 610 (5th Cir. 1985) ............................................................44

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling
　USA, Inc.*,
　699 F.3d 1340 (Fed. Cir. 2012) .........................................................47

*Vas-Cath Inc. v. Mahurkar*,
　935 F.2d 1555 (Fed. Cir. 1991) .........................................................52

*Westbrook v. General Tire & Rubber Co.*,
　754 F.2d 1233 (5th Cir. 1985) .....................................................54, 56

*Whitehead v. Food Max of Miss., Inc.*,
　163 F.3d 265 (5th Cir. 1998) ......................................................54, 56

## Statutes

28 U.S.C. § 1295(a) ..............................................................................2

35 U.S.C. § 112 ...................................................................................52

## Other Authorities

Fed. R. Evid. 401-403 ..........................................................................49

Federal Rule of Civil Procedure 50(b) ...................................................5

Federal Rule of Civil Procedure 52(b) ...................................................3

Federal Rule of Civil Procedure 52(c) ...................................................2

Federal Rule of Civil Procedure 58(c) ...................................................2

## <u>STATEMENT OF RELATED CASES</u>

No appeal in this case was previously before this Court or any other court.

Counsel for Freshub, Inc. and Freshub, Ltd. (collectively "Freshub") is aware of no other case pending in this Court or any other court that would directly affect or be directly affected by the Court's decision in this appeal.

# JURISDICTIONAL STATEMENT

This Court has jurisdiction over this appeal under 28 U.S.C. § 1295(a). Freshub, Inc. and Freshub, Ltd. (collectively "Freshub") and Defendants Amazon.com, Inc., Prime Now, LLC, Whole Foods Market Services, Inc., and Amazon.com Services LLC (collectively "Amazon") had both a jury trial and bench trial before the District Court for the Western District of Texas.  Following the jury's verdict, the district court entered its Final Judgment finding Freshub's patents valid and not infringed on July 15, 2021.  Appx1-2, Appx147 (judgment signed on July 13, 2021, and "entered in the civil docket" pursuant to Federal Rule of Civil Procedure 58(c) on July 15, 2021).  Following the bench trial on Amazon's inequitable conduct allegations, Freshub moved for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c).  Appx145.  The district court granted Freshub's motion on August 3, 2021, finding no merit to Amazon's inequitable conduct claim.  Appx25-38.

Freshub and Amazon both filed post-judgment motions.  *See* Appx147-148 (docket reflecting post-judgment motions at Dkt. Nos. 275, 276, and 277).  The district court set a hearing on the parties' post-judgment motions.  Appx17649.  On October 18, 2021, the district court's clerk emailed all counsel of record inviting the parties to argue any pending motions.  Appx19955.  Amazon did not request argument on its post-judgment motion to amend the district court's findings on

inequitable conduct under Federal Rule of Civil Procedure 52(b).  *See id.*  At the end of oral argument on October 19, 2021, the district court denied the parties' post-judgment motions and wrote in the docket entry for the hearing that there were "[n]o other pending matters."  Appx149-150 (minute entry for hearing at Dkt. No. 295).  The court then memorialized its order denying post-judgment motions on December 17, 2021.  Appx40-51.

Freshub filed a timely notice of appeal on infringement and damages (Appx17688-17691), and Amazon subsequently cross-appealed on validity and inequitable conduct (Appx17692-17694).

# **INTRODUCTION**

Freshub is a small innovative start up company that sells its patented smart kitchen solutions that permit its consumers to easily add grocery items to their online carts or shopping lists and quickly order or replenish products at any time from the comfort of their own homes using, *inter alia*, natural voice commands. Appx500-501 (188:5-18, 189:1-15). Freshub found itself competing against Amazon and sued Amazon for patent infringement. Appx537 (225:1-226:7).

At trial, Freshub presented overwhelming, conclusive evidence of Amazon's infringement of Freshub's U.S. Patent No. 9,908,153 ("the '153 Patent") (Appx52-69), such that there was no substantial evidence to support the jury's verdict of no infringement. Freshub's evidence at trial ranged from Amazon's documents, deposition testimony of Amazon's engineers to the admission of infringement from Amazon's Vice President and Distinguished Scientist who built key portions of the accused technology. In stark contrast, Amazon only offered a single expert who made unsupported claims of no infringement, which should be disregarded, and testified that the infringement admissions of Amazon's Vice President and Distinguished Scientist were wrong. Unsupported expert testimony that is contrary to the admissions of a key Amazon engineer who built key aspects of the accused technology does not amount to substantial evidence that supports the jury's verdict of no infringement.

In erroneously denying Freshub's Motion for Judgment as a Matter of Law Pursuant to Federal Rule of Civil Procedure 50(b) ("JMOL"), the district court asserted that two claim elements, "non-transitory memory" and "identify[ing] an item corresponding to the text," were not practiced and were substantial evidence for the jury's verdict. Appx43-45. Amazon, however, did not contest the non-transitory memory element at trial and even admitted during closing arguments that the accused technology satisfied this element. Further, Amazon's fact witnesses admitted that Amazon's accused technology practiced the "identify an item corresponding to the text" claim element. Thus, the jury verdict is against the great weight of the evidence on which no reasonable jury could find no infringement.

Given the lack of evidence to support its claim of no infringement, Amazon turned to prejudicial and irrelevant arguments to sway the jury to find no infringement. Amazon pointed to Freshub's continued prosecution of the Asserted Patents[1] after Amazon released the accused products as a misuse of the patent system and an affront to the United States Constitutional patent system. The district court abused its discretion in denying a new trial, failing to see the prejudice that was created by such statements during trial.

---

[1] The Asserted Patents are the '153 Patent and two related patents, U.S. Patent Nos. 10,232,408 ("'408 Patent") (Appx90-109) and 10,213,810 ("'810 Patent") (Appx70-89).

For these reasons, Freshub respectfully requests this Court to reverse the district court's denial of Freshub's motion for judgment as a matter of law and enter judgment of infringement as to the '153 Patent. Alternatively, Freshub requests that the Court remand for a new trial on infringement of the Asserted Patents and damages.

## STATEMENT OF THE ISSUES

1.      Whether the jury's verdict regarding infringement as to the '153 Patent should be reversed because there was no substantial evidence to support the verdict of no infringement?

2.      Whether a new trial should be ordered because the great weight of the evidence proved infringement of the '153 Patent?

3.      Whether a new trial should be ordered for the Asserted Patents to remedy the prejudice from Amazon's statements suggesting that Freshub's filing of continuation patent applications after Amazon's accused products were released was a misuse of the patent system and abuse of the United States Constitution?

## STATEMENT OF THE CASE AND FACTS

On June 24, 2019, Freshub sued Amazon in the United States District Court for the Western District of Texas for infringement of the '153 Patent and the related '408 and '810 Patents.  Appx1831-1838.  The district court held a jury trial from June 14, 2021, through June 22, 2021, followed by a bench trial on Amazon's inequitable conduct claim.  Appx143-145.  At trial, Freshub asserted Claims 1 and 6 of the '153 Patent.  Appx1.

### A.    The Public Recognized the Novelty of the Patented Voice Processing Technology, Whose Development Began in 2005

Freshub is a leading technology provider and systems integrator in the smart kitchen commerce ecosystem.  *See* Appx499-500 (187:25-188:15).  In 2018, Freshub merged with Ikan, an innovator in the technology asserted in this case.  As early as 2005, Ikan developed the technology that enables users to use natural voice commands to build and maintain shopping lists and purchase retail items.

Thereafter, Ikan released its first device prototype between late 2007 and early 2008 (Appx18309 (presentation showing the Ikan system launch in 2008)), which practiced the technology described and ultimately claimed in the Asserted Patents (Appx784-785 (472:17-473:6) (expert testimony regarding that the Ikan device practices the '153 Patent)).  The Ikan device attracted the attention of *The New York Times*, *Forbes*, and later, Amazon.  Appx391 (79:9-16).  On June 19, 2008, *The New York Times* published an article (Appx18121-18125) likening the

Ikan device to the fictional Food-a-Rac-a-Cycle invention found on "The Jetsons," a television show about a futuristic family. Appx393-394 (81:16-82:23).

Additionally, *Forbes* published an article on October 13, 2010 (Appx18126-18129), listing the Ikan product as one of "The 10 Best Time-Saving Home Appliances." Appx395-396 (83:21-84:10). Six days after the publication of the *Forbes* article, Amazon sent Ikan an email (Appx18230) to inform them that Amazon had seen the *Forbes* article and wanted to set up a phone call to inquire about Ikan's groundbreaking technology. Appx471-472 (159:23-160:23). Shortly after receiving Amazon's email, Ikan sent Amazon the Ikan device, and Amazon confirmed receipt. Appx473-474 (161:13-162:12); Appx18231 (email confirming receipt). The packaging for the Ikan device listed Ikan's existing and pending patents. Appx476 (164:14-18). Subsequently, Ikan's CEO and two of its founders met with Amazon and gave them a presentation (Appx18308-18314) about Ikan. Appx474-476 (162:23-164:13).

In connection with its development, Ikan filed patent application No. 11/301,291 ("the priority application") on its inventions on December 12, 2005. Appx1542-1543 (1170:23-1171:6); Appx52.[2] In 2017, a continuation application was filed based on the priority application, which matured into the '153 Patent.

---

[2] With the merger, Ikan granted Freshub all rights, title, and interest in the Asserted Patents. Appx347-348 (35:25-36:2), Appx352 (40:1-3).

Appx52.  Additional continuations were filed in 2018 that resulted in the '810 and '408 Patents.  Appx70-71; Appx90-91.

The '153 Patent claims a voice processing system that receives verbal orders, digitizes the verbal order, and transmits it to a remote back-end computer system to then add items from the order to a user's shopping list, and display them on the list.  Appx68-69 ('153 Patent) at Claims 1 and 6.  Claim 1 comprises two distinct systems: a first system (referred to herein as a "front-end" device) that receives and digitizes the voice orders from the user, and a second computer system (referred to herein as a "back-end" system) that processes the verbal order to identify the item to be added to and displayed on a user's shopping list.  Appx68-69 ('153 Patent) at Claim 1.  Claim 6 depends on Claim 1 and expands it to enable the list to be provided to the user via a website.  Appx69 ('153 Patent) at Claim 6.  The '408 and '810 Patents are similar to the '153 Patent, but are written from the perspective of the back-end system's requirements.  Appx108-109 ('408 Patent) at Claims 20 and 30; Appx87-88 ('810 Patent) at Claim 1.

## B.  Amazon Released the Infringing Alexa Years After the Innovations in the Asserted Patents Were Disclosed

Amazon released Alexa in 2014 (Appx852 (540:14-22))—***nine years after*** the priority application for the Asserted Patents was filed and four years after Ikan sent Amazon its device to review.  At trial, Freshub's infringement expert, Dr. Nenad Medvidovic, described how Alexa infringes.  He explained that Alexa—

Amazon's voice processing system that allows a user to place orders with their voice (Appx407 (95:16-19))—includes both consumer devices like the Echo Products[3], Fire TV Products[4], and Tablet Products[5] (the "Alexa Devices"), and Alexa in the cloud (the "Alexa System"). *See*, *e.g.*, Appx567-568 (255:23-256:18). Collectively, he referred to them as "Alexa" and Freshub's counsel referred to the same thing as "Alexa products":

> Q. So when we referred to Alexa products during your testimony, is it fair to say that we're referring to the Echo products with the Alexa system, the Tablet products with the Alexa system, and the Fire TV products with the Alexa system?
>
> A. Absolutely. Alexa is a single system. It just happens to be a distributed system, but it is a single system, and it has a set of tightly-integrated functionalities that require both the back end servers and the front end devices to accomplish its functionality.

Appx574 (262:15-24); *see also* Appx1047-1048 (counsel asking about "Alexa products"). Indeed, when Amazon sells the Alexa Devices on its website, such as the Echo, Amazon describes the product it is selling as "Echo (2nd Generation) -

---

[3] The "Echo Products" include certain models of Echo, Echo Plus, Echo Dot, Echo Spot, Echo Show, and Echo Input. *See* Appx573 (261:21-23). All the Echo Products include Alexa. Appx574 (262:3-10).

[4] The "Fire TV Products" include certain models of Fire Stick, Fire Stick 4K, and, Fire TV Cube. App574 (262:1-2). All the Fire Products include Alexa. App574 (262:3-10).

[5] The "Tablet Products" include certain models of the Fire Tablet 7, Fire HD Tablet 8, and Fire HD Tablet 10. Appx573 (261:24-25). All the Tablet Products include Alexa. Appx574 (262:3-10).

Smart speaker *with Alexa*".  Appx18175 (emphasis added) (product listing for

Echo device).

Alexa comprises two principal subsystems, the first running on the device,

and the second running on a server in the Amazon cloud.  Appx574 (262:11-14).

Dr. Medvidovic pointed to the following diagram from an Amazon's confidential

internal document to demonstrate that Alexa comprise both the front-end device

and the back end Alexa servers.



Appx17913 (annotated); *see also* Appx574 (262:3-24) (Freshub's expert

explaining that they are collectively referred to as "Alexa products because each

one of these is a product that contains Alexa . . . and all of them have elements

that . . . exist both on the front end device that you purchase and on the back end servers that are an integral part of the system.").

Dr. Medvidovic further explained that Alexa allows customers to use the Alexa Devices to order products from Amazon by turning their voice into commands, such as to add items to a shopping list. Appx579-581 (267:5-269:4). The voice commands are sent to the Alexa back-end server in the cloud for processing. *Id*. For example, if a voice command such as "add [item] to my list" is spoken to Alexa, the item is then added to the customer's Alexa Shopping List. Appx581-582 (269:15-270:1).

By the end of trial, Freshub introduced more than 60 exhibits, including Amazon's confidential technical documents. *See*, *e.g*., Appx17931-17932 (block diagram of product flow), Appx17933-17934 (internal confidential document showing Alexa flow), Appx17995 (internal document regarding shopping list requirements), Appx18061-18120 (confidential overview of Alexa). Freshub also introduced Amazon's marketing documents as exhibits, including Amazon's product listings for the accused Alexa Devices. *See*, *e.g*., Appx18175-18185 (product page for Echo), Appx18191-18200 (product page for Echo Dot), Appx18205-18214 (product page for Fire TV Stick), Appx18217-18223, Appx18154 (Amazon's webpage showing Alexa shopping list). Additionally, Freshub introduced deposition testimony from three Amazon corporate witnesses,

including Mr. Halim, principal engineer at Amazon (Appx549 (237:2-8)), Mr.

Portman, principal engineer in the Alexa Shopping division for Amazon

(Appx551-552 (239:25-240:3)), and Mr. Mehta, general manager of Alexa

Shopping at Amazon (Appx765 (453:9-14)).  Also, Dr. Medvidovic tested different

Alexa products extensively, and, as part of his testimony, showed videos of his

testing and the results thereof.  *See*, *e.g.*, Appx575 (263:19-25) (mentioning having

tested different Alexa products), Appx622 (310:3-10) (testifying to having tested

the Alexa products' function with regard to the '408 Patent); *see also, e.g.*,

Appx594-595 (282:18-283:9) (testifying as to what a verbal order is based on the

testing video shown).

## C.    Amazon Contested Two Claim Elements at Trial and One More in Post-Trial Briefing

At trial, Amazon's expert witness for infringement, Dr. Johnson,

summarized the totality of Amazon's non-infringement defense for the '153 Patent.

He testified that there were only two claim elements of the '153 Patent that he

alleged Alexa does not infringe: (1) "receive via the digitizer a verbal order" (the

"Order Element"), and (2) "identify an item corresponding to the text" (the "Item

Element").  Appx1228 (870:5-17) (identifying the grounds for his opinion of no

infringement for the '153 Patent); Appx1251 (893:3-16) (recapping his '153 Patent

non-infringement opinions).

Dr. Johnson's summary slides that he referred to during his trial testimony emphasized the specific claim elements he contested:

## '153 patent, independent claim 1



Amazon conceded at trial that Alexa satisfied the claim elements "non-transitory memory that stores instructions" ("Memory Element") for both the "first system" and the later recited back-end "computer system." Appx1387-1388 (1029:6-1030:11); Appx1290-1291 (932:21-933:6).

However, in response to Freshub's post-judgment JMOL, Amazon argued for the first time that the jury's verdict was supported because Alexa does not contain the Memory Element. Appx17575-17576. The district court denied Freshub's JMOL on December 17, 2021 ("Post-Trial Order"). Appx40-51. The

grounds for denying JMOL was that there was allegedly substantial evidence supporting the jury verdict of no infringement based on the Item Element and the Memory Element. Appx42-45. The district court stated that the Item Element and Memory Element "were not met," such that the jury's determination was supported by substantial evidence. *Id*.[6]

### D. Freshub's Pre-Trial Motion *in Limine* Sought to Prevent Amazon from Making Prejudicial Arguments Regarding Freshub's Prosecution of the Asserted Patents

Freshub moved *in limine* to preclude Amazon from introducing the irrelevant filing dates of the continuation applications that resulted in the Asserted Patents. Appx14404-14406. Freshub anticipated that Amazon would attempt to unfairly prejudice Freshub, confuse the issues and mislead the jury by suggesting that Freshub's filing of continuation applications after Alexa was released was an abuse of the patent system. Appx14404-14406. The district court denied Freshub's motion *in limine*. Appx4.

### E. Freshub Accurately Predicted Amazon Would Improperly Attempt to Paint Freshub as a Bad Actor

At trial, Amazon suggested at least seventeen (17) times that the filing dates of the continuation applications that resulted in the Asserted Patents was a misuse of the patent system, even though such an assertion is contrary to law. In its opening arguments, Amazon stated:

---

[6] The district court did not address the Order Element.

15

[R]ather than do what normal companies do, invest thousands of hours in research and development and invest millions of dollars in research and development, going to the courthouse is a quick way to succeed.

***I'm going to submit to you that's not why our constitutional patent system was set up. It's going to be your decision to decide that***, but I'm going to submit to you that's not why it's there. They said the shareholders will not see any money at that time, but they will see money after we sue Google and Apple. So it's clear, ***this is the tip of the iceberg***.

Appx379 (67:6-17) (emphasis added).

This is Article I, Section 8, Clause 8, from the United States Constitution. That's the clause that creates the United States patent system. And the first few words of that are really, I think, what brings Amazon and Whole Foods here. They say: To promote the progress of science -- promote the progress of science.

So I would just ask you, as you go through and listen to the evidence in this case, ask yourself whether or not this process is really promoting science. ***The patent system wasn't set up for someone to file patents four or five years after someone else has already introduced a product in an attempt to claim that you had the solution a decade ago when you really didn't.***

The patent system wasn't set up to try to reach out and grab the hard work of engineers and scientists who spent thousands of hours developing something like an Alexa system using deep neural networks, using far-field speech recognition, and grab that for quick success in the courtroom.

Appx386 (74:3-21) (emphasis added). Such arguments were reinforced throughout

trial, specifically during Amazon's cross-examination of many of Freshub's

witnesses, and in closing remarks, where Amazon repeated its improper plea:

16

Now, let me wind up here. And it is really where this case started, with Article 1, Section 8, that creates our United States patent system. You remember not last Thursday but the Thursday before last when we first met in jury selection, I told you this case was important. And you probably really didn't have enough context to know what I was talking about at this point. But this case is important. It has bigger ramifications. It has ***broad ramifications for our U.S. patent system***.

The patent system is truly to promote the progress of science. The integrity of the patent system, as I told you, is the utmost and foremost to Amazon. ***This timeline that you've seen many times is not in keeping with promoting science.*** Writing patent claims years after the product comes out and claiming that your patent includes voice shopping technology and Alexa all the way back to 2005 doesn't promote the progress of science.

It does just the opposite. ***It takes from others who have put in hard work and dedication and innovation. It takes from them.***

Appx1804-1805 (1432:16-1433:10) (emphasis added) (referring to the timeline of

when the Asserted Patents were filed relative to their parent application).

So rather than doing this the normal way through hard work and innovation, ***we're going to go to the courthouse***. ***And that's why we're here***, because this conduct needs to stop. This is not what the patent system was designed for. ***The preservation of this constitutional patent system and the integrity of it is -- is at play. And this is not what it's about, and this needs to stop. And one of the reasons it needs to stop is because we know this is the tip of the iceberg.*** That's not me saying it. That's Mr. Zohar saying it. Who comes next? Google, Apple, dot, dot, dot. ***Every U.S. technology company they*** can find. ***And that's why we're here. I can't stop it. Amazon can't stop it. Only you folks can stop it. And that's what we'd ask you to do.***

Appx1808 (1436:3-25) (emphasis added).

Following the jury's verdict, Freshub again raised Amazon's improper and

prejudicial references to the timeline of the continuation applications and

insinuations that Freshub misused the patent system in its motion for a new trial. Appx17416-17418. On December 17, 2021, the district court issued its opinion denying Freshub's motion for a new trial. Appx40-51.

## SUMMARY OF ARGUMENT

There is no legally sufficient evidentiary basis for the jury to have found no infringement of the '153 Patent. At trial, Freshub proved infringement of the asserted claims of the '153 Patent, pointing to engineer testimony, Amazon's public and confidential documents, and testing that Dr. Medvidovic conducted of Alexa. In the face of this overwhelming proof, at trial, Amazon presented its technical expert, Dr. Johnson, and only contested the Order Element and Item Element of the '153 Patent. Dr. Johnson's non-infringement opinion was flawed for numerous reasons. Not only was Dr. Johnson's opinion unsupported and contradicted by Amazon's first witness at trial, Dr. Strom, who was instrumental in building parts of Alexa, Dr. Johnson's opinion was based on his "special meaning" of the claim terms rather than the plain and ordinary meaning of those terms, which is the construction they were given.

In post trial briefing, however, Amazon introduced for the first time a new non-infringement argument with respect to the '153 Patent that it did not advance at trial. It asserted that Alexa did not have the Memory Element, even though Amazon's witnesses and counsel conceded that Alexa does have such memory.

Despite such a concession and in the absence of any evidence to the contrary, the district court concluded the jury could have found non-infringement based on this element and the Item Element. Appx43-44. The district court erred in denying Freshub's motion for JMOL, as well as denying a new trial based on the great weight of the evidence.

The district court abused its discretion in not granting Freshub a new trial. At trial, Amazon painted Freshub as a bad actor, prejudicing the jury against finding infringement for Freshub. Amazon suggested that because Freshub continued prosecuting continuation patent applications that matured into the Asserted Patents after Alexa was released, Freshub misused the United States Constitutional patent system. Filing proper continuations of patent applications after an infringing product is known is not abusing the patent system, and the district court's refusal to grant Freshub's motion *in limine* to keep such evidence out of the trial and Freshub's motion for a new trial of the Asserted Patents based on this was an abuse of discretion.

## **ARGUMENT**

## I.    **STANDARD OF REVIEW**

The Federal Circuit, following Fifth Circuit law, reviews "the denial of judgment as a matter of law de novo." *Barry v. Medtronic, Inc.*, 914 F.3d 1310, 1320 (Fed. Cir. 2019) (citation omitted). In other words, the Federal Circuit asks, "as the district court did, whether a 'reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.*, 853 F.3d 1370, 1378 (Fed. Cir. 2017) (citation omitted). Here, this Court looks to determine whether the jury verdict is not supported by substantial evidence. *Minn. Mining & Mfg. v. Chemque, Inc.*, 303 F.3d 1294, 1300 (Fed. Cir. 2002) (citation omitted). "Substantial evidence is more than a mere scintilla." *Eli Lilly and Co., v. Aradigm Corp.*, 376 F.3d 1352, 1363 (Fed. Cir. 2004) (citation omitted). In reviewing denial of a new trial and evidentiary rulings, the Federal Circuit, following Fifth Circuit law, reviews under the abuse of discretion standard. *Barry*, 914 F.3d at 1320 (citation omitted).

## II.  JUDGMENT AS A MATTER OF LAW IS APPROPRIATE BECAUSE THERE WAS NO LEGALLY SUFFICIENT EVIDENTIARY BASIS TO FIND NO INFRINGEMENT

### A.  Amazon Did Not Present Even a Mere Scintilla, Much Less Substantial Evidence, to Support Its Non-Infringement Contentions

#### 1.  Amazon's corporate representative admitted that Alexa infringes all elements of the '153 Patent.

Amazon's first fact witness, Dr. Strom, a Vice President and Distinguished Scientist of the Alexa Artificial Intelligence Organization, admitted infringement of all the '153 Patent claim elements during cross-examination.  Dr. Strom was an Amazon employee since 2011 and was instrumental in building the Amazon Echo and Alexa.  Appx1016 (658:16-25); Appx1017 (659:1-5).  His trial testimony juxtaposed to Claim 1 proves that Alexa satisfies every element of Claim 1, such that the jury could not reasonably have found no infringement:

| '153 Patent, Claim 1 (Appx68-69) | Dr. Strom's Testimony |
|---|---|
| A voice processing system comprising: a first system configured to receive user spoken words comprising: | Q. Yes or no, sir, would you agree that the Alexa products and the Alexa system, they form a voice processing system? A. It is one thing that they do, yes.  Appx1047 (689:8-10). |
| a microphone; | Q. Okay. And the Alexa products, they include a microphone, correct? A. That's correct.  Appx1048 (690:2-4). |

| '153 Patent, Claim 1 (Appx68-69) | Dr. Strom's Testimony |
|---|---|
| a wireless network interface; | Q. The Alexa products, they include a wireless network interface, correct? A. That's correct. <br><br> Appx1048 (690:5-7). |
| a digitizer coupled to the microphone, wherein the digitizer is configured to convert spoken words into a digital representation; | Q. The Alexa products, they include a digitizer that can digitize a user's spoken words into a digital representation, correct? A. That's correct. <br><br> Appx1048 (690:8-11). |
| a first computer; non-transitory memory that stores instructions that when executed by the first computer cause the first system to perform operations comprising: | Q. And now, the Alexa products, let's say the Echo right there, that's a computer. It includes a processor and memory, correct? … A. So let's see, you asked -- you asked several different things. You asked if it's a computer -- . . . Q. -- that includes processor and memory. A. It has a processor, it has memory -- <br><br> Appx1047 (689:12-24). |
| receive via the digitizer a verbal order, comprising at least one item, from a user, wherein the verbal order was captured by the microphone and digitized by the digitizer; | Q. The spoken order that's received by ASR, so the spoken order that we -- I was just asking you about, that comes into ASR -- A. Yeah. Q. -- that's a digitized format, correct? A. Yes. <br><br> Appx1051 (693:4-9). |

22

| '153 Patent, Claim 1 (Appx68-69) | Dr. Strom's Testimony |
|---|---|
| immediately transmit, using the wireless network interface, the digitized order to a computer system remote from the first system; | Q. At the very least -- so you're saying that the Alexa -- the Alexa products can't transmit the digitized representation of speech to the Alexa system? A. It transmits the speech, that's correct. Appx1048 (690:17-20). |
| the computer system, the computer system comprising: | Q. Okay. And now, the Alexa system, the servers, those are computers, right? A. Correct, yes. Appx1048 (690:21-23). |
| a networks interface; | Q. They also include a network interface to receive that digitized speech, correct? A. Yes. Appx1051 (690:24-691:1). |
| a second computer; non-transitory memory that stores instructions that when executed by the second computer cause the computer system to perform operations comprising: | Q. And now, those computers, they contain memory, right? A. That's correct. Appx1049 (691:2-3). |
| receive, using the network interface, the digitized order from the first system; | Q. And the Alexa system, it can receive that digitized speech from, for instance, the Echo device, right? A. Yes. Appx1049 (691:4-6). |
| translate at least a portion of the digitized order to text; | Q. The spoken order that's received by ASR, it's in audio format, correct? A. That's right. Yes. Q. What's outputted is text, correct? A. That's correct. Appx1051 (693:17-23). |

23

| '153 Patent, Claim 1 (Appx68-69) | Dr. Strom's Testimony |
|---|---|
| identify an item corresponding to the text; add the identified item to a list associated with the user; enable the list, including the identified item, to be displayed via a user display. | Q. Okay. But my question is: If I say, "add milk to my shopping list," and once that gets processed, that item, "milk," will be added to the user's shopping list, correct? A. The item will be using -- yes, if the system does the right thing, an item, "milk," will be added, yes.  Appx1054 (696:6-10). |

Dr. Strom's admissions of infringement were devastating to Amazon's contention of no infringement, because Amazon's expert, Dr. Johnson, would later be forced to say that Amazon's distinguished scientist and a founding developer of Alexa was wrong in order to maintain his own non-infringement opinions.

In the Post-Trial Order, the district court acknowledged that Dr. Strom admitted that Alexa satisfies the Item Element, stating "Freshub contends that Dr. Strom referred to the word 'milk' on Alexa shopping list as an 'item' on cross examination, and therefore admitted that the element was met."  Appx44 (Post-Trial Order) (citing Appx17411).  In denying Freshub's JMOL however, the district court looked to Dr. Johnson's infirm testimony regarding the Item Element, described below in Section II(B)(2), in order to reach the conclusion that there was support for the jury's non-infringement verdict.

### 2.    Unsupported expert testimony should be disregarded, particularly when it contradicts the testimony of a knowledgeable longstanding Amazon employee.

The testimony of Amazon's non-infringement expert, Dr. Johnson, regarding the Item Element was unsupported and contradicted Amazon's fact witness and documents.  Contradictory and unsupported expert opinions cannot supply substantial evidence to support a jury's verdict.  *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005) (affirming district court's JMOL because jury did not have substantial evidence despite testimony of expert witness).

Specifically, Dr. Johnson claimed to know Alexa better than Dr. Strom, as he testified that Dr. Strom was "wrong" and "misspoke" about how Alexa worked.  Specifically, Dr. Johnson testified as follows regarding Dr. Strom's admission:

> Q. Okay. This is the testimony from Mr. Ström -- I mean, Dr. Ström.  He was on the stand yesterday.  You saw him, right?
>
> A. Yes.
>
> Q. . . . This was the question asked: If I say, "add milk to my shopping list," and once that gets processed, the item -- item -- you see that, milk -- will be add to the user's shopping list, correct?
>
>> His answer: The item will be -- yes, if the system does the right thing, an item, milk, will be added, yes.
>
>> Do you agree with his testimony?
>
> A. Well, I'll trust – I'll trust you that this is accurate, that he said that. But if that's the case, he would have misspoke at that point.

I mean, he knows very well, as do I, that what's added in the shopping list feature is text, right? It's just the words that you said, not – it's not associated with some particular item name, like, in the Amazon catalog or something like that.

Q. So Dr. Ström, who was the first witness Amazon put on here --

A. Yes.

Q. -- gave this testimony. He's one of the guys who they put out and said helped design this system, he's wrong?

A. Well, he works on the speech recognition side, not on the other side. But regardless of that, yeah, I would have to say that if these were the words he said, that I don't think that's correct, sure.

Q. So the Amazon documents are wrong and the Amazon engineer is wrong, based on your understanding of how you interpret adding an item to the list, right?

A. Those are two things.  The documents are all fine. The testimony that -- what you showed me, I would say that was incorrect.

Appx1395-1397 (1037:25-1039:9).  Dr. Johnson's opinion that "milk" is not an "item" had no factual support, including from any of Amazon's documents or engineers, including Dr. Strom who was key to building Alexa.

Even while acknowledging that Dr. Johnson's testimony contradicted Dr. Strom's admission, the district court reasoned that the jury could discount the party admission of infringement because the same party's expert contradicted the admission, and the "jury is free to judge the credibility of the witnesses and weigh their testimonies."  Appx44-45.  But the jury is not permitted to rely on

unsupported testimony of expert witnesses, and it is the province of the district court to verify at the JMOL stage that an expert's trial testimony was actually supported if it is the only evidence the jury could have relied on. *See Guile*, 422 F.3d at 227 (excluding expert witness' testimony from evidence the jury could have relied on to support verdict in deciding JMOL).

For example, the *Guile* court held that in order for an expert's opinion to provide the substantial evidence on which a jury could have relied, that opinion "must be supported." *Id*. "[W]e look to the basis of the expert's opinion, and not the bare opinion alone" for that determination. *Id*. (internal quotations and citation omitted). Thus, in affirming the district court, the Fifth Circuit found that it was correct to exclude the expert's unsupported testimony from "the realm of substantive evidence" on which the jury could have relied, due to the expert's self-contradictions combined with the expert's statements that were "unsupported by any data" or were "nothing but his incorrect factual assumptions based on examination of incomplete records." *Id*.

Here, the Court should disregard Dr. Johnson's testimony because it was unsupported and contradicted Dr. Strom. Dr. Johnson's testimony contradicted Amazon's fact witnesses, Amazon's documents, and, as discussed below, the disclosures of the '153 Patent, such that it amounted to nothing more than "the mere *ipse dixit*" of Dr. Johnson. "A claim cannot stand or fall on the mere *ipse*

*dixit* of a credentialed witness." *Id.* (internal quotations and citation omitted).

Without Dr. Johnson's testimony on the Item Element, there is no evidence to

support the jury's non-infringement verdict based on it.

### B. Amazon Did Not Have Any Evidence, Much Less Substantial Evidence, of No Infringement

Amazon presented two non-infringement positions at trial, namely that

Alexa does not satisfy the Order and Item Elements. Dr. Johnson, Amazon's non-

infringement expert, summarized them as follows;

> So [there] are . . . separate pieces, each of which would be sufficient to show non-infringement. The first of these is that the accused devices don't receive digitized orders at all, right? So that's the first point. The second piece is with regard to the Shopping List feature that's been accused, and I find the Shopping List feature does not identify an item that corresponds to the text, which is what's required by the claims.

Appx1228 (870:5-17) (summarizing non-infringement opinions that relate to

the '153 Patent). There is no mention of the Memory Element, which was an

element that Amazon raised after trial.

### 1. Freshub proved that Alexa satisfies the non-transitory Memory Element.

Amazon, in post-trial briefing, attempted to recast Freshub's infringement

case at trial, claiming that Freshub only accused the Alexa Devices, and not Alexa,

of infringement. Appx 17575-17576. The trial record proves otherwise, as

Freshub asserted that Alexa, which is the Alexa System and Alexa Devices,

infringe.  Consistent with Claims 1 and 6 of the '153 Patent, Freshub demonstrated

that there is non-transitory memory on both the Alexa Devices and the Alexa

System.[7]

First, Freshub explained that Alexa consists of both the Alexa Devices and

the Alexa System.  Appx574 (262:15-24).  Freshub's expert, Dr. Medvidovic,

provided additional testimony confirming Freshub's contention that Alexa

infringes.  *See* Appx567-568 (255:23-256:18) (explaining that he was providing an

infringement opinion on Alexa, which include the Alexa Devices and Alexa

System); Appx582-583 (270:2-271:12) (describing the first system of the '153

Patent claims which are the Alexa Devices); Appx600-601 (288:19-289:1)

(describing the second system of the '153 Patent claims, "which is the servers in

the cloud").

He explained how Amazon markets the Alexa Devices for sale on its

website as being sold "with Alexa."  Appx722-723 (410:6-411:17) (describing how

Alexa Devices are sold "with Alexa," the backend system); Appx18175 (product

listing for "Echo (2nd Generation) - Smart speaker *with Alexa*"); Appx18191

---

[7] Freshub and Amazon do not dispute that "non-transitory memory" and "memory"
are equivalent.  Dr. Medvidovic described non-transitory memory as ████████
technical definition ████████ such as hardware, a pin drive or flash drive,
memory card, CD-ROM.  Appx971 (4:2-9).  Dr. Johnson described the claimed
non-transitory memory as "just conventional memory" and "the memory in the
[device] that holds the computer program."  Appx1291 (933:13-15), Appx1289
(931:18-24).

(product listing for "Echo Dot (3rd Gen) - Smart speaker *with Alexa*");

Appx18205 (Fire TV Cube (1st Gen), hands-free *with Alexa*); Appx18217 (Fire

TV Stick streaming media player *with Alexa built in*) (emphasis added). Thus,

there can be no reasonable dispute that Freshub accused Alexa (which is the Alexa

Devices and the Alexa System) of infringement.

Second, Dr. Medvidovic explained that the Alexa Devices and the Alexa

System contain non-transitory memory that store instructions for performing

various operations, thereby satisfying the Memory Element of Claims 1 and 6 of

the '153 Patent. *See* Appx582-583 (270:24-271:5) (explaining that the "first

system" of Claim 1 of the '153 Patent includes specific instructions stored in non-

transitory memory); *see also* Appx600-601 (288:13-289:6) (explaining that the

second computer system contains non-transitory memory, which it has to have "in

order to be able to do anything really but specifically to be able to do what Alexa

does.").

He used the following Amazon architectural diagram of an Echo device,

which is representative of all the Alexa Devices,[8] to show where the Memory

Element is located:

---

[8] Freshub established that the Alexa Devices all operate exactly the same way and used this diagram as a representative schematic for the Memory Element in the Alexa Devices. Appx583 (271:6-24), Appx17956, Appx589-593 (277:8-281:10).



Appx17956 (excerpted and annotated).  Specifically, Dr. Medvidovic identified,

using the diagram, where the non-transitory memory is in the Alexa Devices:

> A. The computer is this MT8163 block . . . , which basically
> means it has four processors running on it. And then the
> memory are these two blocks above it, this one that shows
> 512 megabytes, and this one that shows 4 gigabytes.

> Q. So does that satisfy the computer and the non-transitory
> memory that contains instructions element?

> A. Absolutely, it does.

Appx591-592 (279:22-280:13).

Third, Amazon conceded that the Alexa Devices satisfy the Memory

Element.  Dr. Johnson admitted that the Alexa Devices have "non-transitory

memory that stores instructions to perform operations."  Appx1387-1388 (1029:6-

1030:11) (Dr. Johnson admitting that the Alexa Devices infringe the first system

claim limitation). Further, Dr. Strom also testified that the Alexa Devices contain memory, thereby satisfying the Memory Element. Appx1047 (689:12-24) (admitting the Alexa Devices include a processor and memory).

Fourth, Freshub proved at trial that the Alexa System also separately satisfies the Memory Element. Dr. Medvidovic explained that the "Alexa back end" is a set of "servers that run in the cloud" and that they are "computers and the non-transitory memory that store computer instructions," as required by the claims of the '153 Patent. Appx601-603 (289:7-291:1); discussing diagram at Appx18101. Even Dr. Johnson recognized that the Alexa System has memory, as he testified consistent with Dr. Medvidovic's testimony that the back-end "computer system" of the '153 Patent can be a remote server that has memory, "like a hard drive" that stores the instructions that does the "recognition and stuff like that." Appx1290-1291 (932:21-933:6); *compare with* Appx599-601 (287:19-289:6). Dr. Strom also admitted that the Alexa System has memory. Appx1048-1049 (690:21-691:3) (admitting the Alexa servers are computers that contain memory).

Thus, Amazon's non-infringement argument regarding the Memory Element was not even colorable in light of the foregoing uncontested evidence at trial. Consequently, the district court erred in finding the Memory Element as a basis to uphold the jury's verdict because there was no competing testimony. Appx43. Further, while Freshub asserted that the Alexa Devices contained the Memory

32

Element, Freshub never contended that the Alexa Devices needed server hardware for that functionality. Consequently, contrary to the district court's Post-Trial Order (Appx43), Dr. Johnson's testimony regarding where parts of the server are located does not amount to any evidence, let alone legally sufficient evidence, to support the jury's verdict of non-infringement.

### 2. The district court ignored the great weight of the evidence regarding the Item Element.

The district court erred in upholding the jury's verdict based on Amazon's position that a word does not represent an item because an item in an electronic context is logically and necessarily a word. Dr. Medvidovic explained that Alexa meets the Item Element when a user, for example, says "Alexa, add bananas to my shopping list" and the word "bananas" is added as an item to the shopping list. Appx577 (265:18-24), Appx603 (291:11-25).

Specifically, he detailed how the shopping list functionality of Alexa uses a first module, Automatic Speech Recognition ("ASR"), to take the digitized sequence of 1s and 0s that it received from the Alexa Device and convert it into the actual text "add bananas to my shopping list." Appx605-608 (293:14-295:1, 295:12-296:10) (testifying regarding Appx17931-17392, a step-by-step diagram describing item identification process); *see also* Appx595 (283:1-9), Appx603 (291:11-25). Thereafter, Alexa uses a second module, Natural Language Understanding ("NLU"), to determine the user's intent for the verbal order (*i.e.*,

33

the user's underlying intents) and to identify an item from the text corresponding to the one the user wants to add to their list (*i.e.*, bananas).  Appx605-607 (293:1-294:7); *see also* Appx610-611 (298:8-299:18) (Dr. Medvidovic testifying that the NLU extracts keywords from the ASR output, which "themselves are added to the Shopping List . . . those are the items that we are identifying, like bananas, apples, milk, et cetera").

The testimony of Amazon's engineers confirmed Dr. Medvidovic's description of the foregoing shopping list functionality.  For example, Mr. Halim, a principal engineer at Amazon, testified that the ASR converts utterances to text; the NLU then gives that text a set of intents; the intents are sent to a shopping list domain, which creates a new record for the item "desired to be added" to the list; and it then appears on the shopping list.  Appx549-551 (237:9-239:12). Mr. Portman, a principal engineer in Alexa Shopping responsible for the architecture related to voice search and the search results, testified that the ASR translates the digitized verbal order into text, which the NLU analyzes to detect intent and extract keywords.  Appx560-561 (248:17-249:11).

Dr. Medvidovic's testimony relied upon Amazon's internal confidential technical documents showing how Alexa meets the Item Element.  *See, e.g.*, Appx17931-17932 (step-by-step flow diagram showing how Alexa uses the ASR to NLU process to identify items based on the indicated intent); Appx569 (257:3-

20) (Dr. Medvidovic testifying to having studied Amazon's source code extensively). For example, he pointed to the following confidential internal document describing the "Alexa Shopping List feature":

## Alexa Shopping List Metadata [V1]

## Background

The Alexa Shopping List feature currently allows creating, editing and deleting shopping **ListItems** through Voice, Alexa devices, browser, phone apps and some 3P apps. Customers are only allowed to add keywords to their shopping list and only these keywords are returned to customers (displayed on GUI or spoken back via Alexa).

Appx17995. This document shows that customers "are only allowed to add keywords to their shopping list," meaning the keywords are the items on the list. *Id.*

> Dr. Medvidovic explained this more fully in his testimony:
>
> There is the ListItems reference there, and it talks about how this can be done through voice Alexa devices, and that's exactly what we've been talking about here. … The keywords themselves are added to the Shopping List, and those keywords are the specific things that we care about. So those are the items that we are identifying, like bananas, apples, milk, et cetera.

Appx610-611 (298:23-299:11). Thus, according to Amazon's documents, keywords are the items added to the shopping list.

He also turned to public Amazon documents, like the snippet of Amazon's website shown here, that describe and show the items identified on a shopping list:



Appx18154.  Dr. Medvidovic explained how this exhibit shows the

identified item that was added to the list.  Appx609-610 (297:6-298:7).

Consistent with Dr. Medvidovic's testimony, Amazon's engineer Dr. Strom

also admitted on cross-examination that Alexa identifies "items," such as "milk,"

corresponding to the text, as required by the '153 Patent claims.  *See* Appx1054

(696:6-10) ("if the system does the right thing, an item, "milk," will be added [to

the shopping list], yes.").

Amazon's expert Dr. Johnson could not respond to the abundance of

conclusive evidence supporting infringement of the Item Element.  Tellingly, when

asked about the Item Element during cross-examination, Dr. Johnson resorted to

making an unsupported and nonsensical claim that a word such as "milk" is not an

item:

Q. The second thing that you base your non-infringement opinion on the summary here: Does not identify an item corresponding to the text. Do you see that.

A. Sure.

\*    \*    \*

Q. So you don't think the Alexa system identifies items?

A. The Shopping List feature does not identify an item.

\*    \*    \*

Q. Let me show you a couple of documents here. This is from an Amazon website. This is a Shopping List. Add items to your shopping list using your voice with Alexa. So is it your testimony that Alexa can add items to your shopping list without identifying them?

A. Correct. Yeah, exactly.

Q. You can add an item -- anything to your Shopping List, right?

A. Yes.

Q. Now, when I say, "Alexa, add milk to my shopping list," and milk shows up on my shopping list, right?

A. Sure.

Q. Are you telling me that the Alexa did not identify milk as the item that I wanted added to my shopping list?

A. Correct, it's just a word.

Q. It's just a word. It's not an item?

A. Right, yeah.

Q. Milk is not an item?

A. Right.

Q. But Amazon says you can add an item, but you're saying milk is not the item?

A. Sure.  Yeah, that's what I'm saying.  Right.

Appx1394-1397 (1036:2-1039:9).  Thus, Dr. Johnson's position is a word is not an item.  Dr. Johnson doubles down on this position when confronted with Amazon's webpage:

Q. Okay.  This [webpage] is [from] the Amazon help desk. "Add item to list name."  This is how you use the list with Alexa.  So you're saying when I said, "add milk to my shopping list," milk is not the item?

A. Not in the sense of the patent, no.

Q. No, I'm just talking about how Amazon uses this word.

A. Sure.

Q. Is that the item by Amazon?

A. Sure.  In this document, absolutely.  Sure.

Q. It's the item?

A. Yeah.  The way they talk about it in this document, sure.

Q. And when it shows up in my list, it's been identified as the item, right?

A. No.

Appx1395 (1037:10-24) referring to Appx18154 (Amazon's webpage showing an Alexa Shopping list and describing "Paper Towels," "Markers," "Milk," "Bread," "Toothpaste," as items that can be checked off your list.).

Dr. Johnson's interpretation of item is that it must be a physical object that is placed on the shopping list, which makes no sense within the context of the '153 Patent. Specifically he testified that an item is "something that you would put in your refrigerator or your . . . any storage area like a cabinet" when describing his understanding of what "item" means in connection with the '153 Patent. Appx1235 (877:8-17). Thus, under Dr. Johnson's logic, a physical gallon of milk would have to be added to a user's electronic shopping list in order to infringe, which is contrary to the '153 Patent specification, as discussed further below.

Given the infirmities of Dr. Johnson's positions, there is no legally sufficient evidence of non-infringement to support the jury's verdict as to the Item Element of the '153 Patent.

### 3. Amazon's Alexa satisfies the Order Element.

At trial, Dr. Johnson claimed that Alexa does not receive orders because Alexa does not know the meaning of the words that it is receiving.[9] Appx1230-1231 (872:9-873:15). Amazon heavily advertises Alexa's ability to receive verbal orders that consumers speak to their Alexa Devices. For example, the excerpt below from Amazon's website for the "Echo (2nd Generation)—Smart Speaker with Alexa" (Appx18175) advertises that the Echo device receives verbal orders from the consumer, such as "Amazon, reorder paper towels."

---

[9] The district court did not address the Order Element in the Post-Trial Order.



Appx18177 (annotated).  Amazon similarly advertises the Fire TV's ability to receive verbal orders from consumers, as shown below on Amazon's website (Appx18205):



Appx18211 (annotated).  The Alexa Devices are undoubtedly designed to receive orders from consumers.

At trial, Dr. Johnson premised his non-infringement position regarding the Order Element on a claim that Alexa only receives a bunch of words, otherwise known as an "utterance," and that "utterances" are not "orders" when received. Appx1228-1230 (870:23-872:18) (describing what a user says to Alexa as "just a bunch of words that could do anything"); Appx1389-1392 (1031:1-1034:17) (Dr. Johnson describing the phrase "Alexa, add eggs to my shopping list" as an "utterance" but not an "order").  Under cross-examination, Dr. Johnson could not maintain such a position, conceding that an utterance can be an order.  Appx1392 (1034:18-19).  There is no requirement to prove that every utterance is an order for infringement.  Thus, there is no substantial evidence from which the jury could find non-infringement because Dr. Johnson admitted that some of the utterances that Alexa receives are in fact orders.

**C.    Amazon's Expert Applied a "Special Meaning," as Opposed to the Plain and Ordinary Meaning, to the Claim Terms "Item" and "Order"**

The district court erred in denying Freshub's JMOL because Amazon's only evidence regarding non-infringement of the "Item Element" and "Order Element" was the testimony of its expert, Dr. Johnson, that was based on a "special meaning" of the claim terms "item" and "order."  Dr. Johnson's application of a "special meaning" was contrary to case law and the district court's own instruction to the jury to apply the plain and ordinary meanings of all the claim terms.  *Hill-*

41

*Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014) ("Claim

terms are generally given their plain and ordinary meanings to one of skill in the

art when read in the context of the specification and prosecution history.") (citation

omitted); Appx17093-17094 (Final Jury Instruction No. 2.7).  Thus, Amazon's

non-infringement evidence is legally insufficient and erroneous, and this Court

requires granting JMOL where a jury verdict regarding infringement is based on

incorrect claim construction and where no reasonable jury could have reached the

jury's conclusion applying the proper claim construction.  *800 Adept, Inc. v. Murex*

*Sec., Ltd.*, 539 F.3d 1354, 1366-67 (Fed. Cir. 2008) (reversing JMOL denial where

no reasonable jury could have found infringement under the proper claim

construction).

 The district court improperly ignored that during trial, Dr. Johnson

unequivocally testified that he applied a "special meaning" in his non-infringement

analysis to the term "item," as shown by the following testimony:

> Q. So -- and that comprising at least one item -- ***the term
> "item" has a special meaning to it***.  It's just not any item,
> milk, eggs, whatever?

> A. Well, milk and eggs are items in a refrigerator, maybe that's
> a little closer.  ***But regardless, it's yes***.  Yeah.

> Q. So you understand that in this case, we went through the
> process where we tried to interpret what these claims mean,
> and you were supposed to give them the plain and ordinary
> meaning, not special meanings?

> A. Absolutely, plain and ordinary meaning.

Q. And you just told me right now you gave them special meanings, right?

A. I gave them the meaning that a person of skill in the art at the time would understand those terms to mean from what's in the patent.

Q. *You said they were special meanings.*

A. *Okay.*

Q. They were not ordinary meanings.

A. Okay.

Appx1411-1412 (1053:14-1054:10) (emphases added).

Likewise, regarding "verbal order," Dr. Johnson agreed that the term had "special meaning" in his non-infringement analysis and is "not the colloquial" use of it:

Q. Let me be real clear.

A. Sure.

Q. When the patent claim says, "a verbal order comprising at least one item," the word "verbal order" has a special meaning to you based on your reading of the patent?

A. Special meaning to the patent?

Q. No, I mean, it has special meaning to you. I'm saying the way you read the patent, you gave a special meaning to "verbal order." It's not the colloquial "take out the trash, add to my shopping list." There's something special about "verbal order."

A. Sure. That's fine, yeah.

Appx1411 (1053:2-13).

Amazon's hollow attempt to align Dr. Johnson's testimony with the plain and ordinary meanings of "item" and "order" in the specification fails, and the district court erred in adopting it. Appx44-45. Indeed, the '153 Patent actually lists "milk" as an item added to a list when illustrating an example user interface for ordering items, demonstrating the plain and ordinary uses of both "item" and "order." *See, e.g.,* Appx65 ('153 Patent, 8:38-42), Appx60 ('153 Patent, Fig. 7).

While the district court did not address Amazon's non-infringement defense based on the Order Element, the district court erred in finding that "Dr. Johnson applied the ordinary meaning of 'item' based on his understanding of the term in view of its use in the patent," despite Dr. Johnson's explicit admission to using a special meaning. Appx44-45. No reasonable jury could have applied the plain and ordinary meaning of these terms in reaching its non-infringement verdict based on Dr. Johnson's testimony alone, and thus his testimony is not legally sufficient evidence to support the verdict.

## III.   A NEW TRIAL IS REQUIRED TO CORRECT THE SIGNIFICANT PREJUDICE TO FRESHUB

A new trial is warranted because "the verdict [was] against the great weight of the evidence;" "the trial was unfair;" and "prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612-13 (5th Cir. 1985) (citations omitted); *see also Barry*, 914 F.3d at 1320 (this Court applying Fifth Circuit regional law for granting a new trial when reviewing the district court's

ruling on a motion for new trial). The district court abused its discretion in denying Freshub's motion *in limine* and motion for a new trial because Amazon prejudicially argued that Freshub misused the patent system when Freshub legitimately pursued its patent portfolio over time, as many companies do. Appx16279-16280 (45:11-46:23); *see also* Appx4 (denying motion *in limine*), Appx48-51 (denying motion for new trial).

The time between when Ikan invented the patented technology of the Asserted Patents in 2005 and when the '408 Patent and '810 Patent issued in 2019 spans fourteen years. During that same span, Amazon released Alexa in 2014— nine years after Ikan filed the priority application. Appx852 (540:14-21). This is not uncommon. Because the Asserted Patents all properly claim priority to the 2005 application, the filing dates of the continuation applications that resulted in the Asserted Patents were not relevant to any issue that was before the jury, including validity, infringement, or damages. *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 874 (Fed. Cir. 1988) (not improper to insert claims during prosecution of continuation applications "intended to cover" a product in the marketplace so long as claims "comply with all statutes and regulations") (citation omitted).

Freshub filed a motion *in limine* to preclude Amazon from making legally improper and prejudicial claims that Freshub was a bad actor for pursuing the

45

asserted claims after Amazon released Alexa, that Freshub was doing something

improper and that Amazon could not infringe. Freshub's motion *in limine* sought

to prevent reference to Freshub's filing of the continuation applications to avoid

prejudice because the continuation dates were not relevant to any jury issue and

because it is entirely proper to continue to seek additional claims and patents to

cover later released product as long as the specification supports such patent claims.

Appx14404-14405 (citing *Kingsdown*, 863 F.2d at 874).

Freshub warned the district court that Amazon's goal in introducing the

filing dates was to improperly suggest wrongdoing on Freshub's part:

> Any attempt by Defendants to suggest [that the Asserted Patents'
> enforceability and value is affected by the filing date of the
> continuation applications] *is a blatant attempt to paint Freshub as a*
> *bad actor* for simply utilizing the common practice of filing
> continuation applications. This would be highly prejudicial to
> Freshub and would mislead and confuse the jury with respect to
> infringement, validity and damages, and should not be allowed.

Appx14405 (emphasis added). Freshub also explained the effect that these

references would have on the jury with regard to infringement, explaining how

Amazon would use the irrelevant information to confuse and mislead the jury as to

what Amazon could legally point to for its non-infringement defense:

> Defendants should not be allowed to make reference to filing the
> continuation applications after the [Alexa] Products were released,
> because *it may confuse or mislead the jury into thinking there can*
> *be no infringement* since the [Alexa] Products existed before the
> continuation applications were filed. This is contrary to the law. *Nor*
> *should Defendants be allowed to suggest that the jury can draw a*

*negative inference that Freshub filed the continuations solely to get Defendants on the hook for infringement.  Any such inference would be highly prejudicial to Freshub*.

Appx14405 (emphases added).

The district court denied Freshub's motion *in limine*, after Amazon argued that they were relevant because they are the filing dates of the Asserted Patents themselves.  Appx16279-16280 (45:11-46:23); *see also* Appx4.

## A.    The Jury's Non-Infringement Verdict Was Against the Great Weight of Evidence

Despite the plethora of uncontested infringement evidence before the jury, the jury did not find infringement of the '153 Patent.  *Supra* Section II.  Because the "verdict was against the great weight of the evidence," the district court should have granted a new trial on this basis alone.  *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1359 (Fed. Cir. 2012).  Further, "[g]iven the strength of the plaintiff's evidence" regarding infringement, the jury's incongruous verdict "strongly indicates that the jury's deliberation in this case was not impartial."  *Hall v. Freese*, 735 F.2d 956, 959-60 (5th Cir. 1984) (new trial required to correct substantial injustice resulting from counsel's prejudicial remarks).  Indeed, as discussed below, Amazon introduced irrelevant and highly prejudicial issues to unfairly encourage jurors to find no infringement for reasons wholly external to the merits of the case and the law.

**B.    The District Court Abused Its Discretion in Denying Freshub's Motion *in Limine* Because Amazon Had No Proper Purpose for Introducing the Filing Dates of the Continuation Applications**

When the continuation applications of Freshub's Asserted Patents were filed is not relevant to the issues of infringement, validity, or damages.  In denying Freshub's motion *in limine* (Appx4), the district court abused its discretion, because the filing dates had no relevance to any fact before the jury and was only going to introduce unfair prejudice, confuse the issues, and mislead the jury.

First, the filing dates of the continuation applications were irrelevant to the issues at trial.  Amazon's suggestion that the filing dates had any bearing on infringement (or any issue at trial) is contrary to law, as patent applicants can file continuation applications to cover later released products.  *Kingsdown*, 863 F.2d at 874 ("[T]here is ***nothing improper, illegal or inequitable*** in filing a patent application for the purpose of obtaining a right to exclude a known competitor's product from the market; nor is it in any manner improper to amend or insert claims intended to cover a competitor's product the applicant's attorney has learned about during the prosecution of a patent application . . . its genesis in the marketplace ***is simply irrelevant***.") (emphasis added) (citation omitted).

Indeed, facts surrounding asserted patents, such as what happened during the prosecution or whether it was involved in an *inter partes* proceeding, are regularly excluded from jury trials.  If the facts are not relevant or result in unfair prejudice,

confuse the issues or mislead the jury, they should be excluded. Thus, because Freshub properly prosecuted its patent portfolio, Amazon's references to the continuation applications were irrelevant and incredibly prejudicial.

Second throughout trial, Amazon did exactly what Freshub's motion *in limine* predicted. It improperly referred to when the continuation applications were filed relative to the release of Alexa, which is irrelevant, thereby confusing, misleading, and prejudicing the jury. Fed. R. Evid. 401-403 (providing for the exclusion of otherwise relevant evidence when the probative value of that evidence is substantially outweighed by the danger of unfair prejudice, confusing the issues, or misleading the jury). Thus, the district court abused its discretion in denying Freshub's motion *in limine*, because Amazon's repeated reference to the timing and filing dates of the continuation applications in a way that was irrelevant, confusing, misleading, and contrary to the law inflicted severe prejudice on Freshub at trial.

### C. The District Court Abused Its Discretion in Allowing Amazon to Prejudice the Jury by Unfairly Painting Freshub as a Bad Actor

#### 1. Amazon introduced irrelevant and prejudicial issues external to infringement.

During trial, Amazon ensured that it persuaded the jury that Freshub is a bad actor by improperly referencing the filing dates to suggest that Freshub misused the United States patent system to "take" from Amazon and other United States

technology companies. *See Magnivision, Inc. v. Bonneau Co.*, 115 F.3d 956, 961 (Fed. Cir. 1997) (defendant's emphasis of irrelevant allegations of improper patent prosecution with "assertions and innuendos of impropriety [that] were magnified by repetition" demonstrate unfair prejudice requiring a new trial) (citations omitted).

Amazon's counsel suggested at least 17 times during the trial that the filing dates of the Asserted Patents indicated wrongdoing, despite this assertion being contrary to law. *Id.* at 960 ("[T]here must be material misrepresentation or omission by the applicant, with the intent to deceive or mislead the examiner, in order to establish improper conduct in patent prosecution.") (citation omitted). Aside from attorney argument during opening and closing,[10] Amazon's counsel also asked nearly every Freshub witness, even its experts and its fact witnesses that were not involved with inventing or prosecuting the Asserted Patents, about the dates the Asserted Patents were filed. Appx426-427 (114:2-115:17), Appx428-430 (116:8-118:8), Appx496 (184:5-18), Appx497 (185:7-10), Appx667-672 (355:11-360:22), Appx906-907 (594:22-595:10). Amazon also questioned Dr. Johnson

---

[10] Appx380-382 (68:3-70:5), Appx382-383 (70:11-71:3), Appx386 (74:9-21), Appx1776-1778 (1404:15-1406:5), Appx1783 (1411:1-10, 1411:16-19), Appx1791-1793 (1419:5-1421:5), Appx1804-1806 (1432:16-1434:10), Appx1807-1808 (1435:7-1436:25)

about the dates during his direct testimony.  Appx1256-1257 (898:23-899:8),
Appx1259 (901:10-13).

In opening and closing, Amazon repeatedly insinuated that when the
continuation patent applications were filed somehow reflected that Freshub
intended to use its patents to capture Amazon's products with the goal of creating a
lucrative case for infringement and hinder the promotion of science by taking from
those who have worked hard to innovate.  *See* Appx1804-1805 (1432:25-1433:10)
(referring to the timeline of when the Asserted Patents were filed relative to their
parent application); *see also* Appx386 (74:3-21) ("***The patent system wasn't set up
for someone to file patents four or five years after someone else has already
introduced a product* . . .**") (emphasis added).  Amazon advanced the theme that
Freshub "***cooked up***" a plan "***to come to the courthouse and try to get rich***"
against "[e]very U.S. technology company they can find."  Appx1808 (1436:3-25)
(emphasis added).  Amazon's counsel also improperly characterized the timeline of
this case as "strange" and "bizarre" in closing (Appx1776 (1404:15-24), Appx1791
(1419:5-13)), even though it is common to file continuation applications after
covered products are released.

Further, Amazon's closing argument prominently featured the Constitutional
call to action from its opening, as well as a fabricated story that Freshub's lawyer
obtained an Alexa device and then drafted claims to match it.  *See* Appx1791-1793

(1419:5-1421:5).  Amazon used that fabricated story to suggest non-infringement because the claims as drafted, even when viewing the Alexa Devices, allegedly got it wrong.  *See id.*

The dates that the continuation applications were filed for the Asserted Patents and Amazon's purported purpose for introducing them, however, were wholly irrelevant.  With respect to Amazon's 35 U.S.C. § 112 defenses, the only date that mattered was the date the priority application was filed, which was in 2005.  *See Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1355 (Fed. Cir. 2010), citing *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563-64 (Fed. Cir. 1991) (written description is determined based on the specification as of the "filing date sought").  It did not matter whether the continuation applications were filed ten months or ten years after the parent application—all that would have been at issue is whether the 2005 priority application supported the later-filed claims.  *Id.*

Amazon used the continuation applications' filing dates, which were irrelevant, to (i) mislead the jury into thinking Amazon did not infringe because Alexa existed before the continuation applications were filed, and (ii) fuel its highly prejudicial and improper suggestion that Freshub abused the United States patent system to get Amazon and other United States technology companies on the hook for infringement.  Indeed, these comments were "a conscious and deliberate appeal to the prejudice and passion of the jury: the jurors were asked to

52

judge this case, not on the basis of whether the defendant [infringed], but on the basis of their disapproval of [Freshub's] legal right" to enforce its patents in court. *Irvan v. Frozen Food Express, Inc.*, 780 F.2d 1228, 1231 (5th Cir. 1986); *see also, e.g.*, *HRC Guam Co. v. Bayview II L.L.C.*, 2017 Guam 25, ¶¶ 99-100 (Guam Dec. 29, 2017) (appeal to jury to send a message to outsiders about the proper way to do business was "in and of itself . . . improper" and "compounded" by highlighting a local versus foreigner theme).

Facts cannot be presented solely for the purpose of prejudicing the jury, as Amazon did here.  Indeed, "the Rules of Evidence require that the issues presented at trial be relevant to the matter in dispute, and be supported by admissible evidence that is free of unfair prejudice." *Magnivision*, 115 F.3d at 958 (citation omitted); *see also id.* at 961 ("The purposes of the Federal Rules of Evidence include assuring that irrelevant evidence does not unfairly prejudice the trial.") (citations omitted).  Thus, Amazon's inflammatory remarks, which had nothing to do with whether Amazon infringes, served no purpose other than to bias the jury against Freshub.  Amazon's arguments worked by directing the jury's focus away from the elements of Freshub's infringement case to an extraneous and inflammatory consideration, and deprived Freshub of a fair trial.

To find that manifest injustice would result from allowing the verdict to stand in view of Amazon's improper remarks, the Court "need not find that each

53

statement, taken individually, was so improper as to warrant a new trial." *Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 278 (5th Cir. 1998).  Rather, the cumulative impact of Amazon's numerous prejudicial comments must be considered "as a whole." *Id.*  Taken together, Amazon's improper remarks permeated the trial and "so exceeded the limits of advocacy as to cause a prejudicial verdict." *Westbrook v. General Tire & Rubber Co.*, 754 F.2d 1233, 1238 (5th Cir. 1985); *see also Hall*, 735 F.2d at 961-62 (abuse of discretion to deny new trial where defendant made remarks "to prejudice the jurors" and "argu[ed] outside the record" which does not "serve any remote purpose for which a trial is intended.").  Thus, the district court abused its discretion in denying Freshub's motion for a new trial for the Asserted Patents based on Amazon's erroneous and unfairly prejudicial depiction of Freshub as bad actor for filing successful continuation applications.

> **2.    Amazon appealed to the jury's patriotic sense of duty to protect the United States Constitution and patent system from a foreign threat.**

Amazon further prejudiced the jury and appealed to its emotions by making a Constitutional call to action, insinuating that Freshub was wrong to enforce its patent rights.  Indeed, Amazon told the jury that a finding in its favor was necessary to prevent Freshub—a foreign company—from suing and "taking" from other United States companies.  Amazon accomplished this through multiple

statements over the course of trial that collectively prejudiced the jury against

Freshub, particularly statements Amazon made in closing that this case was an

attack on United States companies from outside forces. For example, Amazon

argued that this case was the "*tip of the iceberg*" of a foreign company's lawsuits

against "*[e]very U.S. technology company they can find*," that "*[o]nly you folks

can stop*." Appx1808 (1436:3-25), Appx379 (67:11-17) (all emphases added). In

addition, in its opening remarks, Amazon stated:

> "[G]oing to the courthouse is a quick way to succeed. *I'm going to submit to you that's not why our constitutional patent system was set up. It's going to be your decision to decide that*. . . . They said the shareholders will . . . see money after we sue Google and Apple. So it's clear, *this is the tip of the iceberg*."

Appx379 (67:6-17) (emphasis added). In its closing remarks, Amazon repeated its

improper plea:

> So rather than doing this the normal way through hard work and innovation, we're going to go to the courthouse. And that's why we're here, because this conduct needs to stop. . . . *The preservation of this constitutional patent system and the integrity of it is -- is at play*. . . . *And one of the reasons it needs to stop is because we know this is the tip of the iceberg*. . . . Who comes next? Google, Apple, dot, dot, dot. *Every U.S. technology company they can find. And that's why we're here*. . . . *Only you folks can stop it.*

Appx1808 (1436:12-25) (emphasis added); *see also* Appx1775 (1403:6-14) ("The

patent system wasn't created to print patents. It wasn't created to generate lawsuits.

It was created to advance science and technology.").

Amazon's impassioned and prejudicial plea appealed to the jury's patriotic duty to view a verdict in Amazon's favor as being in the best interest of the United States against a foreign threat, who it characterized as improperly pursuing continuation patent applications and misusing the patent system, warrants a new trial.  Amazon advanced "us versus them" arguments that biased the jury.  It is well-established that Amazon's tactic is impermissible and warrants a new trial, since verdicts "influenced by passion and prejudice are the antithesis of a fair trial."  *Whitehead*, 163 F.3d at 276-77 (ordering new trial when counsel appealed to emotion and local bias).  "This us-against-them plea can have no appeal other than to prejudice by pitting 'the community' against a nonresident corporation. Such argument is an improper distraction from the jury's sworn duty to reach a fair, honest and just verdict according to the facts and evidence presented at trial." *Westbrook,* 754 F.2d at 1238; *see also Hall*, 735 F.2d at 962; *Irvan*, 780 F.2d at 1231 (verdict demonstrated that improper comments substantially influenced the jury's verdict, and thus were not harmless).

Further, comments meant to appeal to "community conscience" by "pitting 'the community' against a nonresident corporation" are plainly improper. *Westbrook*, 754 F.2d at 1238.  An improper "community conscience" plea is not limited to "specific words; it extends to all impassioned and prejudicial pleas intended to evoke a sense of community loyalty, duty and expectation.  Such

appeals serve no proper purpose and carry the potential of substantial injustice when invoked against outsiders." *Id*. at 1238-39. Amazon repeatedly made improper pleas that it ultimately cemented and tied together during closing arguments. In other words, Amazon exacerbated its tactic of pitting the community against a foreign company—which alone is improper and warrants a new trial.

The district court's failure to regulate Amazon's improper and prejudicial tactics resulted in Amazon successfully prejudicing the jury against Freshub. *Magnivision*, 115 F.3d at 961 ("The obligation of the trial judge to act as 'gatekeeper' is founded on the potential for prejudice.") (citation omitted). Indeed, Amazon used every device available to them—demonstratives, opening arguments, cross and direct examinations, and closing arguments—to drill its improper theme into the jurors' understanding of the case. Collectively, Amazon's tactics, in violation of the evidence rules, had an overwhelming impact that succeeded in nullifying the jury. *Id.* ("Rule 403 in the Notes defines 'unfair prejudice' as 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'").

Maintaining the jury's nullified verdict on infringement would allow the manifest injustice, imposed upon Freshub by the district court's decision denying Freshub's motion *in limine*, to stand. Thus, this Court should find that the district

court abused its discretion in denying Freshub's motion *in limine* regarding the

timing of the continuation applications and motion for new trial.

## CONCLUSION

For at least the foregoing reasons, Freshub respectfully requests that this

Court reverse the jury's finding of non-infringement as to the '153 Patent.

Alternatively, the Court should remand for a partial new trial on infringement of

the Asserted Patents and damages.

Respectfully submitted,

Dated: May 24, 2022          By:  */s/ Paul J. Andre*
                                  Paul J. Andre
                                  Lisa Kobialka
                                  James Hannah
                                  Kramer Levin Naftalis
                                   & Frankel LLP
                                  990 Marsh Road
                                  Menlo Park, CA 94025
                                  Tel: (650)752-1700
                                  pandre@kramerlevin.com
                                  lkobialka@kramerlevin.com
                                  jhannah@kramerlevin.com

                                  *Attorneys for Plaintiffs-Appellants*,
                                  FRESHUB, INC. and FRESHUB, LTD.

# ADDENDUM – TABLE OF CONTENTS

| Date | Dkt. No. | Document Description | Appx No. |
|------|----------|---------------------|----------|
| 07/13/2021 | 268 | Final Judgment (Entered: 07/15/2021) | Appx1 |
| 06/13/2021 | 222 | Order Regarding Motions in *Limine* | Appx3 |
| 06/22/2021 | 253 | Jury Verdict | Appx6 |
| 07/30/2021 | 271 | Findings of Fact and Conclusions of Law Regarding the Inequitable Conduct Issue (VACATED) | Appx15 |
| 08/03/2021 | 272 | Memorandum Opinion and Order Granting Plaintiffs' Motion for Judgment on Partial Findings | Appx25 |
| 08/09/2021 | 274 | Order Vacating Dkt. 271 Findings of Fact and Conclusions of Law | Appx39 |
| 12/17/2021 | 297 | Memorandum Opinion and Order – Plaintiffs' Motion for Judgment as Matter of Law and Motion for New Trial | Appx40 |
| | | U.S. Patent 9,908,153 (JTX-1) | Appx52 |
| | | U.S. Patent 10,213,810 (JTX-2) | Appx70 |
| | | U.S. Patent 10,232,408 (JTX-3) | Appx90 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| **FRESHUB, INC.,  FRESHUB, LTD.,**<br>*Plaintiffs* | § <br> § <br> § | |
| **-vs-** | § <br> § <br> § | **6:21-CV-00511-ADA** |
| **AMAZON.COM INC.,  PRIME NOW, LLC,<br>WHOLE FOODS MARKET INC.,  WHOLE<br>FOODS MARKET SERVICES, INC.,<br>AMAZON.COM SERVICES LLC,**<br>*Defendants* | § <br> § <br> § <br> § | |

## JUDGMENT

This action came before the Court for a trial by jury commencing on June 14, 2021 between Plaintiffs Freshub, Inc. and Freshub, Ltd. (collectively, "Freshub") and Defendants Amazon.com, Inc., Amazon.com Services LLC, Prime Now, LLC, and Whole Foods Market Services, Inc. (collectively, "Amazon"). The issues have been tried and the jury rendered its verdict on June 22, 2021 (Dkt #254). In accordance with the jury verdict, it is hereby ORDERED and AJUDGED that:

1. Claims 1 and 6 of U.S. Patent No. 9,908,153 ("the '153 Patent") are not infringed by Amazon;

2. Claim 1 of U.S. Patent No. 10,213,810 ("the '810 Patent") is not infringed by Amazon;

3. Claims 20 and 30 of U.S. Patent No. 10,232,408 ("the '408 Patent") are not infringed my Amazon;

4. Claims 1 and 6 of the '153 patent are not invalid;

5. Claim 1 of the '810 Patent is not invalid;

6. Claims 20 and 30 of the '408 Patent are not invalid; and

**Appx1**

7.  No damages are awarded to Freshub.

SIGNED this 13th day of July, 2021.

_____
ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| FRESHUB, INC., a Delaware Corporation, and FRESHUB, LTD., an Israeli Limited Liability Company, | § § § | |
| | § | Case No.: 6:21-CV-00511-ADA |
| Plaintiffs, | § § | |
| | § | |
| vs. | § § | |
| | § | |
| AMAZON.COM INC., a Delaware Corporation, AMAZON DIGITAL SERVICES, LLC, a Delaware Limited Liability Company, PRIME NOW, LLC, a Delaware Limited Liability Company WHOLE FOODS MARKET SERVICES, INC., a Texas Corporation, | § § § § § § § § | |
| | § | |
| Defendants. | § § § | |
| | § | |

## ORDER REGARDING MOTIONS *IN LIMINE*

Before the Court are Plaintiffs' Motions *in Limine* (ECF Nos. 180, 181) and Defendants' Motions *in Limine* (ECF No. 178). Having reviewed the motions, the submissions related thereto, and the arguments of counsel, and for good cause shown, the Motions *in Limine* are resolved as follows:

| | |
|---|---|
| Freshub's MIL 1.1 (Non-Infringing Alternatives and Design-Arounds) | Granted. |
| Freshub's MIL 1.2 (Discussion of Defendants' Patents) | Denied, but Amazon cannot argue they do not infringe because they have patents. |
| Freshub's MIL 1.3 (Freshub's Experts' Prior Retentions with Counsel and Prior Court Rulings or Verdicts Involving Freshub's Experts' Opinions in Other Litigations) | Denied as to prior retentions with counsel; parties must approach before asking about prior Court rulings. |
| Freshub's MIL 1.4 (Defendants' "Keyword Sales" Category of GMS Data, or Any | Granted.  Parties must approach before there are questions put to an expert that may elicit |

| Description or Summary Thereof) | testimony regarding keyword sales. |
|---|---|
| Freshub's MIL 2.1 (Defendants' Alleged Inequitable Conduct Defense) | Granted. But if there is an independent reason that evidence relevant to inequitable conduct would come in (*e.g.*, it goes to an argument regarding written description), such evidence is not excluded. |
| Freshub's MIL 2.2 (Reference to Absence of Testimony from Non-Party Named Inventors) | Granted in part as to 3 inventors in Brazil. Denied with respect to Mr. Douer. |
| Freshub's MIL 2.3 (Freshub's Filing Date of the Continuation Applications) | Denied. |
| Freshub's MIL 2.4 (Characterization of the Asserted Patents as "Refrigerator" Patents) | Defendants agree not to refer to Asserted Patents as Refrigerator Patents; Denied as to parent '344 patent and '291 application. |
| Defendants' MIL 1 (Amazon's Total Profits) | Granted, except that if Defendants open the door via testimony from Mr. Bakewell that Amazon is not profitable or loses money on the devices or the like, Freshub can cross as to total profits and/or overall financial success and/or re-call Mr. Reading to address any such testimony by Mr. Bakewell. |
| Defendants' MIL 2 (Reference to Stealing or Trespass by Defendants) | Granted as to "stealing;" Denied as to "Trespass." |
| Defendants' MIL 3 (Reference to non-instituted IPRs) | Granted. |
| Defendants' MIL 4 (Reference to Alexa Privacy Issues, or Any Suggestion that Amazon is Recording or Spying on Its Customers) | Granted. |
| Defendants' MIL 5 (Dr. Cole's Irrelevant Opinion Regarding Alexa's Recording of User Utterances) | Moot based on Court's resolution of *Daubert* motion. |
| Defendants' MIL 6 (Reference to Whole Foods, Including Any Pre-Suit Meetings Between Plaintiffs/Ikan and Whole Foods) | Reserved. |
| Defendants' MIL 7 (Relative Size of the Parties) | Denied. But the parties are to refrain from unnecessary insinuation regarding relative size of the parties beyond what is necessary to provide context for the hypothetical negotiation (*e.g.*, no discussion of Amazon's ability to pay for lawyers). |

**Appx4**

| Defendants' MIL 8 (Reference to Presumption of Patent Validity) | Denied. |
|---|---|

SIGNED this 13th day of June, 2021.

_____
ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE

**Appx5**

**FILED**

June 22, 2021

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____BW_____

DEPUTY

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

FRESHUB, INC. and FRESHUB, LTD.,

        Plaintiffs,

    v.

AMAZON.COM, INC., a Delaware Corporation,
AMAZON.COM SERVICES LLC, a Delaware
Limited Liability Company, PRIME NOW, LLC, a
Delaware Limited Liability Company, and WHOLE
FOODS MARKET SERVICES, INC., a Texas
Corporation,

        Defendants.

Case No. 6:21-cv-00511-ADA

**VERDICT FORM**

In answering the following questions, you are to follow the instructions I have given you in the Court's jury charge. Your answers to each question must be unanimous. Some of the questions contain legal terms that are defined and explained in detail in the Final Jury Instructions. You should refer to and consider the Final Jury Instructions as you answer these questions in the verdict Form.

**You can deliberate on and answer Questions 1 through 3 in any order as long as the decision is unanimous.**

**Please do not answer Questions 4 and 5 unless the instructions for the questions have been met.**

## QUESTION 1: INFRINGEMENT

Has Freshub proven, by a preponderance of the evidence, that Amazon infringed the following claims of the asserted patents?

*Answer "Yes" or "No" for each claim.*

*"Yes" is a finding for **Freshub**.   "No" is a finding for **Amazon**.*

**'153 Patent**

          Claim 1:     YES____     NO ✗

          Claim 6:     YES____     NO ✗

**'810 Patent**

          Claim 1:     YES____     NO ✗

**'408 Patent**

          Claim 20:     YES____     NO ✗

          Claim 30:     YES____     NO ✗

**Please proceed to the next question**.

3

## QUESTION 2: INVALIDITY

Did Amazon prove, by clear and convincing evidence, that the following claims of the asserted patents are invalid?


*Answer "Yes" or "No" for each claim.*

*"Yes" is a finding for **Amazon**.  "No" is a finding for **Freshub**.*


**'153 Patent**

        Claim 1:      YES____      NO__✕__

        Claim 6:      YES____      NO__✕__

**'810 Patent**

        Claim 1:      YES____      NO__✕__

**'408 Patent**

        Claim 20:      YES____      NO__✕__

        Claim 30:      YES____      NO__✕__


**Please proceed to the next question.**

4

## QUESTION 3: PATENT ELIGIBILITY

Did Amazon prove by clear and convincing evidence that, from the perspective of one of ordinary skill in the art, the following claims of the asserted patents only involved activities that were well-understood, routine, and conventional as of December 12, 2005?

*Answer "Yes" or "No" for each claim.*

*"Yes" is a finding for **Amazon**.  "No" is a finding for **Freshub**.*

### '153 Patent

        Claim 1:       YES____     NO____

        Claim 6:       YES____     NO____

### '810 Patent

        Claim 1:       YES____     NO____

### '408 Patent

        Claim 20:     YES____     NO____

        Claim 30:     YES____     NO____

**Please proceed to the next page.**

5

**Appx10**

**If you have reached this point in the verdict form, you should have answered Questions 1 through 3.  If you have not answered Questions 1 through 3, please go back and answer them before proceeding.**

**You should only proceed to answer Questions 4 and 5 if you (1) answered "YES" for any claims in Question 1, and (2) you answered "NO" for those same claims in Question 2.**

**If you answered "NO" for all parts in Questions 1, OR if you answered "YES" for all parts of Questions 2, then do not answer any further questions.  Proceed to the last page, have your Jury Foreperson sign and date this Verdict Form, and then deliver it to the Court Security Officer.  You should not pay attention to any other instructions between this point and the signature page found at the end of this verdict form.**

6

**Appx11**

## QUESTION 4a: DAMAGES

What sum of money, if paid in cash today, do you find Freshub has proven it is entitled to?

$_____

## QUESTION 4b: DAMAGES

Did you calculate this number based on a running royalty or a one-time lump sum (please check only one)?

\_\_\_ Running Royalty

**OR**

\_\_\_ Lump sum

**Please proceed to the next page.**

7

## QUESTION 5: WILLFULNESS

If you found any patent infringed and not invalid, did Freshub prove, by a preponderance of the evidence, that Amazon's infringement of that patent was willful?

*Answer "Yes" or "No" for each claim.*

*"Yes" is a finding for **Freshub** "No" is a finding for **Amazon**.*

**'153 Patent**:   YES_____   NO_____

**'408 Patent**:   YES_____   NO_____

**'810 Patent**:   YES_____   NO_____

**Please proceed to the Final Page of the Verdict Form.**

8

**FINAL PAGE OF THE JURY VERDICT**

You have now reached the end of the Verdict Form and should review it to ensure it accurately reflects your unanimous determinations. The jury foreperson should then sign and date the Verdict Form in the spaces below. Once this is done, notify the Court Security Officer that you have reached a verdict. The jury foreperson should keep the Verdict Form and bring it when the jury is brought back to the court room.

Signed this ___22___ day of ___June_____, 2021.

Jury Foreperson ██████████████████

9

**Appx14**

**IN UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| FRESHUB, INC.,  FRESHUB, LTD.,<br>　　　　*Plaintiffs*<br><br>-vs-<br><br>AMAZON.COM INC.,  PRIME NOW, LLC,<br>WHOLE FOODS MARKET INC.,  WHOLE<br>FOODS MARKET SERVICES, INC.,<br>AMAZON.COM SERVICES LLC,<br>　　　　*Defendants* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | 6:21-CV-00511-ADA |

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW**
<u>**REGARDING THE INEQUITABLE CONDUCT ISSUE**</u>

**INTRODUCTION**

Plaintiffs Freshub, Inc. and Freshub, Ltd. (collectively, "Freshub") asserted four related

patents against Defendants Amazon.com, Inc., Amazon.com Services LLC, Prime Now, LLC,

and Whole Foods Market Services, Inc. (collectively, "Amazon"): U.S. Patent Nos. 9,908,153

("the '153 patent"), 10,213,810 ("the '810 patent"), 10,232,408 ("the '408 patent"), and

10,239,094 ("the '094 patent") (collectively, the "asserted patents"). The asserted patents are all

issued from a common parent application No. 11/301,291 ("the '291 application"), which was

originally assigned to Ikan Technologies, Inc. ("Ikan").

The '291 application was abandoned in January 2012 for failure to respond to a Final

Office Action issued by the U.S. Patent and Trademark Office ("Patent Office"). Five years later,

in January 2017, Ikan petitioned the Patent Office to revive the '291 application. The Patent

Office subsequently granted Ikan's petition and revived the '291 application, which was later

issued as the parent of the asserted patents. As part of its defenses, Amazon contends that the

asserted patents are unenforceable due to inequitable conduct on the part of Ikan, because Ikan made a material misrepresentation to the Patent Office in its petition to revive the '291 application. The Court decided to hold a bench trial for the inequitable conduct issue and a jury trial for all other disputes between the parties.

Jury trial for this case started on June 14, 2021 in the Waco courthouse. On June 21, 2021, after sending the jury to the jury room to deliberate, the Court asked the parties about their witnesses for the bench trial regarding the inequitable conduct issue. The parties represented that they were only going to play the deposition of Mr. David Weiss, the patent attorney who handled the prosecution and revival of the'291 application. *See* Dkt. 244 (6/21/2021 Trial Transcript) at 1442:25-1443:22. The parties did not object to the proposal that the Court review the recording of Mr. Weiss's deposition in private instead of in open court. *Id*. The parties provided the recording of Mr. Weiss's deposition to the Court right afterwards, and the Court duly reviewed the deposition the same day. Also on June 21, 2021, Amazon filed a Notice re Evidence for Bench Trial on Inequitable Conduct (Dkt. 243) and offered the following evidence to prove its case regarding inequitable conduct:

- January 27, 2021 Designated Deposition Testimony of David Weiss (Dkt. 243-1, 243-2);

- Defendants' trial exhibit D0288, Log of Documents Withheld or Redacted for Privilege by Mr. Weiss's law firm – Knobbe, Martens, Olsen & Bear LLP (Dkt. 243-3);

- Defendants' trial exhibit D0291, Final Rejection – U.S. Patent Application 11/301,291 (U.S. 9,821,344 file history) Office Action, dated June 6, 2011 (Dkt. 243-4);

- Defendants' trial exhibit D0292, Notice of Abandonment – U.S. Patent
  Application 11/301,291 (U.S. 9,821,344 file history), dated Jan. 3, 2012 (Dkt.
  243-5);

- Defendants' trial exhibit D0293, Ikan Technologies Inc. Patent Assignment,
  dated December 4, 2012 (Dkt. 243-6);

- Defendants' trial exhibit D0296, Decision on Petition for Revival – U.S. Patent
  Application 11/301,291 (U.S. 9,821,344 file history), dated April 20, 2017 (Dkt.
  243-7); and

- Defendants' trial exhibit D0490, Petition for Revival of an Application for
  Patent Abandoned Unintentionally Under 37 CFR 1.137(a) – U.S. Patent
  Application 11/301,291 (U.S. 9,821,344 file history), dated January 20, 2107
  (Dkt. 243-8).

Based on the evidence of record, the Court hereby enters the following findings of facts
and conclusions of law.

## FINDINGS OF FACT

1.    The asserted patents share a specification and title, and claim priority to a
common parent, U.S. Patent No. 9,821,344 ("the '344 patent"). (Defendants' trial exhibit
D0002.)

2.    Ikan filed the application that matured into the '344 patent, No. 11/301,291 ("the
'291 application"), on December 12, 2005. (D0002.)

3.    The Patent Office published the '291 application on August 10, 2006.  (D0002.)

4.    The Patent Office issued a Final Office Action rejecting the claims of the '291
application on June 6, 2011. (Dkt. 243-4 (D0291); Dkt. 243-1 at 84:23-85:10.)

5.     David Weiss of Knobbe, Martens, Olsen & Bear LLP was the patent prosecuting attorney for Ikan for the '291 application.

6.     Mr. Weiss received the June 6, 2011 Final Rejection, and testified that it was the type of material he would normally forward to his client. (Dkt. 243-4 (D0291); Dkt. 243-1 at 84:23-85:10, 86:9-86:15.)

7.     Ikan did not respond by the deadline to continue prosecution.  (Dkt. 243-5 (D0292); Dkt. 243-4 (D0291); Dkt. 243-1 at 92:18-92:20.)

8.     After six months, on January 3, 2012, the Patent Office sent a Notice of Abandonment.  (Dkt. 243-5 (D0292); Dkt. 243-1 at 91:15-92:17.)

9.     Mr. Weiss received the Notice of Abandonment, and testified that it was the type of material he would normally forward to his client.  (Dkt. 243-5 (D0292); Dkt. 243-1 at 91:15-92:17, 94:13-16, 94:18.)

10.     Ikan and Mr. Weiss took no action in response to the Notice of Abandonment and allowed the '291 application to go abandoned.  (Dkt. 243-1 at 92:18-20.)

11.     On December 4, 2012, Ikan transferred its patent rights to a different Ikan entity, Ikan Holdings LLC, in an assignment eventually recorded at the Patent Office.  (Dkt. 243-6 (D0293); Dkt. 243-1 at 101:25-102:5.)

12.     Mr. Weiss prepared the assignment document. Sony (Sion) Douer, Ikan's principal and a named inventor on the '291 application, represented both entities in the transaction and signed the document before a notary on behalf of Ikan Technologies Inc.  (Dkt. 243-6 (D0293); Dkt. 243-1 at 103:23-105:1, 103:3-19.)

13.    The assignment included lists of issued patents and pending applications, as well as a list of "Inactive/Abandoned/Expired" applications. The '291 application is listed as "Inactive/Abandoned/Expired." (Dkt. 243-6 (D0293); Dkt. 243-1 at 103:23-105:1.)

14.    The '291 application remained abandoned for about five years. (Dkt. 243-8 (D0490); Dkt. 243-1 at 110:14-111:2.)

15.    Ikan petitioned the Patent Office to revive the '291 application on January 20, 2017.  (Dkt. 243-8 (D0490); Dkt. 243-1 at 115:6-115-15, 122:2-12.)

16.    Mr. Weiss prepared the petition for Ikan and was aware when he filed the petition that Ikan had abandoned the '291 application for over five years.  (Dkt. 243-8 (D0490); Dkt. 243-1 at 105:11-18, 115:6-15.)

17.    Mr. Weiss knew that the Patent Office would not revive the application unless he swore that the entire period of the abandonment of the '291 application was unintentional.  (Dkt. 243-1 at 118:19-119:4.)

18.    The same day that Mr. Weiss filed the petition to revive, he also recorded the assignment document that Mr. Douer signed in December 2012, wherein Ikan had acknowledged that it had abandoned the '291 application. (PTX-629, Dkt. 243-1 at 105:11-18, 108:25-109:1, 109:3-4, 109:18-110:6, 118:19-119:4.)

19.    In the petition to revive, Mr. Weiss made a sworn statement that the entire five-year delay in responding to the Patent Office's last rejection of the application was "unintentional."  (Dkt. 243-8 (D0490); Dkt. 243-1 at 118:19-119:4.)

20.    Mr. Weiss knew that the rules required him to investigate the abandonment before requesting revival of the '291 application.  (Dkt. 243-8 (D0490); Dkt. 243-1 at 128:13-16.)

21.    Mr. Weiss could not identify specific actions he took to investigate the abandonment of the '291 application other than looking at his firm's docketing system. (Dkt. 243-1 at 128:13-16, 135:19-23; 136:6-8; 137:17-19, 138:22-23.)

22.    The Patent Office considered Ikan's January 20, 2017 petition to revive the '291 application and granted Ikan's petition on April 20, 2017.

23.    In its decision granting Ikan's revival petition for the '291 application, the Patent Office stated:

> This application has been abandoned for an extended period of time. The U.S. Patent and Trademark Office is relying on petitioner's duty of candor and good faith and accepting the statement that "the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition pursuant to 37 CFR 1.137 was unintentional."

(Dkt. 243-7 (D0296); Dkt. 243-1 at 122:2-123:1, 125:3-125:12, 125:17-23.)

24.    The Patent Office also noted that the applicant is "obligated under 37 CFR 11.18 to inquire into the underlying facts and circumstances when providing the statement required by 37 CFR 1.137." (Dkt. 243-7 (D0296); Dkt. 243-1 at 127:14-127:20.)

## CONCLUSIONS OF LAW

1.    "To prove inequitable conduct, the challenger must show by clear and convincing evidence that the patent applicant (1) misrepresented or omitted information material to patentability, and (2) did so with specific intent to mislead or deceive the PTO." *In re Rosuvastatin Calcium Patent Litig.*, 703 F.3d 511, 519 (Fed. Cir. 2012); *see also Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011).

2.    "Inequitable conduct may involve actions by both 'the patentee and the attorney who prosecuted the application that resulted in the patent-in-suit, because the knowledge and actions of applicant's attorney are chargeable to [the] applicant.'" *Barry v. Medtronic, Inc*., 245

F. Supp. 3d 793, 801 (E.D. Tex. 2017), *aff'd*, 914 F.3d 1310 (Fed. Cir. 2019), *cert. denied*, 140 S. Ct. 869 (2020) (citation omitted); *see also Molins PLC v. Textron, Inc*., 48 F.3d 1172, 1178 (Fed. Cir. 1995); *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 n.8 (Fed. Cir. 1987); *Regeneron Pharm., Inc. v. Merus N.V.,* 864 F.3d 1343, 1346 (Fed. Cir. 2017) (affirming district court's finding of inequitable conduct as to client based on patent prosecutor's withholding of material references); *see also TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1304 (Fed. Cir. 2016) (affirming district court's finding of inequitable conduct based on inventor and attorney both withholding of prior art during prosecution).

### A.   Materiality

3.     "To establish materiality, it must be shown that the [Patent Office] would not have allowed the claim but for the nondisclosure or misrepresentation."  *Rosuvastatin*, 703 F.3d at 519.

4.     The Patent Office will not revive an intentionally abandoned application.   37 C.F.R. § 1.137(a).

5.     A misrepresentation of the applicant's intentional abandonment of an application is therefore material to the Patent Office's determination of whether to revive it.   *In re Rembrandt Techs. LP Patent Litig*., 899 F.3d 1254, 1273 (Fed. Cir. 2018).

6.     The Patent Office would not have agreed to revive the '291 application had it not been for Mr. Weiss's sworn representation on behalf of Ikan that the entire period of abandonment was unintentional and as such the statement is material to patentability.

7.     The Patent Office itself also expressly stated that it was relying on Ikan's statement of unintentional abandonment to grant the petition to revive, confirming that the statement is material.

### B.    Misrepresentation

8.    "Where the applicant deliberately permits an application to become abandoned (e.g., due to a conclusion that the claims are unpatentable, that a rejection in an Office action cannot be overcome, or that the invention lacks sufficient commercial value to justify continued prosecution), the abandonment of such application is considered to be a deliberately chosen course of action, and the resulting delay cannot be considered as 'unintentional' . . . ." M.P.E.P. § 711.03(c), (II)(C)(1).

9.    Abandonment "is not rendered unintentional when, upon reconsideration, the applicant changes his or her mind as to the course of action that should have been taken." M.P.E.P. § 711.03(c), (II)(C)(1).

10.    Delaying revival "by a deliberately chosen course of action, until the industry or a competitor shows an interest in the invention is the antithesis of an 'unintentional' delay." *Id.*, (II)(D).

### C.    Intent to Deceive

11.    If the Court finds that there was no material misrepresentation, the Court needs not consider intent to deceive. *Scanner Techs. Corp. v. ICOS Visim Sys. Corp.*, 528 F.3d 1365, 1375-76 (Fed. Cir. 2008).

12.    "Intent and materiality are separate requirements." *Therasense,* 649 F.3d at 1290 (citation omitted). "A district court should not use a 'sliding scale,' where a weak showing of intent may be found sufficient based on a strong showing of materiality, and vice versa. Moreover, a district court may not infer intent solely from materiality." *Id.*

13.    Proof of intent requires clear and convincing evidence that "the specific intent to deceive must be the single most reasonable inference able to be drawn from the evidence." *Id.*; *see also Rembrandt*, 899 F.3d at 1272-73 (A patentee's actions "constitute material

misrepresentation with intent to deceive" when the "intent to deceive the PTO [is] the single most reasonable inference able to be drawn from the evidence." (citation omitted)).

14.     If "several reasonable inferences, all just as likely as the inference [of intent to deceive]" can be supported by the evidence, then a finding of no inequitable conduct is appropriate. *ROY-G-BIV Corp. v. ABB, Ltd.*, 63 F. Supp. 3d 690, 695 (E.D. Tex. 2014) (finding no inequitable conduct where the evidence provided for "several reasonable inferences, all just as likely as the inference [of intent to deceive]"); *see also Therasense*, 649 F.3d at 1290-91 (if more than one reasonable inference can be drawn from the facts, there can be no finding of intent to deceive).

15.     "[T]he 'patentee need not offer any good faith explanation unless the accused infringer first ... prove[s] a threshold level of intent to deceive by clear and convincing evidence' … The absence of a good faith explanation for withholding a material reference does not, by itself, prove intent to deceive." *Therasense,* 649 F.3d at 1291 (quoting *Star Scientific Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1368 (Fed. Cir. 2008)).

16.     "Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence." *Therasense*, 649 F.3d at 1290; *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1345 (Fed. Cir. 2007).

17.     "A finding that the misrepresentation or omission amounts to gross negligence or negligence under a 'should have known' standard does not satisfy this intent requirement." *Therasense,* 649 F.3d at 1290 (citation omitted).

**D.     Doctrine of Infectious Unenforceability**

18.     Inequitable conduct in the prosecution of a patent may render unenforceable other related patents if there is an "immediate and necessary relation" between the misrepresentation and granting of the related patents. *Hoffmann-La Roche, Inc. v. Promega Corp*, 319 F. Supp. 2d

1011, 1017 (N.D. Cal. 2004) (citing *Consol. Aluminum Corp. v. Foseco Int'l Ltd*., 910 F.2d 804, 810 (Fed. Cir. 1990)).

19.    Inequitable conduct in the prosecution of a parent application may have an "immediate and necessary relation" to the prosecution of a continuation application based on that parent. *Consol. Aluminum Corp. v. Foseco Int'l, Ltd.*, 910 F.2d 804, 810 (Fed. Cir. 1990); *see also Agfa Corp. v. Creo Prods. Inc.*, 451 F.3d 1366, 1379 (Fed. Cir. 2006) (affirming ruling of unenforceability of continuation patent based on inequitable conduct with respect to parent patent); *Fox Indus. v. Structural Pres. Sys.*, 922 F.2d 801, 803-04 (Fed. Cir. 1990) ("[A] breach of the duty of candor early in the prosecution may render unenforceable all claims which eventually issue from the same or a related application.").

20.    However, "where the claims are subsequently separated from those tainted by inequitable conduct through a divisional application, and where the issued claims have no relation to the omitted prior art, the patent issued from the divisional application will not also be unenforceable due to inequitable conduct committed in the parent application." *Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1332 (Fed. Cir. 1998).

SIGNED this 30th day of July, 2021.

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| FRESHUB, INC., FRESHUB, LTD., | § | |
| *Plaintiffs* | § | |
| | § | 6:21-CV-00511-ADA |
| -vs- | § | |
| | § | |
| AMAZON.COM INC., PRIME NOW, LLC, | § | |
| WHOLE FOODS MARKET INC., WHOLE | § | |
| FOODS MARKET SERVICES, INC., | § | |
| AMAZON.COM SERVICES LLC, | § | |
| *Defendants* | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is Plaintiffs' Motion for Judgment on Partial Findings pursuant to Fed. R. Civ. P. 52(c). Dkt. 256. After considering the parties' briefs and applicable law, the Court **GRANTS** Plaintiffs' Motion.

## I.    BACKGROUND

Plaintiffs Freshub, Inc. and Freshub, Ltd. (collectively, "Freshub") filed this patent infringement lawsuit on June 24, 2019 against Defendants Amazon.com, Inc., Amazon.com Services LLC, Prime Now, LLC, and Whole Foods Market Services, Inc. (collectively, "Amazon"). Dkt. 1. Freshub alleges that Amazon has infringed U.S. Patent Nos. 9,908,153 ("the '153 patent"), 10,213,810 ("the '810 patent"), 10,232,408 ("the '408 patent"), and 10,239,094 ("the '094 patent") (collectively, the "asserted patents"). Dkts. 1 and 30. The asserted patents were all issued from a common parent application No. 11/301,291 ("the '291 application"), which was originally assigned to Ikan Technologies, Inc. and subsequently to a different Ikan entity, Ikan Holdings LLC (hereinafter, these two entities are collectively referred to as "Ikan" whenever it is clear from the context). *See* Dkt. 243-6.

The '291 application was abandoned in January 2012 for failure to respond to a Final Office Action issued by the U.S. Patent and Trademark Office ("PTO"). Dkt. 243-5. Five years later, on January 20, 2017, Ikan petitioned the PTO to revive the '291 application. Dkt. 243-8. On April 27, 2017, the PTO granted Ikan's petition to revive the '291 application, which was later issued as U.S. Patent No. 9,821,344 ("the '344 patent")—the parent of all four asserted patents. As part of its defenses, Amazon contends that the asserted patents are unenforceable due to inequitable conduct on the part of Ikan because Ikan made a material misrepresentation to the PTO in its petition to revive the '291 application. The Court decided to hold a bench trial for the inequitable conduct issue and a jury trial for all other disputes between the parties.

Jury trial for this case began on June 14, 2021 in the Waco courthouse, where only three (the '153, '810, and '408 patents) of the four originally asserted patents were tried before the jury. Dkt. 219 at 4. On June 21, 2021, after sending the jury to the jury room to deliberate, the Court asked the parties about their witnesses for the bench trial regarding the inequitable conduct issue. The parties represented that they were only going to play the recording of the deposition of Mr. David Weiss, the patent attorney who handled the prosecution and revival of the '291 application. *See* Dkt. 244 (6/21/2021 Trial Transcript) at 1442:25-1443:22. The parties did not object to the proposal that the Court review the recording of Mr. Weiss's deposition in private instead of in open court. *Id.* The parties provided the recording of Mr. Weiss's deposition to the Court right afterwards, and the Court duly reviewed the deposition on the same day. Also on June 21, 2021, Amazon filed a Notice re Evidence for Bench Trial on Inequitable Conduct (Dkt. 243) and offered the following evidence to prove its case regarding inequitable conduct:

- January 27, 2021 Designated Deposition Testimony of David Weiss (Dkt. 243-1, 243-2);

- Defendants' trial exhibit D0288, Log of Documents Withheld or Redacted for Privilege by Knobbe, Martens, Olsen & Bear LLP (Mr. Weiss's law firm) (Dkt. 243-3);

- Defendants' trial exhibit D0291, Final Rejection – U.S. Patent Application 11/301,291 (U.S. 9,821,344 file history) Office Action, dated June 6, 2011 (Dkt. 243-4);

- Defendants' trial exhibit D0292, Notice of Abandonment – U.S. Patent Application 11/301,291 (U.S. 9,821,344 file history), dated Jan. 3, 2012 (Dkt. 243-5);

- Defendants' trial exhibit D0293, Ikan Technologies Inc. Patent Assignment, dated December 4, 2012 (Dkt. 243-6);

- Defendants' trial exhibit D0296, PTO Decision on Petition for Revival – U.S. Patent Application 11/301,291 (U.S. 9,821,344 file history), dated April 20, 2017 (Dkt. 243-7); and

- Defendants' trial exhibit D0490, Petition for Revival of an Application for Patent Abandoned Unintentionally Under 37 CFR 1.137(a) – U.S. Patent Application 11/301,291 (U.S. 9,821,344 file history), dated January 20, 2107 (Dkt. 243-8).

On June 22, 2021, the jury reached a verdict, finding that the asserted claims of the '153, '810, and '408 patents were valid, but that Amazon did not infringed any of the asserted claims. Dkt. 253. The next day, Freshub filed the instant Motion for Judgment on Partial Findings regarding the inequitable conduct issue pursuant to Fed. R. Civ. P. 52(c). Dkt. 256. The Motion was subsequently fully briefed by the parties. *See* Dkts. 258 and 267.

## II.    LEGAL STANDARD

"If a party has been fully heard on an issue during a nonjury trial . . ., the court may enter judgment against the party on a claim or defense that . . . can be maintained or defeated only with a favorable finding on that issue." Fed. R. Civ. P. 52(c). "A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a)." *Id*. Such findings and conclusions may be incorporated in any opinion or memorandum of decision filed by the court. Fed. R. Civ. P. 52(a).

Rule 52(c) "does not require the district court to draw any inferences in favor of the non-moving party and permits the court to make a determination in accordance with its own view of the evidence." *Fairchild v. All Am. Check Cashing, Inc*., 815 F.3d 959, 964 n.1 (5th Cir. 2016) (quotation and citation omitted). However, a district court still must arrive at each of its factual determinations based on the applicable burden of proof. *In re Medrano*, 956 F.2d 101, 102 (5th Cir. 1992).

## III.    FINDINGS OF FACT

1.    The asserted patents share a specification and title, and claim priority to a common parent, U.S. Patent No. 9,821,344 ("the '344 patent"). (Defendants' trial exhibit D0002.)

2.    Ikan Technologies Inc. filed the application that matured into the '344 patent, No. 11/301,291 ("the '291 application"), on December 12, 2005. (D0002.)

3.    The PTO published the '291 application on August 10, 2006. (D0002.)

4.    The PTO issued a Final Office Action rejecting the claims of the '291 application on June 6, 2011. (Dkt. 243-4 (D0291); Dkt. 243-1 at 84:23-85:10.)

5.    David Weiss of Knobbe, Martens, Olson & Bear, LLP ("Knobbe") was the patent

prosecuting attorney for Ikan for the '291 application.

6.      Mr. Weiss received the June 6, 2011 Final Rejection and testified that it was the type of material he would normally forward to his client. (Dkt. 243-4 (D0291); Dkt. 243-1 at 84:23-85:10, 86:9-86:15.)

7.      Ikan did not respond by the deadline to continue prosecution. (Dkt. 243-5 (D0292); Dkt. 243-4 (D0291); Dkt. 243-1 at 92:18-92:20.)

8.      After six months, on January 3, 2012, the PTO sent a Notice of Abandonment. (Dkt. 243-5 (D0292); Dkt. 243-1 at 91:15-92:17.)

9.      Mr. Weiss received the Notice of Abandonment and testified that it was the type of material he would normally forward to his client. (Dkt. 243-5 (D0292); Dkt. 243-1 at 91:15-92:17, 94:13-16, 94:18.)

10.      Ikan and Mr. Weiss took no action in response to the Notice of Abandonment and allowed the '291 application to go abandoned. (Dkt. 243-1 at 92:18-20.)

11.      On December 4, 2012, Ikan transferred its patent rights to a different Ikan entity, Ikan Holdings LLC, in an assignment eventually recorded at the PTO. (Dkt. 243-6 (D0293); Dkt. 243-1 at 101:25-102:5.)

12.      Mr. Weiss prepared the assignment document. Sony (Sion) Douer, Ikan's principal and a named inventor on the '291 application, represented both entities in the transaction and signed the document before a notary on behalf of Ikan Technologies Inc. (Dkt. 243-6 (D0293); Dkt. 243-1 at 103:23-105:1, 103:3-19.)

13.      The assignment included lists of issued patents and pending applications, as well as a list of "Inactive/Abandoned/Expired" applications. The '291 application is listed as "Inactive/Abandoned/Expired." (Dkt. 243-6 (D0293); Dkt. 243-1 at 103:23-105:1.)

14.    The '291 application remained abandoned for about five years. (Dkt. 243-8 (D0490); Dkt. 243-1 at 110:14-111:2.)

15.    Ikan petitioned the PTO to revive the '291 application on January 20, 2017. (Dkt. 243-8 (D0490); Dkt. 243-1 at 115:6-115-15, 122:2-12.)

16.    Mr. Weiss prepared the petition for Ikan and was aware when he filed the petition that Ikan had abandoned the '291 application for over five years. (Dkt. 243-8 (D0490); Dkt. 243-1 at 105:11-18, 115:6-15.)

17.    Mr. Weiss knew that the PTO would not revive the application unless he swore that the entire period of the abandonment of the '291 application was unintentional. (Dkt. 243-1 at 118:19-119:4.)

18.    The same day that Mr. Weiss filed the petition to revive, he also recorded the assignment document that Mr. Douer signed in December 2012, wherein Ikan had acknowledged that it had abandoned the '291 application. (PTX-629, Dkt. 243-1 at 105:11-18, 108:25-109:1, 109:3-4, 109:18-110:6, 118:19-119:4.)

19.    In the petition to revive, Mr. Weiss made a sworn statement that the entire five-year delay in responding to the PTO's last rejection of the application was "unintentional." (Dkt. 243-8 (D0490); Dkt. 243-1 at 118:19-119:4.)

20.    Mr. Weiss knew that the rules required him to investigate the abandonment before requesting revival of the '291 application. (Dkt. 243-8 (D0490); Dkt. 243-1 at 128:13-16.)

21.    Mr. Weiss could not identify specific actions he took to investigate the abandonment of the '291 application other than looking at his firm's docketing system. (Dkt. 243-1 at 128:13-16, 135:19-23; 136:6-8; 137:17-19, 138:22-23.)

22.    The PTO considered Ikan's January 20, 2017 petition to revive the '291

application and granted Ikan's petition on April 20, 2017.

23.    In its decision granting Ikan's revival petition for the '291 application, the PTO stated:

> This application has been abandoned for an extended period of time. The U.S. Patent and Trademark Office is relying on petitioner's duty of candor and good faith and accepting the statement that "the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition pursuant to 37 CFR 1.137 was unintentional."

(Dkt. 243-7 (D0296); Dkt. 243-1 at 122:2-123:1, 125:3-125:12, 125:17-23.)

24.    The PTO also noted that the applicant is "obligated under 37 CFR 11.18 to inquire into the underlying facts and circumstances when providing the statement required by 37 CFR 1.137." (Dkt. 243-7 (D0296); Dkt. 243-1 at 127:14-127:20.)

## IV.    ANALYSIS

### A. Timeliness

Amazon contends that Freshub's motion under Rule 52(c) is untimely because "such motion must be made *during* the bench trial." Dkt. 258 at 1 (emphasis in original). However, Rule 52(c) itself does not impose a time limitation on when a motion can be filed as long as the motion is filed after the non-moving party "has been fully heard" on the issue. Fed. R. Civ. P. 52(c). Other than citing one single case from the Ninth Circuit, Amazon does not cite any controlling Fifth Circuit law to support its narrow interpretation of Rule 52(c). *See* Dkt. 258. Without any controlling law dictating otherwise, the Court does not interpret Rule 52(c) to impose any time limitation other than that the motion must be filed after the non-moving party "has been fully heard." To the extent that Rule 52(c) imposes any other time limitation, the Court does not find that Amazon is prejudiced by Freshub's motion, which was filed two days after

Amazon presented to the Court all its evidence for the bench trial of the inequitable conduct issue.

## B. Inequitable Conduct

"To prove inequitable conduct, the challenger must show by clear and convincing evidence that the patent applicant (1) misrepresented or omitted information material to patentability, and (2) did so with specific intent to mislead or deceive the PTO." *In re Rosuvastatin Calcium Patent Litig.*, 703 F.3d 511, 519 (Fed. Cir. 2012) (citing *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011) (en banc)).

"Inequitable conduct may involve actions by both 'the patentee and the attorney who prosecuted the application that resulted in the patent-in-suit, because the knowledge and actions of applicant's attorney are chargeable to [the] applicant.'" *Barry v. Medtronic, Inc*., 245 F. Supp. 3d 793, 801 (E.D. Tex. 2017), *aff'd*, 914 F.3d 1310 (Fed. Cir. 2019), *cert. denied*, 140 S. Ct. 869 (2020) (citation omitted); *see also Regeneron Pharm., Inc. v. Merus N.V.,* 864 F.3d 1343, 1346 (Fed. Cir. 2017) (affirming district court's finding of inequitable conduct as to client based on patent prosecutor's withholding of material references); *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1304 (Fed. Cir. 2016) (affirming district court's finding of inequitable conduct based on inventor and attorney both withholding prior art during prosecution).

### 1. Materiality

The first question is whether Ikan's statement that its five-year abandonment of the '291 application was "unintentional" was material to patentability. "To establish materiality, it must be shown that the [PTO] would not have allowed the claim but for the nondisclosure or misrepresentation." *Rosuvastatin*, 703 F.3d at 519. Since the PTO will not revive an intentionally abandoned application, a misrepresentation of the applicant's intentional abandonment of an

application is material to the PTO's determination of whether to revive it. *In re Rembrandt Techs. LP Patent Litig.*, 899 F.3d 1254, 1273 (Fed. Cir. 2018); 37 C.F.R. § 1.137(a).

In its decision granting Ikan's petition to revive the '291 application, the PTO expressly stated that it was "relying on petitioner's duty of candor and good faith and accepting the statement that 'the entire delay . . . was unintentional.'" Dkt. 243-7. The parties also do not dispute that the PTO would not have granted Ikan's revival petition but for Mr. Weiss's sworn statement that the entire period of abandonment was unintentional. Therefore, the Court finds that Ikan's statement of unintentional abandonment of the '291 application is material to patentability.

### 2.  *Misrepresentation*

"Where the applicant deliberately permits an application to become abandoned (e.g., due to a conclusion that the claims are unpatentable, that a rejection in an Office action cannot be overcome, or that the invention lacks sufficient commercial value to justify continued prosecution), the abandonment of such application is considered to be a deliberately chosen course of action, and the resulting delay cannot be considered as 'unintentional' . . . ." M.P.E.P. § 711.03(c), (II)(C)(1); *see also Rembrandt*, 899 F.3d at 1272-73. Delaying revival "by a deliberately chosen course of action, until the industry or a competitor shows an interest in the invention is the antithesis of an 'unintentional' delay." M.P.E.P. § 711.03(c), (II)(D).

Amazon, as the party alleging inequitable conduct, bears the burden to prove by clear and convincing evidence that Ikan made a misrepresentation to the PTO in prosecuting the '291 application. *See Therasense*, 649 F.3d at 1287. Amazon contends that Ikan's statement to the PTO that the abandonment of the '291 application was unintentional was false because it made a deliberate decision to abandon the '291 application. Dkt. 255 at 8. Amazon proffers the

following evidence to prove inequitable conduct: (1) the final rejection of the '291 application by the PTO dated June 6, 2011, (2) the notice of abandonment from the PTO dated January 3, 2012, (3) Ikan's petition to revive the '291 application dated January 20, 2107, (4) the PTO's decision granting Ikan's revival petition dated April 20, 2017, (5) the transcript of designated deposition testimony of Mr. Weiss took on January 27, 2021, (6) the privilege log by Mr. Weiss's law firm, and (7) Ikan's patent assignment agreement dated December 4, 2012 ("Assignment Agreement"). Dkt. 243. However, the Court finds that the evidence offered by Amazon does not prove by clear and convincing evidence that Ikan's statement to the PTO was false. Regarding documents (1)-(4) from the file history, other than showing that Mr. Weiss made a sworn statement to the PTO that the abandonment of the '291 application was unintentional, they do not demonstrate that the statement was false. Mr. Weiss's testimony and the Assignment Agreement both show that Mr. Weiss was aware that the '291 application was abandoned, and it can be inferred from the Assignment Agreement that Ikan's principal, Mr. Douer, may have also been aware of the abandonment. However, they do not amount to clear and convincing evidence that Ikan made a deliberate decision to abandon the '291 application. Finally, the privilege log, which only indicates the timing and recipients of communications between certain Ikan and Knobbe personnel, also does not show that Mr. Weiss's statement to the PTO was false. Given the lack of evidence and Amazon's high burden of proof, the Court finds that Amazon has not shown by clear and convincing evidence that Ikan made a misrepresentation to the PTO in reviving the '291 application.

### 3. Intent to Deceive

Since the Court finds that there was no material misrepresentation, it needs not consider intent to deceive. *See Scanner Techs. Corp. v. ICOS Vision Sys. Corp. N.V.*, 528 F.3d 1365, 1375

(Fed. Cir. 2008) ("[T]he first question to address is whether the statements in question are false. If not, materiality is lacking and there is no need to consider the intent prong of inequitable conduct."). However, for completeness of analysis, the Court finds below that Amazon also has not proved by clear and convincing evidence that Ikan possessed a specific intent to deceive the PTO in reviving the '291 application.

"Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence." *Therasense*, 649 F.3d at 1290. "However, to meet the clear and convincing evidence standard, the specific intent to deceive must be the single most reasonable inference able to be drawn from the evidence." *Id*. (quotation and citation omitted). "[W]hen there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found." *Id*. at 1290-91.

Here, Amazon does not provide any direct evidence that Ikan possessed a specific intent to deceive the PTO in reviving the '291 application. The indirect evidence provided by Amazon similarly fails to show a specific intent to deceive on Ikan's part is the "single most reasonable inference." Amazon's evidence shows that Mr. Weiss received the notice of abandonment from the PTO and that it was the type of material that Mr. Weiss would normally have forwarded to Ikan, but there is no evidence that Mr. Weiss actually forwarded the notice of abandonment to Ikan or that Ikan in fact received and reviewed the notice of abandonment. The only evidence Amazon offered is that the Knobbe privilege log has three entries showing that Mr. Weiss and his staff communicated with Ikan personnel in 2012 after the PTO issued the notice of abandonment on January 3, 2012. Dkt. 258 at 3. However, there is no evidence that Mr. Weiss or his staff in fact sent the notice of abandonment to Ikan during any of the 2012 communications. Similarly, although the '291 application was listed in the "Inactive/Abandoned/Expired"

category in the 2012 Assignment Agreement, which Mr. Douer signed, there is no direct evidence that Mr. Douer had personal knowledge about the status of the '291 application. This especially true given that the '291 application was listed among dozens of other patents and applications and Mr. Douer was not included in the 2012 communications between Mr. Weiss and Ikan personnel after the PTO's notice of abandonment. As such, the Court cannot say that the "single most reasonable inference" based on Amazon's evidence is that Ikan possessed a specific intent to deceive the PTO in reviving the '291 application.

Amazon further contends that (1) Mr. Weiss knew all along that the '291 application was abandoned, (2) knew that the PTO's rules required him to investigate the abandonment before filing the revival petition, and (3) could have checked his firm's record to confirm Ikan's intent regarding the abandonment, yet he did not perform such an investigation before making the sworn statement to the PTO that Ikan had abandoned the '291 application unintentionally. Dkt. 255 at 5; Dkt. 258 at 2-3. The Court agrees with Amazon that Mr. Weiss's knowledge and actions are chargeable to Ikan, which could result in a finding of inequitable conduct. *See, e.g., Barry*, 245 F. Supp. 3d at 801 ("[T]he knowledge and actions of applicant's attorney are chargeable to the applicant."). The Court also agrees with Freshub that, at the most, Amazon has shown that Mr. Weiss was negligent in his failure to conduct a thorough investigation to determine whether Ikan's abandonment of the '291 application was unintentional. However, "[a] finding that the misrepresentation or omission amounts to gross negligence or negligence under a 'should have known' standard does not satisfy this intent requirement," which requires a showing that "the applicant made a deliberate decision." *Therasense*, 649 F.3d at 1290 (citation omitted). Therefore, the Court concludes that Amazon has not proved the intent prong either.

### C.  Waiver of Privilege

Although this case involves patent infringement claims arising under federal law, the Federal Circuit applies regional circuit law to procedural questions that are not themselves substantive patent law issues. *See GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268, 1272 (Fed. Cir. 2001). The issue of waiver by the disclosure of privileged material does not involve substantive patent law issues and is therefore governed by Fifth Circuit law. *Id.* "[W]aiver . . . generally occurs only where the party holding the privilege seeks to gain some strategic advantage by disclosing favorable, privileged information, while holding back that which is unfavorable." *YETI Coolers, LLC v. RTIC Coolers, LLC*, No. A-15-CV-597-RP, 2016 WL 8677303, at *2 (W.D. Tex. Dec. 30, 2016) (citation omitted).

Amazon contends that Freshub waived its claimed privilege of the communications between Knobbe and Ikan personnel as identified in the Knobbe privilege log (Dkt. 243-3) because Freshub argued in its motion that "the Knobbe log introduced by Defendants actually support that Mr. Weiss properly investigated before filing the revival petition." Dkt. 258 at 1-2; Dkt. 256 at 9. However, Freshub has not asserted the *actual content* of the logged communications as evidence in this case. Rather, Freshub's argument relies upon the *timing* and *recipients* of the communications as stated in the log. The Court agrees with Freshub that pointing to non-privileged facts on the log itself in response to Amazon's arguments does not put the underlying communications at issue, and, therefore, does not result in a waiver of privilege. *See, e.g.*, *YETI Coolers*, 2016 WL 8677303, at *2 (finding no waiver of privilege where the privilege holder did not affirmatively disclose "favorable, privileged information" while holding back unfavorable privileged information) (citation omitted). There is no evidence that Freshub gained any strategic advantage by relying on the timing and recipients of the privileged

communications, which information Amazon has equal access to. Therefore, the Court finds that Freshub has not waived its claimed privilege to the communications identified in the Knobbe log.

## V.    CONCLUSION

For the foregoing reasons, the Court finds that Amazon has failed to show inequitable conduct on Ikan's part in reviving the '291 application because Amazon has not carried its burden to prove by clear and convincing evidence that Ikan made a material misrepresentation to the PTO or that Ikan possessed a specific intent to deceive the PTO. Therefore, the Court **GRANTS** Freshub's Motion for Judgment on Partial Findings.

SIGNED this 2nd day of August, 2021.

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| **FRESHUB, INC.,  FRESHUB, LTD.,** | § | |
| *Plaintiffs* | § | |
| | § | **6:21-CV-00511-ADA** |
| **-vs-** | § | |
| | § | |
| **AMAZON.COM INC.,  PRIME NOW, LLC,** | § | |
| **WHOLE FOODS MARKET INC.,  WHOLE** | § | |
| **FOODS MARKET SERVICES, INC.,** | § | |
| **AMAZON.COM SERVICES LLC,** | § | |
| *Defendants* | | |

**<u>ORDER</u>**

The Court hereby vacates its FINDINGS OF FACT AND CONCLUSIONS OF LAW

entered on July 30, 2021 (ECF No. 271), since it is rendered unnecessary by the Court's August

3, 2021 Order (ECF No. 272).


SIGNED this 9th day of August, 2021.


_____
ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

FRESHUB, INC.,  FRESHUB, LTD.,
      *Plaintiffs*

-vs-

AMAZON.COM INC.,  AMAZON DIGITAL
SERVICES, LLC,  PRIME NOW, LLC,  WHOLE
FOODS MARKET INC.,  WHOLE FOODS
MARKET SERVICES, INC.,  AMAZON.COM
SERVICES LLC,
      *Defendants*

§
§
§
§
§
§
§
§
§
§
§

6:21-CV-00511-ADA

## MEMORANDUM OPINION AND ORDER

Before the Court are Plaintiffs Freshub, Inc. and Freshub, Ltd's (collectively "Freshub")

Motion for Judgement as A Matter of Law under Fed. R. Civ. P. 50(b) and Motion for New Trial

on Infringement and Damages under Fed. R. Civ. P. 59(a). Dkt. 277. The Court heard the parties'

arguments on October 19, 2021. After careful considerations of the relevant facts, applicable law,

and the parties' oral arguments, the Court **DENIES** both of Freshub's Motions.

## I.        BACKGROUND

Plaintiff Freshub initiated this patent infringement action on June 24, 2019, against

Defendants Amazon.com Inc., Amazon.com Services, LLC, Prime Now LLC, (collectively,

"Amazon") and Whole Foods Market Services, Inc. ("Whole Foods") (together, "Defendants").

Freshub accuses Defendants of infringing claims 1 and 6 of U.S. Patent No. 9,908,153 ("the '153

Patent"), claim 1 of U.S. Patent No. 10,213,810 ("the '810 Patent"), and claims 20 and 30 of U.S.

Patent No. 10,232,408 ("the '408 Patent") (collectively, the "asserted patents").

Jury trial commenced on May 17, 2021. Dkt. 48. At the conclusion of a five-day trial, the

jury returned a verdict finding that all asserted claims are valid, but none of the asserted claims

were infringed by Defendants. Dkt. 254 (Jury Verdict Form). On August 11, 2021, Freshub filed

the instant motions (Dkt. 277), which were subsequently fully briefed (Dkt. 284, Opposition; Dkt.

291, Reply). The Court heard arguments regarding the motions on October 19, 2021 (Dkts. 295,

296).

## II.    MOTION FOR JUDGEMENT AS A MATTER OF LAW

### A.    Legal Standard

"Under Rule 50, a court should render judgment as a matter of law [(JMOL)] when . . .

there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that

issue." *Reeves v. Sanderson Plumbing Prod., Inc*., 530 U.S. 133, 149 (2000) (quoting Fed. R. Civ.

P. 50(a)(1)). "In the Fifth Circuit, JMOL is appropriate if the facts and inferences point so strongly

and overwhelmingly in favor of one party that a reasonable jury could not have concluded

otherwise." *Mettler-Toledo, Inc. v. B-Tek Scales, LLC*, 671 F.3d 1291, 1294 (Fed. Cir. 2012)

(citing *Armendariz v. Pinkerton Tobacco Co*., 58 F.3d 144, 148 (5th Cir.1995)). "There must be a

conflict in substantial evidence to create a jury question," which means that "a jury's determination

must be supported by substantial evidence." *Id*. (citations omitted). If "reasonable persons could

differ in their interpretations of the evidence, then the motion should be denied." *EEOC v. EmCare,

Inc*., 857 F.3d 678, 682 (5th Cir. 2017) (quoting *Bryant v. Compass Grp. USA Inc*., 413 F.3d 471,

475 (5th Cir. 2005)). A court must be "'especially deferential' to jury verdicts . . . unless the facts

and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors

could not reach a contrary conclusion.'" *Id*. at 683 (quoting *EEOC v. Boh Bros. Constr. Co*., 731

F.3d 444, 451 (5th Cir. 2013)).

Similar to a motion for summary judgment, when considering a motion for a judgment as

a matter of law a "court must draw all reasonable inferences in favor of the nonmoving party, and

2

**Appx41**

it may not make credibility determinations or weigh the evidence." *Reeves*, 530 U.S. at 150. "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id*. at 151. "That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached." *Id*. (quotation and citation omitted).

### B.    Discussion

Freshub moves for judgment as a matter of law under Fed. R. Civ. P. 50(b) that Defendants have infringed the asserted patents. As an initial matter, Freshub as the plaintiff bears the burden at trial to show that the accused devices practice every element of the asserted claims. 35 U.S.C. § 271(a); *see also Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc*., 631 F.3d 1279, 1284 (Fed. Cir. 2011). The absence of even a single limitation defeats a charge of infringement. *Gen. Am. Transp. Corp. v. Cryo-Trans, Inc*., 93 F.3d 766, 771 (Fed. Cir. 1996). "A determination of infringement is a question of fact that is reviewed for substantial evidence when tried to a jury." *ACCO Brands, Inc. v. ABA Locks Mfrs. Co*., 501 F.3d 1307, 1311 (Fed. Cir. 2007).

Freshub argues in its motion that the jury had substantial evidence of Defendants' infringement of the asserted patents. Dkt. 277 at 2–9. However, the correct standard is whether there is substantial evidence to support the jury's verdict of non-infringement. *Mettler-Toledo*, 671 F.3d at 1294 ("[A] jury's determination must be supported by substantial evidence."). The Court finds that Defendants presented substantial evidence during trial that at least some of the claim elements were not met by the accused products and therefore the jury's determination of non-infringement is supported by substantial evidence. Accordingly, the Court finds that Freshub's motion for judgment as a matter of law should be denied.

### 1. The "non-transitory memory" claim limitation ('153 cl. 1 and 6; '810 cl. 1; '408 cl.30)

Freshub asserts that Amazon's Echo, Fire TV, and Fire Tablet devices have infringed the asserted patents. Freshub's expert Dr. Medvidovic agreed that the claimed "non-transitory memory" is a physical structure, like a hard drive, and under his theory the server-side "non-transitory memory" is in those remote cloud servers that power the Alexa functionality. Dkt. 284 at 4. Defendants' expert Dr. Johnson testified at trial that the accused devices "do not include any parts of the server" and therefore do not infringe, but Freshub contends that it has always accused the consumer Alexa devices with the backend Alexa system of infringement. *Id*. at 4; Dkt. 291 at 3. The jury heard competing testimonies from experts from both sides, weighed their credibility, and eventually found for the Defendants. Drawing all reasonable inferences in favor of the Defendants, the nonmoving party, the Court finds that there is substantial evidence to support the jury's determination. *See Reeves*, 530 U.S. at 150 (When considering a motion for JMOL a "court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.").

Freshub contends that Defendants' first fact witness, Dr. Strom, admitted infringement of claim 1 of the '153 patent and produced a table comparing each element of that claim with Dr. Strom's testimony. Dkt. 277 at 5–6; Dkt. 291 at 1. However, when asked about the claim element "a first computer; non-transitory memory that stores instructions . . .," the evidence produced by Freshub only shows that Dr. Strom admitted that the Echo product "has memory" — he did not admit that the Echo product has ***non-transitory*** memory." *Id*. at 5. Similarly, regarding the claim element "a second computer; non-transitory memory that stores instructions . . .," the produced testimony only shows that Dr. Strom admitted that "they [the accused products] contain

memory"— not "non-transitory memory" as required by the claims. *Id.* at 6. Thus, the Court does not find that the evidence overwhelmingly favors Freshub.

### 2. The "identify an item corresponding to the text" claim limitation ('153 cl. 1, 6)

Claims 1 and 6 of the '153 patent require computer instructions to "identify an item corresponding to the text" translated from the "digitized order" and adding the item to a list. Defendants contend that the accused Alexa feature "does not infringe because users can only add ***words*** to their Alexa shopping list, not '***item[s]*** corresponding to' those words." Dkt. 284 at 7. Defendants point out that Dr. Medvidovic testified at trial that "if a user says: Alexa, add 'sad' to my shopping list, the word 'sad' will appear on the list," and John Love, Director of Alexa Shopping, testified that his six-year-old added the word "poopy poop" to their Alexa shopping list, but words "sad" and "poopy poop" are not an "item corresponding to the text" as the claims require. *Id*. Dr. Johnson also testified that the claims require the translated "text" and the "item corresponding to the text" to be separate. *Id.* at 7–8.

Freshub contends that Dr. Strom referred to the word "milk" on Alexa shopping list as an "item" on cross examination, and therefore admitted that the element was met. Dkt. 277 at 11. Defendants counter that Dr. Johnson testified that while it may be normal to say "milk is an item on my shopping list," the asserted patents use the word "item" to refer to what is identified from the translated text. Dkt. 284 at 8. Freshub asserts that Dr. Johnson applies a special meaning to the claim term "item" and his opinion was therefore "critically flawed because it was based on a legally improper construction." Dkt. 277 at 10. However, the Court did not provide any construction for the claim term "item" and Dr. Johnson applied the ordinary meaning of "item" based on his understanding of the term in view of its use in the patent. Thus, the Court does not see any critical

flaw in his opinion and the jury is free to judge the credibility of the witnesses and weigh their testimonies.

> ### 3. The "match[] . . . text . . . to a text description" ('408 cl. 20, 30) and "use the text . . . to identify an item corresponding to the text description" ('810 cl. 1) claim limitations

Freshub argues that these claims are infringed when users use Alexa to add products to a shopping cart. Dr. Medvidovic testified that Alexa's Intelligence Choice Engine ("ICE") uses the text translated from the automatic speech recognition ("ASR") to match or identify a text description associated with a unique product identifier. Dkt. 277 at 8; Dkt. 291 at 4. On the other hand, Dr. Johnson testified that these claims are not infringed because by the time Alexa uses ICE to search for potentially relevant products, the ASR text output is "long gone." Dkt. 284 at 9. Instead, ICE uses intents created by the natural language understanding ("NLU") component—not text from ASR—to search for an item. *Id.*

Further, Dr. Johnson testified that that if Alexa were to work in the same way as the claims, it would use the words in an utterance like "Alexa, I want to buy a PS4 game," to find a matching text description, but Alexa instead determines the meaning of the request, e.g., that the user wants a video game and that a PS4 is a type of game system, and then uses additional contextual information like popularity, purchase history, and delivery preferences to recommend a game. *Id.* at 10. Therefore, Alexa's recommendation may or may not include one or more words spoken by the user. *Id.* Similarly, Mr. Love, Director of Alexa Shopping, testified that "what you'll often find is the No. 1 ranked product has no relationship textually to the request." *Id.* As an example, he testified that a request for "best book" will result in a specific title—e.g. "Where Do the Crawdads Sing paperback," which is a "zero percent match" to the text. *Id.* And, "kid's aspirin" may result in "Motrin with acetaminophen" or "Tylenol," neither of which matches the text. *Id.* Mr. Love

further explained why matching text would not work for Alexa—it would result in an unmanageable list of far too many products based on the large number of items in Amazon's catalog, and it would also return less relevant products, such as a book literally called "best book" instead of a book awarded best book of the year. *Id.*

Again, the jury heard competing testimonies from witnesses from both sides, weighed the witnesses' credibility, and eventually found for Defendants. And there was substantial evidence to support the jury's determination. *See Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1263 (Fed. Cir. 2013) (affirming jury verdict as supported by substantial evidence despite competing testimony).

### 4.  *Doctrine of equivalence*

To assert infringement under the doctrine of equivalents ("DOE"), a plaintiff must prove either that the differences between the accused devices and claims are "insubstantial" or address "on a limitation-by-limitation basis" the function/way/result test for "each claim limitation." *Wavetronix LLC v. EIS Elec. Integrated Sys.*, 573 F.3d 1343, 1360 (Fed. Cir. 2009); *UCB, Inc. v. Watson Labs. Inc.*, 927 F.3d 1272, 1284 (Fed. Cir. 2019); *Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364, 1374 (Fed. Cir. 2014). Both approaches require "particularized testimony and linking argument." *Gemalto*, 754 F.3d at 1374.

Freshub contends that Defendants failed to address infringement under DOE for the '153 Patent. Dkt. 277 at 7. For its proof of infringement under DOE, Freshub states that Dr. Medvidovic explained how the "identify" element is met under DOE because the Accused Alexa Products "basically [] figure out which part of the user's utterance corresponds to the specific thing that needs to be included in the shopping list," "rel[y] on the textual characterization . . . to figure out what element is actually important . . . like apples," and "the output of that process would be

substantially the same result which would be the addition of that element to a shopping list." *Id*. However, these conclusory statements from Dr. Medvidovic are not sufficient to create a jury issue on DOE infringement. *See Akzo Nobel Coatings, Inc. v. Dow Chem. Co*., 811 F.3d 1334, 1343 (Fed. Cir. 2016) ("Broad conclusory statements offered by [an] expert are not evidence that satisfies this standard") (quotation and citation omitted).

In response, Defendants offered evidence from three witnesses explaining how the accused devices are different from the claimed invention and therefore do not infringe under DOE. Dkt. 284 at 12. Dr. Johnson testified that how Alexa discerns a user's intent solves a "massively different" problem of processing utterances without knowing "what comes next," i.e., Alexa does not merely ask the user to state what they want to buy and expect to receive an item name to identify from text. *Id*. Dr. Strom also discussed Alexa's use of far-field speech recognition and neural networks to understand user utterances— problems essential for Alexa to determine a user's intent but which are not solved by the asserted claims or part of their process of identifying an item from text. *Id*. And Mr. Love explained that the purpose of the Alexa shopping list—the sole accused feature for the '153 patent—is to "capture needs" at "different levels" depending on user preferences, not to find a product. *Id*. Even if Dr. Medvidovic's testimony for infringement under DOE is sufficient to create a jury issue, there are competing testimonies from witnesses from both sides, and therefore there is substantial evidence to support the jury's determination of non-infringement.

In view of the foregoing, the Court finds that there is substantial evidence and sufficient evidentiary basis for a reasonable jury to find that Defendants did infringe the asserted patents. *See Reeves*, 530 U.S. at 149. Regarding Defendants' non-infringement theories discussed above, the parties presented to the jury competing testimonies, which the jury weighed and eventually found

for Defendants. And the Court does not find that "the facts and inferences point so strongly and overwhelmingly in favor" of Freshub to warrant a JMOL. *See Mettler-Toledo*, 671 F.3d at 1294. Accordingly, the Court **DENIES** Freshub's Motion for Judgment as a Matter of Law.

### III.    MOTION FOR NEW TRIAL

#### A.    Legal Standard

The Court has discretion to grant a new trial "based on its appraisal of the fairness of the trial and the reliability of the jury's verdict." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612–13 (5th Cir. 1985). "A new trial will not be granted based on trial error unless, after considering the record as a whole, the court concludes that manifest injustice will result from letting the verdict stand." *Foradori v. Harris*, 523 F.3d 477, 506 (5th Cir. 2008). "To justify a reversal based on improper comments of counsel, the conduct must be such as to gravely impair the calm and dispassionate consideration of the case by the jury." *Dixon v. Int'l Harvester Co.*, 754 F.2d 573, 585 (5th Cir. 1985). The moving party must timely object and show that the conduct went "far beyond the bounds of accepted advocacy before [the] court must grant a new trial." *Geoffrion v. Nationstar Mortg. LLC*, 182 F. Supp. 3d 648, 673 (E.D. Tex. 2016) (citing *Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 284 (5th Cir. 1975)); *see also Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 509 (5th Cir. 2012). The burden is on the moving party to show a new trial is warranted. *Sibley v. Lemaire*, 184 F.3d 481, 487 (5th Cir. 1999).

#### B.    Discussion

Freshub's main basis for its Motion for New Trial under Fed. R. Civ. P. 59(a) is that Defendants "played on the stereotype of greedy Jewish executives of an Israeli company allegedly taking advantage of U.S. companies, to trigger religious biases and deepen the 'us vs. them' nationalistic divide in the minds of the jurors." Dkt. 277 at 15. To support its allegation, Freshub

asserts that it is unfairly prejudicial for Defendants to refer to Freshub as an Israeli company and to emphasize "irrelevant facts about Freshub's lack of profitability (and doing so in terms of Israeli shekels)." *Id*. at 14. However, as Defendants correctly point out, Freshub is in fact an Israeli company and Defendants only mentioned Israel when relevant or necessary to rebut Freshub's own statements at trial, including, e.g., discussing the fact that Freshub applied for funding from the Israeli government in response to Freshub's statement about its application for funding, and cross-examining a witness regarding meetings between Amazon and Freshub in Israel after Freshub asked about the same meetings on direct examination. Dkt. 284 at 16. Further, Defendants' counsel, herself a Jewish woman, asked about Freshub's financial records reflecting significant losses in Israeli shekels only because Freshub's financial records were reported in Israeli shekels. *Id*.

Significantly, while Freshub makes these bold allegations in its Motion for New Trial that "*[t]hroughout trial*, Defendants advanced 'us versus them' arguments along national and religious lines that biased the jury" and that "Defendants blew this Jewish stereotype 'dog whistle' *at every opportunity* to unfairly bias the jury" (Dkt. 277 at 12 and 14 (emphasis added)), Freshub never objected to Defendants' alleged play of the Jewish stereotype or pitting the community against a foreign company during the whole trial. Indeed, during the October 19, 2021, hearing, Freshub's counsel Paul J. Andre admitted that Freshub did not make a single objection on the basis that Defendants were pitting a community against a foreign company during either the trial or the closing argument. Dkt. 296 (Hearing Transcript) at 9–11.

It is an "elementary principle of federal law" that a party cannot raise misconduct objections for the first time on a motion for new trial. *See Curtis Publ'g Co. v. Butts*, 351 F.2d 702, 714 (5th Cir. 1965). Therefore, because Freshub did not object, its Motion for New Trial can be

granted only if it establishes that this is an "exceptional case where the error has seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Reese v. Mercury Marine Div. of Brunswick Corp.*, 793 F.2d 1416, 1429 (5th Cir. 1986). Freshub thus asserts, at least implicitly, that the Court must grant a new trial to preserve its own integrity and public reputation. In making such an assertion, Freshub essentially accuses the Court of turning a blind eye to Defendants' highly prejudicial "arguments along the national and religious lines" "[t]hroughout the trial" made "at every opportunity." *See* Dkt. 277 at 12. The Court did not turn a blind eye to any racist or anti-Semitic conduct, because indeed there was none. Throughout the October 19, 2021 hearing, Freshub's counsel could not point to any concrete evidence—or indeed, any evidence at all—that Defendants made arguments that intentionally played into Freshub's Israeli ties or any Freshub witnesses' race, heritage, or religion. Dkt. 296 (Hearing Transcript) at 19–21. Freshub's counsel failed to articulate any coherent argument as to how Defendants' counsel engaged in any racist or anti-Semitic conduct at trial. Without any evidentiary support, these serious allegations are particularly disturbing.

The Court finds that Freshub's inflammatory allegations are nothing but baseless attacks on the integrity of this Court and the reputation of Defendants' counsel. Freshub's motion is apparently the result of its dissatisfaction with the verdict and counsel's difficulty in making sense of the unfavorable outcome, which is apparent from Mr. Andre's statements during the October 19 hearing: "I cannot explain the . . . jury verdict. I just simply can't explain it because the evidence was so overwhelming." Dkt. 296 (Hearing Transcript) at 29. However, a bitter losing party's difficulty in explaining its loss is never a proper basis for counsel to invoke baseless allegations of racism and anti-Semitism to request a new trial. Such vitriolic and unsubstantiated allegations are

not only shocking, but also offensive to this Court. And accusing Defendants' counsel of engaging in this conduct, without any evidentiary support, is similarly unacceptable.

By making such baseless allegations, Freshub's counsel has breached their duty to the Court. In fact, this is not the first time that Freshub's national counsel improperly conducted themselves before a federal district court. *See Finjan Inc. v. Juniper Networks, Inc.,* No. C 17-05659 WHA, Dkt. 669 at *7–8 (N.D. Cal. July 26, 2021) ("In no way does this order vindicate attorneys James R. Hannah, Lisa Kobialka, and Paul J. Andre. Their conduct was improper and frustrated the fairness of the proceedings. Judges in the future should take this into account when dealing with them in future cases."). Therefore, to preserve the integrity of the judicial process and to deter future improper conducts, the Court feels compelled to impose sanctions on all attorneys who signed Freshub's Motion for New Trial.

## IV.   CONCLUSION

For the foregoing reasons, the Court **DENIES** Freshub's Motion for Judgment as a Matter of Law and Motion for New Trial (Dkt. 277). It is **ORDERED** that every attorney who signed Freshub's Motion for New Trial (i.e., Paul J. Andre, Lisa Kobialka, and James Hannah of Kramer Levin Naftalis & Frankel LLP, and John Palmer of Naman Howell Smith & Lee PLLC) shall complete thirty (30) hours of Continuing Legal Education (CLE) of legal ethics and shall certify his/her completion of the CLE hours to the Court within six months from the date of this Order.

**SIGNED** this 17th day of December, 2021.

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE



US009908153B2

(12) **United States Patent**
Zsigmond et al.

(10) **Patent No.:** **US 9,908,153 B2**
(45) **Date of Patent:** **Mar. 6, 2018**

(54) **SYSTEMS AND METHODS FOR SCANNING INFORMATION FROM STORAGE AREA CONTENTS**

(71) Applicant: **IKAN HOLDINGS LLC**, New York, NY (US)

(72) Inventors: **Fabio Zsigmond**, Riverside, CT (US); **Sion Elie Douer**, New York, NY (US); **Geraldo Yoshizawa**, Sao Paulo (BR); **Frederico Wagner**, New York, NY (US)

(73) Assignee: **IKAN HOLDINGS LLC**, New York, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/604,422**

(22) Filed: **May 24, 2017**

(65) **Prior Publication Data**

US 2017/0259304 A1      Sep. 14, 2017

**Related U.S. Application Data**

(63) Continuation of application No. 11/301,291, filed on Dec. 12, 2005.

(60) Provisional application No. 60/635,122, filed on Dec. 10, 2004.

(51) **Int. Cl.**
| | |
|---|---|
| *G10L 15/00* | (2013.01) |
| *G10L 25/00* | (2013.01) |
| *G06F 3/16* | (2006.01) |
| *B07C 5/34* | (2006.01) |

(Continued)

(52) **U.S. Cl.**
CPC ........... *B07C 5/34* (2013.01); *G06Q 30/0601* (2013.01); *G06Q 40/04* (2013.01)

(58) **Field of Classification Search**
CPC .... G06Q 40/10; G06Q 40/02; G06Q 30/0633; G06Q 10/087
USPC ............. 704/266, 268, 270.1; 715/727, 760; 705/30, 26.61–28
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,636,950 | A | 1/1987 | Caswell et al. |
| 5,478,989 | A | 12/1995 | Shepley |
| 5,489,773 | A | 2/1996 | Kumar |

(Continued)

OTHER PUBLICATIONS

Supplementary European Search Report; Application No. 04713957.1; dated Sep. 3, 2008.

(Continued)

*Primary Examiner* — Andrew Joseph Rudy
(74) *Attorney, Agent, or Firm* — Knobbe, Martens, Olson & Bear LLP

(57) **ABSTRACT**

The present invention is related to methods and systems for collected item information for stored items. In one embodiment, a networked food storage system comprises a first sensor configured to read information from item tags coupled to items, wherein the items are stored or intended to be stored in a storage unit. A data store is configured to store food preferences for at least a first user. Instructions, stored in computer readable memory, are configured to: cause a first user interface to be displayed to the first user via which the first user can request a meal suggestion; retrieve preference information for the first user from computer readable memory; retrieve information read from at least a first item tag; and provide a meal suggestion based at least in part on preference information for the first user and item tag information.

**11 Claims, 8 Drawing Sheets**





Joint
Exhibits
**JTX-1**
19-cv-00885-ADA

**US 9,908,153 B2**

Page 2

(51) **Int. Cl.**
　　**G06Q 40/04**　　(2012.01)
　　**G06Q 30/06**　　(2012.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,532,928 A | 7/1996 | Stanczyk et al. |
| 5,641,039 A | 6/1997 | Dumont |
| 5,699,525 A | 12/1997 | Embutsu et al. |
| 5,712,989 A | 1/1998 | Johnson et al. |
| 5,841,115 A | 11/1998 | Shepley |
| 5,914,472 A | 6/1999 | Foladare et al. |
| 5,933,829 A | 8/1999 | Durst |
| 5,940,074 A | 8/1999 | Britt et al. |
| 5,957,695 A | 9/1999 | Redford et al. |
| 5,960,402 A | 9/1999 | Embutsu et al. |
| 5,965,858 A | 10/1999 | Suzuki et al. |
| 5,969,317 A | 10/1999 | Espy et al. |
| 5,978,773 A | 11/1999 | Hudetz et al. |
| 5,979,240 A | 11/1999 | Rix et al. |
| 5,979,757 A | 11/1999 | Tracy et al. |
| 5,983,199 A | 11/1999 | Kaneko |
| 5,987,440 A | 11/1999 | O'Neil et al. |
| 5,995,105 A | 11/1999 | Reber et al. |
| 6,024,281 A | 2/2000 | Shepley |
| 6,031,621 A | 2/2000 | Binder |
| 6,034,660 A | 3/2000 | Kessenich et al. |
| 6,047,843 A | 4/2000 | Mecke |
| 6,089,453 A | 7/2000 | Kayser et al |
| 6,131,744 A | 10/2000 | Pratt |
| 6,314,457 B1 | 11/2001 | Schena et al. |
| 6,367,518 B2 | 4/2002 | Duncan |
| 6,378,721 B1 | 4/2002 | Williams |
| 6,386,386 B1 | 5/2002 | George |
| 6,425,487 B1 | 7/2002 | Emmott et al. |
| 6,434,530 B1 | 8/2002 | Sloane et al. |
| 6,435,407 B1 | 8/2002 | Fiordelisi |
| 6,442,952 B2 | 9/2002 | Roh et al. |
| 6,446,979 B1 | 9/2002 | Schena et al. |
| 6,457,177 B1 | 9/2002 | Reams |
| 6,473,740 B2 | 10/2002 | Cockrill et al. |
| 6,530,518 B1 | 3/2003 | Kirchilsky et al. |
| 6,561,085 B1 | 5/2003 | Durbin et al. |
| 6,640,214 B1 | 10/2003 | Nambudiri et al. |
| 6,643,624 B2 | 11/2003 | Philippe et al. |
| 6,663,004 B2 | 12/2003 | Wagner et al. |
| 6,763,148 B1 | 7/2004 | Sternberg et al. |
| 6,845,388 B1 | 1/2005 | Philyaw |
| 6,928,413 B1 | 8/2005 | Philyaw |
| 6,975,856 B2 | 12/2005 | Ogasawara |
| 6,993,507 B2 | 1/2006 | Meyer et al. |
| 7,013,292 B1 | 3/2006 | Hsu et al. |
| 7,043,457 B1 | 5/2006 | Hansen |
| 7,080,777 B2 | 7/2006 | Wagner et al. |
| 7,086,592 B2 | 8/2006 | Wagner et al. |
| 7,109,445 B2 | 9/2006 | Patterson et al. |
| 7,110,829 B2 | 9/2006 | Cunningham et al. |
| 7,114,656 B1 | 10/2006 | Garver |
| 7,133,739 B2 | 11/2006 | Williamson et al. |

| | | | |
|---|---|---|---|
| 7,165,721 B2 | 1/2007 | Wagner et al. | |
| 7,229,017 B2 | 6/2007 | Persky | |
| 7,246,745 B2 | 7/2007 | Hudnut et al. | |
| 7,281,655 B2 | 10/2007 | Wagner et al. | |
| 7,303,124 B2 | 12/2007 | Wagner et al. | |
| 7,328,159 B2 * | 2/2008 | Chang | G10L 15/22 |
| | | | 704/233 |
| 7,328,842 B2 | 2/2008 | Wagner et al. | |
| 7,344,063 B2 | 3/2008 | Wagner et al. | |
| 7,373,317 B1 | 5/2008 | Kopelman et al. | |
| 7,580,850 B2 * | 8/2009 | Lurie | G06Q 10/06311 |
| | | | 705/7.26 |
| 7,660,772 B2 | 2/2010 | Verkama | |
| 7,681,792 B2 | 3/2010 | Wagner et al. | |
| 7,734,729 B2 | 6/2010 | Du et al. | |
| 2002/0008145 A1 | 1/2002 | Walsh et al. | |
| 2002/0016731 A1 | 3/2002 | Kupersmit et al. | |
| 2002/0059175 A1 | 5/2002 | Nakano | |
| 2002/0069137 A1 | 6/2002 | Hiroshige et al. | |
| 2002/0072923 A1 | 6/2002 | Guidry | |
| 2002/0073029 A1 | 6/2002 | Cheaib et al. | |
| 2002/0120502 A1 | 8/2002 | Sakaguchi | |
| 2002/0139848 A1 | 10/2002 | Catan | |
| 2002/0161658 A1 | 10/2002 | Sussman | |
| 2002/0161704 A1 | 10/2002 | Powar | |
| 2003/0034391 A1 | 2/2003 | Wagner et al. | |
| 2003/0072488 A1 | 4/2003 | Barsness et al. | |
| 2003/0164754 A1 | 9/2003 | Roseen | |
| 2003/0171944 A1 | 9/2003 | Fine et al. | |
| 2003/0195818 A1 | 10/2003 | Howell et al. | |
| 2004/0100380 A1 | 5/2004 | Lindsay et al. | |
| 2004/0199545 A1 | 10/2004 | Wagner et al. | |
| 2004/0260513 A1 | 12/2004 | Fitzpatrick et al. | |
| 2005/0041840 A1 | 2/2005 | Lo | |
| 2005/0064900 A1 | 3/2005 | Goris et al. | |
| 2005/0090233 A1 | 4/2005 | Chambers et al. | |
| 2005/0154560 A1 | 7/2005 | Fitzpatrick et al. | |
| 2005/0189412 A1 | 9/2005 | Hudnut et al. | |
| 2006/0218057 A1 | 9/2006 | Fitzpatrick et al. | |
| 2008/0104596 A1 | 5/2008 | Buonanno et al. | |
| 2008/0133264 A1 | 6/2008 | Wagner et al. | |
| 2008/0306872 A1 | 12/2008 | Felsher | |
| 2009/0152348 A1 | 6/2009 | Ostrowski et al. | |

OTHER PUBLICATIONS

Dietician-Healthy Eating Services, "Transforming How Dietitians Offer Advice," AirClic, 2001-2003.
International Search Report, International Appln. No. PCT-IB04-01076, dated May 25, 2005.
PCT International Search Report dated Feb. 24, 2003.
Shop Smart, Eat Right—Sample Grocery List, "Guide Yourself to Healthier Eating," Beeline Shopper, 2001-2002.
Shop Smart, Eat Right—Sample Recipes, "Great Meals Made Easy," Beeline Shopper, 2001-2002.
Shop Smart, Eat Right, "Healthier, More Nutritious Meals," Beeline Shopper, 2001-2003.

* cited by examiner

FRESHUB 000148



## FIG. 1

FRESHUB 000149



*FIG. 2*

FRESHUB 000150



**FIG. 3**

FRESHUB 000151



```
                                         ╱402
        ┌─────────────────────┐
        │  RETRIEVE EXPIRATION │
        │  FOR AVAILABLE ITEMS │
        └─────────────────────┘
                  │
                  ▼                      ╱404
        ┌─────────────────────┐
        │  RETRIEVE PREFERENCE │
        │  INFORMATION FOR ITEM│
        │      ORDERING        │
        └─────────────────────┘
                  │
                  ▼                      ╱406
        ┌─────────────────────┐
        │      COMPARE         │
        │  PREFERENCES WTH     │
        │  EXPIRATION DATES    │
        └─────────────────────┘
                  │
                  ▼                      ╱408
        ┌─────────────────────┐
        │  PRESENT ORDER LIST  │
        └─────────────────────┘
                  │
                  ▼                      ╱410
        ┌─────────────────────┐
        │    RECEIVE  USER     │
        │  SELECTION  AND PLACE│
        │       ORDER          │
        └─────────────────────┘
```

*FIG. 4*

MEAL SELECTION                    COURSES

    ☐ Breakfast            ☐ SOUP

    ☐ Brunch               ☒ SALAD

    ☐ Lunch                ☒ MAIN COURSE

    ☒ Dinner               ☒ DESERT

    ☐ Late night snack

       MEAL
  PARTICIPANTS

    ☒ MOM

    ☒ DAD

    ☒ BOBBY

    ☒ JANE

    ☐ NANNY

    ☐ GRANDMA

    ☐ GRANDPA

    ☐ GUEST        ☐ NUMBER OF GUEST

```
┌──────────────────────┐
│      PROVIDE         │
│  RECOMMENDATIONS     │
└──────────────────────┘
```

**FIG. 5**

FRESHUB 000153

SALADS

☒ TOMATO SALAD
☐ GREEN SALAD

MAIN COURSE

☐ ROASTED CHICKEN
☒ GRILLED SALMON

DESSERT

☒ SORBET
☐ CHOCOLATE CAKE

| PROVIDE RECIPES | PROVIDE ADDITIONAL SUGGESTIONS |

*FIG. 6*

FRESHUB 000154

☒ MILK                    ☐ QUANTITY

☒ ORANGE JUICE            ☐ QUANTITY

☒ YOGURT                  ☐ QUANTITY

☐ SODA                    ☐ QUANTITY

```
┌─────────────────────────┐
│      SUBMIT ORDER       │
└─────────────────────────┘
```

***FIG. 7***

FRESHUB 000155



FIG. 8

FRESHUB 000156

US 9,908,153 B2

1

# SYSTEMS AND METHODS FOR SCANNING INFORMATION FROM STORAGE AREA CONTENTS

## INCORPORATION BY REFERENCE TO ANY PRIORITY APPLICATIONS

Any and all applications for which a foreign or domestic priority claim is identified in the Application Data Sheet as filed with the present application are hereby incorporated by reference under 37 CFR 1.57.

## BACKGROUND OF THE INVENTION

Field of the Invention

The present invention is related to sensor systems and processes, and in particular for sensing items stored in storage units and performing related automated processes.

Description of the Related Art

Perishable items are often stored in refrigerated storage units, such as refrigerators. Such perishable items often have expiration dates or "best used by dates" printed thereon. However, because perishable items are often densely packed into a refrigerated storage unit, and because the expiration dates are sometimes faintly or poorly printed, users often are not able to conveniently monitor the expiration dates. Hence, items are often retained in the refrigerated storage unit past their expiration date, taking up valuable storage space. In addition, because the user is often unaware of when an item has reached its expiration date, the user often does not replace the expired item in a timely fashion.

## SUMMARY OF THE INVENTION

The present invention is related to sensor systems and processes, and in particular for sensing items stored in storage units and performing related automated processes.

The following embodiments are intended to be illustrative examples, and not to limit the scope of the invention.

One example embodiment provides a networked refrigeration system, comprising: a first sensor configured to read information from item tags coupled to items, wherein the items are stored or intended to be stored in a refrigeration unit; a data store configured to store food preferences for a plurality of household members; instructions, stored in computer readable memory, configured to: cause a first user interface to be displayed to the first user, the first user interface listing household members; receive a user input indicating which household members will participate in a first meal; retrieve preference information for at least a portion of the household members that will participate in the first meal; retrieve information read from at least a first item tag; select at least a first recipe stored in computer readable memory based at least in part on preference information for at least one meal participant and item tag information; and provide the recipe to a first user.

Another example embodiment provides a networked food storage system, comprising: a first sensor configured to read information from item tags coupled to items, wherein the items are stored or intended to be stored in a storage unit; a data store configured to store food preferences for at least a first user; instructions, stored in computer readable memory, configured to: cause a first user interface to be displayed to the first user via which the first user can request a meal suggestion; retrieve preference information for the first user from computer readable memory; retrieve information read from at least a first item tag; and provide a meal suggestion

2

based at least in part on preference information for the first user and item tag information.

Still another embodiment provides a method of providing meal suggestions, comprising: electronically receiving data read, via a first sensor, from a first item, the data including information related to the first item's ingredients; identifying a first user requesting a meal suggestion; reading from computer readable memory food preferences for at least the first user; and providing a meal suggestion based at least in part on preference information for the first user and item tag information.

Yet another example embodiment provides a networked food storage system, comprising: a first sensor configured to read expiration date information from item tags, wherein the items are stored or intended to be stored in a storage unit; a data store configured to store expiration date information; and instructions, stored in computer readable memory, configured to: read expiration date information from the data store; determine if a first item has an expiration date within a first time window; if the first item has an expiration date within a first time window, identify the item on a shopping list.

Still another example embodiment provides an electronic system, comprising: memory configured to store a digitized voice recording from a user; and instructions, stored in computer readable memory, configured to: read the digitized voice recording; identify a product identifier that corresponds to a first item referred to in the digitized voice recording; present a shopping list to the user that includes at least the first item.

Another example embodiment provides an electronic system, comprising: memory configured to store a digital product image from a user; and instructions, stored in computer readable memory, configured to: perform object recognition with respect to the product image; select a product identifier that corresponds to the product in the image; present a shopping list to the user that includes at least the product.

## BRIEF DESCRIPTION OF THE DRAWINGS

Embodiments of the present invention are described herein with reference to the drawings summarized below. These drawings and the associated description are provided to illustrate example embodiments of the invention, and not to limit the scope of the invention.

FIG. 1 illustrates an example embodiment of an item tracking and recommendation processing system.

FIG. 2 illustrates an example embodiment of a networked storage system.

FIG. 3 illustrates an example meal suggestion process.

FIG. 4 illustrates an example order generation process.

FIG. 5 illustrates a first example meal suggestion request user interface.

FIG. 6 illustrates a second example meal suggestion request user interface.

FIG. 7 illustrates an example user interface for ordering items.

FIG. 8 illustrates an example method for processing a voice order.

## DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

Example systems and methods for scanning and obtaining product information and processing such scanned information will be described herein.

FRESHUB 000157

US 9,908,153 B2

3

Throughout the following description, the term "Web site" is used to refer to a user-accessible network site that implements the World Wide Web standards for the coding and transmission of hypertextual documents. These standards currently include HTML (the Hypertext Markup Language), HTTP (the Hypertext Transfer Protocol), Java, and XML. It should be understood that the term "site" is not intended to imply a single geographic location, as a Web or other network site can, for example, comprise multiple geographically distributed computer systems that are appropriately linked together. Furthermore, while the following description relates to an embodiment utilizing the Internet and related protocols, other networks, such as networked interactive televisions, and other protocols may be used as well. In addition, unless otherwise indicated, the functions described herein are preferably performed by executable code and instructions running on one or more general-purpose computers. For example, program code stored in non-volatile and/or volatile memory can include one or more instructions, which can optionally be straight-line code and/or organized as modules or objects configured to receive and process inputs, provide outputs, and to selectively store data. However, the present invention can also be implemented using special purpose computers, state machines, and/or hardwired electronic circuits. While certain example processes are described herein, not all the process states need to be performed, and the order of the process can be varied. While several example embodiments are described with reference to RFID tags and RFID scanners, other tags (e.g., barcodes) and scanners (e.g., a laser barcode scanner), can be used.

In an example embodiment, a networked system includes one or more scanning devices that can scan product information. For example, a scanning system can optionally include one or more of an optical barcode scanner, an RFID (radio frequency identifier) scanner, a character recognition scanner, a camera, and/or other scanner types. The scanning system can be configured to scan/read optical markings such as barcodes (printed or lasered onto the item packaging or the consumable item itself), RFID tags (e.g., a radio frequency transponder), solid state memory tags, and/or magnetic tags. The foregoing data devices are generally referenced herein tags. By way of further example, the scanning system can take electronic, digital pictures of product packaging or markings, or scan/read other information storage devices.

In certain example embodiments, one or more scanning devices and/or related processing systems can be fixedly coupled or removably coupled to a utility device, such as a refrigerator, a conventional oven, a microwave oven, or other device. Optionally, one or more scanning devices and/or related processing systems can be mounted to a wall, inside or outside of a cabinet, or on a stand.

The scanner system can include or be coupled to a local content database and/or can be connected to a remote database via a network, such as the Internet. In addition, the scanner system can be coupled to a suggestion application and database that stores food and/or meal preferences for one or more users. For example, a user can specify types of foods, dishes, or other products that the user prefers or will not eat, wherein the user specifications are stored in the database, optionally in association with an identifier (e.g., a user ID and/or password).

By way of illustration, the user can specify that the user does not want to eat foods containing pork, poultry, beef, fish, gluten, wheat, eggs, nuts, strawberries, and/or seafood. By way of further illustration, the user can specify that the

4

user prefers foods having a certain characteristic or that are in a certain category, such as vegetarian, low fat, low sodium, and/or kosher food products.

The scanner system can include or be coupled to one or more user input and/or output devices, such as a touch screen device, a non-touch screen display, an on/off switch, a mechanical keyboard, voice recognition system, a voice output system, a camera, a character recognition device, a printer, and/or other types of user interfaces. The system optionally can include one or more function-specific hard keys and/or soft keys displayed on a touch screen. The key functions can be software programmable.

An example tag can include some or all of the following information: product code, expiration date, nutrition information, dietary classification information (e.g., low sodium, low cholesterol, low carbohydrate, non-fat, peanut-free, gluten-free, sugar-free, non-dairy, vegetarian), ingredient content, supplier, product, storage temperature range, dimensions (height, length, width, weight), cooking temperature and time, a unique item/tag identifier, etc. Optionally, the tag can further include an identifier associated with an intended user.

If the tag is an RFID tag, the tag can include a RFID chip, with associated memory, an antenna, and optionally a battery. Optionally, an RFID tag can be a chipless tag, that does not use integrated circuit technology to store information, but that does use materials (e.g. fiber) that reflects a portion of the scanner's signal back to the scanner, which can then be used as an identifier. By way of further example, if the tag is an RFID tag, the tag can be powered via a battery, electromagnetically by the RFID scanner, or otherwise.

As will be described below, the scanning system scans item tags and optionally stores some or all of the scanned information in a computer readable data store, such as a database. Optionally, a user can then view some or all of the stored information via a display coupled to the scanning system.

By way of further example, the system can read or scan product information located on or in item tags for items stored, or that are in the process of being stored, inside a refrigerator and/or stored in different household locations including shelves, cabinets, dry storage rooms, pantries, automobile trunks, etc. The scanning can optionally be performed utilizing a network of scanners and/or repeaters in the house.

Thus, for example, one or more scanners, such as an RFID scanner can be placed in, or adjacent to a home refrigerator, as well as on or in proximity with food storage shelves and/or cabinets. The scanner location can be based on the scanner range, wherein the scanner is placed within a useable range of the items to be scanned, and the location can be further selected so that a barrier does not interfere with the scanner's ability to read item tags.

The scanner can be powered via a battery, AC power or otherwise. The scanner can optionally be mounted in or to a refrigerator wall. The RFID scanner optionally includes an antenna or coil, a transceiver, and a decoder. The transceiver produces signals that are emitted by the antenna as radio signals. The radio signals are optionally used to activate the RF tag and to read and optionally write data to the tag. The RFID scanner is optionally shielded by a substantially RF transparent cover to protect the sensor from dirt and/or moisture.

The scanner can periodically (e.g., every 30 seconds, every 15 minutes, every hour, or other regular or irregular time period), in response to a user action (e.g., opening or closing a refrigerator door), and/or other trigger (e.g., a

FRESHUB 000158

US 9,908,153 B2

| 5 | 6 |

weight change detected via a weight sensor) read items tags for items stored within the refrigerator. Optionally, between scans, the scanner can enter into a power down/low power consumption state to conserve power. Optionally, the user can manually cause an item tag to be scanned. For example, if the tag is an optical barcode, the user can manually press a scan button and/or pass the barcode in front of a barcode scanner.

In addition to scanners that read tag information, one or more sensors can be provided that sense the presence of an item without necessarily reading an item tag. For example, one or more pressure sensors can be coupled to one or more shelves to detect if the shelve has an item stored thereon. Other sensors, such as capacitor sensors, millimeter wave sensors, or infrared sensors can be used as well.

A local and/or remote computer processing system can access the stored information, and based on some or all of the stored information, perform one or more of processes, examples of which are described below. Optionally, a user can specify how at least a portion of the information is to be used.

Based on the scanned tag information, the system can determine when products that are inside the refrigerator, on dry products shelves, and/or other selected locations, will expire and will remind or suggest to the user (through a user interface, such as a touch screen display, a voice print, a hardcopy printout, etc.) that the products be consumed on or before the expiration date. The suggestion or reminder can first be provided by the system a number of days before the expiration date, wherein the number of days can be a default value stored in computer readable memory and/or can be based on a value set by the user and stored in computer readable memory. Optionally, in addition, the user can specify that expiration notices are to be provided for certain specified items and/or the user can specify that expiration notices are not to be provided for certain specified items.

Optionally, when a suggestion or reminder is provided, the user can instruct the system not to provide further reminders regarding the expiring product or can instruct the system to provide another reminder at or after a specified time or period (e.g., a snooze instruction).

The system will optionally suggest the reordering of products based on one or more of expiration dates, consumption patterns, delivery schedules, current household item inventory, and user preferences, such as: special diets, as fat free diet, low carb, diet, vegetarian diet, Kosher food only, or other special or selected diet.

As similarly described above, the suggestion or reminder can first be provided a number of days before the expiration date, wherein the number of days can be a default value stored in computer readable memory and/or can be based on a value set by the user and stored in computer readable memory. Optionally, when a suggestion is provided, the user can optionally instruct the system not to provide further reminders regarding the product or can instruct the system to provide another reminder at a specified time or period.

Other consumer food-related information can also be accessed and utilized by the system from computer memory. For example, recipes can be stored on a local and/or a remote information system. The recipes can include ingredients, quantities, and instruction of preparation. Optionally, the system can store and/or calculate from stored information, recipe ingredient quantity information for different serving sizes.

Optionally, the recipes can be selected or downloaded from another computer system based on the products avail-

able in the house, including the contents inside the refrigerator and on other various locations in the house.

The system can compare the available products or contents (e.g., those stored in the refrigerator and/or in other storage locations) with stored recipes, a serving size specified by the user, and/or user preferences, such as: special diets, including fat free diet, low carb, diet, vegetarian diet, Kosher food only, or other special diet.

The system can suggest one or more recipes that more closely match the user's preferences, the available ingredients, and the desired serving size, and the recipe can then be prepared by or for the user. Because the system may not be aware of all the ingredients in the user's possession, the user can manually specify that the user does or does not have certain ingredients available, and the foregoing information can affect the recipes recommended to the user.

By way of further example, the system can present on a display a list of recipe titles (e.g., teriyaki chicken, fried chicken, butter chicken, etc.), optionally with a brief listing of the main ingredients. The user can then select a listed recipe, the complete recipe (including a complete ingredient listing, ingredient quantities, cooking temperature, etc.) is then displayed, and the user can optionally print out the recipe. Because system may not be aware of all the ingredients in the user's possession, the user can manually specify that the user does or does not have certain ingredients available. By way of example, some or all of recipe information (e.g., cooking temperature and time) can be transmitted to a cooking device, such as an oven, which can use the information in the cooking process.

By way of further example, as similarly discussed above, the system optionally reminds the user to replace a product before the expiration date gathered through products tags. The system can optionally be configured by the user to automatically trigger orders within a predetermined amount of time prior to the expiration date. Optionally, the order timing can be based in part on the time it takes to deliver the order once the order is placed, where, for example, the order will be placed to ensure the order will arrive on, or shortly before the expiration date. In addition, the user can optionally specify, via a user interface, that for future orders if an order value is below a certain amount and/or a delivery charge is greater than a certain cost, the order should not yet be placed. Optionally, the system determines if an item has been removed from a storage area (e.g., a refrigerator) by comparing previous scanned information with current scan information. If the system does not locate the item within a storage area within a predetermined amount of time (e.g., an hour, 4 hours. 8 hours, 12 hours, or 24 hours), the system optionally infers that the item has been fully consumed, and adds the item to an order. Optionally, the predetermined amount of time is settable by a user.

The physical configuration of the refrigerator storage areas can be stored in computer local or remote physical memory. By way of example, the configuration information includes the placement, depth, width and height dimensions of the refrigerator and/or freezer storage areas. The configuration information can also store information regarding storage areas intended to store a particular type of food product. For example, information (e.g., dimensions, special temperature settings, etc.) regarding vegetable drawers, fruit drawers, dairy product storage areas, and the like can be stored. Shelve and drawer weight limitations (e.g., recommended maximum weight) are optionally stored as well. Certain configuration information can optionally be downloaded over a network from a remote computer system (e.g.,

FRESHUB 000159

US 9,908,153 B2

<table>
<tr><td>7</td><td>8</td></tr>
</table>

from a Web site associated with the refrigerator or the system provider) based on, for example, the refrigerator model or serial number.

In addition, the system can record which storage locations are occupied, and which locations are available for additional storage.

The system can compare some or all of the foregoing information with product and packaging information (such as volume and dimensions including depth, width and height), that can be read from the item tag or retrieved from a local or remote database using an item identifier read from the item tag, enables the system, and determine one or more ways to organize items on shelves and in drawers. Optionally, the system can provide a user with suggestions or recommendations on how to organize the refrigerator and freezer by suggesting placement of products with respect to storage shelves and drawers.

By way of illustration, the system can compare product dimensions and/or weight with the refrigerator or shelf configuration and/or available locations, and using the comparison results, suggest where a product or products should be placed via a user interface. This information can be presented in a touch screen display or other user interface. By way of example, the system can display a three dimensional representation of items already on storage shelves, and then highlight items that are first to be removed as part of the reorganization process. Once the user has removed the indicated items, the system displays where each of the removed items are to be placed on the storage shelves. Optionally, the system provides a printout of stored items and the storage locations so that the user can easier locate items and determine if the user has a certain items, and without having to physically search for items. Optionally, an "expired" control is provided, which, when activated, causes the system to display and/or printout a list of expired items and their locations.

Optionally, the system provides a user interface with a search field, wherein the user can enter in the name of an item or an item type. The system then searches its database to locate matches or near matches, and display search results to the user. The search results can include a list of the matches or near matches, the quantity of the matching and near matching items, and their storage locations.

As similarly described above, optionally, the system, via a suggestion user interface, provides item suggestions and recommendations to the user. For example, the system can suggest items to be consumed (e.g., via a meal recommendation including one or more of an appetizer, a main course, dessert, and/or a drink) based on item availability in the user's house and/or on information input by one or more users (e.g., members of the household, one or more physicians of a household member, etc.). For example, the user information can include food preferences, special diets, modes, etc., input by the user via a keyboard, a touch screen, voice recognition, or other input method.

Optionally, the system stores different profiles and preferences for different users in the same household. Optionally, when a user wants the system to provide a meal recommendation, the user activates a physical or a soft meal suggestion icon or button. The system then retrieves the names of household members from its database, and presents the names of the household members on the meals suggestions user interface, optionally in addition to an "entire household" control. In order to indicate who will be participating in the meal, the user can select one or more of the household member names, or the "entire household".

Optionally, a user interface is provided via which the user can indicate which type of meal (e.g., breakfast, brunch, lunch, dinner), meal courses (e.g., salad, soup, appetizer, main course, dessert), and a food-type category (e.g., fish, meat, etc.) the user wants. The system will then access the profiles and preferences of the meal participants, as well as the item inventory, and provide a corresponding meal recommendation.

Optionally, a user can trigger or provide a command through a system user interface to communicate to the central system or directly to a service provider, such as a laundry company or a newspaper/magazine service provider, to directly order their service or to trigger a request for servicing, such as the service of picking up or delivering goods, and/or to suspend a service, such as to suspend newspaper delivery for a specified period of time.

Optionally, the system can further include a voice recording device and/or the voice recording device can be independent of the system. The voice recording device can include digital memory (e.g., a disk drive, FLASH memory, etc.) or analog memory (e.g., a cassette tape). A user can record a product description on the device by activating a record control, which can be in the form of a button, a switch, a voice recognition command or other record triggering method. In an example embodiment, the device records a product description verbally provided by the user and creates a digital file. The description can be provided as part of a verbally provided product order. Optionally, a different file is created for each recorded production description. The device transfers the file to a remote database over a network such as the Internet. The transfer can be performed substantially immediately, in response to a user command, or on a scheduled basis.

A remote computer processing system receives, stores, and accesses such files, which can be received from a plurality of voice recording devices. The remote computer system then utilizes voice recognition software to translate the voice recording files into text files. Optionally, the voice recognition software increases recognition accuracy by, when there are more than one potential word matches, placing more weight on words related to the types items being purchased (produce, cereal, milk, etc.) and the users past purchase history. The remote computer system can optionally match the spoken order with a SKU (Stock Keeping Unit, e.g., an identifier, such as a unique numeric identifier associated with a specific product) retrieved from a SKU database. The SKU database optionally stores SKUs in association with a text description of the corresponding item. For example, if the user verbally ordered a cereal by name, the remote computer system translates the name into text or other computer readable form, and matches the text with text stored in association with a SKU (or other identifier) to locate the correct SKU. Optionally, the voice recognition and/or SKU matching and identification can be performed instead or additionally by the user's local system.

The remote computer processing system optionally shares a text version (e.g., the textual representation of the order and/or the corresponding SKU) and/or recorded verbal version of the order. For example, the remote computer system can share the text and/or verbal version of the order via a web site, telephone, fax, short messaging system, or via other communication techniques. Thus, for example, the system can textually share an order that had been placed verbally with one or more product suppliers and/or with the user. For example, the remote system can add the item(s) identified in the verbal order to the user's shopping cart or other shopping list, optionally in association with a digital

FRESHUB 000160

US 9,908,153 B2

9

file that includes the user's spoken order. Users can then verify the text conversion of the spoken order. For example, the user can click on an item in an order list for which verification is requested, hear the user's previously recorded order, and determine if the written description in the shopping list matches the user's spoken order. Optionally, the system uses individual consumer information, such as the user's location and the user's account information and preference profile to better match the user's spoken order with a product. The system uses the product identification (e.g., SKU) generated from the verbal order to request quotes from providers, provide quotes to the user, and to offer additional or alternative products to the user. The user can then place an order for the identified product.

Optionally, the system does not provide voice recognition. Instead, an icon corresponding to the voice recording appears in the user's online shopping list (e.g., an electronic shopping cart). Optionally, the icon has an associated recording date displayed therewith. The user can click on the icon, the system will play the recording to the user, and the user can manually key in the product name and/or search an online catalog.

Optionally, in addition or instead, a picture of an item the user wants to order can be taken using a camera coupled to the system, a cell phone camera, a standalone camera, or other camera. The picture can be transmitted by the system or otherwise to the remote system. The remote system can then perform image recognition to come up with a "signature" identifying the item. The remote system can then locate a corresponding SKU from a SKU database, which optionally stores image signature information and/or an image, in association with a corresponding SKU. The remote system uses the product identification (e.g., SKU) generated from the image to request quotes from providers, provide quotes to the user, and to offer additional or alternative products to the user. The user can then place an order for the identified product. While the foregoing verbal and photographic order processes can be used with a variety of item types, it can be particularly useful with respect to items that often do not have bar codes, such as fresh fruits (e.g., a single apple) or vegetables.

Optionally, the system does not provide image recognition. Instead, a thumbnail (or larger image size) version of the picture of the item, corresponding to the image captured by the camera, appears in the user's online shopping list (e.g., an electronic shopping cart), displayed on the user's local display. Optionally, the displayed picture has an associated image capture date displayed therewith. The user can click on the picture, and the system will optionally display a larger version of the picture. Thus, the picture acts as a reminder to the user. The user can then manually key in the product name and/or search an online catalog and/or the user's purchase history for the product to thereby add the product to the order list.

Example embodiments will now be described with reference to the figures. Referring to FIG. **1**, an item tracking and recommendation processing system **100** includes a central processing unit **102**, computer readable memory **104** (e.g., removable and/or fixed: volatile memory, such as RAM, non-volatile memory, such as FLASH EEPROM, a hard disk drive, an optical drive, etc.), and a database **106**, which can be stored, in whole or in part in the computer readable memory **104**. A network interface **108** (e.g., a wireless or wired network interface) is provided to enable the item tracking and recommendation processing system **100** to access and/or transmit data (e.g., dimensional data regarding a refrigerator or other item storage system, recipes, user

10

preference information, user account information, etc.) across a network, such as the Internet, a local network, and/or other network. The interface **108** can optionally include one or more of a digital subscriber line (DSL) interface, a T1 line interface, a satellite link, a cable hookup, a dial-up modem, etc. The system **100** can further include wired and/or wireless digital and/or analog input/output interfaces to receive and/or transmit information to one or more tag scanning sensors and/or presence sensors.

The system **100** can include and/or be coupled to one or more user interface devices (e.g., a touch screen display, a printer, a keyboard, dedicated mechanical keys, voice recorder, etc.). For example, the system **100** can be coupled to one or more user interface devices, sensors, scanners, and/or other systems via a USB or FireWire bus, via a wired local network, such an Ethernet network, and/or a wireless network, such as an IEEE 802.11b or IEEE 802.11g compliant network, or a Bluetooth network.

The example database **106** includes recipes, content information for one or more item storage units (e.g., refrigerator(s), pantry, etc.), household members and/or frequent visiting meal participants, user preferences (e.g., food preferences, item ordering preferences, payment preferences, etc. of household members and/or frequent visitors), a system serial number, and the like. The database **106**, optionally also includes dimensional and configuration information for one or more storage units (e.g., available temperature settings, the existence of vegetable drawers, fruit drawers, dairy product storage areas, shelve and drawer weight limitations, etc.). For example, the database **106** can store a mapping of product codes or SKUs to product names, sizes, and packaging materials, as well as content information regarding items placed into storage units. Optionally, the database **106** stores shopping lists, passwords and/or unique identifiers for accessing remote databases and services.

The following is an example database schema that includes fields for payment preferences, storage unit identifiers for one or more storage units (e.g., one or more refrigerators), storage unit shelf dimensions, food preferences for one or more users (e.g., food preferences for breakfast, brunch, lunch, dinner, food avoidances, medical or other dietary restrictions, etc.), and order generation/trigger preferences.

User Database Schema

| FIELD | DATA DESCRIPTION |
|---|---|
| Alternative Form of Payment | Alternative form of payment (credit card, electronic fund transfer, check, place on account, etc.), and corresponding payment information (credit card number, and credit card expiration date, bank account number, checking account number, etc.) |
| Refrigeration Unit 1 Identifier | Unique identifier, such as a serial number, associated with a first of the user's disposal units |
| Refrigeration Unit 1 Capacity | The capacity in units of measurement (gallons, liters, etc.) of Disposal Unit 1 |
| Shelf 1 | Shelf 1 dimensions |
| Shelf 2 | Shelf 2 dimensions |
| Shelf n | Shelf n dimensions |
| User 1 Food Preferences | Food preferences - Breakfast |
| | Food avoidance - Breakfast |
| | Food preferences - Brunch |
| | Food avoidance - Brunch |

FRESHUB 000161

US 9,908,153 B2

<table>
<tr><td>11</td><td>12</td></tr>
</table>

-continued

| FIELD | DATA DESCRIPTION |
|-------|------------------|
| | Food preferences - Lunch |
| | Food avoidance - Lunch |
| | Food preferences - Dinner |
| | Food avoidance - Dinner |
| | Dietary restrictions |
| User n Food Preferences | Food preferences - Breakfast |
| | Food avoidance - Breakfast |
| | Food preferences - Brunch |
| | Food avoidance - Brunch |
| | Food preferences - Lunch |
| | Food avoidance - Lunch |
| | Food preferences - Dinner |
| | Food avoidance - Dinner |
| | Dietary restrictions |
| Order Generation Preference | Generate/submit order preferences |

The following is an example contents database schema that stores item information for the contents of one or more storage units. The information, or selected portions thereof, may have been scanned by one or more scanners from an item tag, manually entered by the user, or retrieved from a remote database using the item SKU or other identifier. The example schema includes fields for a product code, ingredients, calories, a diet category, a product name, dimensions, weight, an expiration date, a manufacturer, item location, item storage temperature, and cooking guidelines.

Contents Database Schema

| FIELD | DATA DESCRIPTION |
|-------|------------------|
| Product code | The item SKU |
| Ingredients | The item ingredients |
| Calories | The number of calories in the item or the number of calories per item unit |
| Diet Category | low sodium, low cholesterol, low carbohydrate, non-fat, peanut-free, gluten-free, sugar-free, non-dairy, vegetarian, etc. |
| Product name | The text name of the item |
| Dimensions | One or more of length, width, height, diameter, volume |
| Weight | Original pre-use weight |
| Expiration date | Item expiration or "best if used by" date |
| Manufacturer | The name of the manufacturer or other manufacturer identifier |
| Location Information | Storage unit and/or shelf identifier of where item is stored |
| Storage Temperature | The temperature or temperature range at which the item is to be stored |
| Cooking Information | The temperature or temperature range at which the item is to be cooked, cooking time, cooking method (boiling, roasting, broiling, frying, microwave, etc.) |

Recipe Database Schema

The following is an example recipe database schema. The example schema includes fields for ingredients (e.g., ingredient names, and amount per serving or per a specified number of servings), cooking instructions, calories per serving, and other nutritional information, such as the amount of one or more of salt, carbohydrates, protein, fiber, fat, vitamins, etc. per serving and/or the % percentage of a recommended daily amount of the foregoing a serving will provide.

| FIELD | DATA DESCRIPTION |
|-------|------------------|
| Ingredient 1 | Name and amount per serving |
| Ingredient 2 | Name and amount per serving |
| Ingredient n | Name and amount per serving |
| Cooking Instructions | Cooking method(s), time, temperature, etc. |
| Calories/serving | |
| Salt, carbohydrates, protein, fiber, fat, vitamins/serving | |

FIG. 2 illustrates an example embodiment of a networked storage system. A computer system 202 (which can be in the form of system 100 illustrated in FIG. 1), is coupled to a local scanner 204, a screen 206 (e.g., a touch screen that can receive user inputs via finger and/or pen), and optionally a microphone and/or camera 203. The microphone is optionally coupled to a digitizer which converts spoken language into a digital representation. The camera can be a digital still and/or video camera that captures images and stores them digitally and/or in analog form. The computer system 202, scanner, 204, and/or screen 206 optionally are physical, and optionally removably, mounted to a refrigerator 208. The computer system 202, scanner, 204, and/or screen 206 can optionally be mounted on a wall, a stand, or other supporting structure. The computer system 202 is optionally coupled to remote scanners via networks 218, 220 (e.g., WiFi networks). The remote scanners are mounted to and/or configured to scan one or more other storage units, such as refrigerator 210 and cabinet 212. Optionally, a storage unit, such as cabinet 212, includes multiple shelves with corresponding scanners. Thus, optionally, one computer system can collect and store information scanned from items stored in multiple storage units. Optionally, each storage unit can have a computer system that incorporates some or all of the elements of system 100.

FIG. 3 illustrates an example meal suggestion process. At state 302, a user interface is displayed by an item tracking and recommendation processing system (ITRP), via which a user can indicate who is going to participate in a meal and the meal type (breakfast, lunch, dinner). Optionally, the system can infer the meal type based on the time of day by reading a real time clock (e.g., if the request is at 8:00, the system infers the meal is breakfast). At state 304, the ITRP retrieves information regarding which items are currently available (e.g., in one or more household storage units). At state 306, the system retrieves food preference information for selected meal participants. At state 308, the system matches user preferences and item availability for the meal type. At state 310 the system displays information regarding one or more meals that meet the user preferences and that can be prepared using the available food items. At state 312, the system receives a user selection of the displayed meals. At state 314, the system displays a detailed menu corresponding to the user selection.

FIG. 4 illustrates an example order generation process. At state 402, the system retrieves expiration date information for items within one or more storage units (e.g., a refrigerator and/or cabinet). At state 404, the system retrieves a user preference regarding when an order should be generated relative to at least item expiration dates (e.g., a time prior to an expiration date selected by the user wherein the system is to ask the user if an item should be placed, also referred to as a time window). At state 406, the system compares the user preference with the expiration date information and determines which items have expiration dates that fall within the window. By way of example and not limitation, the time window can be one day or less, greater

FRESHUB 000162

US 9,908,153 B2

13

than one day, and/or selected based upon a projected delivery date or time. At state **408**, the system presents to the user via a display device a list of items identified at state **406** and asks the user to select which items are to be ordered. At state **410**, the system receives the user selections and orders the selected items from a provider selected by the user.

FIG. **5** illustrates an example meal suggestion request user interface. The interface includes a Meal Selection section, wherein the user can indicate for which meal the user wants suggestions. In the illustrated example, the user can select from: breakfast, brunch, lunch, dinner, and a late night snack. A courses section allows the user to indicate what courses suggestions are to be provided for. The course selection optionally changes depending on the meal selection. For example, if the user selects breakfast, optionally, the course selection will not include soup or salad options. A "meal participants" user interface enables the user to indicate who is going to participate in the meal. The example list is based on user set-up information, wherein the user specifies household members and others that will be participating in the meal. In this example, a guest field is provided wherein the user can specify the number of guests attending for which food preference information is not available in the system database. The system can use the guest number information when providing ingredient quantities as part of recipes. Referring back to FIG. **5**, a "provide recommendations" control is provided, which, when activated will cause the system to provide one or more meal recommendations.

FIG. **6** illustrates another example meal suggestion request user interface. The interface provides one or more course suggestions in response to the user selections made via the interface illustrated in FIG. **5**, user food preferences, and item availability. In this example, suggestions are provided for a salad, a main course, and a dessert. Once the user selects the desired suggestions, the user can activate a "provide recipe" control, and the system will then provide the corresponding recipes, with the recipe portions scaled to the number of meal participants. The user can optionally activate a "provide additional suggestions" control, and the system will provide additional suggestions for courses wherein the user has not yet made a selection.

FIG. **7** illustrates an example user interface for ordering items. The example list includes items whose expiration dates are within a predetermined window and/or items were present in a storage unit (e.g., a refrigerator), but which the system has determined is no longer in the storage unit (e.g., has been removed from the storage unit and not replaced within a predetermined amount of time). The user can select which items are to be ordered and the quantity of the items. Optionally, the system defaults by placing check marks for each item and the user unchecks the item if the user does not want to order the item. Optionally, the system provides a default quantity, which can be based on a previous user specified value and/or on consumption patterns.

FIG. **8** illustrates an example method for processing a voice order. At state **802**, the user verbally provides an order. By way of illustration, the user may press a "record shopping list" control. In response, the system can prompt the user via a system display and/or via spoken instruction to verbally record a shopping list or a portion thereof. The recording can be intended as a reminder. The user may be given a limited amount of time (e.g., 5 seconds, 10 seconds, 30 seconds, 1 minute) to speak the order. The system can inform the user of the limited time, and provide a clock or other indicator (e.g., a countdown timer) that continuously displays the time remaining to record the order. Optionally,

14

the user can be provided with an "extend recording time" control, via which the user can cause the system to provide additional recording time. At the end of the recording time, the user is optionally provided the opportunity to review the recording (e.g., have the recording played back), and to delete and re-record the shopping list if the previous recording was unsatisfactory.

For example, the user can speak the order to the microphone **203**, illustrated in FIG. **2**. The system then digitizes and records the spoken order in a file. At state **804**, the system transmits the digitized verbal order to a remote system, such as remote system **214**. At state **806**, the remote system performs voice recognition on the order in order to interpret the spoken order and converts the spoken order into text. By way of example, the remote system can use grammar constrained recognition and/or natural language recognition. The voice recognition system optionally uses training. At state **808**, the remote system transmits the text version of the order to the user so that the user can verify if text version is an accurate interpretation of the spoken order. For example, the remote system can transmit the text version to the system **202** or another user computer for display to the user. Optionally, if the user determines that the order was not correctly translated, the user can provide a corrected order (e.g., via a keyboard, or by speaking the order again) to the remote system.

At state **810**, the remote system transmits the translated version of the order (e.g., the text version) to one or more providers (e.g., supermarkets, wholesale establishments, etc.) in order to receive quotes. The remote system can optionally match the translated version of the spoken order with a SKU retrieved from a SKU database, which stores SKUs in association with a text description of the corresponding item, and transmit the SKU to the providers. At state **812**, the remote system receives quotes from the potential providers, and transmits the quotes to the user. At state **814**, the user selects a provider and authorizes placement of the order. At state **816**, the remote system places the order with the selected provider.

It should be understood that certain variations and modifications of this invention would suggest themselves to one of ordinary skill in the art. The scope of the present invention is not to be limited by the illustrations or the foregoing descriptions thereof.

What is claimed is:

1. A voice processing system comprising:
a first system configured to receive user spoken words comprising:
  a microphone;
  a wireless network interface;
  a digitizer coupled to the microphone, wherein the digitizer is configured to convert spoken words into a digital representation;
  a first computer;
  non-transitory memory that stores instructions that when executed by the first computer cause the first system to perform operations comprising:
    receive via the digitizer a verbal order, comprising at least one item, from a user, wherein the verbal order was captured by the microphone and digitized by the digitizer;
    immediately transmit, using the wireless network interface, the digitized order to a computer system remote from the first system;
the computer system, the computer system comprising:
  a networks interface;
  a second computer;

FRESHUB 000163

US 9,908,153 B2

15

non-transitory memory that stores instructions that when executed by the second computer cause the computer system to perform operations comprising:

receive, using the network interface, the digitized order from the first system;

translate at least a portion of the digitized order to text;

identify an item corresponding to the text;

add the identified item to a list associated with the user;

enable the list, including the identified item, to be displayed via a user display.

**2.** The voice processing system as defined in claim **1**, wherein the item description comprises an item name.

**3.** The voice processing system as defined in claim **1**, wherein the item description from the user is recorded at least partly in response to a verbal user command.

**4.** The voice processing system as defined in claim **1**, wherein a separate digital file is used to store respective digitized item descriptions from the user.

**5.** The voice processing system as defined in claim **1**, wherein the first system further comprises a voice output system.

16

**6.** The voice processing system as defined in claim **1**, wherein the computer system is configured to cause the list to be provided to the user via a website.

**7.** The voice processing system as defined in claim **1**, wherein the computer system is configured to cause the list to be provided to the user via a telephone.

**8.** The voice processing system as defined in claim **1**, wherein the computer system is configured to cause the list to be provided to the user via a short messaging system.

**9.** The voice processing system as defined in claim **1**, wherein the computer system is configured to increase recognition accuracy by, when there are more than one potential matches to the text, placing more weight on words related to the user's past purchase history.

**10.** The voice processing system as defined in claim **1**, wherein the voice processing system is configured to enable the user to add a reminder with respect to at least one item.

**11.** The voice processing system as defined in claim **1**, the operations further comprising identifying a SKU that corresponds to the identified item.

* * * * *

FRESHUB 000164



US010213810B2

## (12) United States Patent
Zsigmond et al.

(10) **Patent No.:**     **US 10,213,810 B2**
(45) **Date of Patent:**          **Feb. 26, 2019**

(54) **SYSTEMS AND METHODS FOR SCANNING INFORMATION FROM STORAGE AREA CONTENTS**

(71) Applicant: **IKAN HOLDINGS LLC**, New York, NY (US)

(72) Inventors: **Fabio Zsigmond**, Riverside, CT (US); **Sion Elie Douer**, New York, NY (US); **Geraldo Yoshizawa**, Sao Paulo (BR); **Frederico Wagner**, New York, NY (US)

(73) Assignee: **IKAN HOLDINGS LLC**, New York, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **16/131,979**

(22) Filed: **Sep. 14, 2018**

(65)          **Prior Publication Data**
US 2019/0009305 A1      Jan. 10, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 16/103,394, filed on Aug. 14, 2018, which is a continuation of application
(Continued)

(51) **Int. Cl.**
  *H04M 3/533*          (2006.01)
  *B07C 5/34*          (2006.01)
  (Continued)

(52) **U.S. Cl.**
  CPC ........... ***B07C 5/34*** (2013.01); ***G06Q 30/0601*** (2013.01); ***G06Q 40/04*** (2013.01); ***H04M 1/6505*** (2013.01); ***H04M 3/533*** (2013.01)

(58) **Field of Classification Search**
  CPC ...... B07C 5/34; G06Q 40/04; G06Q 30/0601; H04M 1/6505; H04M 3/533
  (Continued)

(56)          **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,636,950 A | 1/1987 | Caswell et al. |
| 5,478,989 A | 12/1995 | Shepley |
| (Continued) | | |

FOREIGN PATENT DOCUMENTS

DE      100 17 503 A1    10/2001

OTHER PUBLICATIONS

Supplementary European Search Report; Application No. 04713957. 1; dated Sep. 3, 2008.
(Continued)

*Primary Examiner* — Andrew Joseph Rudy

(74) *Attorney, Agent, or Firm* — Knobbe, Martens, Olson & Bear LLP

(57)          **ABSTRACT**

The present invention is related to methods and systems for collected item information for stored items. In one embodiment, a networked food storage system comprises a first sensor configured to read information from item tags coupled to items, wherein the items are stored or intended to be stored in a storage unit. A data store is configured to store food preferences for at least a first user. Instructions, stored in computer readable memory, are configured to: cause a first user interface to be displayed to the first user via which the first user can request a meal suggestion; retrieve preference information for the first user from computer readable memory; retrieve information read from at least a first item tag; and provide a meal suggestion based at least in part on preference information for the first user and item tag information.

**29 Claims, 8 Drawing Sheets**





Joint Exhibits
**JTX-2**
19-cv-00885-ADA

**US 10,213,810 B2**

Page 2

### Related U.S. Application Data

No. 15/905,591, filed on Feb. 26, 2018, which is a continuation of application No. 15/604,422, filed on May 24, 2017, now Pat. No. 9,908,153, which is a continuation of application No. 11/301,291, filed on Dec. 12, 2005, now Pat. No. 9,821,344.

(60) Provisional application No. 60/635,122, filed on Dec. 10, 2004.

(51) **Int. Cl.**
    **G06Q 30/06**     (2012.01)
    **G06Q 40/04**     (2012.01)
    **H04M 1/65**     (2006.01)

(58) **Field of Classification Search**
    USPC ...... 370/352, 356; 379/88.1, 88.16, 114.01, 379/219; 455/150.1, 405, 406, 414; 704/231, 258, 266, 268, 270.1; 705/28–30; 709/204, 217–219
    See application file for complete search history.

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,489,773 A | 2/1996 | Kumar | |
| 5,532,928 A | 7/1996 | Stanczyk et al. | |
| 5,641,039 A | 6/1997 | Dumont | |
| 5,664,110 A | 9/1997 | Green et al. | |
| 5,699,525 A | 12/1997 | Embutsu et al. | |
| 5,712,989 A | 1/1998 | Johnson et al. | |
| 5,841,115 A | 11/1998 | Shepley | |
| 5,914,472 A | 6/1999 | Foladare et al. | |
| 5,933,829 A | 8/1999 | Durst | |
| 5,940,074 A | 8/1999 | Britt et al. | |
| 5,957,695 A | 9/1999 | Redford et al. | |
| 5,960,402 A | 9/1999 | Embutsu et al. | |
| 5,965,858 A | 10/1999 | Suzuki et al. | |
| 5,969,317 A | 10/1999 | Espy et al. | |
| 5,978,773 A | 11/1999 | Hudetz et al. | |
| 5,979,240 A | 11/1999 | Rix et al. | |
| 5,979,757 A | 11/1999 | Tracy et al. | |
| 5,983,199 A | 11/1999 | Kaneko | |
| 5,987,440 A | 11/1999 | O'Neil et al. | |
| 5,995,105 A | 11/1999 | Reber et al. | |
| 6,024,281 A | 2/2000 | Shepley | |
| 6,031,621 A | 2/2000 | Binder | |
| 6,034,660 A | 3/2000 | Kessenich et al. | |
| 6,047,843 A | 4/2000 | Mecke | |
| 6,085,112 A | 7/2000 | Kleinschmidt | |
| 6,089,453 A | 7/2000 | Kayser et al. | |
| 6,131,744 A | 10/2000 | Pratt | |
| 6,314,457 B1 | 11/2001 | Schena et al. | |
| 6,367,518 B2 | 4/2002 | Duncan | |
| 6,378,721 B1 | 4/2002 | Williams | |
| 6,386,386 B1 | 5/2002 | George | |
| 6,425,487 B1 | 7/2002 | Emmott et al. | |
| 6,434,530 B1 | 8/2002 | Sloane et al. | |
| 6,435,407 B1 | 8/2002 | Fiordelisi | |
| 6,442,952 B2 | 9/2002 | Roh et al. | |
| 6,446,979 B1 | 9/2002 | Schena et al. | |
| 6,457,177 B1 | 9/2002 | Reams | |
| 6,473,740 B2 | 10/2002 | Cockrill et al. | |
| 6,530,518 B1 | 3/2003 | Kirchilsky et al. | |
| 6,561,085 B1 | 5/2003 | Durbin et al. | |
| 6,640,214 B1 | 10/2003 | Nambudiri et al. | |
| 6,643,624 B2 | 11/2003 | Philipps et al. | |
| 6,663,004 B2 | 12/2003 | Wagner et al. | |
| 6,663,148 B2 | 12/2003 | Bonora et al. | |
| 6,845,388 B1 | 1/2005 | Philyaw | |
| 6,885,735 B2 * | 4/2005 | Odinak ............... G10L 15/30 | |
| | | | 379/88.1 |
| 6,928,413 B1 | 8/2005 | Philyaw | |
| 6,934,279 B1 * | 8/2005 | Sollee ............... H04M 1/2535 | |
| | | | 370/352 |
| 6,975,856 B2 | 12/2005 | Ogasawara | |
| 6,993,507 B2 | 1/2006 | Meyer et al. | |
| 7,013,292 B1 | 3/2006 | Hsu et al. | |
| 7,043,457 B1 | 5/2006 | Hansen | |
| 7,080,777 B2 | 7/2006 | Wagner et al. | |
| 7,086,592 B2 | 8/2006 | Wagner et al. | |
| 7,109,445 B2 | 9/2006 | Patterson et al. | |
| 7,110,829 B2 | 9/2006 | Cunningham et al. | |
| 7,114,656 B1 | 10/2006 | Garver | |
| 7,133,739 B2 | 11/2006 | Williamson et al. | |
| 7,165,721 B2 | 1/2007 | Wagner et al. | |
| 7,206,387 B2 * | 4/2007 | Jan ..................... H04M 3/50 | |
| | | | 379/219 |
| 7,229,015 B2 | 6/2007 | Persky | |
| 7,246,745 B2 | 7/2007 | Hudnut et al. | |
| 7,281,655 B2 | 10/2007 | Wagner et al. | |
| 7,295,181 B2 | 11/2007 | Alsio | |
| 7,303,124 B2 | 12/2007 | Wagner et al. | |
| 7,328,159 B2 | 2/2008 | Chang | |
| 7,328,842 B2 | 2/2008 | Wagner et al. | |
| 7,344,063 B2 | 3/2008 | Wagner et al. | |
| 7,373,317 B1 | 5/2008 | Kopelman et al. | |
| 7,386,100 B2 | 6/2008 | Michaelis | |
| 7,472,075 B2 * | 12/2008 | Odinak ............. G06Q 30/0266 | |
| | | | 455/150.1 |
| 7,580,850 B2 | 8/2009 | Lurie | |
| 7,660,772 B2 | 2/2010 | Verkama | |
| 7,681,792 B2 | 3/2010 | Wagner et al. | |
| 7,734,729 B2 | 6/2010 | Du et al. | |
| 7,856,248 B1 * | 12/2010 | Fujisaki ............... H04M 1/575 | |
| | | | 455/414.1 |
| 7,949,529 B2 | 5/2011 | Weider | |
| 8,131,093 B2 | 3/2012 | Kim | |
| 8,320,958 B1 | 11/2012 | Fujisaki | |
| 8,370,163 B2 * | 2/2013 | Faisman ............. G10L 15/22 | |
| | | | 704/231 |
| 8,447,602 B2 | 5/2013 | Bartosik | |
| 8,705,705 B2 | 4/2014 | Thenthiruperai | |
| 9,908,153 B2 * | 3/2018 | Zsigmond ............. B07C 5/34 | |
| 2002/0016731 A1 | 1/2002 | Walsh et al. | |
| 2002/0016731 A1 | 3/2002 | Kupersmit et al. | |
| 2002/0059175 A1 | 5/2002 | Nakano | |
| 2002/0069137 A1 | 6/2002 | Hiroshige et al. | |
| 2002/0072923 A1 | 6/2002 | Guidry | |
| 2002/0073029 A1 | 6/2002 | Cheaib et al. | |
| 2002/0120502 A1 | 8/2002 | Sakaguchi | |
| 2002/0139848 A1 | 10/2002 | Catan | |
| 2002/0143550 A1 | 10/2002 | Nakatsuyama | |
| 2002/0161658 A1 | 10/2002 | Sussman | |
| 2002/0161704 A1 | 10/2002 | Powar | |
| 2003/0034391 A1 | 2/2003 | Wagner et al. | |
| 2003/0072488 A1 | 4/2003 | Barsness et al. | |
| 2003/0164754 A1 | 9/2003 | Roseen | |
| 2003/0171944 A1 | 9/2003 | Fine et al. | |
| 2003/0195818 A1 | 10/2003 | Howell et al. | |
| 2004/0100380 A1 | 5/2004 | Lindsay et al. | |
| 2004/0199545 A1 | 10/2004 | Wagner et al. | |
| 2004/0260513 A1 | 12/2004 | Fitzpatrick et al. | |
| 2005/0041840 A1 | 2/2005 | Lo | |
| 2005/0064900 A1 | 3/2005 | Goris et al. | |
| 2005/0090233 A1 | 4/2005 | Chambers et al. | |
| 2005/0154560 A1 | 7/2005 | Fitzpatrick et al. | |
| 2005/0189412 A1 | 9/2005 | Hudnut et al. | |
| 2006/0218057 A1 | 9/2006 | Fitzpatrick et al. | |
| 2008/0104596 A1 | 5/2008 | Buonanno et al. | |
| 2008/0133264 A1 | 6/2008 | Wagner et al. | |
| 2008/0366872 A1 | 12/2008 | Felsher | |
| 2009/0152348 A1 | 6/2009 | Ostrowski et al. | |
| 2014/0214628 A1 | 7/2014 | Argue et al. | |
| 2015/0379607 A1 | 12/2015 | Pedley et al. | |
| 2016/0267565 A1 | 9/2016 | Katcher | |
| 2017/0293965 A1 | 10/2017 | Sasaki et al. | |
| 2018/0005631 A1 | 1/2018 | Lee et al. | |

#### OTHER PUBLICATIONS

Dietician-Healthy Eating Services, "Transforming How Dietitians Offer Advice," AirClic, 2001-2003.

**US 10,213,810 B2**

Page 3

(56)         **References Cited**

OTHER PUBLICATIONS

International Search Report, International Appln. No. PCT-IB04-01076, dated May 25, 2005.
PCT International Search Report dated Feb. 24, 2003.
Shop Smart, Eat Right—Sample Grocery List, "Guide Yourself to Healthier Eating," Beeline Shopper, 2001-2002.
Shop Smart, Eat Right—Sample Recipes, "Great Meals Made Easy," Beeline Shopper, 2001-2002.
Shop Smart, Eat Right, "Healthier, More Nutritious Meals," Beeline Shopper, 2001-2003.

\* cited by examiner

FRESHUB 000285



**FIG. 1**

FRESHUB 000286



**FIG. 2**

FRESHUB 000287



*302*
PRESENT MEAL
PARTICPANT
SELECTION MENUE

*304*
RETRIEVE CONTENT
INFORMATION FOR
STORAGE UNITS

*306*
RETRIEVE MEAL
PARTICPANT
PREFERENCES WITH
AVAILABLE ITEMS

*308*
VIEW SIDE-BY-SIDE
DISPLAY OF SEGMENT
CONTENTS
CONTENTS

*310*
DISPLAY POTENTIAL
MEAL SELECTIONS

*312*
RECEIVE USER
SELECTION

*314*
DISPLAY DETAILED
MENU AND RECIPE
FOR SELECTED MEAL

*FIG. 3*

FRESHUB 000288



**FIG. 4**

FRESHUB 000289

MEAL SELECTION

- ☐ Breakfast
- ☐ Brunch
- ☐ Lunch
- ☒ Dinner
- ☐ Late night snack

MEAL
PARTICIPANTS

- ☒ MOM
- ☒ DAD
- ☒ BOBBY
- ☒ JANE
- ☐ NANNY
- ☐ GRANDMA
- ☐ GRANDPA
- ☐ GUEST    ☐ NUMBER OF GUEST

COURSES

- ☐ SOUP
- ☒ SALAD
- ☒ MAIN COURSE
- ☒ DESERT

| PROVIDE RECOMMENDATIONS |
|---|

**FIG. 5**

FRESHUB 000290

SALADS

☒ TOMATO SALAD
☐ GREEN SALAD

MAIN COURSE

☐ ROASTED CHICKEN
☒ GRILLED SALMON

DESSERT

☒ SORBET
☐ CHOCOLATE CAKE

| PROVIDE RECIPES | PROVIDE ADDITIONAL SUGGESTIONS |
|---|---|

## FIG. 6

FRESHUB 000291

☒ MILK                ☐ QUANTITY

☒ ORANGE JUICE        ☐ QUANTITY

☒ YOGURT              ☐ QUANTITY

☐ SODA                ☐ QUANTITY

| SUBMIT ORDER |
| --- |

**FIG. 7**

FRESHUB 000292



*FIG. 8*

FRESHUB 000293

US 10,213,810 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# SYSTEMS AND METHODS FOR SCANNING INFORMATION FROM STORAGE AREA CONTENTS

## INCORPORATION BY REFERENCE TO ANY PRIORITY APPLICATIONS

Any and all applications for which a foreign or domestic priority claim is identified in the Application Data Sheet as filed with the present application are hereby incorporated by reference under 37 CFR 1.57.

## BACKGROUND OF THE INVENTION

### Field of the Invention

The present invention is related to sensor systems and processes, and in particular for sensing items stored in storage units and performing related automated processes.

### Description of the Related Art

Perishable items are often stored in refrigerated storage units, such as refrigerators. Such perishable items often have expiration dates or "best used by dates" printed thereon. However, because perishable items are often densely packed into a refrigerated storage unit, and because the expiration dates are sometimes faintly or poorly printed, users often are not able to conveniently monitor the expiration dates. Hence, items are often retained in the refrigerated storage unit past their expiration date, taking up valuable storage space. In addition, because the user is often unaware of when an item has reached its expiration date, the user often does not replace the expired item in a timely fashion.

## SUMMARY OF THE INVENTION

The present invention is related to sensor systems and processes, and in particular for sensing items stored in storage units and performing related automated processes.

The following embodiments are intended to be illustrative examples, and not to limit the scope of the invention.

One example embodiment provides a networked refrigeration system, comprising: a first sensor configured to read information from item tags coupled to items, wherein the items are stored or intended to be stored in a refrigeration unit; a data store configured to store food preferences for a plurality of household members; instructions, stored in computer readable memory, configured to: cause a first user interface to be displayed to the first user, the first user interface listing household members; receive a user input indicating which household members will participate in a first meal; retrieve preference information for at least a portion of the household members that will participate in the first meal; retrieve information read from at least a first item tag; select at least a first recipe stored in computer readable memory based at least in part on preference information for at least one meal participant and item tag information; and provide the recipe to a first user.

Another example embodiment provides a networked food storage system, comprising: a first sensor configured to read information from item tags coupled to items, wherein the items are stored or intended to be stored in a storage unit; a data store configured to store food preferences for at least a first user; instructions, stored in computer readable memory, configured to: cause a first user interface to be displayed to the first user via which the first user can request a meal

suggestion; retrieve preference information for the first user from computer readable memory; retrieve information read from at least a first item tag; and provide a meal suggestion based at least in part on preference information for the first user and item tag information.

Still another embodiment provides a method of providing meal suggestions, comprising: electronically receiving data read, via a first sensor, from a first item, the data including information related to the first item's ingredients; identifying a first user requesting a meal suggestion; reading from computer readable memory food preferences for at least the first user; and providing a meal suggestion based at least in part on preference information for the first user and item tag information.

Yet another example embodiment provides a networked food storage system, comprising: a first sensor configured to read expiration date information from item tags, wherein the items are stored or intended to be stored in a storage unit; a data store configured to store expiration date information; and instructions, stored in computer readable memory, configured to: read expiration date information from the data store; determine if a first item has an expiration date within a first time window; if the first item has an expiration date within a first time window, identify the item on a shopping list.

Still another example embodiment provides an electronic system, comprising: memory configured to store a digitized voice recording from a user; and instructions, stored in computer readable memory, configured to: read the digitized voice recording; identify a product identifier that corresponds to a first item referred to in the digitized voice recording; present a shopping list to the user that includes at least the first item.

Another example embodiment provides an electronic system, comprising: memory configured to store a digital product image from a user; and instructions, stored in computer readable memory, configured to: perform object recognition with respect to the product image; select a product identifier that corresponds to the product in the image; present a shopping list to the user that includes at least the product.

## BRIEF DESCRIPTION OF THE DRAWINGS

Embodiments of the present invention are described herein with reference to the drawings summarized below. These drawings and the associated description are provided to illustrate example embodiments of the invention, and not to limit the scope of the invention.

FIG. 1 illustrates an example embodiment of an item tracking and recommendation processing system.

FIG. 2 illustrates an example embodiment of a networked storage system.

FIG. 3 illustrates an example meal suggestion process.

FIG. 4 illustrates an example order generation process.

FIG. 5 illustrates a first example meal suggestion request user interface.

FIG. 6 illustrates a second example meal suggestion request user interface.

FIG. 7 illustrates an example user interface for ordering items.

FIG. 8 illustrates an example method for processing a voice order.

## DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

Example systems and methods for scanning and obtaining product information and processing such scanned information will be described herein.

FRESHUB 000294

US 10,213,810 B2

<table>
<tr><td>3</td><td>4</td></tr>
</table>

Throughout the following description, the term "Web site" is used to refer to a user-accessible network site that implements the basic World Wide Web standards for the coding and transmission of hypertextual documents. These standards currently include HTML (the Hypertext Markup Language), HTTP (the Hypertext Transfer Protocol), Java, and XML. It should be understood that the term "site" is not intended to imply a single geographic location, as a Web or other network site can, for example, comprise multiple geographically distributed computer systems that are appropriately linked together. Furthermore, while the following description relates to an embodiment utilizing the Internet and related protocols, other networks, such as networked interactive televisions, and other protocols may be used as well. In addition, unless otherwise indicated, the functions described herein are preferably performed by executable code and instructions running on one or more general-purpose computers. For example, program code stored in non-volatile and/or volatile memory can include one or more instructions, which can optionally be straight-line code and/or organized as modules or objects configured to receive and process inputs, provide outputs, and to selectively store data. However, the present invention can also be implemented using special purpose computers, state machines, and/or hardwired electronic circuits. While certain example processes are described herein, not all the process states need to be performed, and the order of the process can be varied. While several example embodiments are described with reference to RFID tags and RFID scanners, other tags (e.g., barcodes) and scanners (e.g., a laser barcode scanner), can be used.

In an example embodiment, a networked system includes one or more scanning devices that can scan product information. For example, a scanning system can optionally include one or more of an optical barcode scanner, an RFID (radio frequency identifier) scanner, a character recognition scanner, a camera, and/or other scanner types. The scanning system can be configured to scan/read optical markings such as barcodes (printed or lasered onto the item packaging or the consumable item itself), RFID tags (e.g., a radio frequency transponder), solid state memory tags, and/or magnetic tags. The foregoing data devices are generally referenced herein tags. By way of further example, the scanning system can take electronic, digital pictures of product packaging or markings, or scan/read other information storage devices.

In certain example embodiments, one or more scanning devices and/or related processing systems can be fixedly coupled or removably coupled to a utility device, such as a refrigerator, a conventional oven, a microwave oven, or other device. Optionally, one or more scanning devices and/or related processing systems can be mounted to a wall, inside or outside of a cabinet, or on a stand.

The scanner system can include or be coupled to a local content database and/or can be connected to a remote database via a network, such as the Internet. In addition, the scanner system can be coupled to a suggestion application and database that stores food and/or meal preferences for one or more users. For example, a user can specify types of foods, dishes, or other products that the user prefers or will not eat, wherein the user specifications are stored in the database, optionally in association with an identifier (e.g., a user ID and/or password).

By way of illustration, the user can specify that the user does not want to eat foods containing pork, poultry, beef, fish, gluten, wheat, eggs, nuts, strawberries, and/or seafood. By way of further illustration, the user can specify that the user prefers foods having a certain characteristic or that are in a certain category, such as vegetarian, low fat, low sodium, and/or kosher food products.

The scanner system can include or be coupled to one or more user input and/or output devices, such as a touch screen device, a non-touch screen display, an on/off switch, a mechanical keyboard, voice recognition system, a voice output system, a camera, a character recognition device, a printer, and/or other types of user interfaces. The system optionally can include one or more function-specific hard keys and/or soft keys displayed on a touch screen. The key functions can be software programmable.

An example tag can include some or all of the following information: product code, expiration date, nutrition information, dietary classification information (e.g., low sodium, low cholesterol, low carbohydrate, non-fat, peanut-free, gluten-free, sugar-free, non-dairy, vegetarian), ingredient content, supplier, product, storage temperature range, dimensions (height, length, width, weight), cooking temperature and time, a unique item/tag identifier, etc. Optionally, the tag can further include an identifier associated with an intended user.

If the tag is an RFID tag, the tag can include a RFID chip, with associated memory, an antenna, and optionally a battery. Optionally, an RFID tag can be a chipless tag, that does not use integrated circuit technology to store information, but that does use materials (e.g. fiber) that reflects a portion of the scanner's signal back to the scanner, which can then be used as an identifier. By way of further example, if the tag is an RFID tag, the tag can be powered via a battery, electromagnetically by the RFID scanner, or otherwise.

As will be described below, the scanning system scans item tags and optionally stores some or all of the scanned information in a computer readable data store, such as a database. Optionally, a user can then view some or all of the stored information via a display coupled to the scanning system.

By way of further example, the system can read or scan product information located on or in item tags for items stored, or that are in the process of being stored, inside a refrigerator and/or stored in different household locations including shelves, cabinets, dry storage rooms, pantries, automobile trunks, etc. The scanning can optionally be performed utilizing a network of scanners and/or repeaters in the house.

Thus, for example, one or more scanners, such as an RFID scanner can be placed in, or adjacent to a home refrigerator, as well as on or in proximity with food storage shelves and/or cabinets. The scanner location can be based on the scanner range, wherein the scanner is placed within a useable range of the items to be scanned, and the location can be further selected so that a barrier does not interfere with the scanner's ability to read item tags.

The scanner can be powered via a battery, AC power or otherwise. The scanner can optionally be mounted in or to a refrigerator wall. The RFID scanner optionally includes an antenna or coil, a transceiver, and a decoder. The transceiver produces signals that are emitted by the antenna as radio signals. The radio signals are optionally used to activate the RF tag and to read and optionally write data to the tag. The RFID scanner is optionally shielded by a substantially RF transparent cover to protect the sensor from dirt and/or moisture.

The scanner can periodically (e.g., every 30 seconds, every 15 minutes, every hour, or other regular or irregular time period), in response to a user action (e.g., opening or closing a refrigerator door), and/or other trigger (e.g., a

FRESHUB 000295

US 10,213,810 B2

<table>
<tr><td>5</td><td>6</td></tr>
</table>

weight change detected via a weight sensor) read items tags for items stored within the refrigerator. Optionally, between scans, the scanner can enter into a power down/low power consumption state to conserve power. Optionally, the user can manually cause an item tag to be scanned. For example, if the tag is an optical barcode, the user can manually press a scan button and/or pass the barcode in front of a barcode scanner.

In addition to scanners that read tag information, one or more sensors can be provided that sense the presence of an item without necessarily reading an item tag. For example, one or more pressure sensors can be coupled to one or more shelves to detect if the shelve has an item stored thereon. Other sensors, such as capacitor sensors, millimeter wave sensors, or infrared sensors can be used as well.

A local and/or remote computer processing system can access the stored information, and based on some or all of the stored information, perform one or more of processes, examples of which are described below. Optionally, a user can specify how at least a portion of the information is to be used.

Based on the scanned tag information, the system can determine when products that are inside the refrigerator, on dry products shelves, and/or other selected locations, will expire and will remind or suggest to the user (through a user interface, such as a touch screen display, a voice print, a hardcopy printout, etc.) that the products be consumed on or before the expiration date. The suggestion or reminder can first be provided by the system a number of days before the expiration date, wherein the number of days can be a default value stored in computer readable memory and/or can be based on a value set by the user and stored in computer readable memory. Optionally, in addition, the user can specify that expiration notices are to be provided for certain specified items and/or the user can specify that expiration notices are not to be provided for certain specified items.

Optionally, when a suggestion or reminder is provided, the user can instruct the system not to provide further reminders regarding the expiring product or can instruct the system to provide another reminder at or after a specified time or period (e.g., a snooze instruction).

The system will optionally suggest the reordering of products based on one or more of expiration dates, consumption patterns, delivery schedules, current household item inventory, and user preferences, such as: special diets, as fat free diet, low carb. diet, vegetarian diet, Kosher food only, or other special or selected diet.

As similarly described above, the suggestion or reminder can first be provided a number of days before the expiration date, wherein the number of days can be a default value stored in computer readable memory and/or can be based on a value set by the user and stored in computer readable memory. Optionally, when a suggestion is provided, the user can optionally instruct the system not to provide further reminders regarding the product or can instruct the system to provide another reminder at a specified time or period.

Other consumer food-related information can also be accessed and utilized by the system from computer memory. For example, recipes can be stored on a local and/or a remote information system. The recipes can include ingredients, quantities, and instruction of preparation. Optionally, the system can store and/or calculate from stored information, recipe ingredient quantity information for different serving sizes.

Optionally, the recipes can be selected or downloaded from another computer system based on the products avail-

able in the house, including the contents inside the refrigerator and on other various locations in the house.

The system can compare the available products or contents (e.g., those stored in the refrigerator and/or in other storage locations) with stored recipes, a serving size specified by the user, and/or user preferences, such as: special diets, including fat free diet, low carb, diet, vegetarian diet, Kosher food only, or other special diet.

The system can suggest one or more recipes that more closely match the user's preferences, the available ingredients, and the desired serving size, and the recipe can then be prepared by or for the user. Because the system may not be aware of all the ingredients in the user's possession, the user can manually specify that the user does or does not have certain ingredients available, and the foregoing information can affect the recipes recommended to the user.

By way of further example, the system can present on a display a list of recipe titles (e.g., teriyaki chicken, fried chicken, butter chicken, etc.), optionally with a brief listing of the main ingredients. The user can then select a listed recipe, the complete recipe (including a complete ingredient listing, ingredient quantities, cooking temperature, etc.) is then displayed, and the user can optionally print out the recipe. Because system may not be aware of all the ingredients in the user's possession, the user can manually specify that the user does or does not have certain ingredients available. By way of example, some or all of recipe information (e.g., cooking temperature and time) can be transmitted to a cooking device, such as an oven, which can use the information in the cooking process.

By way of further example, as similarly discussed above, the system optionally reminds the user to replace a product before the expiration date gathered through products tags. The system can optionally be configured by the user to automatically trigger orders within a predetermined amount of time prior to the expiration date. Optionally, the order timing can be based in part on the time it takes to deliver the order once the order is placed, where, for example, the order will be placed to ensure the order will arrive on, or shortly before the expiration date. In addition, the user can optionally specify, via a user interface, that for future orders if an order value is below a certain amount and/or a delivery charge is greater than a certain cost, the order should not yet be placed. Optionally, the system determines if an item has been removed from a storage area (e.g., a refrigerator) by comparing previous scanned information with current scan information. If the system does not locate the item within a storage area within a predetermined amount of time (e.g., an hour, 4 hours. 8 hours, 12 hours, or 24 hours), the system optionally infers that the item has been fully consumed, and adds the item to an order. Optionally, the predetermined amount of time is settable by a user.

The physical configuration of the refrigerator storage areas can be stored in computer local or remote physical memory. By way of example, the configuration information includes the placement, depth, width and height dimensions of the refrigerator and/or freezer storage areas. The configuration information can also store information regarding storage areas intended to store a particular type of food product. For example, information (e.g., dimensions, special temperature settings, etc.) regarding vegetable drawers, fruit drawers, dairy product storage areas, and the like can be stored. Shelve and drawer weight limitations (e.g., recommended maximum weight) are optionally stored as well. Certain configuration information can optionally be downloaded over a network from a remote computer system (e.g.,

FRESHUB 000296

US 10,213,810 B2

7

from a Web site associated with the refrigerator or the system provider) based on, for example, the refrigerator model or serial number.

In addition, the system can record which storage locations are occupied, and which locations are available for additional storage.

The system can compare some or all of the foregoing information with product and packaging information (such as volume and dimensions including depth, width and height), that can be read from the item tag or retrieved from a local or remote database using an item identifier read from the item tag, enables the system, and determine one or more ways to organize items on shelves and in drawers. Optionally, the system can provide a user with suggestions or recommendations on how to organize the refrigerator and freezer by suggesting placement of products with respect to storage shelves and drawers.

By way of illustration, the system can compare product dimensions and/or weight with the refrigerator or shelf configuration and/or available locations, and using the comparison results, suggest where a product or products should be placed via a user interface. This information can be presented in a touch screen display or other user interface. By way of example, the system can display a three dimensional representation of items already on storage shelves, and then highlight items that are first to be removed as part of the reorganization process. Once the user has removed the indicated items, the system displays where each of the removed items are to be placed on the storage shelves. Optionally, the system provides a printout of stored items and the storage locations so that the user can easier locate items and determine if the user has a certain items, and without having to physically search for items. Optionally, an "expired" control is provided, which, when activated, causes the system to display and/or printout a list of expired items and their locations.

Optionally, the system provides a user interface with a search field, wherein the user can enter in the name of an item or an item type. The system then searches its database to locate matches or near matches, and display search results to the user. The search results can include a list of the matches or near matches, the quantity of the matching and near matching items, and their storage locations.

As similarly described above, optionally, the system, via a suggestion user interface, provides item suggestions and recommendations to the user. For example, the system can suggest items to be consumed (e.g., via a meal recommendation including one or more of an appetizer, a main course, dessert, and/or a drink) based on item availability in the user's house and/or on information input by one or more users (e.g., members of the household, one or more physicians of a household member, etc.). For example, the user information can include food preferences, special diets, modes, etc., input by the user via a keyboard, a touch screen, voice recognition, or other input method.

Optionally, the system stores different profiles and preferences for different users in the same household. Optionally, when a user wants the system to provide a meal recommendation, the user activates a physical or a soft meal suggestion icon or button. The system then retrieves the names of household members from its database, and presents the names of the household members on the meals suggestions user interface, optionally in addition to an "entire household" control. In order to indicate who will be participating in the meal, the user can select one or more of the household member names, or the "entire household".

8

Optionally, a user interface is provided via which the user can indicate which type of meal (e.g., breakfast, brunch, lunch, dinner), meal courses (e.g., salad, soup, appetizer, main course, dessert), and a food-type category (e.g., fish, meat, etc.) the user wants. The system will then access the profiles and preferences of the meal participants, as well as the item inventory, and provide a corresponding meal recommendation.

Optionally, a user can trigger or provide a command through a system user interface to communicate to the central system or directly to a service provider, such as a laundry company or a newspaper/magazine service provider, to directly order their service or to trigger a request for servicing, such as the service of picking up or delivering goods, and/or to suspend a service, such as to suspend newspaper delivery for a specified period of time.

Optionally, the system can further include a voice recording device and/or the voice recording device can be independent of the system. The voice recording device can include digital memory (e.g., a disk drive, FLASH memory, etc.) or analog memory (e.g., a cassette tape). A user can record a product description on the device by activating a record control, which can be in the form of a button, a switch, a voice recognition command or other record triggering method. In an example embodiment, the device records a product description verbally provided by the user and creates a digital file. The description can be provided as part of a verbally provided product order. Optionally, a different file is created for each recorded production description. The device transfers the file to a remote database over a network such as the Internet. The transfer can be performed substantially immediately, in response to a user command, or on a scheduled basis.

A remote computer processing system receives, stores, and accesses such files, which can be received from a plurality of voice recording devices. The remote computer system then utilizes voice recognition software to translate the voice recording files into text files. Optionally, the voice recognition software increases recognition accuracy by, when there are more than one potential word matches, placing more weight on words related to the types items being purchased (produce, cereal, milk, etc.) and the users past purchase history. The remote computer system can optionally match the spoken order with a SKU (Stock Keeping Unit, e.g., an identifier, such as a unique numeric identifier associated with a specific product) retrieved from a SKU database. The SKU database optionally stores SKUs in association with a text description of the corresponding item. For example, if the user verbally ordered a cereal by name, the remote computer system translates the name into text or other computer readable form, and matches the text with text stored in association with a SKU (or other identifier) to locate the correct SKU. Optionally, the voice recognition and/or SKU matching and identification can be performed instead or additionally by the user's local system.

The remote computer processing system optionally shares a text version (e.g., the textual representation of the order and/or the corresponding SKU) and/or recorded verbal version of the order. For example, the remote computer system can share the text and/or verbal version of the order via a web site, telephone, fax, short messaging system, or via other communication techniques. Thus, for example, the system can textually share an order that had been placed verbally with one or more product suppliers and/or with the user. For example, the remote system can add the item(s) identified in the verbal order to the user's shopping cart or other shopping list, optionally in association with a digital

FRESHUB 000297

US 10,213,810 B2

9                                                                    10

file that includes the user's spoken order. Users can then verify the text conversion of the spoken order. For example, the user can click on an item in an order list for which verification is requested, hear the user's previously recorded order, and determine if the written description in the shopping list matches the user's spoken order. Optionally, the system uses individual consumer information, such as the user's location and the user's account information and preference profile to better match the user's spoken order with a product. The system uses the product identification (e.g., SKU) generated from the verbal order to request quotes from providers, provide quotes to the user, and to offer additional or alternative products to the user. The user can then place an order for the identified product.

Optionally, the system does not provide voice recognition. Instead, an icon corresponding to the voice recording appears in the user's online shopping list (e.g., an electronic shopping cart). Optionally, the icon has an associated recording date displayed therewith. The user can click on the icon, the system will play the recording to the user, and the user can manually key in the product name and/or search an online catalog.

Optionally, in addition or instead, a picture of an item the user wants to order can be taken using a camera coupled to the system, a cell phone camera, a standalone camera, or other camera. The picture can be transmitted by the system or otherwise to the remote system. The remote system can then perform image recognition to come up with a "signature" identifying the item. The remote system can then locate a corresponding SKU from a SKU database, which optionally stores image signature information and/or an image, in association with a corresponding SKU. The remote system uses the product identification (e.g., SKU) generated from the image to request quotes from providers, provide quotes to the user, and to offer additional or alternative products to the user. The user can then place an order for the identified product. While the foregoing verbal and photographic order processes can be used with a variety of item types, it can be particularly useful with respect to items that often do not have bar codes, such as fresh fruits (e.g., a single apple) or vegetables.

Optionally, the system does not provide image recognition. Instead, a thumbnail (or larger image size) version of the picture of the item, corresponding to the image captured by the camera, appears in the user's online shopping list (e.g., an electronic shopping cart), displayed on the user's local display. Optionally, the displayed picture has an associated image capture date displayed therewith. The user can click on the picture, and the system will optionally display a larger version of the picture. Thus, the picture acts as a reminder to the user. The user can then manually key in the product name and/or search an online catalog and/or the user's purchase history for the product to thereby add the product to the order list.

Example embodiments will now be described with reference to the figures. Referring to FIG. 1, an item tracking and recommendation processing system **100** includes a central processing unit **102**, computer readable memory **104** (e.g., removable and/or fixed: volatile memory, such as RAM, non-volatile memory, such as FLASH EEPROM, a hard disk drive, an optical drive, etc.), and a database **106**, which can be stored, in whole or in part in the computer readable memory **104**. A network interface **108** (e.g., a wireless or wired network interface) is provided to enable the item tracking and recommendation processing system **100** to access and/or transmit data (e.g., dimensional data regarding a refrigerator or other item storage system, recipes, user

preference information, user account information, etc.) across a network, such as the Internet, a local network, and/or other network. The interface **108** can optionally include one or more of a digital subscriber line (DSL) interface, a T1 line interface, a satellite link, a cable hookup, a dial-up modem, etc. The system **100** can further include wired and/or wireless digital and/or analog input/output interfaces to receive and/or transmit information to one or more tag scanning sensors and/or presence sensors.

The system **100** can include and/or be coupled to one or more user interface devices (e.g., a touch screen display, a printer, a keyboard, dedicated mechanical keys, voice recorder, etc.). For example, the system **100** can be coupled to one or more user interface devices, sensors, scanners, and/or other systems via a USB or FireWire bus, a wired local network, such an Ethernet network, and/or a wireless network, such as an IEEE 802.11b or IEEE 802.11g compliant network, or a Bluetooth network.

The example database **106** includes recipes, content information for one or more item storage units (e.g., refrigerator (s), pantry, etc.), household members and/or frequent visiting meal participants, user preferences (e.g., food preferences, item ordering preferences, payment preferences, etc. of household members and/or frequent visitors), a system serial number, and the like. The database **106**, optionally also includes dimensional and configuration information for one or more storage units (e.g., available temperature settings, the existence of vegetable drawers, fruit drawers, dairy product storage areas, shelve and drawer weight limitations, etc.). For example, the database **106** can store a mapping of product codes or SKUs to product names, sizes, and packaging materials, as well as content information regarding items placed into storage units. Optionally, the database **106** stores shopping lists, passwords and/or unique identifiers for accessing remote databases and services.

The following is an example database schema that includes fields for payment preferences, storage unit identifiers for one or more storage units (e.g., one or more refrigerators), storage unit shelf dimensions, food preferences for one or more users (e.g., food preferences for breakfast, brunch, lunch, dinner, food avoidances, medical or other dietary restrictions, etc.), and order generation/ trigger preferences.

User Database Schema

| FIELD | DATA DESCRIPTION |
|---|---|
| Alternative Form of Payment | Alternative form of payment (credit card, electronic fund transfer, check, place on account, etc.), and corresponding payment information (credit card number, and credit card expiration date, bank account number, checking account number, etc.) |
| Refrigeration Unit 1 Identifier | Unique identifier, such as a serial number, associated with a first of the user's disposal units |
| Refrigeration Unit 1 Capacity | The capacity in units of measurement (gallons, liters, etc.) of Disposal Unit 1 |
| Shelf 1 | Shelf 1 dimensions |
| Shelf 2 | Shelf 2 dimensions |
| Shelf n | Shelf n dimensions |
| User 1 Food Preferences | Food preferences - Breakfast |
|  | Food avoidance - Breakfast |
|  | Food preferences - Brunch |
|  | Food avoidance - Brunch |
|  | Food preferences - Lunch |

FRESHUB 000298

US 10,213,810 B2

11
-continued

| FIELD | DATA DESCRIPTION |
|---|---|
| | Food avoidance - Lunch |
| | Food preferences - Dinner |
| | Food avoidance - Dinner |
| | Dietary restrictions |
| User n Food | Food preferences - Breakfast |
| Preferences | Food avoidance - Breakfast |
| | Food preferences - Brunch |
| | Food avoidance - Brunch |
| | Food preferences - Lunch |
| | Food avoidance - Lunch |
| | Food preferences - Dinner |
| | Food avoidance - Dinner |
| | Dietary restrictions |
| Order Generation | Generate/submit order preferences |
| Preference | |

The following is an example contents database schema that stores item information for the contents of one or more storage units. The information, or selected portions thereof, may have been scanned by one or more scanners from an item tag, manually entered by the user, or retrieved from a remote database using the item SKU or other identifier. The example schema includes fields for a product code, ingredients, calories, a diet category, a product name, dimensions, weight, an expiration date, a manufacturer, item location, item storage temperature, and cooking guidelines.

Contents Database Schema

| FIELD | DATA DESCRIPTION |
|---|---|
| Product code | The item SKU |
| Ingredients | The item ingredients |
| Calories | The number of calories in the item or the number of calories per item unit |
| Diet Category | low sodium, low cholesterol, low carbohydrate, non-fat, peanut-free, gluten-free, sugar-free, non-dairy, vegetarian, etc. |
| Product name | The text name of the item |
| Dimensions | One or more of length, width, height, diameter, volume |
| Weight | Original pre-use weight |
| Expiration date | Item expiration or "best if used by" date |
| Manufacturer | The name of the manufacturer or other manufacturer identifier |
| Location Information | Storage unit and/or shelf identifier of where item is stored |
| Storage Temperature | The temperature or temperature range at which the item is to be stored |
| Cooking Information | The temperature or temperature range at which the item is to be cooked, cooking time, cooking method (boiling, roasting, broiling, frying, microwave, etc.) |

Recipe Database Schema

The following is an example recipe database schema. The example schema includes fields for ingredients (e.g., ingredient names, and amount per serving or per a specified number of servings), cooking instructions, calories per serving, and other nutritional information, such as the amount of one or more of salt, carbohydrates, protein, fiber, fat, vitamins, etc. per serving and/or the % percentage of a recommended daily amount of the foregoing a serving will provide.

12

| FIELD | DATA DESCRIPTION |
|---|---|
| Ingredient 1 | Name and amount per serving |
| Ingredient 2 | Name and amount per serving |
| Ingredient n | Name and amount per serving |
| Cooking Instructions | Cooking method(s), time, temperature, etc. |
| Calories/serving | |
| Salt, carbohydrates, protein, fiber, fat, vitamins/serving | |

FIG. 2 illustrates an example embodiment of a networked storage system. A computer system 202 (which can be in the form of system 100 illustrated in FIG. 1), is coupled to a local scanner 204, a screen 206 (e.g., a touch screen that can receive user inputs via finger and/or pen), and optionally a microphone and/or camera 203. The microphone is optionally coupled to a digitizer which converts spoken language into a digital representation. The camera can be a digital still and/or video camera that captures images and stores them digitally and/or in analog form. The computer system 202, scanner, 204, and/or screen 206 optionally are physical, and optionally removably, mounted to a refrigerator 208. The computer system 202, scanner, 204, and/or screen 206 can optionally be mounted on a wall, a stand, or other supporting structure. The computer system 202 is optionally coupled to remote scanners via networks 218, 220 (e.g., WiFi networks). The remote scanners are mounted to and/or configured to scan one or more other storage units, such as refrigerator 210 and cabinet 212. Optionally, a storage unit, such as cabinet 212, includes multiple shelves with corresponding scanners. Thus, optionally, one computer system can collect and store information scanned from items stored in multiple storage units. Optionally, each storage unit can have a computer system that incorporates some or all of the elements of system 100.

FIG. 3 illustrates an example meal suggestion process. At state 302, a user interface is displayed by an item tracking and recommendation processing system (ITRP), via which a user can indicate who is going to participate in a meal and the meal type (breakfast, lunch, dinner). Optionally, the system can infer the meal type based on the time of day by reading a real time clock (e.g., if the request is at 8:00, the system infers the meal is breakfast). At state 304, the ITRP retrieves information regarding which items are currently available (e.g., in one or more household storage units). At state 306, the system retrieves food preference information for selected meal participants. At state 308, the system matches user preferences and item availability for the meal type. At state 310 the system displays information regarding one or more meals that meet the user preferences and that can be prepared using the available food items. At state 312, the system receives a user selection of the displayed meals. At state 314, the system displays a detailed menu corresponding to the user selection.

FIG. 4 illustrates an example order generation process. At state 402, the system retrieves expiration date information for items within one or more storage units (e.g., a refrigerator and/or cabinet). At state 404, the system retrieves a user preference regarding when an order should be generated relative to at least item expiration dates (e.g., a time prior to an expiration date selected by the user wherein the system is to ask the user if an item should be placed, also referred to as a time window). At state 406, the system compares the user preference with the expiration date information and determines which items have expiration dates that fall within the window. By way of example and not

FRESHUB 000299

US 10,213,810 B2

13                                                              14

limitation, the time window can be one day or less, greater than one day, and/or selected based upon a projected delivery date or time. At state **408**, the system presents to the user via a display device a list of items identified at state **406** and asks the user to select which items are to be ordered. At state **410**, the system receives the user selections and orders the selected items from a provider selected by the user.

FIG. **5** illustrates an example meal suggestion request user interface. The interface includes a Meal Selection section, wherein the user can indicate for which meal the user wants suggestions. In the illustrated example, the user can select from: breakfast, brunch, lunch, dinner, and a late night snack. A courses section allows the user to indicate what courses suggestions are to be provided for. The course selection optionally changes depending on the meal selection. For example, if the user selects breakfast, optionally, the course selection will not include soup or salad options. A "meal participants" user interface enables the user to indicate who is going to participate in the meal. The example list is based on user set-up information, wherein the user specifies household members and others that will be participating in the meal. In this example, a guest field is provided wherein the user can specify the number of guests attending for which food preference information is not available in the system database. The system can use the guest number information when providing ingredient quantities as part of recipes. Referring back to FIG. **5**, a "provide recommendations" control is provided, which, when activated will cause the system to provide one or more meal recommendations.

FIG. **6** illustrates another example meal suggestion request user interface. The interface provides one or more course suggestions in response to the user selections made via the interface illustrated in FIG. **5**, user food preferences, and item availability. In this example, suggestions are provided for a salad, a main course, and a dessert. Once the user selects the desired suggestions, the user can activate a "provide recipe" control, and the system will then provide the corresponding recipes, with the recipe portions scaled to the number of meal participants. The user can optionally activate a "provide additional suggestions" control, and the system will provide additional suggestions for courses wherein the user has not yet made a selection.

FIG. **7** illustrates an example user interface for ordering items. The example list includes items whose expiration dates are within a predetermined window and/or items were present in a storage unit (e.g., a refrigerator), but which the system has determined is no longer in the storage unit (e.g., has been removed from the storage unit and not replaced within a predetermined amount of time). The user can select which items are to be ordered and the quantity of the items. Optionally, the system defaults by placing check marks for each item and the user unchecks the item if the user does not want to order the item. Optionally, the system provides a default quantity, which can be based on a previous user specified value and/or on consumption patterns.

FIG. **8** illustrates an example method for processing a voice order. At state **802**, the user verbally provides an order. By way of illustration, the user may press a "record shopping list" control. In response, the system can prompt the user via a system display and/or via spoken instruction to verbally record a shopping list or a portion thereof. The recording can be intended as a reminder. The user may be given a limited amount of time (e.g., 5 seconds, 10 seconds, 30 seconds, 1 minute) to speak the order. The system can inform the user of the limited time, and provide a clock or other indicator (e.g., a countdown timer) that continuously

displays the time remaining to record the order. Optionally, the user can be provided with an "extend recording time" control, via which the user can cause the system to provide additional recording time. At the end of the recording time, the user is optionally provided the opportunity to review the recording (e.g., have the recording played back), and to delete and re-record the shopping list if the previous recording was unsatisfactory.

For example, the user can speak the order into the microphone **203**, illustrated in FIG. **2**. The system then digitizes and records the spoken order in a file. At state **804**, the system transmits the digitized verbal order to a remote system, such as remote system **214**. At state **806**, the remote system performs voice recognition on the order in order to interpret the spoken order and converts the spoken order into text. By way of example, the remote system can use grammar constrained recognition and/or natural language recognition. The voice recognition system optionally uses training. At state **808**, the remote system transmits the text version of the order to the user so that the user can verify if text version is an accurate interpretation of the spoken order. For example, the remote system can transmit the text version to the system **202** or another user computer for display to the user. Optionally, if the user determines that the order was not correctly translated, the user can provide a corrected order (e.g., via a keyboard, or by speaking the order again) to the remote system.

At state **810**, the remote system transmits the translated version of the order (e.g., the text version) to one or more providers (e.g., supermarkets, wholesale establishments, etc.) in order to receive quotes. The remote system can optionally match the translated version of the spoken order with a SKU retrieved from a SKU database, which stores SKUs in association with a text description of the corresponding item, and transmit the SKU to the providers. At state **812**, the remote system receives quotes from the potential providers, and transmits the quotes to the user. At state **814**, the user selects a provider and authorizes placement of the order. At state **816**, the remote system places the order with the selected provider.

It should be understood that certain variations and modifications of this invention would suggest themselves to one of ordinary skill in the art. The scope of the present invention is not to be limited by the illustrations or the foregoing descriptions thereof.

What is claimed is:

**1**. A voice processing system comprising:

a networks interface;

a computer;

non-transitory memory that stores instructions that when executed by the computer cause the computer to perform operations comprising:

associate a unique identifier with a remote system configured to receive user spoken words, the remote system comprising:

a microphone, a wireless network interface, a voice output system, and a digitizer coupled to the microphone, wherein the digitizer is configured to convert spoken words into a digital representation;

download configuration data to the remote system;

receive, using the network interface, a digitized order of a user from the remote system;

translate at least a portion of the digitized order to text;

use the text, translated from the digitized order, to identify an item corresponding to the text description;

**FRESHUB 000300**

US 10,213,810 B2

| 15 | 16 |

include the identified item in a set of one or more items associated with the user;

enable the set of items, including the identified item, to be displayed to the user via a user device different than the remote system; and

enable the set of items, including the identified item, to be provided to an item provider.

**2.** The voice processing system as defined in claim **1**, wherein the identification of an item corresponding to the text description is based in part on location information of the user.

**3.** The voice processing system as defined in claim **1**, wherein the identification of an item corresponding to the text description is based in part on preference information of the user.

**4.** The voice processing system as defined in claim **1**, wherein the identification of an item corresponding to the text description is based in part on a recorded history associated with the user.

**5.** The voice processing system as defined in claim **1**, wherein the system is configured to increase recognition accuracy by placing more weight on words related to types of items being purchased by the user in translating at least a portion of the digitized order to text.

**6.** The voice processing system as defined in claim **1**, wherein the system is configured to increase recognition accuracy by, when there are more than one potential matches to the text, placing more weight on words related to the user's purchase history.

**7.** The voice processing system as defined in claim **1**, wherein the system is configured to cause the set of items to be shared using speech or text.

**8.** The voice processing system as defined in claim **1**, wherein the system is configured to cause the set of items to be shared via a website, short messaging service, or telephone.

**9.** The voice processing system as defined in claim **1**, wherein the system is configured to:

provide to at least one user device a first identifier determined by the voice processing system as corresponding to a first item in a given user order and identifiers corresponding to alternative items from which the user can choose.

**10.** The voice processing system as defined in claim **1**, wherein the system is configured to use the identification of the item to offer the user an additional or alternative item and to enable the user to order the additional or alternative item.

**11.** The voice processing system as defined in claim **1**, wherein the voice processing system is configured to enable the user to add a reminder with respect to at least one item.

**12.** The voice processing system as defined in claim **1**, wherein the order comprises an item name.

**13.** The voice processing system as defined in claim **1**, wherein an item description from the user is recorded at least partly in response to a verbal user command.

**14.** The voice processing system as defined in claim **1**, wherein a separate digital file is used to store respective digitized item descriptions from the user.

**15.** The voice processing system as defined in claim **1**, wherein the system is configured to enable the user to verify that text conversion of the spoken order via a user interface.

**16.** The voice processing system as defined in claim **1**, wherein the system is configured to enable the user to select among a plurality of providers, a provider to supply the identified item.

**17.** A computer-implemented method, the method comprising:

associating a unique identifier with a remote system configured to receive user spoken words, the remote system comprising:

a microphone, a wireless network interface, a voice output system, and a digitizer coupled to the microphone, wherein the digitizer is configured to convert spoken words into a digital representation;

downloading configuration data to the remote system;

receiving over a network at a network interface a digitized order of a user from the remote system;

receiving, using the network interface, a digitized order of a user from the remote system;

translating at least a portion of the digitized order to text;

using the text, translated from the digitized order, to identify an item corresponding to the text description;

including the identified item in a set of one or more items associated with the user;

enabling the set of items, including the identified item, to be displayed to the user via a user device different than the remote system; and

enabling the set of items, including the identified item, to be provided to an item provider.

**18.** The computer-implemented method as defined in claim **17**, wherein identifying an item corresponding to the text description is based in part on location information of the user, preference information of the user, and a recorded history associated with the user.

**19.** The computer-implemented method as defined in claim **17**, the method further comprising placing more weight on words related to types of items being purchased by the user in translating at least a portion of the digitized order to text.

**20.** The computer-implemented method as defined in claim **17**, the method further comprising, when there are more than one potential matches to the text, placing more weight on words related to the user's purchase history.

**21.** The computer-implemented method as defined in claim **17**, the method further comprising enabling the set of items to be shared using speech or text.

**22.** The computer-implemented method as defined in claim **17**, the method further comprising enabling the set of items to be shared via a website, short messaging service, or telephone.

**23.** The computer-implemented method as defined in claim **17**, the method further comprising providing to at least one user device a first identifier determined to be corresponding to a first item in a given user order and identifiers corresponding to alternative items from which the user can choose.

**24.** The computer-implemented method as defined in claim **17**, the method further comprising using the identification of the item to offer the user an additional or alternative item and to enable the user to order the additional or alternative item.

**25.** The computer-implemented method as defined in claim **17**, the method further comprising enabling the user to add a reminder with respect to at least one item.

**26.** The computer-implemented method as defined in claim **17**, wherein an item description from the user is recorded at least partly in response to a verbal user command.

**27.** The computer-implemented method as defined in claim **17**, wherein a separate digital file is used to store respective digitized item descriptions from the user.

FRESHUB 000301

US 10,213,810 B2

**17**

**18**

**28**. The computer-implemented method as defined in claim **17**, the method further comprising enabling the user to verify that text conversion of the spoken order via a user interface.

**29**. The computer-implemented method as defined in claim **17**, wherein the set of items comprises a list of items.

\* \* \* \* \*

FRESHUB 000302



US010232408B2

## (12) United States Patent
Zsigmond et al.

(10) Patent No.: **US 10,232,408 B2**
(45) Date of Patent: **Mar. 19, 2019**

(54) **SYSTEMS AND METHODS FOR SCANNING INFORMATION FROM STORAGE AREA CONTENTS**

(71) Applicant: **IKAN HOLDINGS LLC**, New York, NY (US)

(72) Inventors: **Fabio Zsigmond**, Riverside, CT (US); **Sion Elie Douer**, New York, NY (US); **Geraldo Yoshizawa**, Sao Paulo (BR); **Frederico Wagner**, New York, NY (US)

(73) Assignee: **IKAN HOLDINGS LLC**, New York, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **16/103,394**

(22) Filed: **Aug. 14, 2018**

(65) **Prior Publication Data**
US 2018/0353998 A1    Dec. 13, 2018

**Related U.S. Application Data**

(63) Continuation of application No. 15/905,591, filed on Feb. 26, 2018, which is a continuation of application
(Continued)

(51) **Int. Cl.**
*B07C 7/04*    (2006.01)
*B07C 5/34*    (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ........... *B07C 5/34* (2013.01); *G06Q 30/0601* (2013.01); *G06Q 40/04* (2013.01); *H04M 1/6505* (2013.01); *H04M 3/533* (2013.01)

(58) **Field of Classification Search**
CPC ...... B07C 5/34; G06Q 40/04; G06Q 30/0601; H04M 1/6505; H04M 3/533
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,636,950 A    1/1987  Caswell et al.
5,478,989 A    12/1995  Shepley
(Continued)

FOREIGN PATENT DOCUMENTS

DE    100 17 503 A1    10/2001

OTHER PUBLICATIONS

Supplementary European Search Report; Application No. 04713957. 1; dated Sep. 3, 2008.
(Continued)

*Primary Examiner* — Andrew Joseph Rudy
(74) *Attorney, Agent, or Firm* — Knobbe, Martens, Olson & Bear LLP

(57) **ABSTRACT**

The present invention is related to methods and systems for collected item information for stored items. In one embodiment, a networked food storage system comprises a first sensor configured to read information from item tags coupled to items, wherein the items are stored or intended to be stored in a storage unit. A data store is configured to store food preferences for at least a first user. Instructions, stored in computer readable memory, are configured to: cause a first user interface to be displayed to the first user via which the first user can request a meal suggestion; retrieve preference information for the first user from computer readable memory; retrieve information read from at least a first item tag; and provide a meal suggestion based at least in part on preference information for the first user and item tag information.

**30 Claims, 8 Drawing Sheets**





Joint Exhibits
**JTX-3**
19-cv-00885-ADA

US 10,232,408 B2

Page 2

**Related U.S. Application Data**

No. 15/604,422, filed on May 24, 2017, now Pat. No. 9,908,153, which is a continuation of application No. 11/301,291, filed on Dec. 12, 2005, now Pat. No. 9,821,344.

(60) Provisional application No. 60/635,122, filed on Dec. 10, 2004.

(51) **Int. Cl.**
*G06Q 40/04* (2012.01)
*G06Q 30/06* (2012.01)
*H04M 3/533* (2006.01)
*H04M 1/65* (2006.01)

(58) **Field of Classification Search**
USPC ........ 370/352, 356; 379/88.1, 88.16, 114.01, 379/219; 455/150.1, 405, 406, 414.1; 704/231, 258, 266, 268, 270.1; 705/28–30; 709/204, 217–219
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,489,773 A | 2/1996 | Kumar | |
| 5,532,928 A | 7/1996 | Stanczyk et al. | |
| 5,641,039 A | 6/1997 | Dumont | |
| 5,664,110 A | 9/1997 | Green et al. | |
| 5,699,525 A | 12/1997 | Embutsu et al. | |
| 5,712,989 A | 1/1998 | Johnson et al. | |
| 5,841,115 A | 11/1998 | Shepley | |
| 5,901,203 A * | 5/1999 | Morganstein .......... G10L 17/22 |
| | | | 379/218.01 |
| 5,914,472 A | 6/1999 | Foladare et al. | |
| 5,933,829 A | 8/1999 | Durst | |
| 5,940,074 A | 8/1999 | Britt et al. | |
| 5,957,695 A | 9/1999 | Redford et al. | |
| 5,960,402 A | 9/1999 | Embutsu et al. | |
| 5,965,858 A | 10/1999 | Suzuki et al. | |
| 5,969,317 A | 10/1999 | Espy et al. | |
| 5,978,773 A | 11/1999 | Hudetz et al. | |
| 5,979,240 A | 11/1999 | Rix et al. | |
| 5,979,757 A | 11/1999 | Tracy et al. | |
| 5,983,199 A | 11/1999 | Kaneko | |
| 5,987,440 A | 11/1999 | O'Neil et al. | |
| 5,995,105 A | 11/1999 | Reber et al. | |
| 6,024,281 A | 2/2000 | Shepley | |
| 6,031,621 A | 2/2000 | Binder | |
| 6,034,660 A | 3/2000 | Kessenich et al. | |
| 6,047,843 A | 4/2000 | Mecke | |
| 6,078,793 A * | 6/2000 | Satyamurti .......... H01Q 11/12 |
| | | | 375/301 |
| 6,085,112 A | 7/2000 | Kleinschmidt | |
| 6,089,453 A | 7/2000 | Kayser et al. | |
| 6,131,744 A | 10/2000 | Pratt | |
| 6,205,204 B1 * | 3/2001 | Morganstein .......... G10L 17/22 |
| | | | 379/67.1 |
| 6,314,457 B1 | 11/2001 | Schena et al. | |
| 6,367,518 B2 | 4/2002 | Duncan | |
| 6,378,721 B1 | 4/2002 | Williams | |
| 6,386,386 B1 | 5/2002 | George | |
| 6,425,487 B1 | 7/2002 | Emmott et al. | |
| 6,434,530 B1 | 8/2002 | Sloane et al. | |
| 6,435,407 B1 | 8/2002 | Fiordelisi | |
| 6,442,952 B2 | 9/2002 | Roh et al. | |
| 6,446,979 B1 | 9/2002 | Schena et al. | |
| 6,457,127 B1 | 9/2002 | Reams | |
| 6,473,740 B2 | 10/2002 | Cockrill et al. | |
| 6,529,881 B2 * | 3/2003 | Morganstein .......... G06Q 20/206 |
| | | | 704/251 |
| 6,530,518 B1 | 3/2003 | Kirchilsky et al. | |
| 6,561,085 B1 | 5/2003 | Durbin et al. | |
| 6,640,214 B1 | 10/2003 | Nambudiri et al. | |

| | | | |
|---|---|---|---|
| 6,643,624 B2 | 11/2003 | Philipps et al. | |
| 6,662,163 B1 * | 12/2003 | Albayrak .............. H04M 3/493 |
| | | | 379/88.22 |
| 6,663,004 B2 | 12/2003 | Wagner et al. | |
| 6,663,148 B2 | 12/2003 | Bonora et al. | |
| 6,845,388 B1 | 1/2005 | Philyaw | |
| 6,885,735 B2 * | 4/2005 | Odinak .................. G10L 15/30 |
| | | | 379/88.1 |
| 6,928,413 B1 | 8/2005 | Philyaw | |
| 6,934,279 B1 * | 8/2005 | Sollee ................. H04M 1/2535 |
| | | | 370/352 |
| 6,975,856 B2 | 12/2005 | Ogasawara | |
| 6,993,507 B2 | 1/2006 | Meyer et al. | |
| 7,006,605 B1 * | 2/2006 | Morganstein .......... G06F 21/32 |
| | | | 379/88.01 |
| 7,013,292 B1 | 3/2006 | Hsu et al. | |
| 7,043,457 B1 | 5/2006 | Hansen | |
| 7,080,777 B2 | 7/2006 | Wagner et al. | |
| 7,086,592 B2 | 8/2006 | Wagner et al. | |
| 7,109,445 B2 | 9/2006 | Patterson et al. | |
| 7,110,829 B2 | 9/2006 | Cunningham et al. | |
| 7,114,656 B1 | 10/2006 | Garver | |
| 7,133,739 B2 | 11/2006 | Williamson et al. | |
| 7,165,721 B2 | 1/2007 | Wagner et al. | |
| 7,206,387 B2 * | 4/2007 | Jan ........................ H04M 3/50 |
| | | | 379/219 |
| 7,224,779 B2 * | 5/2007 | Finnigan .............. H04M 3/533 |
| | | | 379/211.02 |
| 7,229,015 B2 | 6/2007 | Persky | |
| 7,246,745 B2 | 7/2007 | Hudnut et al. | |
| 7,281,655 B2 | 10/2007 | Wagner et al. | |
| 7,295,181 B2 | 11/2007 | Alsio | |
| 7,303,124 B2 | 12/2007 | Wagner et al. | |
| 7,328,159 B2 | 2/2008 | Chang | |
| 7,328,842 B2 | 2/2008 | Wagner et al. | |
| 7,344,063 B2 | 3/2008 | Wagner et al. | |
| 7,373,317 B1 | 5/2008 | Kopelman et al. | |
| 7,386,100 B2 | 6/2008 | Michaelis | |
| 7,392,193 B2 * | 6/2008 | Mault ................... G06F 19/00 |
| | | | 704/275 |
| 7,472,075 B2 * | 12/2008 | Odinak ............. G06Q 30/0266 |
| | | | 455/150.1 |
| 7,580,850 B2 | 8/2009 | Iurie | |
| 7,660,772 B2 | 2/2010 | Verkama | |
| 7,681,792 B2 | 3/2010 | Wagner et al. | |
| 7,734,729 B2 | 6/2010 | Du et al. | |
| 7,856,248 B1 * | 12/2010 | Fujisaki .............. H04M 1/575 |
| | | | 455/414.1 |
| 7,949,529 B2 | 5/2011 | Weider | |
| 8,131,093 B1 | 3/2012 | Kim | |
| 8,175,886 B2 * | 5/2012 | Odinak ................. G10L 15/26 |
| | | | 704/270.1 |
| 8,320,958 B1 | 11/2012 | Fujisaki | |
| 8,370,163 B2 * | 2/2013 | Faisman .............. G10L 15/24 |
| | | | 704/231 |
| 8,447,602 B2 | 5/2013 | Bartosik | |
| 8,705,705 B2 | 4/2014 | Thenthiruperai | |
| 9,908,153 B2 * | 3/2018 | Zsigmond ............. B07C 5/34 |
| 2002/0008145 A1 | 1/2002 | Walsh et al. | |
| 2002/0016731 A1 | 2/2002 | Kupersmit et al. | |
| 2002/0059175 A1 | 5/2002 | Nakano | |
| 2002/0069137 A1 | 6/2002 | Hiroshige et al. | |
| 2002/0072923 A1 | 6/2002 | Guidry | |
| 2002/0073029 A1 | 6/2002 | Cheaib et al. | |
| 2002/0120502 A1 | 8/2002 | Sakaguchi | |
| 2002/0139848 A1 | 10/2002 | Catan | |
| 2002/0143550 A1 | 10/2002 | Nakatsuyama | |
| 2002/0161658 A1 | 10/2002 | Sussman | |
| 2002/0161704 A1 | 10/2002 | Powar | |
| 2003/0034391 A1 | 2/2003 | Wagner et al. | |
| 2003/0072488 A1 | 4/2003 | Barsness et al. | |
| 2003/0164754 A1 | 9/2003 | Roseen | |
| 2003/0171944 A1 | 9/2003 | Fine et al. | |
| 2003/0195818 A1 | 10/2003 | Howell et al. | |
| 2004/0100380 A1 | 5/2004 | Lindsay et al. | |
| 2004/0199545 A1 | 10/2004 | Wagner et al. | |
| 2004/0260513 A1 | 12/2004 | Fitzpatrick et al. | |
| 2005/0041840 A1 | 2/2005 | Lo | |

**US 10,232,408 B2**

Page 3

(56)             **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2005/0064900 A1 | 3/2005 | Goris et al. |
| 2005/0090233 A1 | 4/2005 | Chambers et al. |
| 2005/0154560 A1 | 7/2005 | Fitzpatrick et al. |
| 2005/0189412 A1 | 9/2005 | Hudnut et al. |
| 2006/0218057 A1 | 9/2006 | Fitzpatrick et al. |
| 2008/0104596 A1 | 5/2008 | Buonanno et al. |
| 2008/0133264 A1 | 6/2008 | Wagner et al. |
| 2008/0306872 A1 | 12/2008 | Felsher |
| 2009/0152348 A1 | 6/2009 | Ostrowski et al. |
| 2014/0214628 A1 | 7/2014 | Argue et al. |
| 2015/0379607 A1 | 12/2015 | Pedley et al. |
| 2016/0267565 A1 | 9/2016 | Katcher |
| 2017/0293965 A1 | 10/2017 | Sasaki et al. |
| 2018/0005631 A1 | 1/2018 | Lee et al. |

OTHER PUBLICATIONS

Dietician-Healthy Eating Services, "Transforming How Dietitians Offer Advice," AirClic, 2001-2003.
International Search Report, International Appln. No. PCT-IB04-01076, May 25, 2005.
PCT International Search Report dated Feb. 24, 2003.
Shop Smart, Eat Right—Sample Grocery List, "Guide Yourself to Healthier Eating," Beeline Shopper, 2001-2002.
Shop Smart, Eat Right—Sample Recipes, "Great Meals Made Easy," Beeline Shopper, 2001-2002.
Shop Smart, Eat Right, "Healthier, More Nutritious Meals," Beeline Shopper, 2001-2003.

\* cited by examiner

FRESHUB 000436



*FIG. 1*

FRESHUB 000437



**FIG. 2**

FRESHUB 000438



FIG. 3

FRESHUB 000439



**FIG. 4**

FRESHUB 000440

MEAL SELECTION                COURSES

☐ Breakfast                   ☐ SOUP
☐ Brunch                      ☒ SALAD
☐ Lunch                       ☒ MAIN COURSE
☒ Dinner                      ☒ DESERT
☐ Late night snack

MEAL
PARTICIPANTS

☒ MOM
☒ DAD
☒ BOBBY
☒ JANE
☐ NANNY                       ┌─────────────────────┐
☐ GRANDMA                     │ PROVIDE             │
☐ GRANDPA                     │ RECOMMENDATIONS     │
☐ GUEST    ☐ NUMBER OF GUEST  └─────────────────────┘

## *FIG. 5*

FRESHUB 000441

SALADS

☒ TOMATO SALAD

☐ GREEN SALAD

MAIN COURSE

☐ ROASTED CHICKEN

☒ GRILLED SALMON

DESSERT

☒ SORBET

☐ CHOCOLATE CAKE

| PROVIDE RECIPES | PROVIDE ADDITIONAL SUGGESTIONS |
|---|---|

*FIG. 6*

FRESHUB 000442

FIG. 7

FRESHUB 000443



**FIG. 8**

FRESHUB 000444

US 10,232,408 B2

**1**

# SYSTEMS AND METHODS FOR SCANNING INFORMATION FROM STORAGE AREA CONTENTS

## INCORPORATION BY REFERENCE TO ANY PRIORITY APPLICATIONS

Any and all applications for which a foreign or domestic priority claim is identified in the Application Data Sheet as filed with the present application are hereby incorporated by reference under 37 CFR 1.57.

## BACKGROUND OF THE INVENTION

### Field of the Invention

The present invention is related to sensor systems and processes, and in particular for sensing items stored in storage units and performing related automated processes.

### Description of the Related Art

Perishable items are often stored in refrigerated storage units, such as refrigerators. Such perishable items often have expiration dates or "best used by dates" printed thereon. However, because perishable items are often densely packed into a refrigerated storage unit, and because the expiration dates are sometimes faintly or poorly printed, users often are not able to conveniently monitor the expiration dates. Hence, items are often retained in the refrigerated storage unit past their expiration date, taking up valuable storage space. In addition, because the user is often unaware of when an item has reached its expiration date, the user often does not replace the expired item in a timely fashion.

## SUMMARY OF THE INVENTION

The present invention is related to sensor systems and processes, and in particular for sensing items stored in storage units and performing related automated processes.

The following embodiments are intended to be illustrative examples, and not to limit the scope of the invention.

One example embodiment provides a networked refrigeration system, comprising: a first sensor configured to read information from item tags coupled to items, wherein the items are stored or intended to be stored in a refrigeration unit; a data store configured to store food preferences for a plurality of household members; instructions, stored in computer readable memory, configured to: cause a first user interface to be displayed to the first user, the first user interface listing household members; receive a user input indicating which household members will participate in a first meal; retrieve preference information for at least a portion of the household members that will participate in the first meal; retrieve information read from at least a first item tag; select at least a first recipe stored in computer readable memory based at least in part on preference information for at least one meal participant and item tag information; and provide the recipe to a first user.

Another example embodiment provides a networked food storage system, comprising: a first sensor configured to read information from item tags coupled to items, wherein the items are stored or intended to be stored in a storage unit; a data store configured to store food preferences for at least a first user; instructions, stored in computer readable memory, configured to: cause a first user interface to be displayed to the first user via which the first user can request a meal

**2**

suggestion; retrieve preference information for the first user from computer readable memory; retrieve information read from at least a first item tag; and provide a meal suggestion based at least in part on preference information for the first user and item tag information.

Still another embodiment provides a method of providing meal suggestions, comprising: electronically receiving data read, via a first sensor, from a first item, the data including information related to the first item's ingredients; identifying a first user requesting a meal suggestion; reading from computer readable memory food preferences for at least the first user; and providing a meal suggestion based at least in part on preference information for the first user and item tag information.

Yet another example embodiment provides a networked food storage system, comprising: a first sensor configured to read expiration date information from item tags, wherein the items are stored or intended to be stored in a storage unit; a data store configured to store expiration date information; and instructions, stored in computer readable memory, configured to: read expiration date information from the data store; determine if a first item has an expiration date within a first time window; if the first item has an expiration date within a first time window, identify the item on a shopping list.

Still another example embodiment provides an electronic system, comprising: memory configured to store a digitized voice recording from a user; and instructions, stored in computer readable memory, configured to: read the digitized voice recording; identify a product identifier that corresponds to a first item referred to in the digitized voice recording; present a shopping list to the user that includes at least the first item.

Another example embodiment provides an electronic system, comprising: memory configured to store a digital product image from a user; and instructions, stored in computer readable memory, configured to: perform object recognition with respect to the product image; select a product identifier that corresponds to the product in the image; present a shopping list to the user that includes at least the product.

## BRIEF DESCRIPTION OF THE DRAWINGS

Embodiments of the present invention are described herein with reference to the drawings summarized below. These drawings and the associated description are provided to illustrate example embodiments of the invention, and not to limit the scope of the invention.

FIG. **1** illustrates an example embodiment of an item tracking and recommendation processing system.

FIG. **2** illustrates an example embodiment of a networked storage system.

FIG. **3** illustrates an example meal suggestion process.

FIG. **4** illustrates an example order generation process.

FIG. **5** illustrates a first example meal suggestion request user interface.

FIG. **6** illustrates a second example meal suggestion request user interface.

FIG. **7** illustrates an example user interface for ordering items.

FIG. **8** illustrates an example method for processing a voice order.

## DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

Example systems and methods for scanning and obtaining product information and processing such scanned information will be described herein.

FRESHUB 000445

US 10,232,408 B2

**3**

Throughout the following description, the term "Web site" is used to refer to a user-accessible network site that implements the World Wide Web standards for the coding and transmission of hypertextual documents. These standards currently include HTML (the Hypertext Markup Language), HTTP (the Hypertext Transfer Protocol), Java, and XML. It should be understood that the term "site" is not intended to imply a single geographic location, as a Web or other network site can, for example, comprise multiple geographically distributed computer systems that are appropriately linked together. Furthermore, while the following description relates to an embodiment utilizing the Internet and related protocols, other networks, such as networked interactive televisions, and other protocols may be used as well. In addition, unless otherwise indicated, the functions described herein are preferably performed by executable code and instructions running on one or more general-purpose computers. For example, program code stored in non-volatile and/or volatile memory can include one or more instructions, which can optionally be straight-line code and/or organized as modules or objects configured to receive and process inputs, provide outputs, and to selectively store data. However, the present invention can also be implemented using special purpose computers, state machines, and/or hardwired electronic circuits. While certain example processes are described herein, not all the process states need to be performed, and the order of the process can be varied. While several example embodiments are described with reference to RFID tags and RFID scanners, other tags (e.g., barcodes) and scanners (e.g., a laser barcode scanner), can be used.

In an example embodiment, a networked system includes one or more scanning devices that can scan product information. For example, a scanning system can optionally include one or more of an optical barcode scanner, an RFID (radio frequency identifier) scanner, a character recognition scanner, a camera, and/or other scanner types. The scanning system can be configured to scan/read optical markings such as barcodes (printed or lasered onto the item packaging or the consumable item itself), RFID tags (e.g., a radio frequency transponder), solid state memory tags, and/or magnetic tags. The foregoing data devices are generally referenced herein tags. By way of further example, the scanning system can take electronic, digital pictures of product packaging or markings, or scan/read other information storage devices.

In certain example embodiments, one or more scanning devices and/or related processing systems can be fixedly coupled or removably coupled to a utility device, such as a refrigerator, a conventional oven, a microwave oven, or other device. Optionally, one or more scanning devices and/or related processing systems can be mounted to a wall, inside or outside of a cabinet, or on a stand.

The scanner system can include or be coupled to a local content database and/or can be connected to a remote database via a network, such as the Internet. In addition, the scanner system can be coupled to a suggestion application and database that stores food and/or meal preferences for one or more users. For example, a user can specify types of foods, dishes, or other products that the user prefers or will not eat, wherein the user specifications are stored in the database, optionally in association with an identifier (e.g., a user ID and/or password).

By way of illustration, the user can specify that the user does not want to eat foods containing pork, poultry, beef, fish, gluten, wheat, eggs, nuts, strawberries, and/or seafood. By way of further illustration, the user can specify that the

**4**

user prefers foods having a certain characteristic or that are in a certain category, such as vegetarian, low fat, low sodium, and/or kosher food products.

The scanner system can include or be coupled to one or more user input and/or output devices, such as a touch screen device, a non-touch screen display, an on/off switch, a mechanical keyboard, voice recognition system, a voice output system, a camera, a character recognition device, a printer, and/or other types of user interfaces. The system optionally can include one or more function-specific hard keys and/or soft keys displayed on a touch screen. The key functions can be software programmable.

An example tag can include some or all of the following information: product code, expiration date, nutrition information, dietary classification information (e.g., low sodium, low cholesterol, low carbohydrate, non-fat, peanut-free, gluten-free, sugar-free, non-dairy, vegetarian), ingredient content, supplier, product, storage temperature range, dimensions (height, length, width, weight), cooking temperature and time, a unique item/tag identifier, etc. Optionally, the tag can further include an identifier associated with an intended user.

If the tag is an RFID tag, the tag can include a RFID chip, with associated memory, an antenna, and optionally a battery. Optionally, an RFID tag can be a chipless tag, that does not use integrated circuit technology to store information, but that does use materials (e.g. fiber) that reflects a portion of the scanner's signal back to the scanner, which can then be used as an identifier. By way of further example, if the tag is an RFID tag, the tag can be powered via a battery, electromagnetically by the RFID scanner, or otherwise.

As will be described below, the scanning system scans item tags and optionally stores some or all of the scanned information in a computer readable data store, such as a database. Optionally, a user can then view some or all of the stored information via a display coupled to the scanning system.

By way of further example, the system can read or scan product information located on or in item tags for items stored, or that are in the process of being stored, inside a refrigerator and/or stored in different household locations including shelves, cabinets, dry storage rooms, pantries, automobile trunks, etc. The scanning can optionally be performed utilizing a network of scanners and/or repeaters in the house.

Thus, for example, one or more scanners, such as an RFID scanner can be placed in, or adjacent to a home refrigerator, as well as on or in proximity with food storage shelves and/or cabinets. The scanner location can be based on the scanner range, wherein the scanner is placed within a useable range of the items to be scanned, and the location can be further selected so that a barrier does not interfere with the scanner's ability to read item tags.

The scanner can be powered via a battery, AC power or otherwise. The scanner can optionally be mounted in or to a refrigerator wall. The RFID scanner optionally includes an antenna or coil, a transceiver, and a decoder. The transceiver produces signals that are emitted by the antenna as radio signals. The radio signals are optionally used to activate the RF tag and to read and optionally write data to the tag. The RFID scanner is optionally shielded by a substantially RF transparent cover to protect the sensor from dirt and/or moisture.

The scanner can periodically (e.g., every 30 seconds, every 15 minutes, every hour, or other regular or irregular time period), in response to a user action (e.g., opening or closing a refrigerator door), and/or other trigger (e.g., a

FRESHUB 000446

US 10,232,408 B2

5

weight change detected via a weight sensor) read items tags for items stored within the refrigerator. Optionally, between scans, the scanner can enter into a power down/low power consumption state to conserve power. Optionally, the user can manually cause an item tag to be scanned. For example, if the tag is an optical barcode, the user can manually press a scan button and/or pass the barcode in front of a barcode scanner.

In addition to scanners that read tag information, one or more sensors can be provided that sense the presence of an item without necessarily reading an item tag. For example, one or more pressure sensors can be coupled to one or more shelves to detect if the shelve has an item stored thereon. Other sensors, such as capacitor sensors, millimeter wave sensors, or infrared sensors can be used as well.

A local and/or remote computer processing system can access the stored information, and based on some or all of the stored information, perform one or more of processes, examples of which are described below. Optionally, a user can specify how at least a portion of the information is to be used.

Based on the scanned tag information, the system can determine when products that are inside the refrigerator, on dry products shelves, and/or other selected locations, will expire and will remind or suggest to the user (through a user interface, such as a touch screen display, a voice print, a hardcopy printout, etc.) that the products be consumed on or before the expiration date. The suggestion or reminder can first be provided by the system a number of days before the expiration date, wherein the number of days can be a default value stored in computer readable memory and/or can be based on a value set by the user and stored in computer readable memory. Optionally, in addition, the user can specify that expiration notices are to be provided for certain specified items and/or the user can specify that expiration notices are not to be provided for certain specified items.

Optionally, when a suggestion or reminder is provided, the user can instruct the system not to provide further reminders regarding the expiring product or can instruct the system to provide another reminder at or after a specified time or period (e.g., a snooze instruction).

The system will optionally suggest the reordering of products based on one or more of expiration dates, consumption patterns, delivery schedules, current household item inventory, and user preferences, such as: special diets, as fat free diet, low carb. diet, vegetarian diet, Kosher food only, or other special or selected diet.

As similarly described above, the suggestion or reminder can first be provided a number of days before the expiration date, wherein the number of days can be a default value stored in computer readable memory and/or can be based on a value set by the user and stored in computer readable memory. Optionally, when a suggestion is provided, the user can optionally instruct the system not to provide further reminders regarding the product or can instruct the system to provide another reminder at a specified time or period.

Other consumer food-related information can also be accessed and utilized by the system from computer memory. For example, recipes can be stored on a local and/or a remote information system. The recipes can include ingredients, quantities, and instruction of preparation. Optionally, the system can store and/or calculate from stored information, recipe ingredient quantity information for different serving sizes.

Optionally, the recipes can be selected or downloaded from another computer system based on the products avail-

6

able in the house, including the contents inside the refrigerator and on other various locations in the house.

The system can compare the available products or contents (e.g., those stored in the refrigerator and/or in other storage locations) with stored recipes, a serving size specified by the user, and/or user preferences, such as: special diets, including fat free diet, low carb, diet, vegetarian diet, Kosher food only, or other special diet.

The system can suggest one or more recipes that more closely match the user's preferences, the available ingredients, and the desired serving size, and the recipe can then be prepared by or for the user. Because the system may not be aware of all the ingredients in the user's possession, the user can manually specify that the user does or does not have certain ingredients available, and the foregoing information can affect the recipes recommended to the user.

By way of further example, the system can present on a display a list of recipe titles (e.g., teriyaki chicken, fried chicken, butter chicken, etc.), optionally with a brief listing of the main ingredients. The user can then select a listed recipe, the complete recipe (including a complete ingredient listing, ingredient quantities, cooking temperature, etc.) is then displayed, and the user can optionally print out the recipe. Because system may not be aware of all the ingredients in the user's possession, the user can manually specify that the user does or does not have certain ingredients available. By way of example, some or all of recipe information (e.g., cooking temperature and time) can be transmitted to a cooking device, such as an oven, which can use the information in the cooking process.

By way of further example, as similarly discussed above, the system optionally reminds the user to replace a product before the expiration date gathered through products tags. The system can optionally be configured by the user to automatically trigger orders within a predetermined amount of time prior to the expiration date. Optionally, the order timing can be based in part on the time it takes to deliver the order once the order is placed, where, for example, the order will be placed to ensure the order will arrive on, or shortly before the expiration date. In addition, the user can optionally specify, via a user interface, that for future orders if an order value is below a certain amount and/or a delivery charge is greater than a certain cost, the order should not yet be placed. Optionally, the system determines if an item has been removed from a storage area (e.g., a refrigerator) by comparing previous scanned information with current scan information. If the system does not locate the item within a storage area within a predetermined amount of time (e.g., an hour, 4 hours, 8 hours, 12 hours, or 24 hours), the system optionally infers that the item has been fully consumed, and adds the item to an order. Optionally, the predetermined amount of time is settable by a user.

The physical configuration of the refrigerator storage areas can be stored in computer local or remote physical memory. By way of example, the configuration information includes the placement, depth, width and height dimensions of the refrigerator and/or freezer storage areas. The configuration information can also store information regarding storage areas intended to store a particular type of food product. For example, information (e.g., dimensions, special temperature settings, etc.) regarding vegetable drawers, fruit drawers, dairy product storage areas, and the like can be stored. Shelve and drawer weight limitations (e.g., recommended maximum weight) are optionally stored as well. Certain configuration information can optionally be downloaded over a network from a remote computer system (e.g.,

FRESHUB 000447

US 10,232,408 B2

7

from a Web site associated with the refrigerator or the system provider) based on, for example, the refrigerator model or serial number.

In addition, the system can record which storage locations are occupied, and which locations are available for additional storage.

The system can compare some or all of the foregoing information with product and packaging information (such as volume and dimensions including depth, width and height), that can be read from the item tag or retrieved from a local or remote database using an item identifier read from the item tag, enables the system, and determine one or more ways to organize items on shelves and in drawers. Optionally, the system can provide a user with suggestions or recommendations on how to organize the refrigerator and freezer by suggesting placement of products with respect to storage shelves and drawers.

By way of illustration, the system can compare product dimensions and/or weight with the refrigerator or shelf configuration and/or available locations, and using the comparison results, suggest where a product or products should be placed via a user interface. This information can be presented in a touch screen display or other user interface. By way of example, the system can display a three dimensional representation of items already on storage shelves, and then highlight items that are first to be removed as part of the reorganization process. Once the user has removed the indicated items, the system displays where each of the removed items are to be placed on the storage shelves. Optionally, the system provides a printout of stored items and the storage locations so that the user can easier locate items and determine if the user has a certain items, and without having to physically search for items. Optionally, an "expired" control is provided, which, when activated, causes the system to display and/or printout a list of expired items and their locations.

Optionally, the system provides a user interface with a search field, wherein the user can enter in the name of an item or an item type. The system then searches its database to locate matches or near matches, and display search results to the user. The search results can include a list of the matches or near matches, the quantity of the matching and near matching items, and their storage locations.

As similarly described above, optionally, the system, via a suggestion user interface, provides item suggestions and recommendations to the user. For example, the system can suggest items to be consumed (e.g., via a meal recommendation including one or more of an appetizer, a main course, dessert, and/or a drink) based on item availability in the user's house and/or on information input by one or more users (e.g., members of the household, one or more physicians of a household member, etc.). For example, the user information can include food preferences, special diets, modes, etc., input by the user via a keyboard, a touch screen, voice recognition, or other input method.

Optionally, the system stores different profiles and preferences for different users in the same household. Optionally, when a user wants the system to provide a meal recommendation, the user activates a physical or a soft meal suggestion icon or button. The system then retrieves the names of household members from its database, and presents the names of the household members on the meals suggestions user interface, optionally in addition to an "entire household" control. In order to indicate who will be participating in the meal, the user can select one or more of the household member names, or the "entire household".

8

Optionally, a user interface is provided via which the user can indicate which type of meal (e.g., breakfast, brunch, lunch, dinner), meal courses (e.g., salad, soup, appetizer, main course, dessert), and a food-type category (e.g., fish, meat, etc.) the user wants. The system will then access the profiles and preferences of the meal participants, as well as the item inventory, and provide a corresponding meal recommendation.

Optionally, a user can trigger or provide a command through a system user interface to communicate to the central system or directly to a service provider, such as a laundry company or a newspaper/magazine service provider, to directly order their service or to trigger a request for servicing, such as the service of picking up or delivering goods, and/or to suspend a service, such as to suspend newspaper delivery for a specified period of time.

Optionally, the system can further include a voice recording device and/or the voice recording device can be independent of the system. The voice recording device can include digital memory (e.g., a disk drive, FLASH memory, etc.) or analog memory (e.g., a cassette tape). A user can record a product description on the device by activating a record control, which can be in the form of a button, a switch, a voice recognition command or other record triggering method. In an example embodiment, the device records a product description verbally provided by the user and creates a digital file. The description can be provided as part of a verbally provided product order. Optionally, a different file is created for each recorded production description. The device transfers the file to a remote database over a network such as the Internet. The transfer can be performed substantially immediately, in response to a user command, or on a scheduled basis.

A remote computer processing system receives, stores, and accesses such files, which can be received from a plurality of voice recording devices. The remote computer system then utilizes voice recognition software to translate the voice recording files into text files. Optionally, the voice recognition software increases recognition accuracy by, when there are more than one potential word matches, placing more weight on words related to the types items being purchased (produce, cereal, milk, etc.) and the users past purchase history. The remote computer system can optionally match the spoken order with a SKU (Stock Keeping Unit, e.g., an identifier, such as a unique numeric identifier associated with a specific product) retrieved from a SKU database. The SKU database optionally stores SKUs in association with a text description of the corresponding item. For example, if the user verbally ordered a cereal by name, the remote computer system translates the name into text or other computer readable form, and matches the text with text stored in association with a SKU (or other identifier) to locate the correct SKU. Optionally, the voice recognition and/or SKU matching and identification can be performed instead or additionally by the user's local system.

The remote computer processing system optionally shares a text version (e.g., the textual representation of the order and/or the corresponding SKU) and/or recorded verbal version of the order. For example, the remote computer system can share the text and/or verbal version of the order via a web site, telephone, fax, short messaging system, or via other communication techniques. Thus, for example, the system can textually share an order that had been placed verbally with one or more product suppliers and/or with the user. For example, the remote system can add the item(s) identified in the verbal order to the user's shopping cart or other shopping list, optionally in association with a digital

FRESHUB 000448

US 10,232,408 B2

9

10

file that includes the user's spoken order. Users can then verify the text conversion of the spoken order. For example, the user can click on an item in an order list for which verification is requested, hear the user's previously recorded order, and determine if the written description in the shopping list matches the user's spoken order. Optionally, the system uses individual consumer information, such as the user's location and the user's account information and preference profile to better match the user's spoken order with a product. The system uses the product identification (e.g., SKU) generated from the verbal order to request quotes from providers, provide quotes to the user, and to offer additional or alternative products to the user. The user can then place an order for the identified product.

Optionally, the system does not provide voice recognition. Instead, an icon corresponding to the voice recording appears in the user's online shopping list (e.g., an electronic shopping cart). Optionally, the icon has an associated recording date displayed therewith. The user can click on the icon, the system will play the recording to the user, and the user can manually key in the product name and/or search an online catalog.

Optionally, in addition or instead, a picture of an item the user wants to order can be taken using a camera coupled to the system, a cell phone camera, a standalone camera, or other camera. The picture can be transmitted by the system or otherwise to the remote system. The remote system can then perform image recognition to come up with a "signature" identifying the item. The remote system can then locate a corresponding SKU from a SKU database, which optionally stores image signature information and/or an image, in association with a corresponding SKU. The remote system uses the product identification (e.g., SKU) generated from the image to request quotes from providers, provide quotes to the user, and to offer additional or alternative products to the user. The user can then place an order for the identified product. While the foregoing verbal and photographic order processes can be used with a variety of item types, it can be particularly useful with respect to items that often do not have bar codes, such as fresh fruits (e.g., a single apple) or vegetables.

Optionally, the system does not provide image recognition. Instead, a thumbnail (or larger image size) version of the picture of the item, corresponding to the image captured by the camera, appears in the user's online shopping list (e.g., an electronic shopping cart), displayed on the user's local display. Optionally, the displayed picture has an associated image capture date displayed therewith. The user can click on the picture, and the system will optionally display a larger version of the picture. Thus, the picture acts as a reminder to the user. The user can then manually key in the product name and/or search an online catalog and/or the user's purchase history for the product to thereby add the product to the order list.

Example embodiments will now be described with reference to the figures. Referring to FIG. 1, an item tracking and recommendation processing system 100 includes a central processing unit 102, computer readable memory 104 (e.g., removable and/or fixed: volatile memory, such as RAM, non-volatile memory, such as FLASH EEPROM, a hard disk drive, an optical drive, etc.), and a database 106, which can be stored, in whole or in part in the computer readable memory 104. A network interface 108 (e.g., a wireless or wired network interface) is provided to enable the item tracking and recommendation processing system 100 to access and/or transmit data (e.g., dimensional data regarding a refrigerator or other item storage system, recipes, user

preference information, user account information, etc.) across a network, such as the Internet, a local network, and/or other network. The interface 108 can optionally include one or more of a digital subscriber line (DSL) interface, a T1 line interface, a satellite link, a cable hookup, a dial-up modem, etc. The system 100 can further include wired and/or wireless digital and/or analog input/output interfaces to receive and/or transmit information to one or more tag scanning sensors and/or presence sensors.

The system 100 can include and/or be coupled to one or more user interface devices (e.g., a touch screen display, a printer, a keyboard, dedicated mechanical keys, voice recorder, etc.). For example, the system 100 can be coupled to one or more user interface devices, sensors, scanners, and/or other systems via a USB or FireWire bus, via a wired local network, such an Ethernet network, and/or a wireless network, such as an IEEE 802.11b or IEEE 802.11g compliant network, or a Bluetooth network.

The example database 106 includes recipes, content information for one or more item storage units (e.g., refrigerator (s), pantry, etc.), household members and/or frequent visiting meal participants, user preferences (e.g., food preferences, item ordering preferences, payment preferences, etc. of household members and/or frequent visitors), a system serial number, and the like. The database 106, optionally also includes dimensional and configuration information for one or more storage units (e.g., available temperature settings, the existence of vegetable drawers, fruit drawers, dairy product storage areas, shelve and drawer weight limitations, etc.). For example, the database 106 can store a mapping of product codes or SKUs to product names, sizes, and packaging materials, as well as content information regarding items placed into storage units. Optionally, the database 106 stores shopping lists, passwords and/or unique identifiers for accessing remote databases and services.

The following is an example database schema that includes fields for payment preferences, storage unit identifiers for one or more storage units (e.g., one or more refrigerators), storage unit shelf dimensions, food preferences for one or more users (e.g., food preferences for breakfast, brunch, lunch, dinner, food avoidances, medical or other dietary restrictions, etc.), and order generation/trigger preferences.

User Database Schema

| FIELD | DATA DESCRIPTION |
| --- | --- |
| Alternative Form of Payment | Alternative form of payment (credit card, electronic fund transfer, check, place on account, etc.), and corresponding payment information (credit card number, and credit card expiration date, bank account number, checking account number, etc.) |
| Refrigeration Unit 1 Identifier | Unique identifier, such as a serial number, associated with a first of the user's disposal units |
| Refrigeration Unit 1 Capacity | The capacity in units of measurement (gallons, liters, etc.) of Disposal Unit 1 |
| Shelf 1 | Shelf 1 dimensions |
| Shelf 2 | Shelf 2 dimensions |
| Shelf n | Shelf n dimensions |
| User 1 Food Preferences | Food preferences-Breakfast Food avoidance-Breakfast Food preferences-Brunch Food avoidance-Brunch Food preferences-Lunch |

FRESHUB 000449

US 10,232,408 B2

| 11 | 12 |

-continued

| FIELD | DATA DESCRIPTION |
|-------|------------------|
| | Food avoidance-Lunch |
| | Food preferences-Dinner |
| | Food avoidance-Dinner |
| | Dietary restrictions |
| User n Food Preferences | Food preferences-Breakfast |
| | Food avoidance-Breakfast |
| | Food preferences-Brunch |
| | Food avoidance-Brunch |
| | Food preferences-Lunch |
| | Food avoidance-Lunch |
| | Food preferences-Dinner |
| | Food avoidance-Dinner |
| | Dietary restrictions |
| Order Generation Preference | Generate/submit order preferences |

The following is an example contents database schema that stores item information for the contents of one or more storage units. The information, or selected portions thereof, may have been scanned by one or more scanners from an item tag, manually entered by the user, or retrieved from a remote database using the item SKU or other identifier. The example schema includes fields for a product code, ingredients, calories, a diet category, a product name, dimensions, weight, an expiration date, a manufacturer, item location, item storage temperature, and cooking guidelines.

Contents Database Schema

| FIELD | DATA DESCRIPTION |
|-------|------------------|
| Product code | The item SKU |
| Ingredients | The item ingredients |
| Calories | The number of calories in the item or the number of calories per item unit |
| Diet Category | low sodium, low cholesterol, low carbohydrate, non-fat, peanut-free, gluten-free, sugar-free, non-dairy, vegetarian, etc. |
| Product name | The text name of the item |
| Dimensions | One or more of length, width, height, diameter, volume |
| Weight | Original pre-use weight |
| Expiration date | Item expiration or "best if used by" date |
| Manufacturer | The name of the manufacturer or other manufacturer identifier |
| Location Information | Storage unit and/or shelf identifier of where item is stored |
| Storage Temperature | The temperature or temperature range at which the item is to be stored |
| Cooking Information | The temperature or temperature range at which the item is to be cooked, cooking time, cooking method (boiling, roasting, broiling, frying, microwave, etc.) |

Recipe Database Schema

The following is an example recipe database schema. The example schema includes fields for ingredients (e.g., ingredient names, and amount per serving or per a specified number of servings), cooking instructions, calories per serving, and other nutritional information, such as the amount of one or more of salt, carbohydrates, protein, fiber, fat, vitamins, etc. per serving and/or the % percentage of a recommended daily amount of the foregoing a serving will provide.

| FIELD | DATA DESCRIPTION |
|-------|------------------|
| Ingredient 1 | Name and amount per serving |
| Ingredient 2 | Name and amount per serving |
| Ingredient n | Name and amount per serving |
| Cooking Instructions | Cooking method(s), time, temperature, etc. |
| Calories/serving | |
| Salt, carbohydrates, protein, fiber, fat, vitamins/serving | |

FIG. 2 illustrates an example embodiment of a networked storage system. A computer system 202 (which can be in the form of system 100 illustrated in FIG. 1), is coupled to a local scanner 204, a screen 206 (e.g., a touch screen that can receive user inputs via finger and/or pen), and optionally a microphone and/or camera 203. The microphone is optionally coupled to a digitizer which converts spoken language into a digital representation. The camera can be a digital still and/or video camera that captures images and stores them digitally and/or in analog form. The computer system 202, scanner, 204, and/or screen 206 optionally are physical, and optionally removably, mounted to a refrigerator 208. The computer system 202, scanner, 204, and/or screen 206 can optionally be mounted on a wall, a stand, or other supporting structure. The computer system 202 is optionally coupled to remote scanners via networks 218, 220 (e.g., WiFi networks). The remote scanners are mounted to and/or configured to scan one or more other storage units, such as refrigerator 210 and cabinet 212. Optionally, a storage unit, such as cabinet 212, includes multiple shelves with corresponding scanners. Thus, optionally, one computer system can collect and store information scanned from items stored in multiple storage units. Optionally, each storage unit can have a computer system that incorporates some or all of the elements of system 100.

FIG. 3 illustrates an example meal suggestion process. At state 302, a user interface is displayed by an item tracking and recommendation processing system (ITRP), via which a user can indicate who is going to participate in a meal and the meal type (breakfast, lunch, dinner). Optionally, the system can infer the meal type based on the time of day by reading a real time clock (e.g., if the request is at 8:00, the system infers the meal is breakfast). At state 304, the ITRP retrieves information regarding which items are currently available (e.g., in one or more household storage units). At state 306, the system retrieves food preference information for selected meal participants. At state 308, the system matches user preferences and item availability for the meal type. At state 310 the system displays information regarding one or more meals that meet the user preferences and that can be prepared using the available food items. At state 312, the system receives a user selection of the displayed meals. At state 314, the system displays a detailed menu corresponding to the user selection.

FIG. 4 illustrates an example order generation process. At state 402, the system retrieves expiration date information for items within one or more storage units (e.g., a refrigerator and/or cabinet). At state 404, the system retrieves a user preference regarding when an order should be generated relative to at least item expiration dates (e.g., a time prior to an expiration date selected by the user wherein the system is to ask the user if an item should be placed, also referred to as a time window). At state 406, the system compares the user preference with the expiration date information and determines which items have expiration dates that fall within the window. By way of example and not limitation, the time window can be one day or less, greater

FRESHUB 000450

US 10,232,408 B2

13

than one day, and/or selected based upon a projected delivery date or time. At state **408**, the system presents to the user via a display device a list of items identified at state **406** and asks the user to select which items are to be ordered. At state **410**, the system receives the user selections and orders the selected items from a provider selected by the user.

FIG. **5** illustrates an example meal suggestion request user interface. The interface includes a Meal Selection section, wherein the user can indicate for which meal the user wants suggestions. In the illustrated example, the user can select from: breakfast, brunch, lunch, dinner, and a late night snack. A courses section allows the user to indicate what courses suggestions are to be provided for. The course selection optionally changes depending on the meal selection. For example, if the user selects breakfast, optionally, the course selection will not include soup or salad options. A "meal participants" user interface enables the user to indicate who is going to participate in the meal. The example list is based on user set-up information, wherein the user specifies household members and others that will be participating in the meal. In this example, a guest field is provided wherein the user can specify the number of guests attending for which food preference information is not available in the system database. The system can use the guest number information when providing ingredient quantities as part of recipes. Referring back to FIG. **5**, a "provide recommendations" control is provided, which, when activated will cause the system to provide one or more meal recommendations.

FIG. **6** illustrates another example meal suggestion request user interface. The interface provides one or more course suggestions in response to the user selections made via the interface illustrated in FIG. **5**, user food preferences, and item availability. In this example, suggestions are provided for a salad, a main course, and a dessert. Once the user selects the desired suggestions, the user can activate a "provide recipe" control, and the system will then provide the corresponding recipes, with the recipe portions scaled to the number of meal participants. The user can optionally activate a "provide additional suggestions" control, and the system will provide additional suggestions for courses wherein the user has not yet made a selection.

FIG. **7** illustrates an example user interface for ordering items. The example list includes items whose expiration dates are within a predetermined window and/or items were present in a storage unit (e.g., a refrigerator), but which the system has determined is no longer in the storage unit (e.g., has been removed from the storage unit and not replaced within a predetermined amount of time). The user can select which items are to be ordered and the quantity of the items. Optionally, the system defaults by placing check marks for each item and the user unchecks the item if the user does not want to order the item. Optionally, the system provides a default quantity, which can be based on a previous user specified value and/or on consumption patterns.

FIG. **8** illustrates an example method for processing a voice order. At state **802**, the user verbally provides an order. By way of illustration, the user may press a "record shopping list" control. In response, the system can prompt the user via a system display and/or via spoken instruction to verbally record a shopping list or a portion thereof. The recording can be intended as a reminder. The user may be given a limited amount of time (e.g., 5 seconds, 10 seconds, 30 seconds, 1 minute) to speak the order. The system can inform the user of the limited time, and provide a clock or other indicator (e.g., a countdown timer) that continuously displays the time remaining to record the order. Optionally,

14

the user can be provided with an "extend recording time" control, via which the user can cause the system to provide additional recording time. At the end of the recording time, the user is optionally provided the opportunity to review the recording (e.g., have the recording played back), and to delete and re-record the shopping list if the previous recording was unsatisfactory.

For example, the user can speak the order to the microphone **203**, illustrated in FIG. **2**. The system then digitizes and records the spoken order in a file. At state **804**, the system transmits the digitized verbal order to a remote system, such as remote system **214**. At state **806**, the remote system performs voice recognition on the order in order to interpret the spoken order and converts the spoken order into text. By way of example, the system can use grammar constrained recognition and/or natural language recognition. The voice recognition system optionally uses training. At state **808**, the remote system transmits the text version of the order to the user so that the user can verify if text version is an accurate interpretation of the spoken order. For example, the remote system can transmit the text version to the system **202** or another user computer for display to the user. Optionally, if the user determines that the order was not correctly translated, the user can provide a corrected order (e.g., via a keyboard, or by speaking the order again) to the remote system.

At state **810**, the remote system transmits the translated version of the order (e.g., the text version) to one or more providers (e.g., supermarkets, wholesale establishments, etc.) in order to receive quotes. The remote system can optionally match the translated version of the spoken order with a SKU retrieved from a SKU database, which stores SKUs in association with a text description of the corresponding item, and transmit the SKU to the providers. At state **812**, the remote system receives quotes from the potential providers, and transmits the quotes to the user. At state **814**, the user selects a provider and authorizes placement of the order. At state **816**, the remote system places the order with the selected provider.

It should be understood that certain variations and modifications of this invention would suggest themselves to one of ordinary skill in the art. The scope of the present invention is not to be limited by the illustrations or the foregoing descriptions thereof.

What is claimed is:

**1**. A voice processing system comprising:

a networks interface;

a computer;

non-transitory memory that stores instructions that when executed by the computer cause the computer to perform operations comprising:

  receive, using the network interface, a digitized order of a user from a remote system configured to receive user spoken words, the remote system comprising a microphone, a wireless network interface, and a digitizer coupled to the microphone, wherein the digitizer is configured to convert spoken words into a digital representation;

  translate at least a portion of the digitized order to text;

  match the text, translated from the digitized order, to a text description stored in a database comprising text descriptions of items and associated unique product identifiers;

  based at least in part on the identified match of the text translated from the digitized order to the text description stored in a database, identify an item corresponding to the text description;

FRESHUB 000451

US 10,232,408 B2

15

add the identified item to a set of items associated with the user; and

enable the set of items, including the identified item, to be displayed via a user display.

2. The voice processing system as defined in claim 1, wherein identifying the item corresponding to the text is based in part on location information of the user.

3. The voice processing system as defined in claim 1, wherein identifying the item corresponding to the text is based in part on preference information of the user.

4. The voice processing system as defined in claim 1, wherein identifying the item corresponding to the text is based in part on a purchase history of the user.

5. The voice processing system as defined in claim 1, wherein the system is configured to increase recognition accuracy by placing more weight on words related to types of items being purchased by the user.

6. The voice processing system as defined in claim 1, wherein the system is configured to increase recognition accuracy by, when there are more than one potential matches to the text, placing more weight on words related to the user's purchase history.

7. The voice processing system as defined in claim 1, wherein the system is configured to cause the set of items to be audibly provided to the user via a website, short messaging service, or telephone.

8. The voice processing system as defined in claim 1, wherein the system is configured to cause the set of items to be provided to the user via a website.

9. The voice processing system as defined in claim 1, wherein the system is configured to cause the set of items to be provided to the user via a telephone.

10. The voice processing system as defined in claim 1, wherein the system is configured to cause the set of items to be provided to the user via a short messaging system.

11. The voice processing system as defined in claim 1, wherein the system is configured to:

provide to at least one user device a first identifier determined by the voice processing system as corresponding to a first item in a given user order and identifiers corresponding to alternative items from which the user can choose.

12. The voice processing system as defined in claim 1, wherein the system is configured to use the identification of the item to offer the user an additional or alternative item and to enable the user to order the additional or alternative item.

13. The voice processing system as defined in claim 1, wherein the voice processing system is configured to enable the user to add a reminder with respect to at least one item.

14. The voice processing system as defined in claim 1, wherein the order comprises an item name.

15. The voice processing system as defined in claim 1, wherein an item description from the user is recorded at least partly in response to a verbal user command.

16. The voice processing system as defined in claim 1, wherein a separate digital file is used to store respective digitized item descriptions from the user.

17. The voice processing system as defined in claim 1, wherein the system is configured to enable the user to verify that text conversion of the spoken order via a user interface.

18. The voice processing system as defined in claim 1, wherein the system is configured to enable the user to select among a plurality of providers, a provider to supply the identified item.

19. The voice processing system as defined in claim 1, wherein the set of items is associated with a shopping cart.

16

20. A computer-implemented method, the method comprising:

receiving over a network at a network interface a digitized order of a user from a remote system configured to receive user spoken words, the remote system comprising a microphone, a wireless network interface, and a digitizer coupled to the microphone, wherein the digitizer is configured to convert spoken words into a digital representation;

translating, using a processing system comprising at least one processing device and configured to perform translation of voice orders to text, at least a portion of the digitized order to text;

matching, using the processing system, the text, translated from the digitized order, to a text description associated with a unique product identifier;

based at least in part on the unique product identifier associated with the text description matched to the text translated from the digitized order, identifying, using the processing system, an item corresponding to the text;

causing the identified item to be placed on an item set associated with the user; and

enabling the item set, including at least the identified item, to be displayed via a user display remote from the processing system.

21. The method as defined in claim 20, wherein identifying the item corresponding to the text is based in part on location information of the user.

22. The method as defined in claim 20, wherein identifying the item corresponding to the text is based in part on preference information of the user, or purchase history of the user, or both preference information of the user and purchase history of the user.

23. The method as defined in claim 20, the method further comprising placing more weight on words related to types of items being purchased by the user when performing recognition of spoken words of the user.

24. The method as defined in claim 20, the method further comprising placing more weight on words related to the user's purchase history when performing recognition of spoken words of the user.

25. The method as defined in claim 20, the method further comprising causing the item set to be audibly provided to the user via at least one user device.

26. The method as defined in claim 20, the method further comprising providing to at least one user device a first identifier determined by the voice processing system as corresponding to a first item in a given user order and identifiers corresponding to alternative items from which the at least one user can choose.

27. The method as defined in claim 20, the method further comprising enabling the user to cause the processing system to add a verbal reminder.

28. The method as defined in claim 20, wherein an item description from the user is recorded at least partly in response to a verbal user command.

29. The method as defined in claim 20, the method further comprising enabling the user to verify that text conversion of the spoken order via a user interface.

30. Non-transitory memory that stores instructions that when executed by a computer cause the computer to perform operations comprising:

receive a digitized voice communication of a user from a remote system configured to receive user spoken words, the remote system comprising a microphone, a wireless network interface, and a digitizer coupled to

FRESHUB 000452

US 10,232,408 B2

**17**                                                    **18**

the microphone, wherein the digitizer is configured to
convert spoken words into a digital representation;
translate at least a portion of the digitized voice commu-
nication to text;
match the text, translated from the digitized voice com-  5
munication, to a text description associated with a
unique product identifier, wherein the text description
is accessed from a data store;
based at least in part on the unique product identifier
associated with the text description matched to the text  10
translated from the digitized voice communication,
identify an item corresponding to the text;
cause the identified item to be included in an item set
associated with the user; and
enable the item set, including the identified item, to be  15
displayed via a user display.

\* \* \* \* \*

FRESHUB 000453

Appx109

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on May 24, 2022, a copy of the

foregoing document:

**PLAINTIFFS-APPELLANTS FRESHUB, INC. AND
FRESHUB, LTD.'S OPENING BRIEF [NON-CONFIDENTIAL]**

was filed electronically with the Clerk of the Court using the CM/ECF System,

which will send a Notice of Docket Activity via electronic mail to all counsel of

record.

Dated:  May 24, 2022                    By:  */s/ Paul J. Andre*
                                                  Paul J. Andre

## **CERTIFICATE OF CONFIDENTIAL MATERIAL**

The foregoing document contains 9 unique words (including any numbers)

that are marked confidential as permitted by Fed. Cir. R. 25.1(d)(1)(A).


Dated:  May 24, 2022             By:  */s/ Paul J. Andre*_____
                                       Paul J. Andre

## <u>CERTIFICATE OF COMPLIANCE WITH FED. CIR. R. 28.1(b)</u>

1.      The foregoing filing complies with the type-volume limitation of Fed. Cir. R. 28.1(b)(1) because this brief contains 12,784 words exclusive of the parts of the filing as exempted by Fed. Cir. R. 32(b)(2).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14 point font.


Dated: May 24, 2022                  */s/ Paul J. Andre*
                                                      Paul J. Andre