**Nos. 2022-1391, -1425**

*In the*

# United States Court of Appeals

*for the*

# Federal Circuit

FRESHUB, INC., FRESHUB, LTD.,
*Plaintiffs-Appellants*

v.

AMAZON.COM, INC., PRIME NOW, LLC,
WHOLE FOODS MARKET SERVICES, INC., AMAZON.COM SERVICES LLC,
*Defendants-Cross-Appellants*

*On Appeal from the United States District Court for the Western District of Texas, in No. 6:21-cv-00511-ADA* · Honorable *Judge Alan D. Albright.*

## [CORRECTED] RESPONSE BRIEF OF DEFENDANTS/CROSS-APPELLANTS AMAZON.COM, INC., PRIME NOW, LLC, WHOLE FOODS MARKET SERVICES, INC., AMAZON.COM SERVICES LLC

J. DAVID HADDEN
SAINA S. SHAMILOV
RAVI RANGANATH
FENWICK & WEST, LLP
801 California Street
Mountain View, California 94041
Tel: (650) 988-8500

TODD R. GREGORIAN
ERIC B. YOUNG
FENWICK & WEST, LLP
555 California Street, 12th Floor
San Francisco, California 94104
Tel: (415) 875-2300

*Counsel for Defendants/Cross-Appellants*

September 28, 2022

# PATENT CLAIMS

**U.S. Patent No. 9,908,153**

**1.** A voice processing system comprising:
a first system configured to receive user spoken words comprising:
a microphone;
a wireless network interface;
a digitizer coupled to the microphone, wherein the digitizer is configured to convert spoken words into a digital representation;
a first computer;
non-transitory memory that stores instructions that when executed by the first computer cause the first system to perform operations comprising:
receive via the digitizer a verbal order, comprising at least one item, from a user, wherein the verbal order was captured by the microphone and digitized by the digitizer;
immediately transmit, using the wireless network interface, the digitized order to a computer system remote from the first system;
the computer system, the computer system comprising:
a networks interface;
a second computer;
non-transitory memory that stores instructions that when executed by the second computer cause the computer system to perform operations comprising:
receive, using the network interface, the digitized order from the first system;
translate at least a portion of the digitized order to text;
identify an item corresponding to the text;
add the identified item to a list associated with the user;
enable the list, including the identified item, to be displayed via a user display.

**6.** The voice processing system as defined in claim **1**, wherein the computer system is configured to cause the list to be provided to the user via a website.

**U.S. Patent No. 10,213,810**

**1.** A voice processing system comprising:
a networks interface;
a computer;
non-transitory memory that stores instructions that when executed by the computer cause the computer to perform operations comprising:

associate a unique identifier with a remote system configured to receive user spoken words, the remote system comprising:
a microphone, a wireless network interface, a voice output system, and a digitizer coupled to the microphone, wherein the digitizer is configured to convert spoken words into a digital representation;
download configuration data to the remote system;
receive, using the network interface, a digitized order of a user from the remote system;
translate at least a portion of the digitized order to text;
use the text, translated from the digitized order, to identify an item corresponding to the text description;
include the identified item in a set of one or more items associated with the user;
enable the set of items, including the identified item, to be displayed to the user via a user device different than the remote system; and
enable the set of items, including the identified item, to be provided to an item provider.

**U.S. Patent No. 10,232,408**

**20.** A computer-implemented method, the method comprising:
receiving over a network at a network interface a digitized order of a user from a remote system configured to receive user spoken words, the remote system comprising a microphone, a wireless network interface, and a digitizer coupled to the microphone, wherein the digitizer is configured to convert spoken words into a digital representation;
translating, using a processing system comprising at least one processing device and configured to perform translation of voice orders to text, at least a portion of the digitized order to text;
matching, using the processing system, the text, translated from the digitized order, to a text description associated with a unique product identifier;
based at least in part on the unique product identifier associated with the text description matched to the text translated from the digitized order, identifying, using the processing system, an item corresponding to the text;
causing the identified item to be placed on an item set associated with the user; and
enabling the item set, including at least the identified item, to be displayed via a user display remote from the processing system.

**30.** Non-transitory memory that stores instructions that when executed by a computer cause the computer to perform operations comprising:

receive a digitized voice communication of a user from a remote system configured to receive user spoken words, the remote system comprising a microphone, a wireless network interface, and a digitizer coupled to the microphone, wherein the digitizer is configured to convert spoken words into a digital representation;

translate at least a portion of the digitized voice communication to text;

match the text, translated from the digitized voice communication, to a text description associated with a unique product identifier, wherein the text description is accessed from a data store;

based at least in part on the unique product identifier associated with the text description matched to the text translated from the digitized voice communication, identify an item corresponding to the text;

cause the identified item to be included in an item set associated with the user; and

enable the item set, including the identified item, to be displayed via a user display.

**FORM 9. Certificate of Interest** **Form 9 (p. 1)**
**July 2020**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 22-1391, -1425

**Short Case Caption** Freshub, Inc. v. Amazon.com, Inc., et al.

**Filing Party/Entity** Amazon.com, Inc.; Amazon.com Services LLC; Prime Now LLC; Whole Foods Market Services, Inc.

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: September 28, 2022 Signature: /s/ J. David Hadden

Name: J. David Hadden

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Amazon.com, Inc. | | None |
| Amazon.com Services LLC | | Amazon.com, Inc. |
| Prime Now, LLC | | Amazon.com, Inc. |
| Whole Foods Market Services, Inc. | | Amazon.com, Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☑ Additional pages attached

| | | |
|---|---|---|
| See additional page attached. | | |
| | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

**Additional Attachment to Form 9. Certificate of Interest**

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in the court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47(a)(4).

Vigen Salmastlian, Allen Wang, Fenwick & West LLP;

Deron R. Dacus, The Dacus Firm, P.C.; and

Barry K. Shelton and Bradley D. Coburn, Winston & Strawn LLP.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ---------- i

TABLE OF ABBREVIATIONS ---------- xiv

STATEMENT OF RELATED CASES ---------- xv

JURISDICTIONAL STATEMENT ---------- 1

INTRODUCTION ---------- 2

STATEMENT OF ISSUES ---------- 5

STATEMENT OF THE CASE ---------- 6

A. Ikan's prosecution and abandonment of the original '291 application ---------- 6

1. Specification of the '291 application ---------- 6

2. Initial prosecution and abandonment of the '291 application ---------- 9

B. Amazon's Alexa-enabled products ---------- 11

C. Ikan's belated revival of the '291 application based on the false claim that it was "unintentionally" abandoned ---------- 15

D. Ikan's lawsuit against Amazon ---------- 19

1. Pretrial proceedings ---------- 19

2. The trial and jury verdict ---------- 19

3. Post-trial motions ---------- 21

4. The district court's ruling on inequitable conduct ---------- 23

SUMMARY OF THE ARGUMENT ---------- 24

ARGUMENT ---------- 26

**TABLE OF CONTENTS (CONTINUED)**

**Page**

I. STANDARDS OF REVIEW ---- 26

II. THE COURT SHOULD AFFIRM THE JUDGMENT OF NONINFRINGEMENT ---- 27

A. Substantial evidence showed that the accused devices do not meet the claim requirement to "identify an item corresponding to the text" ---- 29

B. Substantial evidence showed that the accused devices do not meet the "digitized order" limitation ---- 34

C. Substantial evidence showed that the accused devices do not have a "computer system remote from the first system" that includes "non-transitory memory" ---- 37

III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY DENYING A NEW TRIAL ---- 42

A. The district court did not commit plain error by admitting evidence of the asserted patents' filing dates and Amazon's earlier development of Alexa ---- 43

B. The district court did not commit plain error by allowing Amazon to discuss the constitutional purpose of the patent system or Freshub's motives in filing suit ---- 48

ARGUMENT ON CROSS-APPEAL ---- 53

I. THE COURT SHOULD REVERSE THE JUDGMENT ON PARTIAL FINDINGS OF NO INEQUITABLE CONDUCT ---- 53

A. Amazon established by clear and convincing evidence that Ikan had procured the asserted patents by making a false material statement ---- 55

**TABLE OF CONTENTS**
**(CONTINUED)**

**Page**

B. Amazon established by clear and convincing evidence that Ikan intended to deceive the Patent Office ---------- 58

1. Ikan's actions, and knowledge of the consequences, demonstrate its intent ---------- 59

2. Ikan's failure to investigate also demonstrates its intent, and the district court clearly erred by failing to address Ikan's contradictory testimony ---------- 60

C. Ikan's inequitable conduct during the prosecution of the '291 application renders the asserted patents unenforceable ---------- 63

CONCLUSION ---------- 66

CERTIFICATE OF COMPLIANCE ---------- 67

# TABLE OF AUTHORITIES

## CASES

*3D Med. Imaging Sys., LLC v. Visage Imaging, Inc.*,
228 F. Supp. 3d 1331 (N.D. Ga. 2017) ---------- 63

*800 Adept, Inc. v. Murex Sec., Ltd.*,
539 F.3d 1354 (Fed. Cir. 2008) ---------- 32

*Aetna Ins. Co. v. Paddock*,
301 F.2d 807 (5th Cir. 1962) ---------- 50

*Agfa Corp. v. Creo Prods. Inc.*,
451 F.3d 1366 (Fed. Cir. 2006) ---------- 64, 65

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
314 F.3d 1313 (Fed. Cir. 2003) ---------- 49

*Anderson v. City of Bessemer City, N.C.*,
470 U.S. 564 (1985) ---------- 62

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) (en banc) ---------- 44

*Baisden v. I'm Ready Prods., Inc.*,
693 F.3d 491 (5th Cir. 2012) ---------- 42, 49

*Bankers Trust Co. v. Mallis*,
435 U.S. 381 (1978) ---------- 1

*Barry v. Medtronic, Inc.*,
245 F. Supp. 3d 793 (E.D. Tex. 2017), *aff'd*, 914 F.3d 1310
(Fed. Cir. 2019) ---------- 53, 54

*Bayer AG v. Elan Pharm. Research Corp.*,
212 F.3d 1241 (Fed. Cir. 2000) ---------- 38

*Bayer Healthcare LLC v. Baxalta Inc.*,
989 F.3d 964 (Fed. Cir. 2021) ---------- 47

*Biodex Corp. v. Loredan Biomedical, Inc.*,
946 F.2d 850 (Fed. Cir. 1991) ---------- 50

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*C.P. Interests, Inc. v. Cal. Pools, Inc.*,
238 F.3d 690 (5th Cir. 2001) ---------- 44

*Cabriolet Porsche Audi, Inc. v. Am. Honda Motor Co.*,
773 F.2d 1193 (11th Cir. 1985) ---------- 62

*Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*,
15 F.3d 1573 (Fed. Cir. 1993) ---------- 62, 63

*Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*,
631 F.3d 1279 (Fed. Cir. 2001) ---------- 38, 42

*Colburn v. Bunge Towing, Inc.*,
883 F.2d 372 (5th Cir. 1989) ---------- 42, 53

*Conoco, Inc. v. Energy & Env't Int'l, L.C.*,
460 F.3d 1349 (Fed. Cir. 2006) ---------- 30

*Consol. Aluminum Corp. v. Foseco Int'l, Ltd.*,
910 F.2d 804 (Fed. Cir. 1990) ---------- 64, 65

*Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*,
246 F.3d 1336 (Fed. Cir. 2001) ---------- 41

*Dippin' Dots, Inc. v. Mosey*,
476 F.3d 1337 (Fed. Cir. 2007) ---------- 58

*Doe v. Menefee*,
391 F.3d 147 (2d Cir. 2004) (Sotomayor, J.) ---------- 62

*E.E.O.C. v. Boh Bros. Constr. Co.*,
731 F.3d 444 (5th Cir. 2013) (en banc) ---------- 26

*Echeverry v. Jazz Casino Co.*,
988 F.3d 221 (5th Cir. 2021) ---------- 48

*Edionwe v. Bailey*,
860 F.3d 287, 294 (5th Cir. 2017) ---------- 1

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Ericsson, Inc. v. D-Link Sys., Inc.*,
773 F.3d 1201 (Fed. Cir. 2014) ---------- 37

*FMC Corp. v. Manitowoc Co.*,
835 F.2d 1411 (Fed. Cir. 1987) ---------- 54, 60

*Foradori v. Harris*,
523 F.3d 477 (5th Cir. 2008) ---------- 26, 27, 43

*Fox Indus. v. Structural Pres. Sys.*,
922 F.2d 801 (Fed. Cir. 1990) ---------- 64

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
582 F.3d 1288 (Fed. Cir. 2009) ---------- 41

*Function Media, L.L.C. v. Google, Inc.*,
708 F.3d 1310 (Fed. Cir. 2013) ---------- 32

*Gentry Gallery, Inc. v. Berkline Corp.*,
134 F.3d 1473 (Fed. Cir. 1998) ---------- 44

*GS CleanTech Corp. v. Adkins Energy LLC*,
951 F.3d 1310 (Fed. Cir. 2020), *cert. denied*,
141 S. Ct. 1377 (2021) ---------- 27

*Guile v. United States*,
422 F.3d 221 (5th Cir. 2005) ---------- 31

*Haberman v. Gerber Prods. Co.*,
236 F. App'x 592 (Fed. Cir. 2007) ---------- 32

*Hall v. Freese*,
735 F.2d 956 (5th Cir. 1984) ---------- 52

*Hidden Oaks Ltd. v. City of Austin*,
138 F.3d 1036 (5th Cir. 1998) ---------- 43

*i4i Ltd. P'ship v. Microsoft Corp.*,
598 F.3d 831 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011) ---------- 28

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*In re Isbell Records, Inc.*,
774 F.3d 859 (5th Cir. 2014) ---- 49

*In re Rembrandt Techs. LP Pat. Litig.*,
899 F.3d 1254 (Fed. Cir. 2018) ---- 55, 56, 57, 58

*In re Rosuvastatin Calcium Pat. Litig.*,
703 F.3d 511 (Fed. Cir. 2012) ---- 27, 53, 55

*In re Waugh*,
95 F.3d 706 (8th Cir. 1996) ---- 62

*Irvan v. Frozen Food Express, Inc.*,
780 F.2d 1228 (5th Cir. 1986) ---- 52

*Kinetic Concepts, Inc. v. Blue Sky Med. Grp., Inc.*,
554 F.3d 1010 (Fed. Cir. 2009) ---- 28

*Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*,
863 F.2d 867 (Fed. Cir. 1988) ---- 47

*Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*,
22 F.4th 1369 (Fed Cir. 2022) ---- 30

*Magnivision, Inc. v. Bonneau Co.*,
115 F.3d 956 (Fed. Cir. 1997) ---- 47, 48

*Mentor H/S, Inc. v. Med. Device Alliance, Inc.*,
244 F.3d 1365 (Fed. Cir. 2001) ---- 27

*Molins PLC v. Textron, Inc.*,
48 F.3d 1172 (Fed. Cir. 1995) ---- 54

*Novo Nordisk Pharms., Inc. v. Bio-Tech. Gen. Corp.*,
424 F.3d 1347 (Fed. Cir. 2005) ---- 60

*Ohio Willow Wood Co. v. Alps S., LLC*,
735 F.3d 1333 (Fed. Cir. 2013) ---- 53

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Packet Intelligence LLC v. NetScout Sys., Inc.*,
965 F.3d 1299 (Fed. Cir. 2020), *cert. denied*, 141 S. Ct. 2521 (2021) ---------- 30, 37

*PIN/NIP, Inc. v. Platte Chem. Co.*,
304 F.3d 1235 (Fed. Cir. 2002) ---------- 44

*Reese v. Mercury Marine Div. of Brunswick Corp.*,
793 F.2d 1416 (5th Cir. 1986) ---------- 42

*Rembrandt Soc. Media, LP v. Facebook, Inc.*,
640 F. App'x 943 (Fed. Cir. 2016) ---------- 50

*Rohm & Haas Co. v. Crystal Chem. Co.*,
722 F.2d 1556 (Fed. Cir. 1983) ---------- 56

*Sage Prods., Inc. v. Devon Indus., Inc.*,
126 F.3d 1420 (Fed. Cir. 1997) ---------- 41

*Satornino v. Dep't of Veterans Affairs*,
45 F.3d 442 (Fed. Cir. 1994) ---------- 62

*Streber v. Hunter*,
221 F.3d 701 (5th Cir. 2000) ---------- 28, 33, 37

*Sw. Software, Inc. v. Harlequin Inc.*,
226 F.3d 1280 (Fed. Cir. 2000) ---------- 28, 33, 34, 35

*Therasense, Inc. v. Becton, Dickinson & Co.*,
649 F.3d 1276 (Fed. Cir. 2011) ---------- 53, 58

*United States v. Duffault*,
314 F.3d 203 (5th Cir. 2002) ---------- 27, 42, 49

*United States v. Cotto-Flores*,
970 F.3d 17 (1st Cir. 2020), *cert. denied*, 141 S. Ct. 1121 (2021) ---------- 62

*United States v. Graves*,
5 F.3d 1546 (5th Cir. 1993) ---------- 44

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*United States v. Wooden*,
693 F.3d 440 (4th Cir. 2012) ---------- 62

*Westbrook v. Gen. Tire & Rubber Co*.,
754 F.2d 1233 (5th Cir. 1985) ---------- 52

*Whitehead v. Food Max of Miss., Inc.*,
163 F.3d 265 (5th Cir. 1998) ---------- 51, 52

*Wi-Lan, Inc. v. Apple, Inc.*,
811 F.3d 455 (Fed. Cir. 2016) ---------- 26

**STATUTES**

28 U.S.C. § 1295(a)(1) ---------- 1

28 U.S.C. § 1331 ---------- 1

28 U.S.C. § 1338 ---------- 1

35 U.S.C. § 101 ---------- 19

35 U.S.C. § 112 ---------- 25, 44, 45

35 U.S.C. § 133 ---------- 10

**OTHER AUTHORITIES**

37 C.F.R. § 1.137 ---------- 17

37 C.F.R. § 1.137(a) ---------- 15

37 C.F.R. § 11.18(b)(2) ---------- 61

Fed. R. Civ. P. 52(b) ---------- 23

M.P.E.P. § 711.03(c) ---------- 16, 57

Restatement (Second) of Torts § 8A, comment *b* (1965) ---------- 56

U.S. Const. art. I, § 8, cl. 8 ---------- 49, 53

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| ’094 patent | U.S. Patent No. 10,239,094 |
| ’153 patent | U.S. Patent No. 9,908,153 |
| ’408 patent | U.S. Patent No. 10,232,408 |
| ’810 patent | U.S. Patent No. 10,213,810 |
| ’291 application | U.S. Patent Application No. 11/201,291 |
| Amazon | Defendants-Cross-Appellants Amazon.com, Inc., Prime Now, LLC, Whole Foods Market Services, Inc., and Amazon.com Services LLC |
| asserted patents / asserted claims | ’153 patent (claims 1 and 6)<br>’810 patent (claim 1)<br>’408 patent (claims 20 and 30) |
| ASR | Automatic Speech Recognition |
| Freshub | Plaintiff-Appellants Freshub, Inc. and Freshub, Ltd. |
| Ikan | Ikan Technologies Inc. and Ikan Holdings LLC |
| NLU | Natural Language Understanding |
| OB | Opening Brief of Plaintiff-Appellants Freshub, Inc. and Freshub, Ltd. |
| Patent Office or PTO | United States Patent and Trademark Office |

## STATEMENT OF RELATED CASES

Amazon knows of no other cases pending before this Court or before a lower court or agency that will directly affect or be directly affected by this Court's decision in this appeal.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338. It entered final judgment on July 15, 2021. Appx147. The district court denied the parties' Rule 50(b) renewed motions for judgment as a matter of law and Freshub's Rule 59(a) motion for a new trial and entered a minute entry to that effect on October 19, 2021, stating that there were "[n]o other pending matters." Appx149-150. The parties now agree (OB3) that the district court's statement was an implicit denial of Amazon's pending Rule 52 motion and thus ended the action. *Edionwe v. Bailey*, 860 F.3d 287, 294 (5th Cir. 2017) (even though not explicit, district court's indication that the case had ended was an implicit denial of any outstanding motions) (citing *Tollett v. City of Kemah*, 285 F.3d 357, 369 (5th Cir. 2002)); *see also Bankers Trust Co. v. Mallis*, 435 U.S. 381, 382-88 (1978). This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

# INTRODUCTION

Freshub pursued its case against Amazon to a jury verdict in the Western District of Texas—and lost. Freshub asserted three related patents that claim systems and methods for using speech-recognition software to perform voice-based shopping. Amazon presented extensive evidence and testimony to explain that its accused products do not infringe the asserted claims for multiple independent reasons. And the jury agreed. It found that Freshub had failed to establish infringement of any asserted claim from any of the three patents at issue.

Freshub now appeals, challenging the sufficiency of the evidence as to only one of the three patents it pressed at trial. But its brief offers nothing more than disagreement with the jury's verdict. For example, Amazon presented substantial—indeed, compelling—evidence that its products' accused "shopping list" function simply adds words to a digital list without ever matching those words to a specific "item" for purchase or creating a "digitized order" as required by the asserted claims. When the jury compared Freshub's claims with the accused products, it was entitled to weigh the competing evidence and credit Amazon's positions, as it did. Freshub otherwise requests a new trial based on meritless evidentiary objections that it never bothered to raise during the trial, and by repeating accusations for which the district court sanctioned Freshub's counsel. None of Freshub's complaints warrant disturbing the jury's noninfringement verdict.

And in fact, this costly litigation never should have occurred. The asserted patents would not have issued but for a false material representation made to the Patent Office. Freshub's predecessor Ikan filed the application that gave rise to all three patents in 2005. After years of fruitless prosecution, it abandoned that application in 2012. Then, in 2017—after Amazon had introduced successful products using its voice-activated Alexa system—Ikan petitioned the Patent Office to revive the abandoned application. The Patent Office did so, expressly relying on Ikan's sworn statement that the full five-year period of abandonment had been "unintentional," as required under the governing regulations.

That statement was false. Ikan chose to abandon the application, and it misled the Patent Office about that fact when it changed its mind five years later. The Patent Office issued a formal notice of abandonment in 2012, and Ikan's prosecution counsel testified that he provides such documents to his clients. Indeed, just months after the application officially went abandoned, that counsel prepared—and Ikan's principal and named inventor signed—an assignment that expressly listed the application as "Inactive/Abandoned/Expired." Ikan's counsel testified that he knew the application was abandoned in 2013, 2014, and 2015, yet did nothing to revive it. He also testified that his docketing system would flag prosecution deadlines to avoid accidentally abandoning an application, that he would not allow an application to go abandoned without first obtaining his client's express approval, and that he would

note such communications in his docketing system to create a record of the client's approval for abandonment. Despite those established practices, and despite his obligation to undertake a full investigation before representing to the Patent Office that the full five-year period of abandonment had been unintentional, that counsel testified that he had "never gone back to look" for such records in the docketing system. Freshub asserted privilege regarding all contemporaneous communications with prosecution counsel, but the privilege log showed that Ikan's counsel got in touch with the inventors shortly after the Patent Office's last rejection and again nearly a year after the notice of abandonment, when Ikan's principal and named inventor signed the assignment acknowledging that the application was abandoned.

The district court nevertheless concluded that an intentional misrepresentation by Ikan and its counsel was not the "single most reasonable inference" to be drawn from the record. But the record supports no other inference. Prosecution counsel's testimony showed that he would have obtained and documented Ikan's approval before abandoning its long-floundering patent application, yet he chose not even to check those records before swearing to the Patent Office that the entire period of abandonment was unintentional. But the district court concluded that the prosecuting attorney was at most negligent. Specifically, the court found that Ikan's attorney *had* reviewed his firm's records, but it made that finding without addressing the attorney's directly contrary testimony on that point. Moreover, other

contemporaneous evidence confirmed that both Ikan and its attorney were aware of the final rejection and abandonment in 2012 yet chose to do nothing at that time. The district court clearly erred by finding no inequitable conduct, and that judgment should be reversed.

## STATEMENT OF ISSUES

*Freshub's appeal:*

1. Whether substantial evidence supports the jury's verdict that the accused Echo, Fire TV, and Fire Tablet devices do not infringe the asserted claims of the '153 patent, where Amazon showed through testimony and exhibits that these accused devices do not (a) "identify an item corresponding to the text," (b) receive a "digitized order" when Alexa adds spoken words to a user's shopping list, or (c) contain "a computer system remote from the first system" with "non-transitory memory" that performs the operations recited by the remainder of the claims.

2. Whether Freshub may obtain a new trial on infringement based on complaints it never raised by contemporaneous objection at trial, specifically, that the district court allowed the jury to hear (a) references to the asserted patents' filing dates and the accused devices' release dates as part of Amazon's written description defense, and (b) arguments that Freshub's conduct did not serve the constitutional purpose of the patent system.

*Amazon's cross-appeal:*

3. Whether the district court clearly erred in ruling that the asserted patents are not unenforceable for inequitable conduct.

## STATEMENT OF THE CASE

### A. Ikan's prosecution and abandonment of the original '291 application

On appeal, Freshub disputes the jury's noninfringement verdict only as to the '153 patent. The '153 patent—along with every other patent Freshub asserted in this case—claims priority from U.S. Patent Application No. 11/301,291 ("the '291 application"), originally filed in 2005.

#### 1. Specification of the '291 application

Although the asserted claims of the '153 patent recite "voice processing systems," the common specification derived from the original '291 application primarily described a problem with refrigerators: namely, that perishable items with "faintly or poorly printed" expiration dates are "often densely packed into a refrigerated storage unit," preventing a user from keeping track of them. Appx62 (1:23-31).[1] The specification proposed solving this problem with a refrigeration system that can read scannable "tags" (i.e., RFID tags, barcodes, etc.) on the items stored inside, and then prompt a user to use or replace the items before their

[1] For simplicity, all citations to disclosures in the '291 application refer to the specification of the issued '153 patent.

expiration dates. *Id.* (1:35-37); Appx52 (Abstract). The specification also included a cursory description of a voice processing system presented as a series of functional steps. Appx65-66 (8:17-9:14); Appx68 (13:56-14:44); Appx61 (Fig. 8).




FIG. 8

In Figure 8, reproduced here, the user first orders an item by making a spoken request through a generic user interface, *e.g.*, by "activating" a button or using a voice command. Appx61; Appx65 (8:9-11, 8:21-25). The system uses a generic "voice recording device[]" with a digital or analog memory to record the user's request. Appx65 (8:9-11, 17-25, 35-36).

Next, the system transmits the recorded request to a "remote system" (Appx68 (14:10-12)) using any network, "such as the Internet" (Appx65 (8:30-31)). The specification depicted the remote system as a literal black box, as shown in Figure 2 here, connected to a refrigerator with a scanner, computer, screen, and camera:




FIG. 2

Appx55 (Fig. 2).

Next, the remote system "performs voice recognition." For performing this critical step of "translating" voice to text, the specification explained that the system may simply use existing "voice recognition software" or "grammar constrained recognition and/or natural language recognition." Appx65 (8:36-38); Appx68 (14:15-17).

The system then performs a search to match the text of the order against a catalog of specific products—i.e., the system "matches the [translated] text with text stored in association with a SKU (or other identifier) to locate the correct SKU"[2] and identify the requested item. Appx65 (8:51-53). The system then presents the matched information to the user on a generic display device. Appx68 (13:2-6, 43-44); Appx60 (Fig. 7).

### 2. Initial prosecution and abandonment of the '291 application

Ikan Technologies Inc. filed the '291 application in late 2005 and pursued prosecution for more than five years, filing numerous information disclosures, amending the claims in response to a restriction requirement, receiving a non-final action rejecting all claims, amending once again, and ultimately receiving a final rejection of all pending claims in June 2011. Appx4719-4724; Appx17056-17065.

Meanwhile, Ikan's product-development efforts hit a wall. When Ikan first filed the '291 application in 2005, it had no product—just an idea for a trash can with a barcode scanner. Appx484-488 (172:23-176:5); Appx18969. Ikan envisioned that a user could place an order by scanning the barcode of an item as it was discarded, or alternatively from a booklet with pictures of food products and corresponding barcodes. Appx485-488 (173:6-176:5); Appx18974. Ikan eventually

---

[2] The specification explains that "SKU" means "Stock Keeping Unit," which is "an identifier, such as a unique numeric identifier associated with a specific product." Appx65 (8:44-46).

released this product and attempted to add voice ordering to a later version by adapting commercially available third-party voice recognition software. Appx488-491 (176:6-179:23); Appx19121. But Ikan was never able to use even this off-the-shelf solution. When a user said “bananas,” for example, the Ikan product converted the speech to “lemons.” Appx491-492 (179:10-180:23); Appx19169-19170. In 2011, Ikan put its device business “on hold” to “focus on the core” business of managing its “broad patent portfolio.” Appx476-477 (164:19-165:5).

Ikan then abandoned the ’291 application. After the Patent Office issued its final rejection on June 6, 2011 (Appx17056-17065; Appx16992 (84:23-85:10)), Ikan did not file a response within the six-month time limit under 35 U.S.C. § 133. The Patent Office therefore publicly issued a notice of abandonment on January 3, 2012. Appx17067-17068; Appx16993-16994 (91:15-92:17).

Ikan’s prosecuting attorney confirmed that he received both the final rejection and the notice of abandonment. Appx17067-17068; Appx16994 (91:15-92:17). Furthermore, several months after the notice of abandonment issued, the same attorney prepared an assignment agreement on Ikan’s behalf that correctly identified the ’291 application among Ikan’s “Inactive/Abandoned/Expired Applications.” Appx17070-17072; Appx16996-16997 (103:23-105:1). Sion Douer—Ikan’s principal and a named inventor on the ’291 application—received and signed that document before a notary on December 4, 2012. Appx17070-17072; Appx16995-

16996 (102:6-7, 103:3-19, 103:23-105:1); Appx17000 (121:3-7, 121:9). Even as Ikan abandoned the ’291 application, it continued to prosecute other pending applications. Appx17070 (listing active Application No. 13/303,577, which eventually issued as U.S. Patent No. 8,464,953); s*ee also* Appx4692-4694 (¶¶28-35, listing pending Ikan applications and patent office submissions from 2012 to 2017); Appx5074-5236 (same).

The ’291 application remained abandoned for nearly four more years. Appx17079-17080; Appx16997-16998 (109:18-22, 109:23-110:6, 110:14-111:2). Ikan’s counsel confirmed in sworn testimony that he had known in each of 2013, 2014, and 2015 that the ’291 application was abandoned and did nothing to revive it. Appx16997-17000 (109:23-110:6, 110:14-111:2, 119:5-16).

### B. Amazon’s Alexa-enabled products

In 2014, more than two years after Ikan abandoned the ’291 application, Amazon introduced the first products featuring the Alexa voice service. Amazon’s Alexa-enabled products include the Amazon Echo, Fire TV, and Fire Tablet, which have a wide variety of capabilities. Echo devices are smart speakers. Appx18158-18168; Appx18175-18184; Appx18191-18198. Fire TV devices are media streaming devices that connect to a television and allow users to stream video and music content, play games, browse the web, and download and use apps. Appx18205-18213; Appx18217-18223. Fire Tablet devices are mobile tablet

devices with a color touch screen. Appx5492-5493 ¶¶78-79. The relevant common feature of these devices is their ability to access the Alexa voice service. When properly configured by the user, they can receive a user's utterance after detecting the "Alexa" wake word (or, for some models, after the user pushes a button), and send the utterance to the Alexa cloud for processing. Appx5476 ¶45; Appx5491 ¶76; Appx5500-5502 ¶¶91-96.

Alexa is a voice-based virtual assistant that can answer questions, play music, stream real-time information, and perform thousands of other tasks. Appx17884-17888; Appx18175-18186; Appx18205-18214. The software to parse and respond to a user's voice commands resides in a multitude of cloud-based servers rather than in a user's device.




Appx18063.

The Amazon devices send digitized audio signals to the Alexa servers in the cloud. Appx1033-1035 (675:13-677:5); Appx1048-1049 (690:8-691:6)). There, Alexa's ASR engine uses advanced neural networks and machine learning to determine a set of hypotheses about the possible words that correspond to the digitized audio. Appx1035-1040 (677:6-682:22); Appx1232 (874:9-16). Alexa sends these on to an NLU engine that uses neural networks to parse the intent of the user's request. Appx1040-1041 (682:23-683:17); Appx1232 (874:17-23). The NLU engine first converts the words in the hypotheses into numbers. Appx1041-1043 (683:12-685:13); Appx1232-1233 (874:24-875:9). It does so using "semantic embeddings," which assign each word hundreds of numbers that attempt to capture each word's full meaning. *Id.* The NLU engine combines the semantic embeddings for the individual words and runs them through a neural network, which transforms them into a large number of different possible user intents. *Id.* These different intents output from the NLU are then ranked based on a large set of other information (e.g., what the user has done before, their geographic location, etc.). Appx1233 (875:10-21).

Alexa then routes the intent to an Amazon "speechlet" or a third party "skill" for resolution. Appx1043-1044 (685:4-686:1); Appx1233-1234 (875:22-876:4). Thus, if Alexa determines the most likely user intent is to request a joke, it invokes a joke speechlet that handles that request. Appx1043 (685:22-24). If the most likely

user intent is a shopping-related request, Alexa invokes the speechlet that handles the corresponding feature within Alexa Shopping. Appx1043-1044 (685:25-686:1); Appx1063-1065 (705:22-707:16); Appx1233-1234 (875:10-876:4).

For example, Amazon has a shopping list feature which, like a paper notepad, enables users to jot down reminders of what they may want to purchase later at their local store or online. Appx1061-1063 (703:25-705:21). When Alexa detects an "add to list" intent, it invokes the shopping list speechlet, which places words spoken by the user on the list. Appx1092 (734:10-15); Appx1235-1236 (877:18-878:7). The shopping list speechlet does not process the words to find relevant products sold on Amazon.com, unlike some other speechlets. *Id*. For example, Alexa can also invoke a shopping speechlet, which *does* attempt to find a relevant product sold on Amazon.com. Appx1089-1090 (731:5-732:16); Appx1091-1093 (733:21-735:7); Appx1245-1246 (887:6-888:16).[3]

---

[3] Freshub accused Alexa's "add to cart" capability of infringing claims 20 and 30 of the '408 patent and claim 1 of the '810 patent (Appx45-46), but it did not appeal the noninfringement judgment as to those claims. At trial, Freshub only accused Alexa's shopping list capability of infringing the '153 patent. *See* Appx575 (263:7-18) (identifying Alexa's Shopping List as the infringing functionality for the '153 patent); Appx568 (256:23-24) (characterizing the '153 patent as the "Shopping List patent"); Appx349 (37:19-24) (same); *see generally* Appx575-621 (263:7-309:17) (Medvidovic) (limiting testimony for the '153 patent infringement opinion to Alexa Shopping List functionality); *see also* Appx17402-17407; Appx17578-17579; Appx17628.

### C. Ikan's belated revival of the '291 application based on the false claim that it was "unintentionally" abandoned

In January 2017, nearly five years after abandoning the '291 application and two years after Amazon successfully launched Echo, Ikan filed a petition with the Patent Office to revive the application as having been abandoned "unintentionally" under 37 C.F.R. § 1.137(a). Appx17079-17080; Appx852 (540:11-22); Appx17000 (119:5-16). Ikan's patent counsel—the same attorney who had handled the original prosecution of the '291 application and prepared the 2012 assignment document for Ikan confirming the abandonment—first reached back out to Mr. Douer regarding the '291 application in October 2016, and after a series of communications, filed the petition to revive. Appx17022-17024 (lines 108-137); Appx17079-17080; Appx16998 (115:6-15). On the same day, Ikan's counsel recorded at the Patent Office the 2012 assignment—prepared by him and signed by Ikan's principal—confirming the abandonment. Appx16999-17000 (118:19-119:4).

In the petition, Ikan's counsel represented to the Patent Office that the "*entire delay*"—more than five and a half years at that point—in filing a response to the June 2011 final office action "was unintentional." Appx4995. As Ikan's counsel was aware (Appx17079-17080; Appx16998 (115:16-21); Appx17001-17002 (125:3-12, 125:17-23, 127:14-20, 128:13-16, 189:13-19)), "an intentional course of action is not rendered unintentional when, upon reconsideration, the applicant changes his or her mind as to the course of action that should have been taken" and

"a change in circumstances that occurred subsequent to the abandonment of an application does not render 'unintentional' the delay resulting from a previous deliberate decision to permit an application to be abandoned." MPEP § 711.03(c).

Ikan's counsel had 25 years of experience as a patent prosecutor and had previously allowed patent applications to go abandoned intentionally. Appx16988 (23:23-24:4); Appx17002 (189:13-19). The "vast majority of the time" he had done so by choosing not to respond to an office action. Appx16989 (24:10-13). He thus knew that filing no response to a final office action would result in abandonment of the '291 application. Appx16988 (22:15-22, 23:19-22, 24:10-13). Ikan's counsel confirmed that it was his practice to forward all material Patent Office communications to his client and obtain his client's express approval for allowing an application to go abandoned. Appx16989-16991 (26:21-27:3, 31:12-19, 40:16-25). And Ikan's counsel also testified that he documented the fact that a client agreed to allow an application to go abandoned, due to the associated risk of a malpractice claim. Appx16989-16991 (24:18-24:22, 26:21-27:3, 28:4-28:8, 31:12-19, 39:2-14, 39:16-18, 39:20-40:1, 40:16-19). As a result, there is an express indication in his law firm's docketing system that one can look up to confirm each time a client had intentionally abandoned an application. Appx16991 (40:20-25).

Although counsel's own knowledge is imputed to Ikan, the record also confirms that he contacted Ikan after receiving the final office action in June 2011

and again after receiving the notice of abandonment in January 2012. Appx17020-17021 (lines 91-96, 98-99). And again, Ikan's counsel reconfirmed the abandonment in writing later in 2012, when he prepared the assignment expressly noting that the '291 application was abandoned and transferring it and Ikan's other patents and applications to a related Ikan entity. Appx17070-17072; Appx16995 (101:25-102:7). Counsel further admitted that he had known about the abandonment in each of 2013, 2014, and 2015 yet had done nothing to revive. Appx16997-17000 (109:23-110:6, 110:14-111:2, 119:5-16).

When Ikan's counsel submitted the petition to revive, he knew that the Patent Office would not revive an abandoned application without a sworn statement that the abandonment was unintentional. Appx17001-17002 (125:3-12, 125:17-23, 127:14-20, 128:13-16). He also understood that he had "an obligation to do a full investigation" concerning the statement required by 37 C.F.R. § 1.137 that the abandonment of the '291 application was unintentional. Appx17378; Appx17001-17002 (125:3-12, 127:14-20, 128:13-16). And he knew that reviewing his firm's docketing system would confirm Ikan's intentions at the time of abandonment. Appx16990-16991 (39:2-14, 39:16-18, 40:20-25). But he gave contradictory testimony about whether he ever did so. He first said "yes," but then stated that he could not recall. Appx17002 (136:6-8, 137:17-19, 138:22-23). Tellingly, he also testified that he did not even know how approval of an abandonment was noted in

the firm's docketing system because he had "*never gone back to look*." Appx16990 (39:20-40:1) (emphasis added). Ikan's counsel therefore had no basis to represent that the abandonment of the '291 application was unintentional—he could not identify a single fact that supported that claim, and he admitted knowledge of facts that contradict it. *See* Appx17127-17138 ¶26 (citing Appx16986-17003 (40:16-19, 137:17-19, 138:22-23)); *see id.* ¶25 (citing Appx16986-17003 (128:13-16, 137:17-19, 138:22-23)).

After considering the petition, the Patent Office granted revival, stating expressly that it had relied on the sworn statement from Ikan's counsel that the delay was unintentional. Appx17075. Ikan then filed a series of continuation applications claiming priority to the revived '291 application, and those continuations issued as the asserted patents, including the '153 patent. Appx4999-5002.

In 2017, Ikan met with Freshub, a company that had a similar bar code scanning product with no working speech-recognition technology and no revenue. Appx1127-1128 (769:9-770:13); Appx741-742 (429:12-430:20). Ikan later merged with Freshub (Appx906-908 (594:22-596:9)) and assigned its patents—including the '153 patent and all others that issued from the revived '291 application—to Freshub (Appx16355). Freshub's president and CEO, Iri Zohar, declared that Freshub would switch its business model to filing patent infringement lawsuits—suing companies including Amazon, Google, and Apple for "big money" with "a

very quick and relatively high chance to success." Appx756-760 (444:10-448:8); Appx19246.

### D. Ikan's lawsuit against Amazon

#### 1. Pretrial proceedings

Freshub filed the complaint on June 24, 2019, asserting four patents that all sprang from the revived '291 application: the '153 patent, the '810 patent, the '408 patent, and the '094 patent. Appx1831; Appx1886. In *Markman* proceedings, Freshub proposed an affirmative construction for only one claim term in any of the asserted patents,[4] and the district court did not construe any terms beyond rejecting Amazon's indefiniteness positions and applying ordinary meaning. Appx4573. The district court denied all of Amazon's summary judgment motions—including patent ineligibility under § 101, non-infringement, invalidity for lack of written description, and inequitable conduct—all without issuing a written opinion. Appx16135-16182.

The district court later clarified that it would consider inequitable conduct at a separate bench trial. Appx16276-16277; Appx16371.

#### 2. The trial and jury verdict

The case proceeded to a five-day jury trial. At trial, Freshub argued that the accused devices infringe the '153 patent because a user can tell Alexa to add to an

---

[4] That term, "placing more weight on words," appeared only in claims that were no longer asserted by the time of the trial. Appx4487; Appx8.

Amazon shopping list. Appx575 (263:14-25). Amazon's witnesses explained that Alexa does not receive a "digitized order" as required by the asserted '153 patent claims because the information sent from the accused devices to the Alexa cloud represents whatever free-form utterance a user speaks into the device (e.g., tell a joke, the time, the weather, etc.), which has no necessary relation to any digitized shopping "order." Appx1230-1231 (872:9-873:20). Instead, Alexa determines the user's intent and how to respond to it. Appx1040-1044 (682:23-686:1). Amazon's witnesses also explained that Alexa does not meet the requirement to "identify an item corresponding to the text" because users can only add words to their Alexa shopping list, not "item[s] corresponding to" those words. Alexa merely transcribes whatever words the user speaks to the shopping list; it does not identify an item for purchase. Appx1092 (734:6-15); Appx1234-1236 (876:22-878:18). Thus, if a user says: Alexa, "add 'sad' to my shopping list," the word "sad" will appear on the list. *Id.* In this way, the accused shopping list speechlet operates differently than the other Alexa Shopping capabilities discussed above.

Amazon's technical expert also explained that the accused devices also could not infringe because they do not contain the second "computer system"—*i.e.*, Amazon's Alexa cloud servers, which were not accused or identified as accused in the final pretrial order. Appx1227 (869:5-23).

The jury ultimately found that Amazon had not infringed any of the asserted claims. Appx8-9.

### 3. Post-trial motions

Both parties filed post-trial motions. Freshub's motion for judgment as a matter of law on infringement argued that the testimony of its expert, Dr. Medvidovic, was "overwhelming," while the testimony of Amazon's expert, Dr. Johnson, was "incredulous." Appx17401. In essence, Freshub asked the district court to substitute its own credibility determinations for the jury's (or in some instances to apply new claim constructions that Freshub had never previously proposed). Appx17401-17411. The district court denied the motion, noting that Freshub had applied the incorrect legal standard by arguing that "the jury had substantial evidence of Defendants' infringement," rather than addressing "the correct standard[,] whether there is substantial evidence to support the jury's verdict of non-infringement." Appx42. The district court ruled that substantial evidence supported the jury's verdict that "at least some of the claim elements were not met by the accused products," pointing specifically to the "non-transitory memory" and "identify an item corresponding to the text" limitations for the asserted claims of the '153 patent. Appx42-45.

Freshub also moved for a new trial based on allegations that Amazon's counsel had invoked anti-Semitic stereotypes and made xenophobic calls to guard

the U.S. patent system against a foreign threat. Appx17411-17420. The supposed examples included an Amazon attorney mentioning Israeli shekels when cross-examining a witness about a Freshub financial report *stated in shekels* (Appx17414 (citing Appx741-743 (429:19-431:25)); *see also* Appx19226-19241 (Freshub financial report)), as well as an argument that suing Amazon and other technology companies based on later-filed patents with no written description support offended the patent system's constitutional purpose, i.e., to promote progress in science and the useful arts. Appx17413-17414. Freshub made those post-trial arguments even though it had never objected at trial on these grounds. Furthermore, its own counsel gratuitously referenced Freshub's connections to Israel multiple times throughout the trial,[5] while Amazon mentioned Israel only when relevant or necessary to rebut Freshub's own statements.[6] After a hearing on the new trial motion (Appx17650-17687) the district court found Freshub's "vitriolic and unsubstantiated allegations" to be "shocking," "offensive," and "unacceptable." Appx50-51. It denied the

---

[5] Appx508 (196:17-22 (noting that a co-founder worked on Iron Dome defense system successfully used in Israeli conflict)); Appx732 (420:22-25 (introducing Freshub witness Ms. Keren as a person from Israel)); Appx739 (427:9-20 (Ms. Keren describing Freshub's work with a leading supermarket in Israel)); Appx1683 (1311:11-12 (Freshub's counsel asking questions about a meeting in Israel)).)

[6] *See* Appx17586-17587 (citing Appx1692-1694 (1320:18-1322:4); Appx1528-1534 (1156:4-1162:2); Appx1682-1685 (1310:16-1313:9); Appx743 (431:11-25); Appx904 (592:7-17); Appx17593-17594).

motion and sanctioned Freshub's trial counsel, ordering them to complete additional legal ethics training. Appx51; *see also* Appx41-51.

### 4. The district court's ruling on inequitable conduct

The district court also conducted a bench trial on inequitable conduct by watching designated excerpts from the deposition of Ikan's patent prosecution counsel in chambers (Appx1814-1815 (1442:25-1443:22); Appx1817-1818 (1445:14-1446:15)) and issuing findings of fact and conclusions of law (Appx17-24). The court later vacated its initial findings (Appx39) in favor of granting Freshub's motion for judgment on partial findings (Appx38). In granting judgment on partial findings, the district court ruled that the representation by Ikan's counsel that the multiyear abandonment of the '291 application had been "unintentional" was material to patentability. Appx32-33. It nonetheless held that Amazon had failed to show falsity or intent to deceive. Appx33-36. Amazon moved under Rule 52(b) to amend the partial findings to address additional evidence in the record concerning those elements, including the fact that Ikan's counsel had testified that he had "never gone back to look" at the docketing system entry that would have confirmed his client's intentional abandonment. Appx17375-17383. The court provided no explanation of its ruling concerning this motion. Appx149-150. This appeal followed. Appx17688-17691; Appx17692-17694.

## SUMMARY OF THE ARGUMENT

1. *Noninfringement of the '153 patent.* Substantial evidence supports the jury's verdict of noninfringement for claims 1 and 6 of the '153 patent on three different grounds. *First*, the accused devices do not "identify an item corresponding to the text," because when a user adds to a shopping list, Alexa merely adds words spoken by the user to a written list without identifying any corresponding item for purchase. *Second*, Alexa does not receive a "digitized order." The accused function does not create an order for any product, but rather just adds text to a list. *Third*, the accused devices do not contain the "non-transitory memory" of a "remote computer system." Freshub accused only the Amazon devices—i.e., the Echo, Fire TV, and Fire Tablet—in the final pretrial order, even though Amazon had pointed out at summary judgment that the devices themselves do not run Alexa. While Freshub at trial mapped these limitations to the Alexa cloud servers, the jury was at liberty to find that those servers were not accused in the case. Moreover, even under Freshub's theory, the user—not Amazon—"makes" or "uses" the claimed invention by configuring their devices to connect with Alexa.

2. *New Trial*. Freshub has attempted to reframe and sanitize the arguments that caused the district court to sanction its trial counsel, but those arguments remain baseless. Freshub argues the district court erred by admitting evidence of the asserted patents' filing dates and allowing Amazon to point out that

Alexa had already been on the market for years. Freshub waived this argument by not objecting during the trial after the district court denied its motion *in limine*. Moreover, the district court did not commit clear or obvious error in admitting this evidence, which was relevant to explain Amazon's § 112 defense and to rebut allegations of willful infringement. In addition, Freshub continues to argue that Amazon's references to the Constitution and to Freshub's own stated intent to go after "big money" by suing Amazon, Google, and Apple were in fact a xenophobic attack meant to prejudice the jury against a foreign company. Again, Freshub waived this argument by not objecting during the trial. Furthermore, Amazon pointed to the Constitution to explain the purpose behind the written description requirement and to Freshub's business conduct as part of its showing that Freshub and its predecessor had never invented or described any voice shopping system and that its witnesses were biased due to their personal financial interests. That Freshub itself found none of the supposedly prejudicial comments objectionable until after it lost belies its accusations, and the Court should reject Freshub's belated attempt to assign error to the district court.

3. *Inequitable conduct.* The court should reverse the district court's judgment, on partial findings, of no inequitable conduct. After vacating its original findings, the district court left unaddressed record evidence that contradicts its partial findings and its ultimate ruling. That was clear error. Moreover, the only inference

supported by the record was that Ikan made a false material statement intended to deceive the Patent Office into reviving the '291 application when revival was otherwise barred.

## ARGUMENT

## I. STANDARDS OF REVIEW

The Court reviews both the denial of judgment as a matter of law and denial of a new trial under the regional circuit's standard. *Wi-Lan, Inc. v. Apple, Inc.*, 811 F.3d 455, 461 (Fed. Cir. 2016). In the Fifth Circuit, the "standard of review with respect to a jury verdict is especially deferential." *E.E.O.C. v. Boh Bros. Constr. Co.*, 731 F.3d 444, 451 (5th Cir. 2013) (en banc) (citation omitted). The Court must "draw all reasonable inferences in the light most favorable to the verdict and cannot substitute other inferences that [it] might regard as more reasonable." *Id*. at 452. It must uphold the verdict "unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Id*. (cleaned up). The Court reviews questions of law de novo and reviews the jury's factual findings for substantial evidence. *Wi-Lan*, 811 F.3d at 461 (applying Fifth Circuit law).

A new trial "will not be granted based on trial error unless, after considering the record as a whole, the court concludes that manifest injustice will result from letting the verdict stand." *Foradori v. Harris*, 523 F.3d 477, 506 (5th Cir. 2008). The Fifth Circuit generally reviews denial of a new trial for abuse of discretion, but

it reviews only for plain error where the requesting party failed to object to the disputed evidence or argument at trial. *Id.* at 508. "To demonstrate plain error, an appellant must show clear or obvious error that affects his substantial rights; if he does, [the Court] has discretion to correct a forfeited error that seriously affects the fairness, integrity, or public reputation of judicial proceedings, but is not required to do so." *United States v. Duffaut*, 314 F.3d 203, 209 (5th Cir. 2002) (citing *United States v. Calverley*, 37 F.3d 160, 162-64 (5th Cir. 1994) (en banc)).

The Court reviews a district court's inequitable conduct ruling for abuse of discretion. *In re Rosuvastatin Calcium Pat. Litig.*, 703 F.3d 511, 519 (Fed. Cir. 2012). A district court's ruling may be reversed where it was based upon clearly erroneous findings of fact, based on a misapplication or misinterpretation of law, or shows a clear error of judgment. *GS CleanTech Corp. v. Adkins Energy LLC*, 951 F.3d 1310, 1324 (Fed. Cir. 2020), *cert. denied*, 141 S. Ct. 1377 (2021).

## II. THE COURT SHOULD AFFIRM THE JUDGMENT OF NONINFRINGEMENT.

"Courts grant JMOL for the party bearing the burden of proof only in extreme cases, when the party bearing the burden of proof has established its case by evidence that the jury would not be at liberty to disbelieve and the only reasonable conclusion is in its favor." *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365, 1375 (Fed. Cir. 2001). To prevail on appeal, Freshub must "run the table" with respect to all of Amazon's noninfringement grounds; if substantial evidence supports just one

ground for each asserted claim, the Court must affirm. *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 849 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011).

Here, Freshub appeals from the denial of JMOL only as to the '153 patent. OB6. But substantial evidence supports the jury's noninfringement verdict as to multiple limitations. Freshub's arguments on appeal mostly amount to the same suggestion that it made to the district court to credit the "overwhelming" testimony of its expert over Amazon's expert. Appx17401-17420.[7] But in cases of "conflicting expert testimony, the jury is entitled to make credibility determinations and believe the witness it considers more trustworthy." *Streber v. Hunter*, 221 F.3d 701, 726 (5th Cir. 2000) (citation omitted); *see also Kinetic Concepts, Inc. v. Blue Sky Med. Grp., Inc.*, 554 F.3d 1010, 1024 (Fed. Cir. 2009) ("the Fifth Circuit has made clear that the jury is entitled to disbelieve a party's expert if it chooses"). The Court should therefore affirm the judgment of noninfringement.

---

[7] Freshub likewise argues that the Court should consider "the great weight of evidence" to overturn the jury's verdict. OB33; OB47. But "[i]n reviewing the propriety of the grant of JMOL," the Court does "not weigh the evidence, consider the credibility of witnesses, or decide disputed facts." *Sw. Software, Inc. v. Harlequin Inc.*, 226 F.3d 1280, 1289-90 (Fed. Cir. 2000) (applying Fifth Circuit law).

### A. Substantial evidence showed that the accused devices do not meet the claim requirement to "identify an item corresponding to the text."

Asserted claims 1 and 6 of the '153 patent each require computer instructions that translate a "digitized order" to text, "identify an item corresponding to the text," and "add the identified item to a list associated with the user." Appx68-69. But the Alexa "add to list" feature does not "identify an item corresponding to the text," as it merely places words on a user's shopping list. Specifically, when a user tells Alexa to add to their shopping list, NLU determines the user's intent, and a server running the "add to list" speechlet performs the function of adding the spoken words to the shopping list. Appx1061-1062 (703:25-705:24); Appx1043-1044 (685:4-686:1); Appx1092 (734:10-15). Alexa does not attempt to find relevant products on Amazon.com as it does for some other shopping intents like "add to cart." Appx1062 (704:17-25); Appx1089-1090 (731:5-732:16); Appx1091-1093 (733:21-735:7); Appx1234 (876:22-24). The trial record contains numerous examples of Alexa adding arbitrary spoken words to the user's shopping list—"sad," "poopy poop," "unicorns in a can,"—even though there is no item or product that corresponds to those words at all, let alone one "identified" by the system. Appx1063 (705:1-21); Appx1235-1239 (877:8-881:5). The record thus contained substantial evidence that the accused Alexa feature does not "identify an item that

corresponds to the text" as required by the '153 patent claims. Appx1062 (704:17-25); Appx1090 (732:4-16); Appx1092 (734:10-15); Appx1235-1239 (877:8-881:5).

Freshub argues that the Court must disregard testimony from Amazon's expert because he allegedly relied on a "specialized" meaning for the word "item." OB41-44. Freshub's argument fails for two reasons. First, parties must object at trial to preserve their JMOL arguments based on claim construction, and "failure to object amounts to waiver of these issues." *Packet Intelligence LLC v. NetScout Sys., Inc.*, 965 F.3d 1299, 1311-12 (Fed. Cir. 2020), *cert. denied*, 141 S. Ct. 2521 (2021); *see also Conoco, Inc. v. Energy & Env't Int'l, L.C.*, 460 F.3d 1349, 1359 (Fed. Cir. 2006) ("[L]itigants waive their right to present new claim construction disputes if they are raised for the first time after trial."). Freshub did not object to this testimony of Amazon's expert at trial (or request a claim construction) and thus waived any argument that the jury could not consider that testimony because it advanced an impermissible claim construction. *See* Appx1238-1239 (880:14-881:5).

Second, Amazon's expert Dr. Johnson in fact applied that term's plain and ordinary meaning, "which is the meaning one of ordinary skill in the art would ascribe to a term when read in the context of the claim, specification, and prosecution history." *Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*, 22 F.4th 1369, 1378 (Fed Cir. 2022) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313-14 (Fed. Cir. 2005) (en banc)). Dr. Johnson explained that an "item" in the claims must be

an actual *thing*—i.e., "something in your refrigerator or in your cabinet"—and not a simply a word. Appx1238-1239 (880:1-881:5). The abstract of the '153 patent discloses that "the invention is related to methods and systems for collected item information for *stored items*." Appx1238 (880:1-14) (emphasis added); *see also* Appx52. The specification further discloses that the system contains sensors to read information from item tags coupled to *stored items* in a storage unit. Appx1238-1239 (880:14-881:5); *see also* Appx52 (Abstract); Appx62 (1:35-37, 40-44). Similarly, it discusses that the system searches to match the text of an order to a *product SKU* or other identifier in a *catalog of items*. Appx65 (8:51-53).

When Freshub's counsel accused Dr. Johnson on cross examination of applying a "special meaning" for the word "item," Dr. Johnson clarified that he was merely applying the "plain and ordinary meaning" which is "the meaning a person of skill in the art at the time would understand those terms to mean from what's in the patent." Appx1411-1412 (1053:19-1054:3).[8] The district court instructed the jury to "use the plain and ordinary meanings and apply them" (Appx1720 (1348:17-22)), and the jury was free to adopt Dr. Johnson's description if "consistent with the

---

[8] Freshub's cited authority is distinguishable on this point. OB25, OB26-28. In *Guile v. United States*, the court found that many of the expert's statements were "unsupported by any data" and were "later contradicted by him, or [were] nothing but his incorrect factual assumptions based on examination of incomplete records." 422 F.3d 221, 227 (5th Cir. 2005). Here, Dr. Johnson based his understanding of "item" on the '153 patent's disclosures.

jury's understanding." *Haberman v. Gerber Prods. Co.*, 236 F. App'x 592, 600 (Fed. Cir. 2007). [9]In essence, Freshub attempts to do what this Court rejected in *Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1325-27 (Fed. Cir. 2013)—i.e., wait until after trial to argue that the district court sent claim construction issues to the jury. *Id.* (citing *Verizon Servs. Corp. v. Cox Fibernet Va., Inc.*, 602 F.3d 1325 (Fed. Cir. 2010)).

Freshub also argues that the Court must disregard Dr. Johnson's testimony because it contradicted the testimony of an Amazon witness and thus lacked factual support. OB25-26. Freshub points to Dr. Johnson's testimony that when a user commands Alexa to "add milk to my shopping list," the word "milk" is not an "item" under the claims, and argues that it conflicts with the testimony of an Amazon engineer, Dr. Ström, who referred to "milk" as an "item." But Dr. Johnson explained this supposed "contradiction"—namely, that Dr. Ström was speaking colloquially as someone who works neither on Alexa Shopping nor the shopping list feature. Appx1395-1397 (1037:25-1039:3). While it might be normal to say, "milk is an item on my shopping list," the '153 patent uses the word "item" to refer to something

[9] Again, Freshub's cited authority (OB42) does not hold otherwise. In *800 Adept, Inc. v. Murex Securities, Ltd.*, the trial court modified its prior claim construction during trial in response to counsel's request. 539 F.3d 1354, 1361 (Fed. Cir. 2008). This Court held that the modified construction was incorrect and had resulted in an incorrect infringement verdict. *Id.* at 1366-67. Here, Freshub never asked the district court to construe the term "item" until after it lost at trial.

identified (and thus separate) from the translated "text" of the digitized order. Appx1405-1408 (1047:6-1050:7); Appx1234-1239 (876:22-881:5). Freshub has *at most* pointed to competing testimony in the record that the jury was free to evaluate and resolve in Amazon's favor.[10]

Freshub also argues that the Court should credit Freshub's expert's testimony over Amazon's when evaluating various documents. OB34-36. But it is the jury who considers the credibility of witnesses and decides any disputed facts. *Sw. Software*, 226 F.3d at 1289-90; *Streber*, 221 F.3d at 726. Freshub points first to a document entitled "Alexa Shopping List Metadata [V1]" (Appx17995), which states that customers "are only allowed to add keywords to their shopping list." OB35. Amazon's expert explained that this document did not even describe the accused Amazon shopping list feature, but rather the Whole Foods phone application, which was not accused in the case and *has no Alexa voice capability*. Appx1239-1240 (881:6-882:5); Appx17995; Appx1240 (882:16-23). Even if that document *had* described an accused feature, the jury would still have been free to disbelieve the testimony of Freshub's expert that "keywords" are the "items" of the patent claims.

[10] Freshub's assertion that Dr. Ström "admitted infringement" is also incorrect. OB24. In fact, he testified the opposite: that "there's no direct mapping"—*i.e.*, *no identification*—between what Freshub's counsel referred to for an item ("milk") and the text added to the shopping list. Appx1053-1054 (695:25-696:5). He also testified that he would defer to others concerning how the shopping speechlet works. Appx1053 (695:4-9).

Appx610-611 (298:23-299:11). Freshub also points to a screenshot from an Amazon website displaying an "Alexa Shopping List" with words underneath. OB36; Appx18154. But nothing about this document established that the system has identified *an item* corresponding to the words placed on the list, and Amazon presented evidence that it did not. Appx1239-1241 (881:9-883:13).

Ultimately, the jury was free to judge the credibility of each witness and to accept Amazon's evidence and testimony and reject Freshub's. *Sw. Software*, 226 F.3d at 1289-90. Substantial evidence supports the jury's verdict of noninfringement on the grounds that that the accused devices do not meet the claim requirement to "identify an item corresponding to the text."

### B. Substantial evidence showed that the accused devices do not meet the "digitized order" limitation.

The asserted claims of the '153 patent each also recite a "digitized order" received and translated to text for use in identifying a corresponding item. Appx68-69. The district court did not construe the term "digitized order" (Appx4573), and Amazon's expert testified that a person of ordinary skill would understand its plain meaning as an order for specific items recognized by the system. Appx1228-1230 (870:23-872:8). In contrast, Alexa does not receive an order for any items through the accused shopping list function. After determining the user's intent, Alexa instead invokes the shopping list speechlet that does nothing more than add text to a shopping list. Appx1062 (704:17-25); Appx1092 (734:10-15); Appx1235-1236

(877:8-878:3) The jury had ample evidence from which to find that an utterance asking Alexa to add text to a shopping list does not meet the ordinary meaning of receiving a "digitized order."

Furthermore, the audio of a user utterance that Alexa receives is not a "digitized order," but a sequence of words that could mean anything. At trial, both sides' experts agreed that the accused devices send digitized audio to the Alexa cloud representing whatever free-form utterance a user speaks into the device (e.g., "tell a joke," "what's the time," "what's the weather," etc.). Appx409 (97:5-10); Appx659-660 (347:24-348:6); Appx1230-1231 (872:9-873:20). Alexa does not limit what a user can say, but instead determines a user's "intent"—i.e., what he or she is trying to accomplish—by analyzing the likely meaning of all the words in the utterance. Appx1232-1234 (874:3-876:13). Freshub's expert opined that any words spoken by a user that do not identify an item to be ordered are merely "useless" or "superfluous" and can therefore be ignored in the infringement analysis. Appx580 (268:9-12); Appx1228-1234 (870:25-876:13). But this only further distinguishes Alexa from the claimed system. In the patent, the system scans the barcodes of items to be ordered; the patent disclosed voice ordering as a backup option for items lacking barcodes. Appx1229-1230 (871:6-872:3). And for these, the specification disclosed that the words spoken by the user—"banana" or "five bananas"—are received by the system as a digitized order. *Id.*; *see also* Appx61 (Fig. 8). To Alexa, no words in

an utterance are "useless" or "superfluous," because it uses all of them to determine a user's likely intent. Appx1230-1231 (872:19-873:20). Alexa may provide vastly different results for an utterance that includes the word "banana"—e.g., research information for a report on bananas, movies about bananas, songs with the word banana, devices in the home named "banana," etc.—depending on the context. Appx1229-1231 (871:6-873:20).

Freshub devotes only two pages to the "digitized order" limitation in its opening brief, arguing that Amazon infringes because Alexa can interpret input spoken by a user as a directive to purchase a product. OB39-41. But this attempted mapping of the limitation does not work for the two reasons just discussed. First, Freshub was required to prove that an utterance *invoking the accused shopping list feature* is an "order." *See* Appx68-69 (14:46-15:13). Whether other utterances are "digitized orders" is irrelevant to Freshub's claim of infringement targeting that feature. Second, Freshub was required to prove that the signal received by a second computer using the network interface is a "digitized order," not just that a user may speak an "order" to purchase a product at an Alexa-enabled device. As discussed, what Alexa receives is not the digitized order of the claims, it is a digital representation of *anything* the user says, *all* of which is used to determine what further action the system should take. Freshub moves even further afield when it argues that Amazon's expert Dr. Johnson "admitted that some of the utterances that

Alexa receives are . . . orders." OB41. The utterance Freshub refers to is its counsel's example of telling his son to take out the trash. Appx1392 (1034:14-19). This colloquial English example of an "order" (i.e., a directive) has no relation to either the claimed "digitized order" or the utterances received by Alexa. Appx1407-1410 (1049:2-1052:4).

Finally, Freshub argues that Dr. Johnson provided another "special meaning," this time for "digitized order." OB41-43. But Freshub forfeited this claim construction argument by not objecting at trial or requesting a construction, *Packet Intelligence*, 965 F.3d at 1311-12, and Dr. Johnson testified that he had applied the plain and ordinary meaning. Appx1229 (871:6-25); Appx1407-1408 (1049:2-1050:7); Appx1411-1412 (1053:24-1054:3); Appx1413 (1055:13-17). The jury was free to apply Dr. Johnson's opinion concerning the "digitized order" limitation consistent with their understanding. *Streber*, 221 F.3d at 726. For all these reasons, substantial evidence supported the jury's verdict that Alexa does not receive the "digitized order" required by the claims.

### C. Substantial evidence showed that the accused devices do not have a "computer system remote from the first system" that includes "non-transitory memory."

"To prove literal infringement, the patentee must show that the accused device contains *each and every limitation* of the asserted claims." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1215 (Fed. Cir. 2014) (emphasis in original). "If any claim

limitation is absent from the accused device, there is no literal infringement as a matter of law." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). Even if a defendant provides multiple components of a claimed system, the components do not infringe individually unless they contain all elements of the claim. *See, e.g.*, *Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.,* 631 F.3d 1279, 1287-88 (Fed. Cir. 2001) (rejecting argument that defendant infringed by "build[ing] all of the parts of the system including the client-side software," because "[i]n order to 'make' the system under § 271(a), [accused infringer] would need to combine all of the claim elements").

Claims 1 and 6 of the '153 patent recite a (1) "voice processing system comprising" both a "first system" containing a "first computer" that includes "non-transitory memory" (Appx68 (14:46-55)) and (2) a "computer system remote from the first system" that includes "non-transitory memory" (Appx68-69 (14:63-15:1)).

Throughout the case, Freshub accused only the individual Amazon Echo, Fire TV, and Fire Tablet devices of infringement; it did not accuse Amazon's back-end cloud servers that run Alexa. This was a strategic decision that Freshub made for the purpose of inflating its damages claim. Fewer than 5% of Echo users (and even fewer Fire TV and Fire Tablet users) use the Alexa voice service to place an order on Amazon.com or add words to their shopping list—Freshub thus accused the devices alone to bolster its claim to a high per-unit royalty on the sale of each

accused device. Appx913 (601:11-16); Appx928-929 (616:19-617:13); Appx1441-1443 (1083:6-1085:14). Even after Amazon pointed out that this was fatal to the infringement claims, Appx5324-5345; Appx16160-16162 (29:24-31:21), Freshub still accused only the individual devices in the final pretrial order designating issues for trial. Appx16349-16350. And the district court instructed the jury accordingly: "The *products Freshub accuses of infringing* the asserted patents *are Echo devices*, including the Echo, Echo plus, Echo Dot, Echo Spot, Echo Show and Echo Input products, *Fire TV devices*, which include the Fire TV Stick with Alexa voice remote and Fire TV Cube products, *and Amazon Fire Tablet devices*." Appx303 (151:20-25) (emphasis added).

Based on the issues designated for trial in the pretrial order, Amazon's expert testified that the accused devices do not infringe because they "do not include any parts of the server, including the hardware or anything else … [o]nly the accused products are accused." Appx1227 (869:5-23). Freshub's assertion in its brief (OB5; OB28) that Amazon limited its infringement challenge at trial to only the "order" and "item" elements is therefore incorrect.[11] And Freshub's expert agreed that when

[11] In addition to presenting this testimony from which a reasonable jury could reach a noninfringement verdict, Amazon also objected to Freshub's infringement demonstratives identifying the cloud servers as part of the infringing system. Appx462-463 (150:15-151:2). Amazon also moved at the close of evidence for judgment as a matter of law on this ground. Appx16923-16925.

a user takes one of the accused devices out of its shrink-wrapped box, that device does not include a hard drive that stores instructions for voice shopping functions. Appx679 (367:3-8) (FireTV); Appx675-676 (363:20-364:15) (Echo and Fire Tablet). The jury thus had substantial evidence to conclude that the accused devices lack the remote computer system with a "non-transitory memory."[12]

Freshub argues that it accused "Alexa" which "consists of both the Alexa Devices and the Alexa System." And Freshub's expert attempted to map the "computer system remote from the first system" that includes "non-transitory memory" not to the accused devices themselves but to the cloud servers that run Alexa. Appx673-674 (361:7-362:19); *see* OB32. But this argument attempts to have it both ways. Freshub expressly identified the "infringing products" as the devices, not the "Alexa System" (i.e., "*products that use* Defendants' Alexa technology" including "Amazon Echo Products," "Amazon Fire TV Products," and "Amazon Fire Tablets"). Appx16349-16350 (emphasis added). It also did not object to the jury instructions identifying only the devices as accused, or the testimony of Amazon's expert discussed above. Appx303 (151:20-25); Appx1227 (869:5-23). A reasonable jury could therefore find that the accused Echos, Fire TVs, and Fire

---

[12] Indeed, for this same reason, substantial evidence supported a verdict that the accused devices did not infringe *any* of the '153 patent's remote computer elements, including "a second computer" that "receive[s] … the digitized order from the first system," "translate[s] … the digitized order," and so forth. Appx68-69.

Tablets did not infringe because they do not contain a remote (i.e., server-side) computer system with non-transitory memory. It did not have to accept Freshub's evidence concerning the Alexa cloud servers. *See Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1345 (Fed. Cir. 2001) ("Application of the claim to the accused device is a question of fact …."). [13]

Moreover, even under Freshub's "Alexa system" infringement theory, substantial evidence supported the noninfringement verdict. That is because Freshub's theory still requires *combining* the accused devices with the Alexa cloud servers into the single system, and the record showed that the device *users*—not Amazon—make that connection. In fact, Freshub's expert expressly admitted that Echo is "nothing more than a paper weight" until the user does so. Appx675-676 (363:8-364:2). The evidence showed also that using the combined system requires

---

[13] Freshub's post-trial motion for JMOL argued that the accused devices met both "non-transitory memory" limitations for the '153 patent based solely on cross-examination testimony from a single witness that both Echo and Alexa servers have "memory." Appx17405-17406. In denying Freshub's motion, the district court held that without testimony that "memory" is equivalent to the "non-transitory memory" of the patents, Freshub failed to satisfy its burden for establishing infringement. Appx43-44. Freshub now asks the Court to consider additional testimony from its expert and a counsel-annotated diagram that it did not raise at the district court. OB28-32. This Court should deem these arguments waived. *See Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1296 (Fed. Cir. 2009); *see also Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1427 (Fed. Cir. 1997) ("if a litigant seeks to show error in a trial court's overlooking an argument, it must first present that argument to the trial court").

a user to initiate it by providing an utterance. Appx576 (264:12-18); Appx661 (349:9-13); Appx996-997 (29:25-30:2). Substantial evidence therefore showed that it is the users, and not Amazon, who "combine all of the claim elements" necessary to make or use the complete "system" of the asserted claims even under Freshub's "Alexa system" infringement theory. *Centillion*, 631 F.3d at 1288.

## III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY DENYING A NEW TRIAL.

A party's failure to object to attorney remarks at trial presents a nearly insuperable bar to review under Fifth Circuit law. *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491 (5th Cir. 2012). Where a party seeks a new trial but did not object on the same grounds during trial, it must establish not just ordinary prejudice but plain error, i.e., an "exceptional case where the error has seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Reese v. Mercury Marine Div. of Brunswick Corp.*, 793 F.2d 1416, 1429 (5th Cir. 1986) (citation omitted); *see also Duffaut*, 314 F.3d at 209. As the Fifth Circuit has explained, an appellant cannot choose "to gamble on the verdict" and when that "strategy fail[s]" request a new trial. *Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 376 (5th Cir. 1989).

But that is exactly what Freshub did here. Before the district court, Freshub's primary argument for a new trial was its accusation that Amazon had invoked stereotypes and xenophobic bias against Israel to prejudice the jury. At the post-trial hearing, Freshub's counsel admitted that Freshub had not objected on these grounds

during the trial, could not provide examples of the alleged misconduct when pressed by the district court, and ultimately was sanctioned for making baseless accusations. Appx17664-17672 (15:4-23:16); Appx48-51. Freshub has dressed up its argument on appeal by focusing first on Amazon's references to the asserted patents' filing dates (OB48-52) and the constitutional purpose of the patent system (OB51, OB54), but ultimately it returns to the same unsupported claim that Amazon tried to prejudice the jury against a "foreign" plaintiff (OB54-58). The result remains the same. The district court did not commit plain error by permitting arguments in the absence of an objection. Nor did it abuse its discretion in rejecting a request to redo the trial based on meritless accusations that Freshub never raised until it lost.[14]

### A. The district court did not commit plain error by admitting evidence of the asserted patents' filing dates and Amazon's earlier development of Alexa.

Freshub first takes issue with the district court admitting evidence of the filing dates of the continuation applications that became the asserted patents, and then allowing Amazon to discuss Alexa's earlier development. OB48-52. To preserve this issue, Freshub had to renew its motion *in limine* objections during the trial, which it did not do. *See Foradori*, 523 F.3d at 507 n.26 (party waived objection by

---

[14] Freshub argues for a new trial based also on "the great weight of evidence." OB47. That standard requires Freshub to show "an absolute absence of evidence to support the jury's verdict." *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1049 (5th Cir. 1998) (citation omitted). As substantial evidence supported the noninfringement verdict, no new trial is warranted on this ground.

failing to renew it at trial); *C.P. Interests, Inc. v. Cal. Pools, Inc.*, 238 F.3d 690, 701 (5th Cir. 2001) (same); *United States v. Graves*, 5 F.3d 1546, 1552 (5th Cir. 1993) (same, holding that "the settled rule of this circuit [is] that a motion in limine does not preserve error for Rule 103 purposes"); *see also* OB48-49; Appx14404. Freshub thus forfeited the issue. Moreover, these subjects were relevant to Amazon's § 112 defense and rebutting Freshub's willfulness allegations.

First, to satisfy the written description requirement of § 112, "the disclosure of the application relied upon [must] reasonably convey[] to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). Evidence about the timing and circumstances of Freshub's patent filings relative to the accused products is relevant to this inquiry. *See Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479 (Fed. Cir. 1998) (identifying inventor's failure to consider adding a limitation until becoming aware of competitors as significant in affirming § 112 invalidity); *see also PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235, 1247-48 (Fed. Cir. 2002) (claim added to cover competing product was invalid where original application was "devoid of any mention" of the substance of later-added claim).

Here, Freshub's filing of the asserted claims more a dozen years after the priority application and several years after Amazon developed Alexa was similarly

probative of the § 112 defense. The priority '291 application neither disclosed the voice-shopping inventions that the patentee eventually claimed nor contained information from which someone could make such an invention work. It merely disclosed a refrigeration system with a box that says "perform speech recognition." Appx1259-1260 (901:10-902:2). But speech-recognition and natural-language understanding posed difficult technological challenges, many of which had not been solved at the time of the application, including far-field speech-recognition and determining user intents. Appx1260 (902:3-23); Appx1026-1043 (668:3-685:13). Corroborating Amazon's defense was the fact that Freshub called no witness to trial willing to claim that they had invented voice-shopping technology like Alexa in 2005. Appx1777-1778 (1405:10-1406:2); Appx1805-1806 (1433:15-1434:10). These facts were not used to mislead the jury into thinking there can be no infringement, as Freshub claims. To the contrary, Amazon pointed to these facts expressly as part of its written description defense. Appx382-383 (70:22-71:22); *see also* Appx1256-1260 (898:10-902:11); Appx1776-1787 (1404:1-1415:1); Appx428-430 (116:17-118:8); Appx431-433 (119:3-121:20); Appx906-907 (594:22-595:10); Appx1787 (1415:2-12) ("Written description prevents you from claiming your patent [covers what] somebody else invents in the future, and that's what Freshub is doing in this case.").

Relatedly, Freshub accuses Amazon of telling the jury that a patent attorney obtained an Alexa-enabled device and used it to draft the asserted claims. OB51-52 (citing Appx1791-1793 (1419:4-1421:5)). That simply mischaracterizes the record. Throughout the trial, Freshub had emphasized that the accused devices infringed based on their basic prior art components like a microphone and wireless network interface. *See, e.g.*, Appx349 (37:7-13), Appx354 (42:9-17), and Appx356 (44:4-8) (opening argument noting "microphone," "wireless network interface," and "digitizer" in the patent); Appx357 (45:17-24) (opening argument noting accused products all have "the microphone, the digitizer, and everything else"). Amazon suggested that while a patent attorney hypothetically "*could* set [the Echo] down on the desk in front of them and just describe it" to claim that these basic components that Freshub's trial presentation had emphasized (Appx1791 (1419:5-18) (emphasis added); *see also* Appx1791-1792 (1419:19-1420:12)), the step between "receiving the words that the user says and identifying an item" "wasn't obvious from just using Alexa and the Echo." Appx1792 (1420:13-16). The claims recited "a standard way as it [(i.e., voice recognition)] was done in the past," but the accused Amazon products employ a more sophisticated artificial intelligence not claimed by the patent. Appx1792-1796 (1420:13-1424:23). None of this suggested to the jury that the patent attorney had actually drafted the patent claims with an Echo speaker or other Alexa-enabled device in the room.

Second, "[k]nowledge of the asserted patent and evidence of infringement is necessary … for a finding of willfulness." *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 988 (Fed. Cir. 2021). Freshub introduced evidence that four years before Alexa's release, Ikan sent Amazon a barcode scanner and information about its patents. Appx475-476 (163:18-164:18); Appx18309. But that purported evidence came from *2010*—seven years before Ikan petitioned to revive the '291 application and filed the first of the asserted patents. The fact that the asserted patents were not even filed until years after Alexa's release was thus relevant to rebut Freshub's suggestion and show that the information sent to Amazon could not possibly have included the asserted patents. Appx495-497 (183:11-185:10).

Freshub cites *Kingsdown Medical Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867 (Fed. Cir. 1988) to argue that the filing dates were "not relevant to any issue that was before the jury, including validity, infringement or damages." OB45; *see also* OB46, OB48. In *Kingsdown*, the Court held that amendments drafted to cover a competitor's product are "simply irrelevant" to an inequitable conduct claim and "cannot of itself evidence deceitful intent" for *inequitable conduct*. 863 F.2d at 874. The Court did not address the relevance of filing dates for other issues including written description and willful infringement. Freshub cites also to *Magnivision, Inc. v. Bonneau Co.*, 115 F.3d 956 (Fed. Cir. 1997). OB49-50. But in *Magnivision*, the Court ordered a new trial because the district court resolved issues related to alleged

"prosecution irregularities" at summary judgment, but then erroneously allowed the defendant to present evidence about them and instructed the jury incorrectly that the presumption of validity could be lost because of them. 115 F.3d at 957, 960-962. No such error occurred here, and no new trial is warranted.[15]

### B. The district court did not commit plain error by allowing Amazon to discuss the constitutional purpose of the patent system or Freshub's motives in filing suit.

Freshub also takes issue with Amazon's explanation of the constitutional purpose of the patent system and the allegation that Freshub abused the system in this case. OB54-57. Here too, Freshub forfeited its claim by failing to object at trial (*see* Appx17658-17661 (9:2-12:8)).[16] The Court therefore need not consider

---

[15] Freshub's arguments also fail under the abuse of discretion standard. OB49. In the Fifth Circuit, "the district court has 'great discretion' in admitting evidence that has any tendency to make any material fact more or less probable," and the appellant must show that the district court's alleged error "would have altered the outcome of the case." *Echeverry v. Jazz Casino Co.*, 988 F.3d 221, 235 (5th Cir. 2021) (citation omitted). Here, Freshub cannot show that excluding this evidence would have altered the verdict, since the jury found for Freshub on written description. Appx9.

[16] *See* Appx17659-17660 (10:15-11:3) ("THE COURT: … I'm going to ask you one more time…. During the course of the trial, when you say the Defendant pitted the community against a foreign company, did you – on behalf of your client, did you ever object? Because I don't remember you objecting. Had you done so, I'm sure I would have remembered it at least, and I certainly would have taken it seriously. So you'll agree with me that on behalf of your client, you never objected during the course of the trial when evidence was coming in; is that correct?

MR. ANDRE: Your Honor, I think that – I would agree with that statement.").

Freshub's argument at all, *Baisden*, 693 F.3d at 509, but if it does, it reviews only for plain error, *Duffaut*, 314 F.3d at 209.

Even where a timely objection is made, attorney statements only "implicate the interest of substantial justice when counsel's assertions are 'either false or without basis in the record.'" *In re Isbell Records, Inc.*, 774 F.3d 859, 872 (5th Cir. 2014) (citations omitted). Here, Amazon's argument was entirely consistent with the law and the facts of the case, a point that Freshub itself conceded before the district court.[17] The constitutional purpose of the patent system is to promote innovation—an inventor receives the limited monopoly of a patent only in exchange for his or her contribution to public knowledge. U.S. Const. art. I, § 8, cl. 8. That purpose is not served when the applicant does not possess, and thus cannot adequately describe, the claimed invention. Indeed, the cornerstone of the Patent Act's written description requirement is "to prevent an applicant from later asserting that he invented that which he did not" by requiring an applicant to "recount his invention in such detail that his future claims can be determined to be encompassed within his original creation." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d

[17] After the district court observed that Amazon's comments were "completely consistent with exactly what your company did…. Those were the facts," Freshub's counsel agreed: "Yeah, it is the facts, Your Honor, and we don't – we don't deny that." *See* Appx17661-17663 (12:9-14:2).

1313, 1330 (Fed. Cir. 2003) (quoting *Vas–Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1561 (Fed. Cir. 1991)).

Given that Freshub (and its predecessor Ikan) never had working voice-shopping technology yet still claimed to have invented Alexa, Amazon was within its rights to allege that Freshub's conduct was an abuse of the U.S. patent system. Freshub's internal communications showed that it was interested in the "big money" it could get by suing Amazon, which its CEO expected would be "very quick [with a] relatively high chance to success" and not like "normal companies." Appx757-758 (445:3-446:24); Appx19246. According to the CEO himself, after Freshub sued Amazon, it intended to sue Google, Apple, and others. Appx1145-1146 (787:24-788:17); Appx19246. These were all undisputed facts in the record, which were relevant to the jury's assessment of the credibility of Freshub's witnesses and the alleged value of the asserted patents. *See Biodex Corp. v. Loredan Biomedical, Inc.*, 946 F.2d 850, 859-60 (Fed. Cir. 1991) (jurors may assess witness credibility based on financial interest); *Rembrandt Soc. Media, LP v. Facebook, Inc.*, 640 F. App'x 943, 950 (Fed. Cir. 2016) (questions about witness's financial interests "clarified" motive); *see also Aetna Ins. Co. v. Paddock*, 301 F.2d 807, 812 (5th Cir. 1962) (excluding evidence of financial interest was "prejudicial error" and observing that "[e]vidence to show bias or interest of a witness in a cause [c]overs a wide range and

the field of external circumstances from which probable bias or interest may be inferred i[s] infinite").

Freshub thus falls back on the xenophobia claim for which it was sanctioned. It attempts to distort Amazon's remarks as portraying Freshub not merely as an abuser of the patent system that sought to forgo the hard work of innovation in favor of filing lawsuits, but as a "foreign threat" to the United States. OB54; OB56. This claim remains baseless. The statements that Freshub quotes in its brief do not actually refer to Freshub as a foreign company at all. Appx379 (67:6-17); Appx1775 (1403:6-14); Appx1808 (1436:12-25). Instead, Freshub truncated those quotations and inserted the words "foreign company" itself. OB55. Moreover, it was Freshub, not Amazon, who loudly trumpeted Freshub's foreign connections throughout the trial, bragging about how Freshub's co-founder developed software for Israel's Iron Dome missile defense system, Appx508 (196:9-24); how Freshub had received funding from the European Commission (Appx734-735 (422:20-423:6)); and how Freshub had sold its systems to supermarkets in Israel (Appx739 (427:9-20). Amazon mentioned Freshub's foreign connections only when relevant or necessary to rebut Freshub's testimony about relevant issues in the case.

Finally, Freshub's cited authorities (OB53, OB56-58) serve only to contrast this case from the types of extreme attorney misconduct that *did* warrant a new trial. In *Whitehead v. Food Max of Mississippi, Inc.*, 163 F.3d 265 (5th Cir. 1998), the

plaintiff's counsel made prejudicial and unsupported statements, including that the victim's "last thought before death would be of the rapists, and that [her daughter] needed to compensated to avoid thoughts, on her wedding night, of her mother's rape." *Id.* at 277-78. In *Westbrook v. General Tire & Rubber Co*., 754 F.2d 1233 (5th Cir. 1985), the plaintiff explicitly told the jury to "be the conscience of the community" against the "outsider" defendant. *Id.* at 1238-39. In *Irvan v. Frozen Food Express*, *Inc.*, 780 F.2d 1228 (5th Cir. 1986), the plaintiff's counsel told the jury the irrelevant fact that the defendant was self-insured. *Id.* at 1231. Importantly, in all three of these cases the misconduct occurred after the trial court had already sustained an objection concerning a challenged statement. And in *Hall v. Freese*, 735 F.2d 956 (5th Cir. 1984), counsel referenced plaintiff flying in from New Orleans and made unsubstantiated statements accusing the plaintiff of heavy drug use and extramarital affairs, "to characterize Hall as a woman … who was trying to take advantage of the good people of rural northern Mississippi." *Id.* at 960. None of these holdings bear any resemblance to the circumstances here.

***

Freshub never objected to any of the statements it now attempts to paint as prejudicial. It instead simply argued that it had "played by the rules," doubled down on its implausible claim to have invented a voice shopping system in 2005, and claimed that its filing dates were irrelevant. Appx1809-1811 (1437:18-1439:13).

And it countered that the U.S. Constitution protects inventions so "you get the fruits of your labor" while asserting that its requested damages of $246 million would be "a pittance" to Amazon. Appx1812-1813 (1440:12-1441:3). In other words, Freshub made a clear choice to "gamble on the verdict," *Colburn*, 883 F.2d at 376. Freshub did not object to the argument and evidence it now disputes, and the district court did not commit plain error in allowing those arguments or abuse its discretion by denying Freshub's motion for a new trial.

## ARGUMENT ON CROSS-APPEAL

### I. THE COURT SHOULD REVERSE THE JUDGMENT ON PARTIAL FINDINGS OF NO INEQUITABLE CONDUCT.

Inequitable conduct during prosecution renders the resulting patent unenforceable. *See Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1285 (Fed. Cir. 2011). The doctrine applies when "the patentee has unfairly obtained an unwarranted patent through misconduct." *Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1344 (Fed. Cir. 2013). "To prove inequitable conduct, the challenger must show by clear and convincing evidence that the patent applicant (1) misrepresented or omitted information material to patentability, and (2) did so with specific intent to mislead or deceive the PTO." *Rosuvastatin*, 703 F.3d at 519. Inequitable conduct encompasses actions by both "the patentee and the attorney who prosecuted the application that resulted in the patent-in-suit, because the knowledge and actions of applicant's attorney are chargeable to [the] applicant." *Barry v.*

*Medtronic, Inc.*, 245 F. Supp. 3d 793, 801 (E.D. Tex. 2017), *aff'd*, 914 F.3d 1310 (Fed. Cir. 2019) (citation omitted); *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995); *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1415 n.8 (Fed. Cir. 1987).

Amazon proved both elements. All evidence of record showed that Ikan's counsel stated falsely that the failure to respond to a final office action for more than five years was "unintentional," and that he made that false statement because he knew that it was necessary to induce the Patent Office to grant revival. Moreover, there was no contrary evidence at trial. Freshub claimed privilege to avoid producing records, the named inventor intentionally evaded service to avoid testifying,[18] and Freshub dropped its sole witness, a former Patent Office official

[18] The district court observed that the "the reason" that Mr. Douer "wouldn't take service" was "because of the concerns that [Freshub] had that if he was asked about what he did in terms of the continuation patents and what existed back in the 2000s, those answers might not be very good for you." Appx17665 (16:13-18:21). Freshub originally disclosed Mr. Douer as a witness knowledgeable about the '291 application and stated that Freshub's counsel represented him. Appx5243. But Freshub's counsel refused to accept service of a deposition subpoena (Appx5264-5265), and later claimed that they had never represented him (*id.*; Appx5276-5283). Amazon made ten attempts to serve Mr. Douer at his home and seven attempts to serve him at his office (Appx5268-5274), receiving the explanations that he was "in the shower" (Appx5269), then that he no longer lived at that same address (Appx5270), then three days that he was simply not available, apparently confirming that he still resided there (*id.*). Freshub's CEO later confirmed that Mr. Douer was evading service intentionally. Appx5033-5034 (18:3-12; 19:6-17).

with no personal knowledge of the case. Appx29-30 (findings of fact ¶¶6, 9, 14-24); Appx1815 (1443:2-12, 1445:14-19); Appx6492-6498.

The district court found that prosecution counsel's statement to the Patent Office asserting "unintentional" abandonment was material, but ruled that Amazon had not proven that statement was false or made to deceive the Patent Office into reviving the '291 application.[19] But those latter conclusions were clearly erroneous given Ikan's counsel's admissions and the absence of any evidence supporting a contrary inference.

### A. Amazon established by clear and convincing evidence that Ikan had procured the asserted patents by making a false material statement.

Amazon established that Ikan abandoned the '291 application intentionally, thus showing that Ikan's contrary statement to the Patent Office was false. Proving that "intent" merely required "a showing of acts the natural consequences of which

[19] The district court's materiality finding was correct. Appx33. "To establish materiality, it must be shown that the PTO would not have allowed the claim but for the nondisclosure or misrepresentation." *Rosuvastatin*, 703 F.3d at 519. A statement of unintentional delay is material to the revival determination as a general matter. *In re Rembrandt Techs. LP Pat. Litig.*, 899 F.3d 1254, 1273 (Fed. Cir. 2018). Moreover, here, the Patent Office also said expressly said that: "The U.S. Patent and Trademark Office is relying on petitioner's duty of candor and good faith and accepting the statement that 'the entire delay in filing the required reply from the due date for the reply until the filing of a grantable petition pursuant to 37 CFR 1.137 was unintentional.'" Appx17075. Ikan had received and failed to respond to the final rejection and notice of abandonment knowing the consequences; both its attorney and its principal then separately confirmed the abandonment in an assignment document several months later. Appx29-31.

are presumably intended by the actor." *Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556, 1571 (Fed. Cir. 1983) (quoting *Kan. Jack, Inc. v. Kuhn*, 719 F.2d 1144 at 1151 (Fed. Cir. 1983)). Intent is not "limited to consequences which are desired." Restatement (Second) of Torts § 8A, comment *b* (1965). "If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result." *Id.* These principals apply in the current context: "Where the applicant deliberately permits an application to become abandoned … the abandonment of such application is considered to be a deliberately chosen course of action, and the resulting delay cannot be considered as 'unintentional' …." *Rembrandt Techs.*, 899 F.3d at 1273 (quoting Changes to Patent Practice and Procedure, 62 Fed. Reg. 53,132, 53,158-59 (Oct. 10, 1997)).

Here, Ikan's attorney testified that he had received both the final office action *and* the ensuing notice of abandonment, and he took no action in response to either one. Appx29 ¶¶9-10; Appx17056-17065; Appx17067-17068. Instead, he prepared the assignment listing the '291 application as abandoned and had Ikan sign it before a notary. Appx29 ¶18; *see also* Appx17000 (119:5-16, 121:3-7)). He further testified that he knew in each of the succeeding years that the '291 application remained abandoned, yet he failed to take any step to respond to the Patent Office at any point. Appx16997-17000 (109:23-110:6, 110:14-111:2, 119:5-16). And finally,

he knew that such a deliberate choice not to respond to an office action made that the resulting abandonment *intentional*—indeed, he had intentionally abandoned other applications in the very same manner. Appx16988-16991 (23:23-24:4, 24:10-24:13, 37:16-37:23, 39:2-39:14, 39:16-39:18, 39:20-40:1, 40:16-40:19); Appx16994 (94:13-94:16, 94:18). This evidence established that Ikan had "consciously allowed" the application to go abandoned, and that its later claim of mistake was false. *See Rembrandt Techs.*, 899 F.3d at 1273 ("It is clear, therefore, that the PTO would not have revived the patents if it had known that [the patentee] consciously allowed them to expire."); M.P.E.P. § 711.03(c), II(C) (Abandonment "is not rendered unintentional when, upon reconsideration, the applicant changes his or her mind as to the course of action that should have been taken").

The district court's ruling simply cannot be squared with the record or even its own partial findings. The district court expressly found that Ikan's attorney "was aware that the '291 application was abandoned, and it can be inferred from the Assignment Agreement that Ikan's principal, Mr. Douer, may have also been aware of the abandonment" (Appx34), yet they took no action to revive over the course of five years, and instead confirmed the abandonment in the assignment. Appx29 ¶¶9-13; Appx30 ¶¶16-18. Those findings alone show a deliberate choice to abandon prosecution. But even more, the district court's analysis did not even address Amazon's other evidence, such as its proof that Ikan's prosecuting attorney

forwarded Patent Office communications to his clients and recorded those clients' approval to abandon in the firm docketing system before allowing an application to go abandoned. Appx33-36. The district court clearly erred by failing to find that Ikan's counsel made a false statement of "unintentional" abandonment to the Patent Office.

### B. Amazon established by clear and convincing evidence that Ikan intended to deceive the Patent Office.

A patentee's actions "constitute material misrepresentation with intent to deceive" so long as "the intent to deceive" the PTO is "the single most reasonable inference able to be drawn from the evidence." *Rembrandt Techs.*, 899 F.3d at 1273. "Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial evidence." *Therasense*, 649 F.3d at 1290. Put another way, intent to deceive can still be "inferred from the facts and circumstances surrounding the applicant's overall conduct." *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1345 (Fed. Cir. 2007) (citation omitted). Here, the single most reasonable inference to be drawn from the evidence is that Ikan misrepresented the abandonment to induce the Patent Office to grant its petition to revive. It remains the case after *Therasense* that a direct admission of inequitable conduct is not required—circumstantial evidence may provide clear and convincing proof of intent. 649 F.3d at 1290. If that rule is to have any meaning, it must apply in a case like

this, where all evidence of record points to an intent to deceive. The district court's contrary finding was clearly erroneous.

**1. Ikan's actions, and knowledge of the consequences, demonstrate its intent.**

With respect to intent to deceive, the district court found that Ikan's counsel was at most "negligent" for failing to conduct a thorough investigation of Ikan's abandonment. Appx36. But in reaching this conclusion, the district court again bypassed its own partial fact findings—including that Ikan's counsel was aware when filing the revival petition that the application had been abandoned for more than five years;[20] that Ikan's counsel knew that the Patent Office would not revive the petition unless he swore that the entire period of abandonment was unintentional (Appx30 ¶17; Appx16998-17001 (117:6-118:13, 122:2-123:1)); and that on the very same day that Ikan's counsel filed the revival petition, he also filed the assignment showing that Ikan confirmed the abandonment in 2012. Appx30 ¶18. Ikan's counsel thus made his sworn statement that the entire five-year delay in responding to the Patent Office's rejection of the application was "unintentional" (Appx30 ¶19), with knowledge that statement was untrue. No witness testified in support of Freshub's claim that the '291 application went abandoned through inadvertence, and no

[20] Appx30 ¶16 (confirming that Ikan's attorney "prepared the petition for Ikan and was aware when he filed the petition that Ikan had abandoned the '291 application for over five years"); *see also* Appx17000 (119:5-7) (Q. So at least in your mind, December 2012, you knew that the patent was abandoned, right? A. Yes.").

witness contradicted counsel's testimony that he knew the original circumstances of abandonment but submitted the (false) sworn statement anyway. As the district court itself noted (Appx36), Ikan bears responsibility for any deceit by its prosecuting attorney. *See FMC Corp.*, 835 F.2d at 1415 n.8 (knowledge and actions of applicant's representative chargeable to the applicant); *see also Novo Nordisk Pharms., Inc. v. Bio-Tech. Gen. Corp.*, 424 F.3d 1347, 1361-62 (Fed. Cir. 2005) (rejecting argument that "counsel's failure to disclose the truth … is excused because the inventors failed to fully inform them of the details" (collecting cases)).[21] Accordingly, the district court's resting its determination of intent on the failure to "investigate" the abandonment is error. That failure is relevant only because it cements what was already established in the record: that Ikan's counsel knew the '291 application was abandoned deliberately and misrepresented that fact to secure revival.

**2. Ikan's failure to investigate also demonstrates its intent, and the district court clearly erred by failing to address Ikan's contradictory testimony.**

Even if intent to deceive turned on Ikan's counsel's failure to conduct a thorough investigation, that was also established here. Ikan's counsel certified that

---

[21] Freshub's assertion in the district court briefing that Ikan's attorney "understood that the MPEP deems an intentional abandonment to be a directed course of action *by the applicant* resulting in abandonment" (Appx17144) is thus misplaced. *See also* Appx17178-17179; Appx6375-6376.

"[t]he entire delay in filing the required reply from the due date for the required reply until the filing of a grantable petition under 37 CFR 1.137(a) was unintentional." Appx17080. The Patent Office rules required him to make this representation "[t]o the best of [his] knowledge, information and belief, *formed after an inquiry reasonable under the circumstances*." 37 C.F.R. § 11.18(b)(2) (emphasis added). Here, Ikan's counsel confirmed that he had been aware of his duty to conduct a reasonable investigation and that it was his standard practice to do so. Appx17075; Appx17080; Appx17000-17002 (122:2-123:1, 125:3-12, 125:17-23, 127:14-20, 128:13-16, 189:13-190:1). Yet he could not identify *any step* he had taken to investigate whether his statement was true or false before he swore to it under penalty of perjury. This suffices to show intent to deceive. Appx30 ¶18; Appx16997-16998 (108:25-109:1, 109:3-109:4, 109:18-109:22, 109:23-110:6).

The district court rested its conclusion that Ikan's counsel was "at most negligent" on an express finding that Ikan's counsel "could not identify specific actions he took to investigate the abandonment … *other than looking at his firm's docketing system*." Appx30 ¶21; Appx36. But that finding was clearly erroneous, as counsel had equivocated concerning that issue, testifying ultimately that *he could not recall* checking the docketing system and, crucially, that he did not even know how an abandonment approval would be noted in his firm's system because he had "never gone back to look." Appx16990 (39:20-40:1); Appx17002 (137:17-19,

138:22-23). A district court clearly errs when, without explanation, it makes a finding based on one version of a witness's testimony without considering inconsistent testimony from that same witness. *See Cabriolet Porsche Audi, Inc. v. Am. Honda Motor Co.*, 773 F.2d 1193, 1206 (11th Cir. 1985); *see also Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1580 (Fed. Cir. 1993) ("where we view the court's account of the evidence to be implausible in light of the record viewed in its entirety, that finding cannot stand"); *United States v. Wooden*, 693 F.3d 440, 454-55 (4th Cir. 2012) (where a witness's testimony is internally inconsistent, there is "no safe harbor for the district court's factual findings"); *In re Waugh*, 95 F.3d 706, 712 (8th Cir. 1996).[22]

Here, the Ikan attorney's evasions about checking the docket for an abandonment approval, while admitting he had *never* actually done so, reflects his deceptive intent. *See Satornino v. Dep't of Veterans Affairs*, 45 F.3d 442 (Fed. Cir. 1994); *In re Waugh*, 95 F.3d at 712. But at the very least, the district court provided

[22] Similarly, presented with contrary evidence, a district court is "required to at least consider the evidence, and account for it, when concluding otherwise." *Wooden*, 693 F.3d at 454; *see also United States v. Cotto-Flores*, 970 F.3d 17, 46 (1st Cir. 2020), *cert. denied*, 141 S. Ct. 1121 (2021); *Doe v. Menefee*, 391 F.3d 147, 164 (2d Cir. 2004) (Sotomayor, J.). Thus, while a district court may make credibility determinations, *either* "objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985).

no explanation for its finding—it was silent about prosecution counsel's contrary testimony, despite Amazon raising it specifically in proposed findings and in its post-trial motion. Appx17379-17380. That unexplained finding was, at a minimum, clearly erroneous. *Carroll Touch*, 15 F. 3d at 1580-81.

This case is thus ultimately like *3D Med. Imaging Systems, LLC v. Visage Imaging, Inc.*, 228 F. Supp. 3d 1331 (N.D. Ga. 2017). There, the patentee decided to abandon a patent by not paying a maintenance fee and confirmed that it would be doing so in an email with patent counsel. *Id*. at 1334. Following a bankruptcy, a company called MedFlex acquired the patent and petitioned the Patent Office to revive, knowing that the patentee had not paid. *Id*. at 1334-35. The district court held on summary judgment that a statement the abandonment was "unintentional" in the request for revival was made with the intent to deceive because MedFlex had not investigated the reasons for the original abandonment. *Id.* at 1339. The single most reasonable inference from the evidence was therefore that MedFlex had intended to deceive the Patent Office. *Id.* This Court should reach the same conclusion. Any other result would only encourage similar baseless representations to the Patent Office.

### C. Ikan's inequitable conduct during the prosecution of the '291 application renders the asserted patents unenforceable.

Inequitable conduct related to an application will render continuation and related patents unenforceable where the prosecution histories and the conduct at

issue have an immediate and necessary relation to the equity sought. *Consol. Aluminum Corp. v. Foseco Int'l, Ltd.*, 910 F.2d 804, 810 (Fed. Cir. 1990) (citation omitted); *see also Agfa Corp. v. Creo Prods. Inc.*, 451 F.3d 1366, 1379 (Fed. Cir. 2006) (affirming ruling of unenforceability of continuation patent based on inequitable conduct with respect to parent patent); *Fox Indus. v. Structural Pres. Sys.*, 922 F.2d 801, 803-04 (Fed. Cir. 1990) ("a breach of the duty of candor early in the prosecution may render unenforceable all claims which eventually issue from the same or a related application").

In *Consolidated Aluminum*, for example, the invention concerned ceramic foam filters for molten metal. The inventors concealed the best mode, a particular slurry used for the ceramic foam, and disclosed a fictitious, inoperable mode that omitted key ingredients from the slurry. They then filed continuations that incorporated the withheld best mode. 910 F.2d at 809. This Court determined that there was more than a mere relatedness in subject matter and that the prosecution history established that the patentee's inequitable conduct in prosecuting the original patent had "immediate and necessary relation" to the enforcement of the continuation patents, and thus made them unenforceable. *Id*. at 810-11 (quoting *Keystone Driller Co. v. Gen. Excavator Co*., 290 U.S. 240, 245 (1933)).

In *Agfa*, the invention concerned a "computer-to-plate" printing system. The applicant withheld prior art that established a *prima facie* case of unpatentability of

the asserted patents and contradicted positions the applicant had taken during prosecution. *Agfa Corp.*, 451 F.3d at 1379. The Federal Circuit affirmed the district court's unenforceability ruling also as to a continuation patent, noting that it was a continuation, not a divisional, and that the patentee had made no argument suggesting its subject matter was sufficiently distinct from the parent patent to require different treatment. *Id.*

Here, Ikan could not have filed any continuation applications (or otherwise claimed priority to the parent application's filing date) without first reviving the '291 application. The asserted patents therefore would not exist if not for the false claim that Ikan's five-year abandonment was "unintentional." Under such circumstances, the inequitable conduct in the prosecution of the '291 application extends to the asserted continuation patents, as their enforcement—indeed, their very existence—has an "immediate and necessary relation" to the underlying misconduct. *See Consol. Aluminum*, 910 F.2d at 810.

## CONCLUSION

For the foregoing reasons the Court should affirm the judgment of the district court with respect to the jury's noninfringement finding, and reverse or remand the judgment that the asserted patents are unenforceable for inequitable conduct.

September 28, 2022

FENWICK & WEST LLP

By: */s/ J. David Hadden*
J. David Hadden

*Counsel for Defendants-Cross-Appellants Amazon.com, Inc., Prime Now, LLC, Whole Foods Market Services, Inc., Amazon.com Services LLC*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Circuit Rule 28.1(b)(2)(A). This brief contains 15,905 words, excluding parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief uses a proportionally spaced typeface using Microsoft Word and 14-point Times New Roman font.

September 28, 2022

FENWICK & WEST LLP

By: */s/ J. David Hadden*
J. David Hadden

*Counsel for Defendants-Cross-Appellants Amazon.com, Inc., Prime Now, LLC, Whole Foods Market Services, Inc., Amazon.com Services LLC*